**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2010 JUN 30 PM 3: 41

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

SIERRA CLUB, INC.; PEOPLE FOR PROTECTING
PEACE RIVER, INC.; and MANASOTA-88, INC.;

Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS;
and COLONEL ALFRED A. PANTANO, JR.,
Commanding District Engineer, U.S. Army Corps
of Engineers, Jacksonville District;

Defendants

_____/

Case No.

3:10-cv-564-J-34TEMV

## COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs - Sierra Club, Inc.; People for Protecting Peace River, Inc.; and

Manasota-88, Inc. - bring this verified complaint against the United States Army Corps of

Engineers and Colonel Alfred A. Pantano, Jr., contesting the issuance of a wetlands

"dredge and fill" permit which violates the substantive and procedural requirements of

the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, the National Environmental

Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Endangered Species Act, 16

U.S.C. §§ 1531 *et seq.*, and which was arbitrary, capricious, an abuse of discretion, and

otherwise not in accordance with the law, in violation of the Administrative Procedure

Act ("APA"), 5 U.S.C. §§ 553, 706(2)(A). This verified complaint seeks a temporary

restraining order, declaratory judgment and preliminary and permanent injunctive relief.

## INTRODUCTION

1. On June 14, 2010, the United States Army Corps of Engineers' ("Corps") issued a CWA section 404 dredge and fill permit authorizing Mosaic Fertilizer, LLC ("Mosaic") to strip mine 7,687 acres of wetlands, streams and uplands in Hardee County for phosphate ore. The challenged permit authorizes the destruction of 534 acres of wetlands – including 261 acres of forested wetlands and 26 acres of open water - and 56,661 linear feet of streams at the so-called "South Fort Meade Extension project." The streams and wetlands that will be destroyed by the strip mining are associated with the headwaters of the Peace River, Little Charlie Creek, Max Branch, Lake Dale Branch, and Parker Branch, all of which drain ultimately into the Charlotte Harbor estuary.

2. Open pit strip mining for phosphate has a devastating impact on the local environment. Huge electrically powered draglines strip away all overlying vegetation, water bodies, topsoil, and overburden (the sandy soils that overlay the phosphate deposit) down to the phosphate containing layer. The result is the utter destruction of the local natural environment from ground surface down to a depth of approximately 80 feet.

3. In the face of such enormous environmental degradation, and despite serious concerns raised by the U.S. Environmental Protection Agency and other governmental agencies and the public, the Corps determined that NEPA did not require the preparation of an Environmental Impact Statement for this action, and refused to hold a public hearing, finding that "this permit action will not have a significant impact on the quality of the human environment." Worse yet, the Corps

downplayed the cumulative effects of this strip mine and tens of thousands of acres of similar mines on the Peace River and Charlotte Harbor estuary, an "aquatic resource of national interest" and drinking water source for 250,000 Floridians.

4. Because the Corps has failed to comply with its statutory duties under NEPA, the Clean Water Act and the APA, Plaintiffs ask the Court to (1) declare that the Corps violated its statutory and regulatory duties under the CWA, NEPA, ESA and APA; (2) issue a temporary restraining order, and preliminary and permanent injunctions requiring the Corps to rescind the South Fort Meade mine permit; and (3) enjoin the Corps from reissuing a South Fort Meade mine permit for the until the Corps has complied with its statutory and regulatory duties under the CWA, NEPA, ESA and the APA.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, including § 1344(b) (application of Corps guidelines in permit determinations) and § 1344(c) (prohibition of discharge of dredged or fill material that will have an unacceptable adverse effect); the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*; the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706. Additionally, jurisdiction exists under 28 U.S.C. § 1331 ("Federal question"); 28 U.S.C. § 1361 ("Action to compel an officer of the United States to perform his duty"); and 28 U.S.C. §§ 2201-2202 ("Creation of remedy" and "Further relief" provisions establishing power to issue declaratory judgments in cases of actual controversy).

6. Venue is proper in this judicial district and in this Court under 28 U.S.C. § 1391(e). Two of the Plaintiffs reside in this district. The Defendant resides or maintains its District Office in Jacksonville, Florida which is located in this District and a substantial part of the events or omissions giving rise to the claim occurred in the Jacksonville District Office, including the Defendants' authorization and issuance of its Environmental Assessment and Finding of No Significant Impact ("EA/FONSI"), and its authorization and issuance of the South Fort Meade Extension dredge and fill permit, both of which are challenged in this case.

## THE PARTIES

7. Plaintiff Sierra Club, Inc. ("Sierra Club") is a non-profit public benefit corporation with its principal place of business in San Francisco, California. Approximately 30,000 Sierra Club members live in the State of Florida, and many reside in the counties within the Peace River watershed. The Sierra Club represents the interests of its members in state and federal litigation, public policy advocacy, administrative proceedings, and before state, local, and federal lawmakers. The Sierra Club is very involved in advocacy regarding issues related to preserving wetlands and improving water quality. All of these activities support Sierra Club's mission to explore, enjoy, and protect the wild places of the earth and educate and enlist humanity to protect and restore the quality of the natural and human environment.

