# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA 2010 JUN 30 PM 3: 45
## JACKSONVILLE DIVISION

### CASE NO.

SIERRA CLUB; PEOPLE FOR
PROTECTING PEACE RIVER, INC.,
and MANASOTA-88, INC.;

3:10-cv-564-J-34 TEM

      Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS;
and COLONEL ALFRED A. PANTANO, JR.,
Commanding District Engineer,
U.S. Army Corps of Engineers, Jacksonville District;

      Defendants.

_____/

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................ii

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF
LAW..................................................................................................1

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION.................3

NATURE OF THE CASE.................................................................3

NEED FOR TEMPORARY RESTRAINING ORDER.......................................5

ARGUMENT.................................................................................5

    I.      STANDARD AND SCOPE OF REVIEW.......................................5

    II.     LIKELIHOOD OF SUCCESS ON THE MERITS............................6

          A.     The Corps Violated NEPA by Failing to Prepare and
                 Environmental Impact Statement for the South Fort
                 Meade Extension Permit.......................................7

          B.     The Corps Failed to Require that Mosaic Avoid Wetlands to the
                 Maximum Extent Practicable..................................16

          C.     The Corps Violated the Clean Water Act by Failing to Hold
                 a Public Hearing...............................................19

    III.    IRREPARABLE HARM WILL OCCUR ABSENT INJUNCTIVE
         RELIEF.................................................................20

    IV.    DEFENDANTS WILL NOT SUFFER HARM FROM INJUNCTIVE
         RELIEF.................................................................22

    V.     THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF.............22

CONCLUSION.............................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st. Cir. 1986) ............................................. 6

*Amoco Prod. Co v. Village of Gambell, Alaska*, 480 U.S. 531 (1987) ......................................... 21

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ................... 15

*Cady v. Morton*, 527 F.2d 786 (9th Cir.1975) .............................................................................. 13

Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326 (M.D. Fla. 2009)........ 7

*Curry v. U.S. Forest Service*, 988 F. Supp. 541 (W.D. Pa. 1997) ................................................. 10

*Florida Wildlife Ass'n, Inc. v. U.S. Army Corps of Engineers*, 401 F. Supp.2d
1298 (S.D. Fla. 2005).................................................................................................................. 18

*Florida Wildlife Federation v. U.S. Army Corps of Engineers*, 404 F. Supp.2d 1352
(S.D. Fla., 2005).................................................................................................................. 21, 22

*Friends of the Earth v. Hall*, 693 F. Supp. 904 (W.D. Wash. 1988) ............................................ 15

*Fund for Animals, Inc. v. Rice*, 85 F.3d 535 (11th Cir. 1996) ...................................................... 20

*Hill v. Boy*, 144 F.3d 1446 (11th Cir. 1998) ............................................................................ 8, 10

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982 (11th Cir. 1995) ........................... 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983)........................................................................................................................ 6

*National Audubon Society v. Hoffman*, 917 F. Supp. 280 (D. Vt. 1995)...................................... 10

*National Wildlife Fed. v. Marsh*, 721 F.2d 767 (11th Cir. 1983) ............................................ 5, 21

*Natural Resources Defense Council, Inc. v. Morton*, 337 F. Supp. 16 (D. D.C. 1971)................. 2

*North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533 (11th Cir. 1990) .................................... 21

*People of the State of California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*,
766 F.2d 1319 (9th Cir. 1985) ..................................................................................................... 3

*Protect Key West, Inc. v. Cheney*, 795 F. Supp. 1552 (S.D.Fla. 1992)................................... 13, 21

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349,
109 S.Ct. 1835 L.Ed.2d 351 (1989) ................................................................................. 8, 13, 21

*Sabine River Auth. v. U.S. Dept. of Interior*, 951 F.2d at 677 (5th Cir. 1992) ................................ 8

*Sierra Club v. Lujan*, 716 F.Supp. 1289 (D.Ariz.1989) .................................................................... 13

*Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985) ........................................................................ 10

*Wilderness Society v. Tyrrel*, 701 F. Supp. 1473 (E.D. Cal. 1988) ................................................. 3

*Winter v. NRDC*, 129 S.Ct. 365 (2008) ............................................................................................ 13

**Federal Statutes**

5 U.S.C. § 701 .................................................................................................................................... 6

5 U.S.C. § 706(2)(A) ........................................................................................................................... 6

33 U.S.C. § 1344(b)(1) ...................................................................................................................... 17

42 U.S.C. § 4332(C) ............................................................................................................................ 8

**Code of Federal Regulations**

33 C.F.R. § 320.4(r) .......................................................................................................................... 18

33 C.F.R. § 325.2(a)(6) ..................................................................................................................... 17

33 C.F.R. § 327.4(b) .......................................................................................................................... 20

33 C.F.R. § 327.4(c) ........................................................................................................................... 20

33 C.F.R. §§ 320.4(b)(4) ................................................................................................................... 17

40 C.F.R. § 230.1(c) ........................................................................................................................... 17

40 C.F.R. § 230.10 ............................................................................................................................. 17

40 C.F.R. § 230.10(a) ........................................................................................................................ 17

40 C.F.R. § 230.10(a)(3) .................................................................................................................... 17

40 C.F.R. § 230.10(d) ........................................................................................................................ 17

40 C.F.R. § 230.5 ................................................................................................................ 17

40 C.F.R. §§ 230.5(c) .......................................................................................................... 17

40 C.F.R. § 1500.1 .............................................................................................................. 13

40 C.F.R. §§ 1500.1(b) ....................................................................................................... 15

40 C.F.R. § 1500.3 ................................................................................................................ 8

40 C.F.R. § 1501.2 .............................................................................................................. 13

40 C.F.R. § 1508.9(a)(1) ....................................................................................................... 8

40 C.F.R. § 1508.25(c) .......................................................................................................... 9

