1      **IN THE UNITED STATES DISTRICT COURT, MIDDLE DISTRICT**

2          **OF FLORIDA, JACKSONVILLE DIVISION**

3

4

5  SIERRA CLUB, INC.; PEOPLE FOR   Jacksonville, Florida

6  PROTECTING PEACE RIVER, INC.;  Case No. 3:10-cv-564-J-25-TEM

7  and MANASOTA-88, INC.,       July 1, 2010

8           Plaintiffs,    1:34 p.m.

9  -vs-                Courtroom 10 A

10  UNITED STATES ARMY CORPS OF

11  ENGINEERS; and COLONEL ALFRED

12  A. PANTANO, JR., Commanding

13  District Engineer, U.S. Army

14  Corps of Engineers,

15  Jacksonville District,

16          Defendants.

17

18    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

19

20     **HEARING ON MOTION FOR TEMPORARY RESTRAINING ORDER**

21       **BEFORE THE HONORABLE HENRY LEE ADAMS, JR.**

22        **SENIOR UNITED STATES DISTRICT JUDGE**

23

24

25

<u>COUNSEL FOR THE PLAINTIFFS:</u>

**BRAD E. KELSKY**
*Brad E. Kelsky, P.A.*
10189 Cleary Boulevard, Suite 102
Plantation, Florida 33324

**THOMAS W. REESE**
*Law Office of Thomas W. Reese*
2951 61st Avenue South
St. Petersburg, Florida 33712

<u>COUNSEL FOR THE DEFENDANTS:</u>

**COLLETTE B. CUNNINGHAM**
*United States Attorney's Office*
300 N. Hogan Street
Suite 700
Jacksonville Florida 32202

**JOHN F. KASBAR,** Lead Regulatory Counsel
**CHRISTINA D. STORZ,** Assistant District Counsel
U.S. ARMY CORPS OF ENGINEERS - JACKSONVILLE DISTRICT
701 San Marco Boulevard
Jacksonville, Florida  32207-0019


**FRANK E. MATTHEWS      (representing Mosaic Fertilizer, LLC)**
*Hopping Green & Sams*
P.O. Box 6526
119 South Monroe Street, Suite 300
Tallahassee, Florida 32314



Court Reporter:

     L. Marie Splane, RDR, CRR,
      221 N. Hogan Street, #244
      Jacksonville, Florida   32202
      Telephone:  (904) 616-6942
      Internet:  mariesplane@gmail.com

**P R O C E E D I N G S**

July 1, 2010                                        1:34 p.m.

                           ---

        COURT SECURITY OFFICER:  All rise.  The United

States District Court in and for the Middle District of

Florida is now in session.  The Honorable Henry Lee Adams Jr.

presiding.  Be seated, please.

        THE COURT:  Let's call the case.

        THE CLERK:  Case number 3:10-Cv-564-J-2425 TEM,

Sierra Club, Inc., People For Protecting Peace River Inc. and

Manasota-88 Inc., versus United States Army Corps of

Engineers, et al.  Counsel, please state your appearance for

the record.

        MR. KELSKY:  Brad Kelsky, on behalf of People for

Protecting Peace River Inc. and Sierra club.

        MR. REESE:  Thomas W. Reese for the plaintiffs.

        MS. CUNNINGHAM:  Your Honor, good afternoon.

Collette Cunningham, Assistant United States Attorney here on

behalf of the federal defendants.  With me today I have two

attorneys from the U.S. Army Corps of Engineers, the

Jacksonville Division, Ms. Christina Storz and John Kasbar.

        THE COURT:  Counselor, are you with the local --

with the Middle District?

        MS. CUNNINGHAM:  I'm here in Jacksonville, yes, at

the U.S. Attorney's Office.  The primary responsibility for

 1  this litigation will be with the Department of Justice's

 2  Environment and Natural Resources Division in Washington,

 3  D.C.

 4          THE COURT:  And who will be arguing today on behalf

 5  of the government?

 6          MS. CUNNINGHAM:  Ms. Storz, Your Honor.

 7          THE COURT:  Okay.

 8          MS. CUNNINGHAM:  Thank you.

 9          MR. MATTHEWS:  If permitted, Your Honor, Frank

10  Matthews of Hopping, Green and Sams, hoping and anticipating

11  intervention on behalf of Mosaic Fertilizer LLC in this

12  matter as the permit holder.