8. Members of the Sierra Club frequently use and enjoy the waters of the Peace River and its tributaries and the waters of the Charlotte Harbor estuary for birdwatching, boating, canoeing, fishing, wildlife photography, and scientific

research. These members' use and enjoyment of these waters and of the flora and fauna that use these waters as habitat will be adversely affected by the destruction of wetlands, disruption of groundwater flows, reductions in surface water flows, and changes to wildlife ecology of the Peace River and Charlotte Harbor that will be caused by the proposed mining activity.

9. Other members of the Sierra Club have sources of drinking water that will be adversely affected by the diminished water flows and groundwater disruptions caused by the proposed mining, including members whose drinking water source is the Peace River.

10. Other members of the Sierra Club live in Hardee County and their aesthetic enjoyment of the natural beauty and wildlife of the area where they live will be adversely affected by the environmental degradation caused by the proposed phosphate mining operations.

11. People for Protecting Peace River, Inc. ("3PR") is a Florida not-for-profit corporation with its principal place of business in Wachula, Florida. 3PR's stated mission is protecting the Peace River and the Peace River basin. 3PR has printed press releases, has written letters to the editors of newspapers and has prepared the production of short film to educate the public about the problems associated with phosphate mining and has expanded its membership in order to have the means to protect the Peace River and the Peace River Basin.

12. 3PR was originally incorporated under the name Desoto Citizens Against Pollution, Inc. to "promote and protect the health and safety of the general public and the environment, and to increase public awareness of potential

environmental hazards and to discourage activities that may be hazardous to public health or the environment." Given the influx of phosphate mining applications from Desoto County into Hardee County where 125,000 acres in the Peace River watershed were slated for strip mining, DCAP actively sought Hardee County membership. As a result, a sister organization, HARDCAP, was formed in 2002 and sought to match the actions of DCAP to prevent phosphate mining from occurring in Hardee County. 3PR was formed by consolidating HARDCAP and DCAP into a single entity to oppose phosphate mines in the Peace River watershed and to further the predecessor organizations' purposes. Membership is mainly drawn from communities of Bowling Green, Wauchula, and Lily in Hardee County.

13.     The overwhelming majority of the members of 3PR are directly affected by the threat of damage to the environment and to the Peace River by MOSAIC's phosphate mining. Specifically, the 3PR members engage in agricultural activities that face dewatering as a result of the phosphate mining. This would have the effect of damaging individual members' ability to farm and to grow crops/food for sale or for personal use. Many members affected by the proposed phosphate mine expansion live in the vicinity of the clay settling areas (containing radioactive deposits) that, upon breach or other failure of the ditch and berm system (as has happened with other phosphate mines), face substantial property damage and/or damage to their homes and persons (including the potential for death). The mine will generate dust, dirt, artificial lighting and noise in a rural area, limiting the 3PR members from the quiet enjoyment and use of their homes. The river itself, a protected waterway, will likewise suffer dewatering thereby limiting 3PR's

6

members the ability to enjoy the river.  Moreover, the river drawdown will result in

the death of natural flora thereby causing invasive plant species to propagate, further

causing greater evapotranspiration and resulting in an even further reduction of

water in the river.  (The river supplies drinking water "downstream" to other

counties including Charlotte County.) This damage to the Peace River will limit 3PR

members from engaging in recreational activities such as boating, canoeing, fishing

and birdwatching along the river, and will damage the potential for tourism dollars

resulting in a net loss of revenue for the individual 3PR members.  Additionally,

those 3PR members who rely upon wells for irrigation and for drinking water face a

risk of contamination or drawdown, forcing them to rely upon alternative sources of

water for the use of farming or for their homes (thereby increasing overhead for their

businesses and the costs of living in their homes).  Further, and without limitation,

the existence of the mine, given the extensive footprint and the long time it will take

to even partially reclaim the land, will result in the significant loss of property

values to the residents of Hardee County who live in close proximity to the mine.

14.      Plaintiff ManaSota-88, Inc. ("ManaSota-88") is a public interest

conservation and environmental protection organization which is a Florida not-for-

profit corporation and a citizen of the State of Florida.  ManaSota-88's principal

place of business is located in Nokomis, Florida.  The corporate purposes of

ManaSota-88 include the protection and preservation of water quality and wildlife

habitat in Manatee and Sarasota Counties which includes the Peace River watershed

and, therefore, challenging the Corps's issuance of the South Fort Meade mine

permit because of its impacts to the Peace River watershed falls within ManaSota-88's general scope of interest and activity.