40 C.F.R. § 1508.27 .......................................................................................................... 8, 9

40 C.F.R. § 1508.27(b)(7) ............................................................................................... 9, 16

Plaintiffs Sierra Club, Manasota-88, Inc., and People for Protecting Peace River, Inc., by and through the undersigned counsel, respectfully move for a temporary restraining order and preliminary injunction staying the effectiveness of U.S Army Corps of Engineers Permit Number SAJ-1997-4099-IP-MGH, and enjoining any strip mining activities that may be occurring in reliance on said permit, and state:

1.     On June 14, 2010, the U.S. Army Corps of Engineers ("Corps") issued a Clean Water Act section 404 permit to Mosaic Fertilizer, Inc., authorizing strip mining for phosphate ore on the 10,885-acre "South Fort Meade Extension" site, with impacts to 534 acres of forested and herbaceous wetlands and 10.7 miles of streams feeding the Peace River and Charlotte Harbor watershed.

2.     Mining equipment has been mobilized immediately adjacent to the South Fort Meade Extension site and Plaintiffs are informed and believe that strip mining may commence as early as July 1, 2010, sooner than the minimum fourteen-day period required for a preliminary injunction under Local Rule 4.06. Appendix A to this Motion contains a photograph taken by a local resident of the mining "drag lines" parked immediately across the road from the new mine site.

3.     Plaintiffs' reasons for its Motion for Temporary Restraining Order and Preliminary Injunction are fully explained and supported in Plaintiffs' Memorandum of Law below, the moving affidavits and affirmations, and the exhibits attached thereto. Plaintiffs have demonstrated the likelihood of success on the merits on their claims that the Corps issued the permit in violation of the Clean Water Act and National Environmental Policy Act and acted in a manner that was arbitrary, capricious and contrary to law under the Administrative Procedure Act.

4.  Without temporary and preliminary injunctive relief, Plaintiffs and the environment will suffer irreparable harm. Huge draglines will strip away all overlying vegetation, waterways, wetlands, topsoil, and overburden (the sandy soils that overlay the phosphate deposit) down to the phosphate-containing layer. The result is the utter destruction of the local natural environment from ground surface down to a depth of approximately 50-80 feet. Appendix B to this Motion contains two Google Earth satellite photos showing the existing South Fort Meade mine and the new mine site which is immediately south of the existing mine. The repair of the highly degraded mine site with human-engineered wetlands and streams is highly problematic and controversial. Injury to the Peace River and Charlotte Harbor and their headwater and tributary wetlands and streams is sufficiently likely if mining commences pursuant to the permit, affecting natural resources enjoyed and relied upon by thousands of area residents, including but not limited to drinking water supplies and commercial and recreational fisheries of the Charlotte Harbor, an estuary of national significance.

5.  The public interest favors the issuance of a temporary restraining order and preliminary injunction to protect these resources and the natural environment and maintain the status quo until this case can be resolved on the merits.

6.  Defendants will not be harmed by the issuance of a temporary restraining order because the South Fort Meade Extension is a continuation of mining activities occurring under a different Corps permit just north of the site in Polk County, and the value of phosphate ore will not diminish during the pendency of these proceedings.

7.  Plaintiffs should not be required to post a bond pursuant to Federal Rule of Civil Procedure 65(c), because it is customary to waive bonds in public interest litigation such as this and Plaintiff does not have a financial interest in the outcome. *Natural Resources Defense*

*Council, Inc. v. Morton,* 337 F. Supp. 167, 168 (D. D.C. 1971) ("courts have held that security is not necessary where requiring security would have the effect of denying the plaintiffs their right to judicial review of administrative action"), *People of the State of California ex rel. Van De Kamp v. Tahoe Regional Planning Agency,* 766 F.2d 1319, 1325 (9th Cir. 1985) ("The court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review"); *Wilderness Society v. Tyrrel,* 701 F. Supp. 1473, 1492 (E.D. Cal. 1988).

   8.    Pursuant to Local Rule 3.01(g), counsel for Plaintiffs certify that counsel for Plaintiffs notified counsel for the Defendants of their intent to seek a temporary restraining order on June 29, 2010 because of the imminence of mining, and Defendants responded that the papers should be served.

   WHEREFORE, Plaintiffs respectfully request the Court issue a temporary restraining order and set a hearing on a preliminary injunction hearing date; stay the effectiveness of permit SAJ-1997-4099; and temporarily and preliminarily restrain and enjoin Defendants and all of its agents, officers, employees and attorneys, and Mosaic Fertilizer, Inc., which is acting in concert with Defendants as the permitee, from conducting any activities in reliance on Corps permit SAJ-1997-4099, including but not limited to any excavation, dredging, filling or other alteration of jurisdictional waters of the United States at the South Fort Meade Extension site.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION

### NATURE OF THE CASE

   This case challenges the final agency action of the U.S. Army Corps of Engineers ("Corps"), approving a Clean Water Act section 404 dredge and fill permit for Mosaic Fertilizer, LLC ("Mosaic") to strip mine 7,687 acres in Hardee County, Florida for phosphate ore (the

"South Fort Meade Extension Permit" or the "Permit"). The Permit authorizes the destruction of 534 acres of wetlands and 10.7 miles (56, 661 linear feet) of streams in the headwaters of the Peace River and Charlotte Harbor estuary. The Peace River watershed is considered a Priority Watershed and Aquatic Resource of National Interest ("ARNI") by the U.S. Environmental Protection Agency ("EPA") and is a drinking water source for 700,000 Floridians. Congress has designated Charlotte Harbor as an "estuary of national significance."

Plaintiffs bring this action under the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA"), to challenge the Corps' decision as unreasonable, arbitrary and capricious, and otherwise not in accordance with federal law. Despite the self-evident significance of destroying such large areas of wetlands and streams in critically important areas, and despite the alarms sounded by EPA, the County Commissions of Sarasota, Charlotte and Lee Counties and the public, the Corps determined that NEPA did not require the preparation of an Environmental Impact Statement for this action, and refused to hold a public hearing, finding that "this permit action will not have a significant impact on the quality of the human environment."