13          THE COURT:  That was going to be my first question

14  to the plaintiff, if I could do anything in this case, now

15  that Mosaic has a permit, without Mosaic being a party to

16  this case.

17          MR. KELSKY:  I think they should be -- should be

18  allowed to intervene.

19          THE COURT:  Anything from the government on this

20  issue?

21          MS. STORZ:  The Corps does not object.

22          THE COURT:  Pardon?

23          MS. STORZ:  The Corps does not object to Mosaic

24  intervening.

25          THE COURT:  All right, I'm going to grant your

1  motion, counselor.

2          MR. MATHEWS:  Thank you, sir.

3          THE COURT:  My next question to the plaintiff is why

4  a second suit?

5          MR. KELSKY:  Second suit, Your Honor?

6          THE COURT:  Yes.

7          MR. KELSKY:  The --

8          THE COURT:  This is the second lawsuit that's been

9  filed on the same issue.

10          MR. KELSKY:  As it relates -- well, Your Honor, I

11 represent People For Protecting Peace River and an action in

12 Hardee County that has to do with challenging the development

13 order as being inconsistent with the comprehensive plan.

14 That action is different than the basis of this action.

15          THE COURT:  There is a suit pending here, you may

16 not know about it, but there's a lawsuit pending in my

17 division.

18          MR. REESE:  Yes, sir.

19          THE COURT:  That I think summary judgments have been

20 filed.

21          MR. REESE:  They're separate permits that have been

22 issued.  One was in 2008.

23          THE COURT:  Okay.  So that is -- they are separate

24 cases.

25          MR. REESE:  Correct, they're separate permits.  This

1  one was issued June 14th of 2010, just days ago.

2  THE COURT:  All right.  Let me have the plaintiff

3  tell me why I ought to issue this injunction.

4  Don't fight, guys.

5  MR. REESE:  Just for the record, the lead attorney

6  will be Patrick Gallagher, who is the senior attorney with

7  Sierra Club, but he was not able to be here from San

8  Francisco today.

9  MR. KELSKY:  Your Honor, Brad Kelsky again.  I think

10  it stands to reason that EPA.

11  THE COURT:  Why don't you go to the podium.  I think

12  that might be a little more comfortable, or easier for you.

13  MR. KELSKY:  Thank you.

14  The United States Environmental Protection Agency

15  has been in correspondence with the Army Corps of Engineers

16  for years over the existence of this permit.  There are major

17  environmental concerns that were pointed out to the court

18  that were basically ignored, and some of them are that the

19  Peace River, where -- it entered about where this mine is

20  going to affect, is an aquatic resource of natural interest.

21  The Charlotte Harbor estuary, which is downstream of the

22  Peace River from the mine, has been designated as a estuary

23  of national importance.  They're going to destroy 534 acres

24  of wetlands, 10.7 miles of streams.  There are threatened and

25  endangered species in place that are going to be disturbed by

the mine.  EPA's acknowledged the damage the mine will cause

to the hydrology of the region of the mine; and, you know,

more importantly, EPA issued 101 -- excuse me -- the Corps

issued a 101-page decision basically identifying why this is

not an area -- there is no significant impact in this case.

As a practical matter, we believe that the Corps

violated NEPA and the APA.  There are many reasons, based

upon the -- just the factual background I gave you, why an

environmental impact statement should have been issued.  And

what really belies the fact is that after the issuance of

this permit, the Corps determined that the entire area needed

an environmental impact statement for the region.  We find

that it's basically disingenuous for the court to issue this

permit and then say, you know what, you're right, we need to

adhere to what the EPA is requesting and we need to do a

regional impact study, and it just wasn't done.

We find that it was arbitrary and capricious; we

find that it was not in compliance with the law.  I think the

issues are well briefed by the Sierra Club and the other

plaintiffs.  Unless the court has specific questions, we

think it's well set out why an environmental impact statement

should have been done.  I will point out to the court --

THE COURT:  I think you made some reference to the

fact that this -- this mining is imminent.

MR. KELSKY:  Well, in fact I've been told today by

Mosaic that they've already disturbed 9 acres of wetlands,

and that has occurred since the issuance of the permit.

        THE COURT:  And what day was the permit issued?

        MR. KELSKY:  It was June 14th.

        THE COURT:  When did you get notice of it?