15.     Members of Manasota-88 have, for decades, canoed the headwaters of the Peace River and camped on the banks of the Peace River. While canoeing they enjoy bird-watching and observing the wildlife of the area. Their use and enjoyment of the Peace River will be adversely affected by the proposed mining and the attendant destruction of wetlands and wildlife habitat and diminished downstream flows that occurs when land is strip mined for phosphate.

16.     Members of ManaSota-88 backpack through natural, rural areas of Hardee County, have toured the South Fort Meade area, have viewed the destruction caused by strip mining, and have viewed strip mined areas that were supposedly restored but which looked nothing like the natural state of land. These members use and enjoyment of the natural beauty of the lands along Peace River and the natural flora and fauna that inhabit those lands will be adversely affected by the proposed mining activity.

17.     Plaintiffs submitted numerous letters to the Corps expressing their concerns associated with the South Fort Meade mine, requested a public hearing, and have actively sought to be involved in the Corps' decision making process. Sierra Club specifically requested notice of Corps actions relating to the South Fort Meade extension permit.

18.     Members of all the plaintiff organizations are concerned that the actions authorized by the permit for the South Fort Meade mine, combined with the cumulative impacts of phosphate mining in the past, present, and future, will

seriously and adversely affect the hydrologic balance and aquatic ecology of the region and the native wildlife and natural beauty of the Peace River and its tributaries, and will severely diminish and interfere with their quality of life and their use and enjoyment of the natural beauty, fresh water and native flora and fauna of this region.

19.     Members of all the plaintiff organizations are concerned that the Corps' failure to follow the law has prevented them from having a meaningful opportunity to express their concerns over the impacts of the South Fort Meade mine and has effectively silenced their voices on this issue.

20.     Each of the Plaintiffs files this action on its own behalf and on behalf of its members in an effort to protect their health, economic, recreational, aesthetic, scientific and conservation interests in the waters and lands of the region, including the Peace River basin and the Charlotte Harbor estuary.

21.     Defendant United States Army Corps of Engineers is the federal agency charged with administering permits under § 404 of the Clean Water Act for discharge of dredged or fill material into the waters of the United States.  The Corps is headquartered in Washington, D.C.

22.     Defendant Colonel Alfred A. Pantano, Jr., is the District Engineer in charge of the Jacksonville District office of the U.S. Army Corps of Engineers in Jacksonville, Florida and is designated to act for the Secretary of the Army.  The Jacksonville District office is responsible for permitting discharges of dredged and fill material in Florida under Section 404 of the Clean Water Act and conducting the

9

associated environmental reviews under NEPA, and acted as the lead permitting

agency for the proposed discharges at issue in this case.

## STATUTORY AND REGULATORY BACKGROUND

## CLEAN WATER ACT

23.     The Clean Water Act was enacted by Congress in 1972 to "restore

and maintain the chemical, physical, and biological integrity of the Nation's waters."

33 U.S.C. § 1251(a).  To achieve this goal, section 404 of the CWA prohibits the

discharge of any pollutant, including dredged spoil or other fill material, into

navigable waters unless authorized by a permit.  *Id.* § 1344.

24.     The Corps oversees the CWA section 404 permit process and must

comply with guidelines promulgated by the U.S. Environmental Protection Agency

("EPA"), which are incorporated into the Corps' own regulations.  *Id.* § 1344(b)(1);

33 C.R.F. §§ 320.4(b)(4) (2010), 325.2(a)(6) (2010).  The underlying intent behind

the guidelines is that dredged or fill material should not be discharged if it will result

in an unacceptable impact on the aquatic ecosystem.  40 C.F.R. § 230.1(c) (2010).

25.     In general, the joint EPA/Corps' guidelines provide that no

discharge of dredged or fill material shall be permitted: (1) if there is a practicable

alternative to the proposed discharge; (2) if the discharge causes or contributes to

violations of applicable state water quality standards; (3) if the discharge will cause

or contribute to significant degradation of the environment; and (4) unless all

appropriate steps have been taken to minimize potential adverse impacts.  40 C.F.R.

§ 230.10 (2010).  The Corps' regulations also require that destruction of wetlands is

to be avoided to the extent practicable.  33 C.F.R. § 320.4(r) (2010).

26.     The joint EPA/Corps guidelines provide that "practicable alternatives" include "not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences." 40 C.F.R. §§ 230.5(c) (2010), 230.10(a) (2010). If a project is not "water dependent," as is the case with phosphate strip mining, the guidelines contain a presumption that a less environmentally damaging practicable alternative exists, and require that the applicant clearly demonstrate that practicable alternatives which would not involve discharge of fill material into special aquatic sites were not available. 40 C.F.R. § 230.10(a)(3) (2010).