The Corps also accepted Mosaic's claim that it could not implement economically practicable measures required under the CWA to avoid or reduce the impact of the mine on wetlands and streams, despite EPA's technical assessment that Mosaic had utterly failed to demonstrate that less damaging mine configurations would be economically unviable.

Finally, the Corps also downplayed the cumulative effects of this proposed strip mine and hundreds of thousands of acres of similar mines surrounding the Peace River and Charlotte Harbor estuary, concluding in error that artificially recreated wetlands and streams will offset the

severe impacts of excavating native wetlands and streams. Oddly enough, immediately following the issuance of the Permit, the Corps announced that it would conduct a regional environmental impact statement to address widespread concerns over the cumulative effects of phosphate strip mining. But this EIS comes too late to influence the South Fort Meade Extension Permit.

## NEED FOR TEMPORARY RESTRAINING ORDER

The Corps issued the permit on June 14, 2010, but did not notify Plaintiffs of its action, despite a written request that they be so notified. Affidavit of Patrick Gallagher ¶ 3, Exh. A The Corps did not make the permit documents publicly available and, after repeated requests, sent them by electronic mail to Plaintiffs' counsel on June 25, 2010. *Id.* ¶¶ 4-6, 9. According to area residents, Mosaic has begun moving heavy equipment to the mining site. Verified Complaint ¶ 61; see also Appendix A. Mining could begin at any time. Accordingly, Plaintiffs cannot wait fourteen days for the adjudication of a noticed motion for preliminary injunction and respectfully seek a temporary restraining order to maintain the status quo of the existing environment at this ecologically critical site.

## ARGUMENT

### I.     STANDARD AND SCOPE OF REVIEW

Plaintiffs are entitled to a temporary restraining order and preliminary injunctive relief if they show: (1) a substantial likelihood of success on the merits; 2) a substantial threat of irreparable injury if the injunction is not granted; 3) the threatened irreparable injury outweighs the threatened harm the injunction may do to the defendant; and 4) granting the preliminary injunction will not disserve the public interest. *Nat'l Wildlife Fed'n v. Marsh*, 721 F.2d 767, 770 (11th Cir. 1983); Local Rule 4.05.

The Corps' decision to issue the Permit under section 404 of the Clean Water Act, as well as its Finding of No Significant Impact under NEPA, are reviewed under the APA. 5 U.S.C. § 701 *et seq.* Under the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action must be set aside if the agency "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency's expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

The Eleventh Circuit does not hold a plaintiff seeking preliminary injunctive relief to the same evidentiary standard that would be required in a summary judgment proceeding. For instance, "a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (*quoting Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st. Cir. 1986)). *See also Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326 (M.D. Fla. 2009).

## II.   LIKELIHOOD OF SUCCESS ON THE MERITS

Given the exigency of this motion, Plaintiffs will focus on three specific claims on which they can demonstrate a likelihood of success on the merits at this early stage of the case, before the Corps has even produced its administrative record for the Permit. Plaintiffs reserve the right

6

to prosecute all of the claims in their complaint at the summary judgment stage of the proceeding.

## A. The Corps Violated NEPA by Failing to Prepare an Environmental Impact Statement for the South Fort Meade Extension Permit

The Corps should have prepared an environmental impact statement for the South Fort Meade Extension Permit because of the very significant direct and cumulative impacts the strip mine will cause on critically important aquatic areas, threatened and endangered wildlife and neighboring residents. The South Fort Meade Extension Permit authorizes, *inter alia,* the following direct environmental impacts: a) strip mining to a depth of approximately eighty feet on 7,687 acres of land that includes the headwaters of the Peace River and Charlotte Harbor estuary; b) the destruction of 534 acres of native wetlands; c) the destruction of 10.7 miles (56,661 linear feet) of streams; d) the killing or harming ("take") of 50 eastern indigo snakes and 2 Audubon's crested caracaras, both listed as threatened species under the ESA; e) the degradation of the habitat of the Wood Stork, listed as endangered under the ESA; f) significant alteration of the local hydrology, including the creation of large surface impoundments for mining waste known as "clay settling areas" (or less generously as "slime pits"); and g) severe impacts to neighboring residents, including 24-hour lighting, noise, dust and disruption of their water supply. Gallagher Affidavit Exh. I at 1-2, 7, 10, 37-38, 54-55; Exhs. D, E, F; Affidavit of Frank Kirkland; Affidavit of Donald McLellan. Satellite photographs of the existing, adjacent mine site reveal the severe alteration of the landscape involved with strip mining. Appendix B.

Moreover, the Permit authorizes these impacts in connection with several hundred thousand acres of past, present and future phosphate strip mines in the region. The Corps states that the cumulative impacts attributable to just the past mines include: a) the loss of 343 miles of

7

streams; b) the loss of 136,000 acres of wetlands, a 38.5% decrease; c) the loss of 591, 000 acres of upland habitat, a 71% decrease; and d) a decline in the Florida aquifer of 20 to 50 feet. *Id.* Exh. I at 48. If these impacts are not significant on their face, NEPA certainly makes them so.

Section 102(2) of NEPA, 42 U.S.C. § 4332(C), mandates that federal agencies consider the environmental impact, and potential alternatives, for every proposed "major Federal action" significantly affecting the environment. It is an action-forcing provision designed to prevent agencies from acting on incomplete information and to "ensure[ ] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).