        MR. KELSKY:  I just learned today that the 9 acres

had been impacted.

        THE COURT:  No.  When did you get notice that the

permit had been issued?

        MR. KELSKY:  It was the day after.

        MR. REESE:  Your Honor, there was a delay in getting

the actual Corps determination.  We made a series of

requests, and that is reflected in Patrick Gallagher's

affidavit in this case.  We were asking for copies of the

actual Corps determination document.  It had not been put on

the website for a time period, and we wanted to look at that

before we actually filed, and we have filed a copy of it.

        THE COURT:  But the Corps did indicate to you prior

to -- I read that affidavit and I was -- I don't know why I

was construing that to read that for some reason a decision

was made and you were not told of that decision until a

certain period of time had elapsed.

        MR. REESE:  Correct.  June 14th was when we first

found out about it, and to actually get a copy of the

document took approximately, I think it was approximately a

1  week.

2      THE COURT:  But you knew immediately, almost

3  immediately that the permit had been issued?

4      MR. REESE:  Correct.  And then we immediately

5  started in the process.  We made contact with the Army Corps

6  of Engineers and discussed and let them know that we would be

7  filing a complaint as well as a motion for a temporary

8  restraining order and we needed to collect the affidavits and

9  get the documents that we could file, and we filed them

10 yesterday afternoon.

11     THE COURT:  All right.  And it's your understanding

12 that -- is it Mosaic?

13     MR. REESE:  Mosaic.

14     THE COURT:  Mosaic has disturbed 9 acres since that

15 are point in time?

16     MR. REESE:  That's what Mr. Matthews advised me

17 approximately a half hour ago.  It's been cleared, has not

18 yet been mined, but it's 9 acres of wetlands and it has been

19 cleared.  And absent a temporary restraining order, we

20 anticipate it will be shortly mined.

21     THE COURT:  All right.  Thank you.

22     Let me hear from the defendants.  Why shouldn't I

23 grant a TRO in this case?

24     MS. STORZ:  Your Honor, the Corps believes that the

25 permit in this case was -- was issued in accordance with the

law.  It is based on an extensive administrative record, as
reflected in the decision document for the permit decision.
And the Corps believes that the standard of substantial
likelihood of success on the merits cannot be met without a
review of the administrative record, because that's what the
Corps based its decision upon.

THE COURT:  Can you turn that microphone up some?

MS. STORZ:  I'll stand closer.  Is that better?

I'm sorry about that.

NEPA is not a substantive statute, it is a
procedural statute, and the Corps believes that it did comply
with all proper procedures in issuing the environmental
assessment for this permit decision.

Additionally, the Corps has its own public interest
review factors which are listed in our regulations at 33 CFR,
Part 320.4.  We considered over 20 public interest review
factors in issuing this permit and found that it was not
contrary to the public interest.

The Corps would like an opportunity to further brief
this issue for the motion on -- the motion for preliminary
injunction.  And I think that counsel for Mosaic probably is

1  more prepared to speak to Mosaic's interests in immediate and

2  irreparable harm and the balance of hardship in this case.

3          THE COURT:  Okay.

4          MR. MATTHEWS:  Thank you, Your Honor.  Again, Frank

5  Matthews; I'm with Hopping, Green and Sams.  We're attorneys

6  with Mosaic Fertilizer LLC, and speaking as intervenors in

7  the proceeding.

8          Clearly, we don't believe that the plaintiffs have

9  come close to establishing the justifications for a temporary

10 restraining order.  They cannot establish irreparable harm

11 resulting from a very sequential mining operation, which is

12 what we engage in.  It is a moving building that actually has

13 to be in place in order to extract minerals.  We've done

14 clearing and site preparation at the northernmost portion of

15 it.

16         THE COURT:  Did you get a copy of their --

17         MR. MATTHEWS:  I did, at 6:30 p.m. last night, Your

18 Honor.

19         THE COURT:  Wow, you got it about the same time we

20 did, so that's pretty good.