27.     The Clean Water Act requires public participation in permitting decisions. It states that: "The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The applicable Corps regulations state: "[A]ny person may request, in writing, ... that a public hearing be held .... Upon receipt of any such request, stating with particularity the reasons for holding a public hearing, the district engineer... shall promptly set a time and place for the public hearing .... Requests for a public hearing under this paragraph shall be granted, unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing." 33 C.F.R. § 327.4(b) (2010).

## NATIONAL ENVIRONMENTAL POLICY ACT

28.     NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") on every proposal for a major federal action which may significantly affect the quality of the human environment. 42 U.S.C. § 4332(C).

29.     The Council on Environmental Quality ("CEQ"), created by Congress to implement NEPA, has promulgated detailed regulations to assist federal agencies in complying with NEPA. 40 C.F.R. § 1500.3 (2010).

30.     To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the lead federal agency first prepares an environmental assessment ("EA"). 40 C.F.R. § 1508.9 (2010). An EA must provide sufficient evidence and analysis to determine whether to prepare an EIS. *Id.* The lead agency must take a 'hard look' at the relevant environmental concerns and alternatives to the proposed action. *Id.*

31.     If the agency concludes in an EA that a project may have significant environmental impacts on the environment, then an EIS must be prepared. 40 C.F.R. § 1501.4 (2010). To determine whether a proposed action may significantly affect the environment, the agency must consider both the context and intensity of the proposed action, including whether the project will take place in "ecologically critical areas," and whether the project will affect endangered species. 40 C.F.R. § 1508.27 (a) and (b) (2010).

32.     NEPA also mandates that the lead agency consider "the degree to which the action is related to other actions . . . with cumulatively significant impacts . . . ." 40 C.F.R. § 1508.27(b)(7) (2003). NEPA defines the "cumulative impact" of

mining to mean "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7 (2010). A federal action will significantly affect the environment "if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. 1508.27(b)(7) (2010).

33.     If an EA concludes that there are no potentially significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a "finding of no significant impact" (FONSI). 40 C.F.R. § 1508.13 (2010). If the agency issues an EA/FONSI, it must make a convincing case for a finding of no significant impact on the environment.

34.     The CEQ regulations require a give and take between an agency and members of the public. *See* 40 C.F.R. §§ 1500.1(b) (2010) ("public scrutiny [is] essential"), § 1500.2(d) (2010) (the agency must "encourage and facilitate public involvement"), § 1506.6 (2010) (the agency must "[m]ake diligent efforts to involve the public" in preparing environmental documents, give "public notice of ... the availability of environmental documents so as to inform those persons ... who may be interested or affected," and "solicit appropriate information from the public."). CEQ regulations require federal agencies to give the public as much information as is practicable, so that the public has a sufficient basis to address those areas that the

agency must consider in preparing the Environmental Assessment.   40 C.F.R. §
1501.4 (2010).

## ENDANGERED SPECIES ACT

35.      Recognizing the societal value of threatened wildlife and flora,
Congress enacted the Endangered Species Act ("ESA") in 1973. 16 U.S.C. § 1531 *et
seq*.  Principal responsibilities for implementing the requirements of the ESA have
been delegated to the U.S. Fish and Wildlife Service, an agency within the
Department of the Interior, and to the
National Marine Fisheries Service ("NMFS"), an agency within the Department of
Commerce. The Service is responsible for implementing the ESA for terrestrial
species and NMFS is responsible for implementing the ESA for marine species.  See
16 U.S.C. § 1532(15); 50 C.F.R. § 402.01 (2010).

36.      Under the ESA, a species is listed as "endangered" when it is "in
danger of extinction throughout all or a significant portion of its range." 16 U.S.C. §
1532(6). Once listed, a species is entitled to a number of protections.  Most notably
for this case, section 7(a)(2) of the ESA requires that each federal agency consult
with the Service or NFMS as the case may be to "insure that any action authorized,
funded, or carried out by such
agency. . . is not likely to. . . jeopardize the continued existence of any endangered
species." 16 U.S.C. § 1536(a)(2). An action would "jeopardize the continued
existence of" a species if it "reasonably would be expected, directly or indirectly, to
reduce appreciably the likelihood of both the survival and recovery of a listed

species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (2010).

## ADMINISTRATIVE PROCEDURE ACT

37.     The Administrative Procedure Act, 5 U.S.C. §§ 701-06, provides for judicial review of agency actions such as those at issue here.  A reviewing court shall hold unlawful and set aside any Corps' actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## FACTUAL AND PROCEDURAL BACKGROUND

38.     The Peace River Watershed contains highly valuable wetlands, water bodies, riparian, estuarine, and marine habitats, as well as scrub and other upland habitats.  The state of Florida and EPA have designated the Peace River watershed as both a Priority Watershed and an Aquatic Resource of National Importance (ARNI).  The Charlotte Harbor estuary has been designated by Congress as an "estuary of national significance." The Charlotte Harbor estuary depends on freshwater flows from the Peace River Watershed.  Without clean freshwater flows, the estuary cannot remain viable as an incredibly rich ecosystem that supports commercial and recreational fisheries and wildlife. These natural resources are essential for the survival of both human and wildlife communities in the watershed, including threatened and endangered wildlife and fish.