To determine whether an action may have significant environmental impacts and therefore require an environmental impact statement, an agency is required to comply with regulations promulgated by the federal Council on Environmental Quality ("CEQ"). 40 C.F.R. § 1500.3. The CEQ regulations direct federal agencies to first prepare an Environmental Assessment ("EA") that "provides sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. 40 C.F.R. § 1508.9(a)(1). "Thus, an agency will reach one of two conclusions in an EA: 'either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact . . . necessitating no further study of the environmental consequences which would ordinarily be explored through an EIS.'" *Hill v. Boy,* 144 F.3d 1446, 1450 (11th Cir. 1998) (quoting *Sabine River Auth. v. U.S. Dept. of Interior*, 951 F.2d at 677 (5th Cir. 1992).

Under the CEQ regulations, "significance" requires consideration of both context and intensity. 40 C.F.R. § 1508.27. "Context" includes the affected region, interests, and locality,

varying with the setting of the action and includes both short and long-term effects. *Id.* "Intensity" refers to the severity of the impact, and includes: unique characteristics of the geographic area such as proximity to wetlands or ecologically critical areas; whether the project will affect endangered species; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; and whether the action is related to other actions with individually insignificant but cumulatively significant impacts. *Id.*.

In conducting the cumulative impact analysis, NEPA requires the Corps to consider the direct and indirect effects of its actions, and the cumulative impacts of past, present and reasonably foreseeable future actions, on the environment. 40 C.F.R. § 1508.25(c). Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment; significance cannot be avoided by terming an action temporary or by breaking it down into small component parts. 40 C.F.R. § 1508.27(b)(7).

By almost every measure of the CEQ regulations, the Corps should have prepared an environmental impact statement. Among these measures are the facts that EPA and the counties of Sarasota, Lee and Charlotte have expressed grave concerns with the Permit because it will affect a watershed and estuary deemed nationally significant; that large areas of native wetlands and streams will be destroyed; that members of several threatened or endangered species will be killed or their habitat harmed; that the Peace River provides water to approximately 700,000 Floridians; and that regardless of how successful the Corps believes that wetland and stream recreation will be, these natural resources will be lost at least for the short to medium term, and

the prospect of their one-for-one replacement is highly uncertain and controversial. Gallagher Affidavit, Exhs. D, E, F, G; I at 1-2,10,13-15; Affidavit of Brian Winchester.

The 101-page length and the complexity of the Corps' June 14, 2010 Decision Document (Gallagher Affidavit, Exh. I) itself shows that an EIS is necessary. *National Audubon Society v. Hoffman,* 917 F. Supp. 280, 287 (D. Vt. 1995), aff'd, 132 F.3d 7 (2nd Cir. 1997) ("[T]he magnitude of the instant proposals [to extend roads and conduct logging operations], as set forth in an EA totaling over 65 pages, undermines defendants' contention that the ... proposals are not significant"); *Curry v. U.S. Forest Service,* 988 F. Supp. 541, 552 (W.D. Pa. 1997) (49-page EA). As then-Judge Breyer observed in *Sierra Club v. Marsh,* 769 F.2d 868, 874 (1st Cir. 1985): "To announce that these documents- despite their length and complexity- demonstrate no need for an EIS is rather like the mathematics teacher who, after filling three blackboards with equations, announces to the class, 'You see, it is obvious.'"

The Eleventh Circuit has adopted a four-part test to determine whether an agency's decision not to prepare an EIS is arbitrary and capricious: 1) the agency must have accurately identified the relevant environmental concerns; 2) the agency must then take a "hard look" at those concerns when preparing the EA; 3) the agency must make a convincing case for a finding of no significant impact; and (4) if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum. *Hill,* 144 F.3d at 1450.

For the purposes of this motion, Plaintiffs will focus on four glaring errors in the Corps decision to avoid an EIS for the South Fort Meade Extension Permit: 1) the failure to make a convincing case that the regional, cumulative effects of phosphate mining are insignificant given the Corps' and permittee's own admissions to the contrary; 2) the failure

to address the highly uncertain and controversial assumption that all destroyed wetlands, streams, hydrological functions and wildlife habitat will replaced one-for-one; 3) the failure to address the fact that, even assuming *arguendo* that all destroyed natural resources will be restored one-for-one, such restoration will not be accomplished for a decade or more, and very significant short to medium term impacts will occur regardless; and 4) the failure to address the very severe impacts the mine will have on neighboring residents, including 24-hour lighting, noise, dust and disruption of their water supply.

First, the Corps' failure to take a hard look at cumulative effects of phosphate strip mining can be highlighted by tracing EPA's correspondence over the three years leading to the permit issuance. In 2007, after first receiving notice of the Permit, EPA outlined serious concerns with the cumulative effects of phosphate mining on the Peace River and Charlotte Harbor, stating: "Given the high functional level of the ecosystems affected by this project, the large acreage of impacts associated with the proposed project, and the potential for significant impacts to the Peace River and downstream estuaries which may result in significant cumulative adverse impacts, EPA requests that this proposal be subject to a rigorous application of the [CWA]Guidelines." Gallagher Affidavit, Exhs. D, E.

In March 2010, unsatisfied with the Corps' approach, EPA formally demanded a regional cumulative impact study. EPA's letter stressed a number of points, including but not limited to: a) "[t]he State of Florida and EPA have designated the Peace River Watershed as both a Priority Watershed and an Aquatic Resource of National Importance;" b) "EPA has substantial concerns with the cumulative impacts and the downstream effects on the [Charlotte Harbor National Estuary] resulting from proposed federal 404 permit actions for mining;" and c) "[t]he Peace River supplies potable water directly or through

purchase to approximately 700,000 citizens, and any water quality deterioration due to mining activities may compromise the public drinking water supplies and adversely impact public health." *Id.*, Exh. G.