21         MR. MATTHEWS:  The harm that they claim is simply as

22 if 535 acres of wetlands disappear overnight, and thus they

23 need to rush here to have some injunctive relief questioning

24 the decision that the government has made based on years of

25 application evaluation, thousands of pages of administrative

record, none of which are before you, which would allow you

to claim that the government acted arbitrarily and

capriciously.  That's the standard, of course, that

ultimately they would have to prevail upon.  They would have

to show you that their decisions were effectively an abuse of

law.  It's not so, because of eight years of analysis that

went into it.  They disagree with the result, as they are

entitled.  But, Your Honor, the standard of course is they

have a substantial likelihood of prevailing on finding this

act to be arbitrary and capricious.  They didn't appear below

in a state administrative proceeding that took six days.

That was two years ago.  There was multiple land use hearings

in Hardee County, all going to the same natural resource

implications.  This action that they now take, subsequent to

June 14th, 2011, is utterly unwarranted from an irreparable

harm standpoint, simply based on the affidavit that I believe

you have now in your possession from Mr. Myers, who oversees

the mining operation.  We'll have ample time to adjudicate,

just as you have in the Altman case, which is the one you

referred to previously, based on a schedule of summary

judgment pleadings that will provide you the opportunity to

assess the decision that the government rendered in that

case.  This is --

        THE COURT:  But that's a 2008 case, isn't it?

        MR. MATTHEWS:  Yes, sir.  Totally different in

1 Manatee County, involving 4,000 acres up there.

2           THE COURT:  And we're at the summary judgment stage

3 on that.

4           MR. MATTHEWS:  Yes, sir.

5           THE COURT:  And if this case lasted that long and

6 there is a possibility of irreparable injury, it would be

7 substantial and unrecoverable two years from now, wouldn't

8 it?

9           MR. MATTHEWS:  If one concludes, Your Honor, that

10 those impacts are not reclaimable, mitigable, in terms of the

11 actions that the company takes pursuant to the permit where

12 they have to restore and reclaim the land as they disrupt it.

13 There's a complete schedule of events outlined over years of

14 activity, it doesn't again happen.  We have represented, as

15 Mr. Myers' affidavit reflects, 9 acres of clearing and site

16 preparation.  You have to build a berm around an area before

17 you can even commence any kind of extraction of the material.

18 That's all that's occurred and that's the kind of increment

19 of activity which occurs.

20           In the Altman case the parties agreed to that

21 briefing schedule.  You know, the time associated with when

22 they filed the suit and when adjudication will occur.  There

23 was no injunctive relief, no action of urgency in that case.

24 There should -- and clearly -- be no basis in this record to

25 consider that the caracara, the wood stork, endangered

species, any of the things they allege are not going to occur
in this process of mining for literally years as we progress
over a 10,500 acre site.

So, again, we would be happy to argue on the merits
injunctive relief, but a temporary restraining order, such an
extreme and extraordinary measure, is absolutely unwarranted.
And, again, the record hasn't even been indexed, let alone
presented to you in order for you to conclude it's arbitrary
and capricious.  The two issues they raise to demonstrate
that the government was arbitrary and capricious was a
subsequent decision by the government to consider regional
impacts on a prospective basis going forward.  They therefore
conclude that because they agreed as a matter of public
policy, they may want to look at a large-scale consequence of
future actions, that this action is therefore defective.
Well, this action has been pending for 8 years.  For the
government to conclude that they should stop any action in
this case because of a two- to three-year analysis they
proposed to perform, is kind of anti public policy.  You
should be able to proceed with some degree of repose.

In addition, the whole idea that 100-page
environmental assessment by definition proves that you should
do an environmental impact statement.  Instead, what it
proves is that the government was very thorough and was very
comprehensive and evaluated all of the implications of mining

both on the site and adjacent properties. It would be bad

public policy to tell the Corps, well, because you did a

100-page environmental assessment I'm going to find you at

fault, that would suggest they should have done a two-page

environmental assessment in this property. Clearly

inappropriate.

But, again, thousands of pages of documentation, a

six-day administrative hearing at the state level authorizing

these same impacts, using the same natural resource

parameters, absolutely an absence of justification.

I'll go on to tell you in terms of harm, Your Honor,

in trying to balance equity, one thing that's utterly

omitted -- and there's numerous facts omitted, such as a 1978

programmatic environmental impact statement was conducted.

This is the continuation of a mine that's been in existence

for over 18 years with the same beneficiation processing

plant. This will just be new land feeding that plant. The

only thing that separates this from that prior activity is a

road.