39.     One inhabitant of the Charlotte Harbor National Estuary is the Smalltooth sawfish, a federally listed endangered species.  On November 20, 2008, to provide better protection for this endangered species, the National Marine

Fisheries Service proposed the Charlotte Harbor Estuary as Critical Habitat for the species. 73 Fed. Reg. 70290. It was determined by those agencies that a "resident, reproducing population of smalltooth sawfish exists only in southwest Florida." *Id.* at 70291. Estuarine habitats near sources of freshwater inflow appeared to be an important feature in species distribution. *Id.* at 70293. On September 2, 2009, the Critical Habitat Designation was formally adopted and specifically identified shallow euryhaline areas (estuarine areas with a salinity gradient) as features necessary to the preservation of the species. 74 Fed. Reg. 45353.

40.     In a letter of July 28, 2009, the Sierra Club supplied the Corps with an analysis by Dr. Ernest Peebles of the potential negative impacts of water withdrawal and the change in salinity gradients on the continued viability of the small-toothed sawfish. The Smalltooth Sawfish Critical Habitat designation and the continued pressure on freshwater flows to the estuary emphasize the need to analyze cumulative effects of water usage and aquifers impacts in light of population needs and the extraordinary  environmental value of the Estuary.  This has not been done.

41.     The South Fort Meade mining site is also home to three terrestrial endangered or threatened species: the wood stork, Audubon's crested caracara and the eastern indigo snake.  All three species are threatened by habitat loss.

42.     The last comprehensive Environmental Impact Study of the Peace River was completed over thirty years ago. 31,000 acres of wetlands have been lost in the watershed since 1979. In the last three decades, a large portion of the region has been declared a Water Use Caution Area due to excessive consumptive uses. The region is under serious regulatory restrictions and current drought conditions are

expected to continue. Large-scale dewatering of the Peace River watershed's northern sub-basin from mining and other uses has caused a 20 to 50 foot drop in the Floridan Aquifer level. This dewatering and associated alteration of natural hydroperiods has caused widespread destruction of native wetland and upland habitat in un-mined areas. Phosphate strip mining and reclamation, including the post-mining creation of large surface impoundments known as "clay settling areas," alter and disrupt natural drainage patterns and lower water levels. A report by the University of South Florida, Karst Research Group, "Underground Florida: Fieldtrip Guidebook of the West Central Florida Karst," (January 24-28, 2007), states, inter alia, that "Physical effects of phosphate mining on the hydrology of Florida include the reduction or elimination of base flow, reduced surface runoff, lowering of water levels in the Upper Floridan aquifer, the replacement of natural surface drainage by modified topography and reclaimed ditches and swales."

43.     According to a Florida Department of Environmental Protection (FDEP) "Rate of Reclamation (ROR) Report," 184,681 acres in the region were strip-mined for phosphate ore from 1975 through December 31, 2008.

44.     Significantly, the same ROR report reveals that the land reclamation on which Corps permitting assumptions rely is not actually occurring. Only 28% of Mosaic's mined lands have been reclaimed and released. Much of the rest has been converted to "industrial use" or multi-year variances from reclamation requirements have been given because of a lack of fill to complete reclamation.

45.     The topic of wetland and stream recreation at mining sites is very controversial, and for several types of streams and wetlands, including bayhead

swamps and wet prairies, there is no track record of successful recreation. Recreated wetlands rarely provide the full ecological function provided by the destroyed natural wetland.

46.     The original notice of the proposed permit for the South Fort Meade mine was published by the Corps on May 29, 2007.

47.     On June 13, 2007, the National Marine Fisheris Service responded to the Corps notice by stating that it did not have adequate staffing to address the permit at that time, but that it neither supported nor opposed the project. The Corps never contacted NMFS again.

48.     On July 26 and August 23, 2007, EPA wrote letters to the Corps recommending denial of the permit because of its deficiencies and the severe environmental impacts associated with the mine. In these letters it was pointed out that the Peace River, its watershed and tributaries within and neighboring the project site were "aquatic resources of national significance" (ARNI). EPA raised numerous other concerns, including the fact that the Peace River Watershed supplies drinking water to over 250,000 people in southwest Florida and is largely responsible for maintaining the ecological integrity of the Charlotte Harbor estuary system.