Finally, one week before the Corps issued the Permit, EPA wrote again to the Corps, stating: "concerns outlined in EPA's letter dated August 23, 2007, regarding secondary and cumulative impacts to the Peace River Watershed are largely substantiated by Mosaic through modeling efforts and have not been validated through an independent review." Gallagher Affidavit, Exh. H. In other words, *the permittee in this case has substantiated that significant cumulative effects will occur.*

It was not surprising then, although oddly timed, that immediately following the issuance of the South Fort Meade Permit, the Corps announced that it would "conduct a comprehensive study of the cumulative impacts of phosphate mining on the entire Peace River watershed." *Army Corps to Conduct Watershed Summary,* Charlotte Sun-Herald, Jun. 25, 2010, *available at*

http://www.sunnewspapers.net/articles/pnnews.aspx?NewsID=459068&a=newsarchive2/06 2510/ch1.htm&pnpg=0. (A paper copy of the news article is attached as Exhibit C). The media reported that "Ironically, however, the impact study came too late to provide insight into the mine application [South Fort Meade extension] that inspired it." *Id.* EPA's wetlands chief for the region was quoted as stating: "We have basically worked with the (COE) district, they recognize they need to improve their process and the colonel has worked with us and he has agreed they need an area-wide EIS ….Unfortunately, this project [South Fort Meade] had been going on for such a long time, neither the Army Corps nor the EPA felt we could delay it any longer." *Id.*

In essence, the wetlands and streams of the South Fort Meade Extension site will be

sacrificed while the Corps figures out how to address the pressing regional problem of

phosphate strip mining. But this is not how NEPA works: the agency's hard look at

environmental impacts must come before the project decision, not after the wetlands and

streams have been destroyed. As the Supreme Court held:

> In light of these objectives, the timing of an EIS is critical. CEQ regulations instruct
> agencies to 'integrate the NEPA process with other planning at the earliest possible time
> to insure that planning and decisions reflect environmental values.' 40 CFR § 1501.2
> (1987). An EIS must be prepared 'early enough so that it can serve practically as an
> important contribution to the decisionmaking process and will not be used to rationalize
> or justify decisions already made.'

*Winter v. NRDC*, 129 S.Ct. 365, 390 (2008) (citations omitted). The Southern District of

Florida held similarly:

> The Act's effectiveness depends on involving environmental considerations in the initial
> decisionmaking process. *See Robertson*, 109 S.Ct. at 1845 (NEPA goals achieved
> during period when agency is "contemplating a major action"); *see also* 40 C.F.R. §
> 1501.2 ("Agencies shall integrate the NEPA process with other planning at the earliest
> possible time to insure that planning and decisions reflect environmental values, to
> avoid delays ..., and to head off potential conflicts); 40 C.F.R. § 1500.1 ("NEPA
> procedures must insure that environmental information is available to public officials
> before decisions are made and before actions are taken"). In the NEPA context, *post hoc*
> compliance *by definition* does not accord with the congressional mandate. *See Sierra
> Club v. Lujan,* 716 F.Supp. 1289 (D.Ariz.1989); *Cady v. Morton*, 527 F.2d 786, 794
> (9th Cir.1975).

*Protect Key West, Inc. v. Cheney,* 795 F. Supp. 1552, 1561-62 (S.D.Fla. 1992) (emphasis in

original). Plaintiffs respectfully submit that only one conclusion flows from this precedent:

the Corps must rescind the South Fort Meade Extension Permit until it has completed its EIS

on the cumulative regional impacts of phosphate strip mining.

A second, fundamental failure with the Corps effort to avoid an EIS stems from its

premise that all wetlands and streams and hydrological functions destroyed by the strip mine

will be recreated one-for-one. This is the foundation of the Corps' finding that direct and

cumulative impacts are not significant. Gallagher Affidavit, Exh. I at 33, 56-57, 62. The
Corps' rose-colored assumptions about the functionality of replacement streams and
wetlands fails the *Hill* test because it ignores the considerable empirical evidence, scientific
controversy and uncertainty which cast doubt on such mitigation regimes. The science
demonstrates that artificially recreated wetlands and streams rarely, if ever, replace the
ecological function of the lost resources. Affidavit of Brian Winchester. Several types of
wetlands are not amenable to artificial recreation, and even those which can be recreated
rarely provide the full range of ecological functions lost. *Id.*

Stream restoration is even more uncertain: the Permit implicitly admits as much by
granting Mosaic ten years to demonstrate the successful recreation of streams, and requiring
a "remediation plan" if the streams do not function as promised. Gallagher Affidavit, Exh. I
at 86 *et seq.*.

Moreover, the track record of reclamation in the region hardly shows a successful
one-for-one replacement of resources over any sort of reasonable time frame. According to
a 2008 Florida Department of Environmental Protection (FDEP) "Rate of Reclamation
(ROR) Report," 184,681 acres in the region were strip-mined for phosphate ore from 1975
through December 31, 2008. Significantly, the same ROR report reveals that the land
reclamation on which Corps permitting assumptions rely is not actually occurring. Only
28% of Mosaic's mined lands have been reclaimed and released. Much of the rest has been
converted to "industrial use" or multi-year variances from reclamation requirements have
been given because of a lack of fill to complete reclamation. Gallagher Affidavit, Exh. J.

The Corps also failed to take a hard look at the hydrologic impacts of the mine,
including but not limited to the clay settling areas ("slime pits") which store the clay wastes

from the mining operation. The Corps acknowledges that 1,500 acres of these large surface impoundments may disrupt the normal water cycle on the site that is crucial to the functioning of this critically important watershed. Gallagher Affidavit, Exh. 1 at 54. The Corps then glosses over the problem, in part, by relying on Mosaic's commitment to manage the particle sizes of the clays stored in these impoundments, so as to mitigate interference with water flow. *Id.* Yet the Corps ultimately concedes that more research is needed to determine the true hydrologic impacts of the impoundments. *Id.*

The Corps' findings on wetland and stream impacts fail the *Hill* test because they lack scientific integrity and fail to grapple with the well known, chronic problem of reclaiming mined lands. NEPA's "hard look" requirement obligates an agency to disclose and discuss opinions challenging the scientific basis upon which the agency's conclusions rests. *Friends of the Earth v. Hall*, 693 F. Supp. 904, 934 (W.D. Wash. 1988) ("where the agency fails to acknowledge opinions held by well-respected scientists concerning the hazards of the proposed action, EIS is fatally deficient"); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (failure to discuss report that warned of unforeseen detrimental impacts caused by post-fire salvage logging in EA lends weight to claim that Forest Service failed to take a hard look at environmental consequences of authorizing logging); *see also* 40 C.F.R. § 1500.1(b) (agency use "accurate scientific analysis" and "high quality" information in analyzing a proposed action).