So if there were all of these irreparable harms that

were suffered, that should have been suffered over the last

15 years, because this mining is just continuing the same

kind of landscape over the same area in Hardee County as

opposed to Polk County. So the allegation of irreparable

harm is almost --

1        THE COURT:  But they raised -- they do raise the

2   issue of the condemnation of the existing mine, the mining

3   that's been going on --

4        MR. MATTHEWS:  Yes.

5        THE COURT:  -- and this mine.  Once you add those

6   two or combine those two, I think the argument is that the

7   government didn't consider the damages as a result of both of

8   those.

9        MR. MATTHEWS:  And I would suggest to you, Your

10  Honor, in 1978 when they did a programmatic 2,000 square mile

11  environmental impact statement, this very site was part of

12  that analysis.  In 1981 when they did an environmental impact

13  statement for that Polk County portion of the mine I

14  referenced, this project was considered in that evaluation.

15       In the 100-page environmental assessment that they

16  developed in support of this permit, that cumulative

17  consequence, there's a very good chart I'll show you sometime

18  in the record that shows how reclamation peaked, how mining

19  peaked, and where we are now in terms of that bell curve.  Is

20  the land any more disturbed than it was in 1975, 1985?  These

21  are the allegations of the complaint.  I'm here to tell you,

22  sir, that no.  In fact, the evidence that the Corps

23  elucidated showed you that we peaked in terms of land

24  disturbed versus land reclaimed.  Now, we're on the positive

25  side.  And so all of those acreages, both the ones in Manatee

County, the ones in Polk County, were all evaluated as part

of this decision and is in this administrative record.  You

may again ultimately disagree with the Corps' conclusion, but

not at a TRO stage are we at a position to simply say they

abused discretion and there's a substantial likelihood that

these plaintiffs will prevail.

THE COURT:  You're asking that I deny the TRO?

MR. MATTHEWS:  Yes, sir.

THE COURT:  Allow your company to continue at the

rate it's continuing, it's working?

MR. MATTHEWS:  That's correct.

THE COURT:  And set a hearing on an injunction,

what, 14 days from now?

MR. MATTHEWS:  I certainly think that's a minimum,

Your Honor, but yes, I'm -- clearly that's within your

prerogative.  But yes, I would suggest 30 days, but whatever

dates you would suggest are appropriate.  You have to have

sufficient notice for us to develop this argument and these

facts that are missing.  I mean there's an extraordinary

number of facts that you need to have before you before you

could get to that kind of decision.

THE COURT:  Okay.  Counselor?

MR. REESE:  Tom Reese.  And briefly, the points I'd

like to make is the EIS, environmental impact statement,

looks at past, present and foreseeable future impacts.  And

1  that is a very broad category.

2       THE COURT:  What I'm hearing, that the impact of

3  this additional property, of mining on this additional

4  property was looked at some years ago.

5       MR. REESE:  The study --

6       THE COURT:  And that not only was it looked at, but

7  that was considered by the government in this permitting.

8       MR. REESE:  The Army Corps of Engineers did a very

9  broad, almost Southwest Florida study, it was an area-wide.

10  They were looking at multiple issues that included south of

11  Charlotte Harbor, included Lee County, Collier County, and it

12  did not specifically address the Peace River phosphate mining

13  impacts, which the Corps's announcement after they issued

14  this permit, they announced they're going to do an EIS on

15  phosphate mining impacts in the Peace River, and that's a

16  very specific, much more focused study.  And they need to

17  look at past, present and foreseeable future mining impacts.

18  That's not what that prior areawide, Southwest Florida EIS

19  did.  It was a much more generalized, much larger area.  And

20  the fact that the Corps has made the decision, EPA had

21  recommended for the past two years, ever since the original

22  notice came out in 2007 for this South Fort Meade mine, EPA

23  has been sending letters and comments to the Corps saying

24  that they thought a cumulative impact study, an environmental

25  impact statement looking at cumulative impacts needed to be

done.  What happened is the Corps issued a determination document saying we don't think an EIS is necessary, issued the permit, and then turns around after the permit is out the door and says, okay, now we're going to do a Peace River impact statement on phosphate mining.  But the permit's already been issued.

What we're asking is that we maintain the status quo and --

THE COURT:  But that doesn't say that the law requires that that statement be done, because they agreed to do it eventually at the urging of EPA, does it?