49.     Several statements in EPA's July and August 2007 letters are especially noteworthy: a) "Given the high functional level of the ecosystems affected by this project, the large acreage of impacts associated with the proposed project, and the potential for significant impacts to the Peace River and downstream estuaries which may result in significant cumulative adverse impacts, EPA requests

that this project be subject to a rigorous application of the [CWA]Guidelines;" b) "Avoidance of wetlands is important because mitigation in the form of re-creating wetland and tributary systems is rarely able to replace the full range of functions and values of the impacted water resources...In particular, we believe that all wetlands adjacent to and tributaries contributing to the Peace River should be avoided;" c) "a cumulative effects analysis should be provided for the entire Peace River watershed and include an analysis of the overall mining activities that are currently underway and/or planned for this watershed;" and d) "EPA finds this project will have substantial and unacceptable adverse impacts on ARNI.... Therefore, we believe the permit for the project, as currently proposed, is not approvable at this time."

50.     In the summer of 2007, the County Board of Commissioners for Sarasota, Lee and Charlotte Counties wrote to the Corps and requested a public hearing on the proposed mine, noting their concern over the cumulative impacts of widespread phosphate mining in the region.

51.     Mosaic did not respond to EPA's concerns for almost two years, and only in August 2009 submitted a package of permit documents purporting to address EPA's concerns. This time could have been used to hold public hearings and develop an EIS on the mine, but it was not.

52.     On January 15, 2010, EPA again wrote to the Corps, and reiterated its concerns with the permit. EPA stated: a) "no minimization of impacts to wetlands or streams has been incorporated into the proposed project since EPA provided objection letters in 2007;" b) "the applicant does not present iterative combinations of a reduced number of stream crossings;" c) "all impacts to the Lake

Dale stream [should] be avoided, since it is also one of the higher functioning streams on-site;" and d) "EPA does not believe that the applicant has fully minimized their impacts, we are concerned that the two forms of mitigation being offered are the least desirable."

53.     On March 10, 2010, EPA again wrote to the Corps and requested that an Area Wide Environmental Impact Statement be prepared to assess the cumulative impacts of phosphate mining in the region.  EPA's letter stressed a number of points, including but not limited to: a) "both the state of Florida and EPA have designated the Peace River watershed as both a Priority Watershed and an Aquatic Resource of National Importance;" b) "EPA has substantial concerns with the cumulative impacts and the downstream effects on the Charlotee Harbor National Estuary resulting from proposed federal 404 permit actions for mining;" and c) "The Peace River supplies potable water directly or through purchase to approximately 700,000 citizens, and any water quality deterioration due to mining activities may compromise the public drinking water supplies and adversely impact public health."

54.     On May 28, 2010, the U.S. Fish and Wildlife Service issued a Biological Opinion and Incidental Take permit for the phosphate mine, finding that mining activities would kill or harm ("take") 50 eastern indigo snakes and 2 Audubon's crested caracaras.  The Service further found that the mine would harm 25 eastern indigo snake nests and wood stork habitat.

55.     On June 8, 2010, EPA again wrote to the Corps, expressing continuing concerns over the permit, including but not limited to: a) "concerns

regarding project purpose and alternative configurations of the preferred project site,

that would result in a reduction of impacts to waters of the U.S., (minimization)

have not been addressed;" b) "EPA's request for "an analysis of different

combinations and/or a reduced number of stream crossings, the resulting deliverable

product from each scenario, and the ability to meet or not meet project purpose

under each scenario" was not completed;" c) "concerns outlined in EPA's letter

dated August 23, 2007, regarding secondary and cumulative impacts to the Peace

River Watershed are largely substantiated by Mosaic through modeling efforts and

have not been validated through an independent review;" d) the permit "does not

analyze any iterative combinations of a reduced number of stream crossings or other

on-site alternatives matched to Mosaic's ability to meet them;" and e) "the

alternatives introduced in this section do not address on-site alternatives to

extraction areas or methods."

56.     On June 14, 2010, without preparing an environmental impact

statement, without ever consulting NMFS on the small-toothed sawfish, and without

holding a public hearing, the Corps issued a permit to Mosaic for the South Fort

Meade mine, based on an Environmental Assessment and Finding of No Significant

Impact.

57.     The basis for the Corps' Finding of No Significant Impact was that

the impact of destroying 534 acres of high-quality wetlands (and their biological and

hydrological functions) and 56,661 linear feet of first order streams will be mitigated

entirely by the creation of human-built wetlands and streams following the mining.

With respect to cumulative impacts, the Corps concluded that the successful

reclamation of other mined lands in the region would offset the destruction of the 7,687 acres at the South Fort Meade site and the associated harm to wildlife and the Peace River watershed.