Third, even assuming, *arguendo,* that the Corps and Mosaic could replace the 543 acres of wetlands and 10.7 miles of streams lost by mining, the replacement would not occur for ten years or more. As noted above, only 28% of Mosaic's mined lands have been

successfully reclaimed to date. Gallagher Affidavit, Exh. J. The Corps itself does not require Mosaic to meet stream reclamation standards for ten years. *Id.*, Exh. I at 86. The loss of 10.7 miles of streams for ten years plainly constitutes a significant impact, and the Corps cannot evade this fact by deeming the impact "temporary." As the CEQ regulations dictate, significance cannot be avoided by terming an action temporary or by breaking it down into small component parts. 40 C.F.R. § 1508.27(b)(7).

Finally, the Corps finding that no significant impacts will occur ignores the tragic consequences mining will impose on the neighbors of the mine site. As stated in the affidavits of two neighbors who live within 500 feet of the proposed strip mine, the 24-hour lighting, noise, dust and water drawdown effects of the existing mine have made life almost unbearable for them. Affidavits of Frank Kirkland and Donald McLellan. The Corps' sole response to these concerns is the imposition of a requirement for noise and dust berms. Gallagher Affidavit, Exh. I at 32. The Corps' finding that such impacts to neighboring residents are not significant not only violates NEPA, it defies common sense and basic respect for the citizenry.

## B. The Corps Failed to Require that Mosaic Avoid Wetlands to the Maximum Extent Practicable

Under the Clean Water Act, the Corps should have required Mosaic to avoid as many wetlands and streams as possible, while still running an economically viable mining operation. Instead, the Corps essentially accepted Mosaic's claims that it would not make enough money if it were required to mine less intensively, without requiring an empirical demonstration that such an approach would be economically impracticable. EPA criticized the Corps continually for this shortcoming. Gallagher Affidavit, Exhs. F, H.

The Corps oversees the CWA section 404 permit process and must comply with guidelines promulgated by the EPA, which are incorporated into the Corps' own regulations. 33 U.S.C. § 1344(b)(1); 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6). The underlying intent behind the guidelines is that dredged or fill material should not be discharged if it will result in an unacceptable impact on the aquatic ecosystem. 40 C.F.R. § 230.1(c).

The Corps' regulations provide that no discharge of dredged or fill material shall be permitted: (1) if there is a practicable alternative to the proposed discharge; (2) if the discharge causes or contributes to violations of applicable state water quality standards; (3) if the discharge will cause or contribute to significant degradation of the environment; and (4) unless all appropriate steps have been taken to minimize potential adverse impacts. 40 C.F.R. § 230.10.

The regulations provide that "practicable alternatives" include "not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences." 40 C.F.R. §§ 230.5(c), 230.10(a). If a project is not "water dependent," as is the case with phosphate strip mining, the guidelines contain a presumption that a less environmentally damaging practicable alternative exists, and require that the applicant clearly demonstrate that practicable alternatives which would not involve discharge of fill material into special aquatic sites were not available. 40 C.F.R. § 230.10(a)(3). One alternative which must be examined is practicable changes to the project plan to minimize the environmental impact of the discharge. 40 C.F.R. § 230.5.

If the permit applicant establishes that no less damaging, practicable alternative is available, the applicant must then show that all "appropriate and practicable steps" will be taken to minimize adverse effects of the discharge on the wetlands. 40 C.F.R. § 230.10(d).

17

"Losses will be avoided to the extent practicable." 33 C.F.R. § 320.4(r). "Only after showing that avoidance and minimization criteria have been met, can the Corps consider mitigation." *Florida Wildlife Ass'n, Inc. v. U.S. Army Corps of Engineers*, 401 F. Supp.2d 1298, 1308 (S.D. Fla. 2005).

The South Fort Meade Extension Permit issued in violation of these provisions. EPA's numerous and ongoing objections indicate that the Corps failed to comply with the Clean Water Act. The Corps' treatment of the dispute essentially boils down to one basic proposition: that Mosaic should get to mine the full 50.85 million metric tons of recoverable phosphate on the site, because to require otherwise would be impracticable due to reducing the mineable reserves and a set of undefined costs and logistics problems associated with mining less ore. Gallagher Affidavit, Exh. 1 at 26-28. In fact, Mosaic and the Corps actually increased the amount of wetlands disturbed after conducting their minimum analysis. *Id* . This nullifies the basic mandate of the CWA regulations and simply does not cut the mustard.

Again, tracing EPA's correspondence with the Corps underscores the failures in the Permit. On January 15, 2010, EPA wrote to the Corps, and expressed numerous concerns: a) "no minimization of impacts to wetlands or streams has been incorporated into the proposed project since EPA provided objection letters in 2007;" b) "the applicant does not present iterative combinations of a reduced number of stream crossings;" and c) "EPA does not believe that the applicant has fully minimized their impacts, we are concerned that the two forms of mitigation being offered are the least desirable." Gallagher Affidavit, Exh. F.