MR. REESE:  It puts them in a position where under the Administrative Procedures Act, how is that not arbitrary and capricious to say, well, the data is there, the EPA asked to us do this.  We agree that EPA has a need to have this Peace River impact statement looking at phosphate mining in the Peace River basin.  They essentially are admitting EPA is correct, but they issued the permit first.  And the purpose of, under NEPA, for impact statements is to get that information before you make the decision.  As counsel for the Corps stated in her comments, it's a procedural document, NEPA is.  It's to get the information to the decision-maker.  And if you make the decision to issue the permit before you do the impact statement, which you say -- are admitting needs to be done, it's backwards.  And that's why we're asking the

court to try to maintain the status quo.  What we're asking

for in the TRO, it's against the Corps and the Corps permit

to mine wetlands.

THE COURT:  How many acres are currently being

mined, not under the new permit, but under the other permit,

if you know?

MR. REESE:  I can find that answer out, but I cannot

tell you --

THE COURT:  Is this a larger number of acres to be

mined that's permitted to be mined under the recent permit?

MR. REESE:  This permit is 534 acres and 10 miles of

streams, and the other permit is generally the same.  I would

not -- I don't know precisely, but it's in that neighborhood.

THE COURT:  And how long do you anticipate it would

take to do this EIS, this environmental impact statement or

study?

MR. REESE:  They generally take a year or more.

Now, the thing is, which is my next point, actually Mosaic,

if the TRO is issued against the Corps with regards to mining

the wetlands, they can mine the uplands.

THE COURT:  Let me take a different route.  What

you're asking me to do is to order the Army Corps of

Engineers to rescind the permit?

MR. REESE:  Correct.

THE COURT:  And to -- that's about all you could get

 1  out of a TRO; is that accurate?

 2          MR. REESE:  Well, it's -- temporary restraining

 3  order would say that the --

 4          THE COURT:  If you can get that.

 5          MR. REESE:  Yes.  And the preliminary injunction

 6  would then direct them to do an EIS.  And in the meantime,

 7  Mosaic can mine their uplands.  And if they prevail, they can

 8  come back and mine the wetlands.  I don't think they're going

 9  to prevail, but they have the right to mine the uplands.

10  What the Army Corps is giving them is the right to mine 534

11  acres of wetlands.  These are headwaters of the Peace River

12  and it's affecting the base flow of the Peace River,

13  affecting the water quality.  There's information with regard

14  to the wetlands, when they are attempted to be reclaimed,

15  whether they function the same.  In fact, EPA's comment to

16  the Corps was basically that in EPA's opinion they had not --

17  Mosaic had not proven they can actually restore the

18  functionality.

19          THE COURT:  All right.  That's it, Counsel.  I'm

20  finished.

21          Let me give this some thought and I'll get something

22  out to you either today or tomorrow on this.  Under either

23  circumstances, a hearing has to be set for preliminary

24  injunction.  And, Counselor, you're asking for 30 days?

25          MR. MATTHEWS:  That would be my suggestion, Your

1  Honor.

2         THE COURT:  And counselors?

3         MR. KELSKY:  We would prefer the 14.

4         THE COURT:  Well, if I can give you the 30 days,

5  Counselor, I will.  I've got to recognize that you just got

6  in this case today and it's no fault of yours.  But, yes, if

7  I can give you the 30 days, I will give you the 30 days.

8         Government got anything it wants to say?

9         MS. STORZ:  No, I don't think so, Your Honor.

10        THE COURT:  All right.  But I'll get something out

11 today or tomorrow on this.  All right?

12        Thank you, folks.  Thank you for coming in.

13        MR. KELSKY:  Thank you, Your Honor.

14        THE COURT:  We're in recess.

15        (Proceedings concluded at 2:03 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3  UNITED STATES DISTRICT COURT)

 4  MIDDLE DISTRICT OF FLORIDA)

 5

 6       I hereby certify that the foregoing transcript is a

 7  true and correct computer-aided transcription of my stenotype

 8  notes taken at the time and place indicated therein.

 9

10

11

12

13                    /s/ L. Marie Splane
                      L. MARIE SPLANE, CRR, RDR, FPR
14                    221 N. Hogan Street, #244
                      Jacksonville, Florida  32202
15

16

17

18

19

20

21

22

23  Certified Realtime Reporter (CRR)

24  Registered Diplomate Reporter (RDR)

25  Florida Professional Reporter (FPR)
```