58.    The Corps' permit approval also found that Mosaic had minimized or avoided impacts to wetlands to the maximum extent practicable after finding that EPA-recommended alternatives for greater avoidance of wetlands were impractical because they reduced the size of the mineable reserves and would cost Mosaic more money. The Corps' permit did not respond to EPA's June 8, 2010 letter in which EPA criticized the permit for failing to make a demonstration that greater avoidance of wetland impacts was economically impractical.

59.    With respect to the widespread demand for a public hearing, the Corps found that because it considered all of the issues raised in the requests for a hearing, a hearing would serve no purpose.

60.    Following issuance of the Permit, on June 25, 2010, the Corps announced that it would conduct "conduct a comprehensive study of the cumulative impacts of phosphate mining on the entire Peace River watershed." http://www.sunnewspapers.net/articles/pnnews.aspx?NewsID=459068&a=newsarch ive2/062510/ch1.htm&pnpg=0. The media reported that "Ironically, however, the impact study came too late to provide insight into the mine application [South Fort Meade extension] that inspired it." EPA' wetlands chief for the region was quoted as stating: ""We have basically worked with the (COE) district, they recognize they need to improve their process and the colonel has worked with us and he has agreed they need an area-wide EIS ....Unfortunately, this project had been going on for

such a long time, neither the Army Corps nor the EPA felt we could delay it any longer."

61.     Mosaic has begun staging machinery and equipment at the South Fort Meade site to begin strip mining, and irreversible environmental impacts will occur imminently, including but not limited to direct interference with neighboring residents' ability to enjoy their homes and the irreversible loss of native wetlands and streams.

## GENERAL ALLEGATIONS

62.     The Corps failed to undertake an objective, good faith evaluation of numerous environmental concerns before making its decision not to undertake an EIS and issue the permit. The EA/FONSI and the 404 permit are based upon an incomplete and inaccurate record and findings that ignore critical environmental concerns. The Corps: a) failed to consider the unique characteristics of the geographic area including a failure to even discuss the fact that EPA considers Peace River, its wetlands, and the Charlotte Harbor estuary to be Aquatic Resources of National Importance; b) failed to consider the chronic failures of reclamation, the uncertainty regarding the "functionality" of reclaimed wetlands, the large amounts of land left unreclaimed in so-called "clay settling areas," and the uncertainty surrounding the timely implementation of reclamation plans by Mosaic and other mining companies in the watershed; c) failed to evaluate the risks and impacts of mining wastes including radioactive wastes and wastewater impoundments; d) failed to evaluate the effects of strip mining on the endangered small-toothed sawfish; e)

failed to consider the cumulative impact of this action with other pending and future mining operations within the Peace River and Charlotte Harbor watershed; and f) failed to consider the extent to which this action might set a precedent for the numerous future mining permits that are going to occur in this watershed.

63.     The Corps' NEPA and 404 permit analysis contains an incomplete and inadequate analysis of the cumulative impacts of past and reasonably foreseeable phosphate mining on the Charlotte Harbor and Peace River watershed, and its post-permit concession to EPA to conduct an area-wide EIS should precede any permit for the South Fort Meade extension mine.

64.     The Corps does not make a convincing case that strip mining over 500 acres of wetlands and 10 miles of streams in the headwaters of the Peace River and Charlotte Harbor estuary will not have a significant effect on the environment and aquatic resources, and cannot do so where its cumulative impact analysis is inadequate. The Corps's finding of no significant cumulative impacts is based upon an assumption that all reclamation activities will be conducted on the schedule set forth in state regulations but the Corps fails to examine whether, in fact, reclamation actually succeeds or proceeds at the pace projected.

65.     The Corps failed to assess and develop alternatives that would avoid or minimize the destruction of wetlands and streams to the maximum extent practicable. The permit issued in the face of EPA's June 8, 2010 letter noting that: a) "an analysis of different combinations and/or a reduced number of stream crossings, the resulting deliverable product from each scenario, and the ability to meet or not meet project purpose under each scenario was not completed;" b) the

permit "does not analyze any iterative combinations of a reduced number of stream crossings or other on-site alternatives matched to Mosaic's ability to meet them;" and c) "the alternatives introduced in this section do not address on-site alternatives to extraction areas or methods."

66.     Several plaintiffs requested a public hearing from the Corps on the South Fort Meade mine permit, but the Corps never convened a hearing. Its rationale for not conducting a hearing – that it considered all of the issues raised in the requests – defeats the very purpose of public participation.

## CLAIMS FOR RELIEF

67.     In alleging the following counts of liability, Plaintiffs hereby incorporate all preceding paragraphs of this complaint and all allegations contained within them.