On June 8, 2010, EPA again wrote to the Corps, expressing continuing concerns: a) "concerns regarding project purpose and alternative configurations of the preferred project

18

site, that would result in a reduction of impacts to waters of the U.S., (minimization) have not been addressed;" b) "EPA's request for "an analysis of different combinations and/or a reduced number of stream crossings, the resulting deliverable product from each scenario, and the ability to meet or not meet project purpose under each scenario" was not completed;" c) the permit "does not analyze any iterative combinations of a reduced number of stream crossings or other on-site alternatives matched to Mosaic's ability to meet them;" and d) "the alternatives introduced in this section do not address on-site alternatives to extraction areas or methods." *Id.* Exh. H. In sum, EPA's correspondence demonstrates that the Corps utterly failed to discharge its obligations under the Clean Water Act.

## C. The Corps Violated the Clean Water Act by Failing to Hold a Public Hearing

Three Florida counties and numerous organizations and area residents requested that the Corps hold a public hearing to address concerns over the South Fort Meade Extension Permit. The Comissions of Sarasota, Charlotte and Lee Counties requested a hearing. Gallagher Affidavit, Exh. I at 13-14. The Sierra Club, People for Protecting Peace River and neighbors of the proposed mine requested a hearing. *Id.* The Corps ignored them all, and all it had to say in the final permit was: "we considered their issues, and a public hearing would have served no purpose." Gallagher Affidavit, Exh. I at 95.

The Corps' attitude defies the very purpose of public involvement codified in the Clean Water Act and the Corps' own rules, and is sufficient to remand the Permit. The regulations state:

[A]ny person may request...that a public hearing be held to consider the material matters at issue.... Requests for public hearing under this paragraph shall be granted, unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing.

33 C.F.R. § 327.4(b). The district engineer must state the reasons for the denial to all requesting parties. *Id.* The Corps regulations state that "[i]n case of doubt, a public hearing shall be held." 33 C.F.R. § 327.4(c). Therefore, public hearings ought to be granted where the requesting party supplies a reason. Here, the Corps made a conclusory determination that the issued raised in the requests for hearing were insubstantial and no valid interest would be served by holding a hearing. The Corps abused its discretion.

The Eleventh Circuit has held that the Corps has the discretion not to hold a hearing if the Corps determines that the public hearing is unlikely to generate any new information pertinent to the permit. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535 (11th Cir. 1996). That case is distinguishable, as two public hearings had been held under state process and the opponents had submitted voluminous written information. *Id.* Here, the Corps simply brushed off the public and unilaterally decided that it had all of the information it needed. Given the widespread interest in this Permit, including those of the downstream counties, a valid interest is served by a hearing—namely, that of the Corps making an informed decision based on broad information and inquiry following public participation. *See* 33 C.F.R. § 327.4(b). The Corps' indifference to public participation is especially misplaced given the acute concerns of neighboring residents. See Affidavits of Frank Kirkland and Donald McLellan.

## III. IRREPARABLE HARM WILL OCCUR ABSENT INJUNCTIVE RELIEF

Mosaic's mining operations are set to begin, and once the wetlands and streams are excavated, they will never be the same. Winchester Affidavit. Threatened and endangered wildlife will also be killed or harmed. Gallagher Affidavit, Exh. 1 at 10, 37. In sum, strip mining of the South Fort Meade Extension site will irreparably harm the wetlands and

streams on the site, the local plant and wildlife communities that depend upon these resources, and the ecological health of the downstream estuarine system. *Amoco Prod. Co v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987) (environmental injury can seldom be adequately remedied by money damages and is often permanent or of long duration, *i.e.*, irreparable); *National Wildlife Fed. v. Marsh*, 721 F.2d 767, 786 (11th Cir. 1983) (irreparable injury demonstrated where absent injunction, wetlands would be destroyed).

Absent a temporary restraining order and preliminary injunction, a host of irreparable harms also will be imposed on the Plaintiffs and their members, ranging from loss of enjoyment of the local environment to loss of their enjoyment of their homes and loss of property value. Affidavits of Frank Kirkland, Donald McClellan and Helen Jelks King.

Moreover, a fundamental purpose of NEPA is to ensure "that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (citations omitted); *see also North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1540 (11th Cir. 1990). If the Permit is not temporarily suspended, these as yet unexamined effects would begin to take place, and no amount of subsequent environmental analysis would undo them. *See, e.g., Protect Key West, Inc. v. Cheney*, 795 F.Supp. 1552 (S.D. Fla. 1992) ("irreparable harm results where environmental concerns have not been addressed by the NEPA process"); *Florida Wildlife Federation v. U.S. Army Corps of Engineers*, 404 F. Supp.2d 1352, 1362 (S.D. Fla., 2005) (principal irreparable harm is Corps permitting of large-scale development in environmentally sensitive area without first taking into account reasonably foreseeable direct and cumulative effects of such action).

## IV.    DEFENDANTS WILL NOT SUFFER HARM FROM INJUNCTIVE RELIEF

Plaintiffs are not aware of any special harm that would accrue to the Corps or Mosaic if injunctive relief is granted. This permit has been in process for three years, and additional time to resolve the merits of Plaintiffs' case will not cause harm. The Corps' announced intention to conduct a regional EIS on the cumulative effects of phosphate strip mining corroborates that additional time to resolve environmental concerns is appropriate. Moreover, the phosphate ore in the ground will not degrade or diminish, nor to Plaintiffs' knowledge will the market for such ore.

## V.    THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF

The public interest in preserving the health of the Peace River and Charlotte Harbor watershed is overwhelming, as evidenced by the following: a) Congress' has designated Charlotte Harbor as an estuary of national significance; b) both the state of Florida and EPA have designated the Peace River watershed as both a Priority Watershed and an Aquatic Resource of National Importance; c) the Peace River provides drinking water to hundreds of thousands of Florida residents; and d) the County Commissions of Sarasota, Charlotte and Lee Counties have requested that a regional study be performed to assess the cumulative impacts of phosphate strip mining, and the Corps has just recently granted that request. *See supra.* These considerations are in addition to the settled doctrine that the public has a great interest in the preservation of the natural environment.