## COUNT I

## VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT AND ITS IMPLEMENTING REGULATIONS AND THE ADMINISTRATIVE PROCEDURE ACT

68.     The Corps violated NEPA and its implementing regulations, 40 C.F.R. § 1500.1, et seq., and the APA because it:

a) Failed to take a hard look at the environmental impacts of the mine;

b) Failed to define the project purpose properly and failed to conduct an analysis of all reasonable alternatives meeting the project purpose, and to independently verify the information relied upon in determining the need for the project;

c) Failed to analyze the cumulative environmental impacts of this mine and other phosphate mining in the region adequately; and,

d) Failed to make a convincing case that the proposed project would not significantly impact the human environment and that no EIS was required.

69.      Accordingly, the Defendant's failure to comply with NEPA and its implementing regulations and its finding of no significant impact was arbitrary, capricious, and not in accordance with the law, and violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## COUNT II

### VIOLATIONS OF THE CLEAN WATER ACT
### AND IMPLEMENTING REGULATIONS
### AND THE ADMINISTRATIVE PROCEDURE ACT

70.      The Corps violated the CWA and its implementing regulations, 33 C.F.R. § 320.1 *et seq.*; and 40 C.F.R. § 230.1 *et seq.*, and the APA because it:

a) failed to adequately analyze the direct and cumulative impacts of the proposed action and issued a section 404 permit for a discharge into wetlands that will cause or contribute to significant degradation of the environment;

b) failed to take all appropriate steps to minimize potential adverse impacts;

c) failed to conduct an analysis of all practicable alternatives; and

d) failed to provide a public hearing.

71.      Accordingly, the Defendant's failure to comply with the Clean Water Act before issuing the permit was arbitrary, capricious, and not in accordance with the law, and violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## COUNT III

**VIOLATIONS OF THE ENDANGERED SPECIES ACT**
**AND IMPLEMENTING REGULATIONS**
**AND THE ADMINISTRATIVE PROCEDURE ACT**

72.     The Corps failed to consult with National Marine Fisheries Service

under the ESA to ensure that its action in approving strip mining at the South Fort

Meade Extension site is not likely to jeopardize the continued existence of the small-

toothed sawfish.

73.     Accordingly, the Defendant's failure to comply with the

Endangered Species Act before issuing the permit was arbitrary, capricious, and not

in accordance with the law, and violated the Administrative Procedure Act, 5 U.S.C.

§ 706(2)(A).

74.     These violations of NEPA, the Clean Water Act, the Endangered

Species Act and the APA by the Corps threaten the Plaintiffs with irreparable injury

for which they have no adequate remedy at law.

75.     Therefore, Plaintiffs are entitled to injunctive relief set forth in the

prayer to prevent injury to themselves and the public.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Honorable Court to enter the

following relief:

(1) a temporary restraining order enjoining strip mining in wetlands at the South Fort

Meade mine pending preliminary injunction proceedings;

(2) a preliminary injunction enjoining strip mining in wetlands at the South Fort

Meade mine pending summary judgment proceedings;

(4) summary judgment and a declaration that the U.S. Army Corps of Engineers'

environmental assessment and finding of no significant impact for the South Fort Meade Mine, and failure to prepare an EIS before issuing the permit was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law in violation of the National Environmental Policy Act and the Administrative Act;

(5) summary judgment and a declaration that the U.S. Army Corps of Engineers' issuance of the South Fort Meade permit is void and vacated because it was issued in violation of the Clean Water Act and was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law in violation of the APA;

(6) summary judgment and a declaration that the U.S. Army Corps of Engineers' issuance of the South Fort Meade permit is void and vacated because it was issued in violation of the Endangered Species Act and was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law in violation of the APA;

(5) a permanent injunction prohibiting the Corps from reissuing the South Fort Meade permit until Defendants fully comply with requirements of the National Environmental Policy Act and the Clean Water Act; and,

(6) an award of litigation costs, including reasonable attorneys' fees, incurred in connection with this action, as authorized in the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and,

(7) any other relief this Court deems necessary and just to effectuate a complete resolution of the legal disputes between Plaintiffs and Defendants.

//

//

Respectfully submitted on this 30th day of June, 2010.

Respectfully submitted this 29th day of June, 2010,

Pat Gallagher
California Bar No. 146105
*Pro Hac Vice application pending*
Sierra Club
85 Second Street, 5th Floor
San Francisco, CA 94105
T: (415) 977-5709
F: (415) 977-5793
pat.gallagher@sierraclub.org

Brad E. Kelsky, Esq. (Trial Counsel)
Florida Bar No. 0059307
*Pro Hac Vice application pending*
Law Offices of Brad E. Kelsky, P.A.
10189 Cleary Blvd., Suite 102
Plantation, FL 33324
T: (954) 449-1400
F: (954) 449-8986
bradkelsky@Kelskylaw.com

Thomas W. Reese, Esq.
Florida Bar No. 310077
Attorney At Law
2951 61st Avenue South
St. Petersburg, FL 33712
T: (727) 867-8228
TWReeseEsq@aol.com
MDFL Bar Member
MDFL CM/ECF Registered