## CONCLUSION

For all of the reasons stated above, Plaintiffs respectfully request that the Court grant their motion for a temporary restraining order and preliminary injunction, so that the

invaluable natural resources at and surrounding the South Fort Meade Extension site may be preserved pending an adjudication of this case on the merits.

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

Respectfully submitted this 29th day of June, 2010,

Pat Gallagher
California Bar No. 146105
*Pro Hac Vice application pending*
Sierra Club
85 Second Street, 5th Floor
San Francisco, CA 94105
T: (415) 977-5709
F: (415) 977-5793
pat.gallagher@sierraclub.org


Brad E. Kelsky, Esq. (Trial Counsel)
Florida Bar No. 0059307
*Pro Hac Vice application pending*
Law Offices of Brad E. Kelsky, P.A.
10189 Cleary Blvd., Suite 102
Plantation, FL 33324
T: (954) 449-1400
F: (954) 449-8986
bradkelsky@Kelskylaw.com


Thomas W. Reese, Esq.
Florida Bar No. 310077
Attorney At Law
2951 61st Avenue South
St. Petersburg, FL 33712
T: (727) 867-8228
TWReeseEsq@aol.com
MDFL Bar Member
MDFL CM/ECF Registered

# Appendix A



# Appendix
# B





# Appendix
# C





**UNLEASH** your pet online!

▶ SHARE PHOTOS  ▶ MEET OTHER LOCAL PETS

CLASSIFIEDS ▾   COUPONS   EMPLOYMENT ▾   PETS   REAL ESTATE   SUBSCRIBE   TRAVEL

**Printed News**

BACK                    PRINT    EMAIL

Published on Friday, June 25, 2010

# Army Corps to conduct watershed summary

The Story

Text Size                                    PRINT    EMAIL

After 13 years of prodding by environmentalists and politicians, the U.S. Army Corps of Engineers has decided to conduct a comprehensive study of the cumulative impacts of phosphate mining on the entire Peace River watershed.

Charlotte County Commissioner Adam Cummings, who had supported the county's push for a Regional Environmental Impact Statement throughout most of his 12 years in office, called the federal agency's decision "a giant step in the right direction."

"I know that, throughout all of our phosphate litigation, our primary goal was to get an EIS and follow it up with a realistic, sustainable management plan (for the mining)," Cummings said Wednesday.

County Commission Chairman Bob Starr also called the decision "a win." He expressed hope that the government can make use of volumes of reports on mining impacts the county procured from experts during its years of anti-phosphate litigation, between 2002-08.

Ironically, however, the impact study came too late to provide insight into the mine application that inspired it. The Army engineers granted that permit June 14 for Mosaic Fertilizer's 10,700-acre South Fort Meade Mine Extension.

The permit was granted over lingering objections from the EPA, which had called for the permit to be denied.

Thomas Welborn, chief of the EPA's wetlands, coastal and oceans branch, pointed out in a Jan. 15 letter to the COE's regulatory commander, Col. Alfred Pantano Jr., that the mine calls for 511 acres of wetlands to be excavated along the Peace River, a "priority watershed."

The river has been designated a resource of national importance because it feeds fresh water to the Charlotte Harbor National Estuary and provides drinking water for 700,000 people, Welborn wrote.

Although Mosaic's plan calls for replacing those wetlands with some 700 acres of man-made wetlands once mining is completed in 21 years, Welborn argued the company didn't do enough to avoid mining some areas, as federal rules require.

He also noted that Mosaic planned to eliminate another high-quality wetland and a stream to make room for a 1,500-acre clay settling area.

Welborn also cited that Mosaic plans to excavate 60,000 linear feet of streams and replace them with man-made versions. Mosaic has no history of reclaiming streams, according to Welborn.

In a March 10 letter to Pantano, Welborn said Mosaic's application once again had brought the need for an EIS to EPA's attention.

Since then, Mosaic offered up some additional mitigation, Welborn said Wednesday. Those measures included adding 60 acres to some 2,000 acres that were to be preserved from mining. That area now includes a 49-acre still-water swamp adjacent to the river that was targeted for excavation, Welborn said.

Mosaic also agreed to place the preservation lands into conservation easements. Welborn said the EPA requested the easements because Mosaic was counting the protection of land from strip mining as mitigation for strip mining.

"We have basically worked with the (COE) district, they recognize they need to improve their process and the colonel has worked with us and he has agreed they need an area-wide EIS," Welborn said. "Unfortunately, this project had been going on for such a long time, neither the Army Corps nor the EPA felt we could delay it any longer."

He said the COE should postpone granting permits for future mines until the study is concluded.

Nancy Sticht, COE public affairs director, said Pantano has taken a special interest in phosphate mining. That interest became clear at a joint-agency summit on phosphate mining May 20, because Pantano spent an entire day at the summit, Sticht said.

The COE is planning a public meeting in October to gather input from citizens, environmental groups and local governments about the scope of the study, Sticht said.

"Col. Pantano wants to make sure we're considering all points of view in order to make good decisions," she said.

Russell Schweiss, spokesman for Mosaic, said his company's position on an areawide study remains the same as it has always been. "We do not object to one as long as it's conducted in a scientifically valid manner and fully distinguishes between early mining practices of those of today," he said.

Jim Cooper of Protect Our Watershed said he was "heartened" to hear about the study, which he believes is required under the National Environmental Policy Act.

"It is long overdue," Cooper wrote in an e-mail to the Sun Thursday.

He called for a moratorium on new phosphate mine permits until the study is completed.

E-mail: gmartin@sun-herald.com

By GREG MARTIN

Staff Writer
Return to Top of story






Sun Internet Services
© 2010 All Rights Reserved
A Division of Sun Coast Media Group
Publishers of SUN Newspapers