UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SIERRA CLUB, INC.; PEOPLE FOR
PROTECTING PEACE RIVER, INC.; and
MANASOTA-88, INC.,

     Plaintiffs,

v.                              Case No.: 3:10-cv-564-J-25JBT

UNITED STATES ARMY CORPS OF
ENGINEERS; and ALFRED A. PANTANO,
JR.,

     Defendants.

---

## INTERVENING DEFENDANT, MOSAIC FERTILIZER, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

David B. Weinstein
Fla. Bar No. 604410
weinsteind@gtlaw.com
Kerri L. Barsh
Fla. Bar No. 443840
Kimberly S. Mello
Fla. Bar No. 002968
mellok@gtlaw.com
GREENBERG TRAURIG, P.A.
625 E. Twiggs St., Ste. 100
Tampa, FL  33602
Telephone: (813) 318-5700
Facsimile:  (813) 318-5900

Frank E. Matthews
Fla. Bar No. 328812
frankm@hgslaw.com
Susan L. Stephens
Fla. Bar No. 986836
susans@hgslaw.com
HOPPING GREEN & SAMS, P.A.
123 South Calhoun Street
P.O. Box 6526
Tallahassee, Florida 32314-6526
Telephone: (850) 222-7500
Facsimile: (850) 224-8551

*Counsel for Mosaic Fertilizer, LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

   A.   The South Fort Meade Tract. ..................................................................................... 2

   B.   The degraded condition of the site. ........................................................................... 3

   C.   The critical role of phosphate in the agriculture industry ........................................ 3

   D.   Harm will result if Mosaic is enjoined from mining on the SFM-HC Tract. ....................... 4

   E.   History of phosphate mining in Central Florida and related studies. ................................ 5

   F.   The SFM Hardee County Extension has undergone years of intense scrutiny by
       federal, state, and local agencies. ............................................................................. 6

ARGUMENT ....................................................................................................................... 8

   I.   LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF .......................... 8

   II.   PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS
       ON THE MERITS. ................................................................................................. 9

       A.   There is no likelihood of success in demonstrating that the Corps violated
          NEPA when it determined that an EIS was not required. ........................................... 10

          1.   Plaintiffs cannot demonstrate that the Corps failed to take a hard look
             at cumulative impacts based on concerns raised by the EPA. .............................. 12

          2.   There is no basis for Plaintiffs' claims that the Corps failed to take a
             hard look at mitigation and reclamation. ................................................................. 14

             a)   The Corps properly determined that Mosaic could successfully
                reclaim the wetlands and streams. .................................................................... 15

             b)   The Corps properly determined that the temporary impact to
                wetlands and streams would not be significant. .............................................. 18

             c)   Plaintiffs' oblique reference to the Corps' purported failure to
                consider the effect of the clay settling areas on the sites' hydrology is
                baseless. ............................................................................................................ 18

        d)   The evidence demonstrates that there will be no significant impacts to threatened or endangered species. ............................................................... 19

      3.   The Corps addressed the impacts on neighboring residents. .............................. 20

  B.   Plaintiffs have no likelihood of success on their CWA claims. ................................... 20

      1.   The Corps carefully considered a reasonable range of alternatives with less adverse environmental impacts. ........................................................................ 21

      2.   The Corps' decision not to hold a public hearing was neither arbitrary nor capricious. ............................................................................................................. 23

III.   PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM. ................. 24

IV.   THE BALANCE OF HARDSHIPS WEIGH AGAINST ISSUING A PRELIMINARY INJUNCTION. ........................................................................................ 26

V.   THE REQUESTED INJUNCTION IS NOT IN THE PUBLIC INTEREST. ........... 27

  A.   Devastating effects on the local economy. ..................................................................... 28

  B.   Significant impacts on the agricultural industry and world food supplies. ................ 29

  C.   Negative impacts on the environment. .......................................................................... 30

CONCLUSION ................................................................................................................................. 30

CERTIFICATE OF SERVICE ...................................................................................................... 32

TABLE OF AUTHORITIES

Cases

*Ala. v. U.S. Army Corps of Eng'rs,*
   424 F.3d 1117 (11th Cir. 2005) ............................................................................................. 8

*All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.,*
   887 F. 2d 1535 (11th Cir. 1989) ............................................................................................. 8

*Amoco Prod. Co. v. Vill. of Gambell,*
   480 U.S. 531 (1987) ............................................................................................................... 24

*Bering Strait Citizens For Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,*
   524 F.3d 938 (9th Cir. 2008) ............................................................................................. 9, 12

*C.A.R.E. Now, Inc. v. FAA,*
   844 F. 2d 1569 (11th Cir. 1988) ...................................................................................... 10, 14

*Camp v. Pitts,*
   411 U.S. 138 (1973) ............................................................................................................... 17

*Citizens Alliance to Protect Our Wetlands v. Wynn,*
   908 F. Supp. 825 (W.D. Wash. 1995) ................................................................................... 24

*DeKalb Stone, Inc. v. County of DeKalb,*
   106 F.3d 956 (11th Cir. 1997) ................................................................................................. 9

*Fla. Clean Water Network, Inc. v. Grosskruger,*
   587 F. Supp. 2d 1236 (M.D. Fla. 2008) ................................................................................ 21

*Fla. Keys Citizens Coal, Inc. v. U.S. Army Corps of Eng'rs,*
   374 F. Supp. 2d 1116 (S.D. Fla. 2005) ................................................................................. 14

*Friends of Magurrewock, Inc. v. U.S. Army Corps of Eng'rs,*
   498 F. Supp. 2d 365 (D. Maine 2007) ................................................................................... 17

*Friends of the Payette v. Horseshoe Bend Hydroelectric Co.,*
   988 F.2d 989 (9th Cir. 1993) ........................................................................................... 15, 23

*Fund for Animals, Inc. v. Rice,*
   85 F.3d 535 (11th Cir. 1996) ............................................................................................. 9, 23

*Global Tel*Link Corp. v. Scott,*
   652 F. Supp. 2d 1240, 1247 (M.D. Fla. 2009) ..................................................................... 26

*Heartwood, Inc. v. U.S. Forest Service,*
   380 F. 3d 428, 433-34 (8th Cir. 2004) .................................................................................. 13

*Kleppe v. Sierra Club,*
   427 U.S. 390 (1976) ............................................................................................................... 20

*Masurek v. Armstrong,*
  520 U.S. 968 (1997) ........................................................................................8

*Miccosukee Tribe of Indians, v. S. Fla. Water Mgmt. Dist.,*
  280 F.3d 1364 (11th Cir. 2002),
  *vacated on other grounds and remanded,*
  541 U.S. 95 (2004) ..........................................................................................8

*Monsanto Co. v. Geertson Seed Farms, -- S.Ct. --,*
  2010 WL 2471057, *3 (2010) ........................................................................24

*Mooreforce, Inc. v. U.S. Dep't of Transp.,*
  243 F. Supp. 2d 425 (M.D.N.C. 2003) ..........................................................17

*Nat'l Wildlife Fed'n v. Whistler,*
  27 F.3d 1341 (8th Cir. 1994) ........................................................................21

*North Carolina v. Fed. Aviation Admin.,*
  957 F. 2d 1125 (4th Cir. 1992) ......................................................................12

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,*
  556 F.3d 177 (4th Cir. 2009) ..........................................................................9

*Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,*
  87 F.3d 1242 (11th Cir. 1996) ......................................................................14

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ......................................................................................10

*Shell Oil Co. v. Altina Assoc., Inc.,*
  866 F. Supp. 536 (M.D. Fla. 1994) ..............................................................24

*Sierra Club v. U.S. Army Corp of Eng'rs.,*
  464 F. Supp. 2d 1171 (M.D. Fla. 2006) ........................................................15

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  2005 WL 2090028 (D.N.J. 2005) ......................................................24, 26, 30

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  295 F.3d 1209 (11th Cir. 2002) ....................................................................10

*Sierra Club v. Van Antwerp,*
  526 F.3d 1353 (11th Cir. 2008) ..............................................9, 10, 12, 17, 20, 23

*Tillamook County v. U.S. Army Corps of Eng'rs,*
  288 F. 3d 1140 (9th Cir. 2002) ........................................................................9

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton,*
  433 F. 3d 852, 862 (D.C. Cir. 2006) ............................................................13

*U.S. v. Jefferson County,*
  720 F. 2d 1511 (11th Cir. 1983) ......................................................................8

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ...................................................................................................... 9

*Wetlands Action Network v. U.S. Army Corp. of Eng'rs,*
   222 F.3d 1105 (9th Cir. 2000) ............................................................................... 15, 18

*Winter v. Natural Res. Defense Council,*
   129 S. Ct. 365 (2008) ............................................................................................ 24, 27

Statutes

§ 288.0656, Fla. Stat. .......................................................................................................28

§ 378.202, Fla. Stat. .........................................................................................................27

33 U.S.C. § 1344 ..............................................................................................................10

42 U.S.C. § 4332 ..............................................................................................................10

5 U.S.C. § 706(2) ...............................................................................................................9

Regulations

33 C.F.R. § 230.7 .............................................................................................................10

33 C.F.R. § 320.1 ...............................................................................................................6

33 C.F.R. § 320.4 ....................................................................................................... 19, 20

33 C.F.R. § 327.4 .............................................................................................................23

33. C.F.R. pt. 332 ............................................................................................................14

40 C.F.R. § 1508.7 ...........................................................................................................11

40 C.F.R. § 230.10 ..................................................................................................... 21, 22

40 C.F.R. 1508.9 ..............................................................................................................10

40 C.F.R. pt. 230 .............................................................................................................14

Other Authorities

FDEP Bureau of Mining & Minerals Regulation's Evaluation of Reclaimed and Released
   Mining Parcels, presented to the Peace River Basin Management Advisory Committee
   on September 30, 2009 ...................................................................................................16

Florida Institute of Phosphate Research ............................................................................5

Miller, R.E., and B.E. Gunsalus, Wetland Rapid Assessment Procedure (WRAP)
   Technical Publication REG-001 (1997) .........................................................................14

INTERVENING DEFENDANT, MOSAIC FERTILIZER, LLC'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

Intervening defendant, Mosaic Fertilizer, LLC. ("Mosaic"), files this memorandum of law in opposition to Plaintiffs' Motion for Preliminary Injunction ("Motion").

<u>INTRODUCTION</u>

Plaintiffs' request the drastic remedy of an injunction based on a false premise: that phosphate mining conducted with current technology, best practices, and the specific conditions imposed by the subject permit destroys the environment. Plaintiffs' papers obfuscate the true facts and deliberately paint a distorted picture that ignores controlling precedent. Their overzealous efforts to halt mining are based on documents that Plaintiffs have "cherry picked" in an attempt to advance their agenda. Plaintiffs ignore the intense scrutiny undertaken at the local, state, and federal levels—which spanned over seven years—before the necessary permits were issued to Mosaic to mine on South Fort Meade Hardee County Extension ("SFM-HC"). The United States Army Corps of Engineers ("Corps") itself reviewed an estimated 100,000 pages of documentation. Based on this rigorous and exhaustive review, the Corps determined that Mosaic's mining activities would not have significant environmental consequences to the Peace River Watershed.

The mere fact that Plaintiffs disagree with the Corps' conclusion, however, does not entitle them to disrupt the federal government's robust regulatory regime with an unsubstantiated request for injunctive relief. The evidence demonstrates that environmental impacts can and will be sufficiently avoided or minimized and mitigated by Mosaic's protective mining and extensive Mitigation Plan. As a result, sensitive habitat will be avoided by mining and preserved by a perpetual conservation easement and areas disturbed by mining will be reclaimed, including compensatory wetlands mitigation to more than offset the functional values currently provided. Thus, wetlands and streams that have already been severely degraded by

decades of agricultural activities will be replaced by functioning wetlands and streams established on reclaimed landforms. Contrary to Plaintiffs' false assertions of irreparable harm, Mosaic's Mitigation Plan will have long-term environmental benefits. Perhaps even more troubling than Plaintiffs' disregard of these facts is that they ignore the devastating and far-reaching consequences that will result if a preliminary injunction is issued. These consequences extend far beyond the economic harm that will be sustained by Mosaic: Hundreds of Florida citizens will lose their jobs, charities will be forced to cut programs and services, local governments and businesses will lose millions of dollars of revenue, and others who rely on Mosaic's operations for their livelihood will also suffer serious harm.

Other harm will result nationally and beyond. Plaintiffs fail to disclose the critical fact that phosphate is a limited natural resource for which there is no substitute. The fertilizers manufactured with phosphate extracted from rock mined by Mosaic are essential for the world's food supply. Plaintiffs also fail to mention that phosphate rock from the South Fort Meade mine represented almost 20% of the total U.S. production. If Mosaic is enjoined from mining these reserves it could result in product shortages and price increases that would damage farmers and consumers and ultimately impact world food supplies. Thus, what Plaintiffs are asking this Court to do would be extraordinarily harmful. Plaintiffs' request for a preliminary injunction must be denied.

<u>STATEMENT OF FACTS</u>

**A.** The South Fort Meade Tract.

The South Fort Meade ("SFM") Tract was acquired by a predecessor of Mosaic in 1995, and it is comprised of two tracts: 17,508 acres located in Polk County ("Polk Co. Property") and 10,856 acres located in Hardee County, Florida ("Hardee Co. Property"). [MFR2 at 1-1 and 1-57]. Under the SFM mine plan, extraction of phosphate rock first commenced on the Polk Co. Property, to be followed by mining on the Hardee Co. Property as Polk County reserves were

Greenberg Traurig, P.A.

depleted. [MFR2 at §§ 1.0 and 1.3.2; Rahm Decl. ¶7]. Consistent with this plan, extraction of phosphate rock began on the Polk Co. Property in the mid-1990's and it is now substantially complete. *Id.* In fact, as of May 31, 2010, three of the four draglines[1] have exhausted the available reserves and the remaining dragline is extracting minimal rock from low-yield reserves. [MFR2§ 1.0; *Id.* ¶10]. In an effort to ensure continuous and efficient production from the SFM mine, Mosaic began the permitting process in 2003 to extend mining into the SFM-HC tract.[2]

B.     The degraded condition of the site.

The wetlands, streams, and uplands on the SFM-HC Tract have been severely disturbed by agricultural activities that have been ongoing since the 1940's. As a result of these activities, the wetlands and streams are of generally low quality. [Cantrell Decl. ¶¶6, 8; BiOp at 71]. In fact, the Deputy Director for the Division of Water Resource Management of the Florida Department of Environmental Protection ("FDEP") during the SFM-HC permitting process described the streams that will be disturbed by mining as some of the "most polluted streams" with sedimentation in Central Florida. [Cantrell Decl. ¶7, Environmental Assessment ("EA") at 7 (over 75% of the property has been converted to agricultural use)]. Consequently, the biological function of these streams has been severely affected and they are adversely impacting other surface waters. [Cantrell Decl. ¶7]. The reclamation authorized in the Permit will restore and improve the function of these currently degraded systems. [*See* MIT2 generally].

C.     The critical role of phosphate in the agriculture industry.

Phosphate—essential for plant growth, crop production, and livestock health—is a limited resource for which there is no substitute. [MFR2 at 1-43]. Most of the world's food supply is derived from crops that have been nourished with manufactured fertilizer, in which phosphate is a critical component. *Id.* Without sufficient resources to mine, the U.S.'s supply of

---

[1]     Draglines are massive six story earth moving machines used to excavate the phosphate rock from the site.

[2]     Mine extensions, such as SFM-HC, are simply a geographic expansion of an already existing previously permitted mine.

phosphate would be severely constrained, potentially resulting in substantial price increases and reduced crop production for food supplies. Fertilizers are responsible for between 40 and 60 percent of the world's food supply.[3] Only a limited number of mineable phosphate reserves exist in the U.S., with Central Florida having most economically accessible phosphate reserves. [MFR2 at 1-47].

Mosaic—the world's leading producer of phosphate-based crop nutrients and animal feed ingredients—plays a vital role in this process. Mosaic conducts all of its U.S. phosphate rock mining activities in Central Florida, where it currently operates five mines. [MFR2 at 1-47]. In fiscal 2009, Mosaic's phosphate rock production accounted for approximately 48% of North American production and it produced 58% of the U.S.'s finished phosphate products. [Myers Decl. ¶¶5-6]. Phosphate rock produced from Mosaic's SFM-HC mine represents approximately 18% of U.S. phosphate production. [Rahm Decl. ¶9].

**D.** Harm will result if Mosaic is enjoined from mining on the SFM-HC Tract.

If mining on the SFM-HC Tract is enjoined, it will have far-reaching, devastating consequences. Not only will it cause economic consequences for Mosaic, but over 200 Mosaic employees will lose their jobs, resulting in profound harm to themselves and their families. [Rahm Decl. ¶11(a)]. Additionally, the lack of sufficient phosphate rock could result in closure or production curtailment at one of Mosaic's fertilizer production plants exacerbating job losses and causing further harm. [Rahm Decl. ¶11(c); MFR2 at 2-13].

The impacts, however, are not limited to Mosaic and its employees. Because phosphate is a limited resource, the inability to mine at SFM-HC would cause a significant reduction in global annual phosphate rock production, which could ultimately influence global fertilizer markets creating product shortages and price increases that would damage the U.S. farmers and

---

[3]      CRA International, August 2009, Economic Contributions of the U.S. Fertilizer Manufacturing Industry; *see also* Declaration of M.M. Alley.

potentially impact world food supplies. [MFR2 at 1-48; Rahm Decl. ¶¶ 11(f)12; Vroomen Decl. ¶9].

Finally, an injunction would negatively affect Hardee County, its citizens, and others. [*See* Albritton Decl. and numerous other non-parties]. Mining operations at SFM-HC would provide over 100 jobs to Hardee County citizens and generate substantial revenue for the county and local businesses. [Albritton Decl. ¶9]. In addition, Mosaic has committed in excess of $42 million over a 10-year period for funding of infrastructure and economic development in Hardee County, predicated on Mosaic's ability to mine there. [*Id.* ¶6]. This funding and the tax revenue generated from Mosaic's business is vitally important to Hardee County, which has been designated by the Florida Legislature as a Rural Area of Critical Economic Concern. [*Id.* ¶3(a)]. Others will also suffer adverse consequences if an injunction were issued including Mosaic's suppliers, contractors, transportation providers and others who rely on the SFM mine's operation for their livelihood.[4]

**E.** History of phosphate mining in Central Florida and related studies.

Mining has occurred in Central Florida since the 1880's. [Myers Decl. ¶3(a)]. Over time, practices have significantly improved with advancements in technology and the implementation of extensive local, state, and federal regulation.[5] These laws were enacted to protect against adverse environmental impacts. In addition to regulatory safeguards, there is a long history of studies involving the impacts of phosphate mining in the region.[6] One of the earliest comprehensive studies was a 1978 area-wide environmental impact assessment prepared for the Central Florida Phosphate Mine District ("CFPMD"). [App. F]. This study encompassed

---

[4] *See* Notice of Filing Declarations of Mosaic Fertilizer, LLC's vendors, suppliers, and contractors, filed contemporaneously with this Memorandum.

[5] Wetland reclamation was not required until 1975 and isolated wetlands were not reclaimed until the mid-1980's. [EA at 48].

[6] *See* Florida Institute of Phosphate Research.

approximately 2,000 square miles in Polk, Hillsborough, Manatee, Sarasota, Hardee, and DeSoto counties, and included the SFM-HC Tract. [EA at 4]. Detailed discussion of cumulative impacts of mining within the CFPMD was included in this assessment.

Most recently, FDEP and the Southwest Florida Water Management District ("SWFWMD") prepared a Peace River Cumulative Impact Study ("PRCIS") that assessed all major factors influencing water quality, water supply, and wetlands from key stressors, including urbanization, agriculture, mining, and climatic changes. [App. G; MFR2 § 1.2.2.2]. The PRCIS determined that impacts on the Peace River Basin from mining are largely historical, and that current data suggests that cumulative impacts from historical mining are now being reversed, given the protections associated with current mining practices and the success of modern reclamation efforts. Since the PRCIS was issued, FDEP has continued to assess stressors on the Peace River Watershed and implement measures to ensure that water quality and supply is maintained. The Corps considered this regional, comprehensive study during its permit decision-making process. [EA at 98].

**F.** The SFM Hardee County Extension has undergone years of intense scrutiny by federal, state, and local agencies.

Mosaic's SFM-HC has undergone years of intense evaluation and scrutiny by federal, state, and local agencies (the "agencies").[7] [MFR2 §§ 1.0, 1.4, and 1.5]. Three years before the Joint Permit Application ("Permit Application")[8] was filed in October 2006, multiple meetings were held with the agencies, Mosaic, and its consultants to address environmental issues. [EA at 2]. After the Permit Application was filed, the FDEP undertook a two-year analysis of the project, which included consideration of Mosaic's agreement to eliminate and reduce potential

---

[7]     Beginning in 1999, long before the Permit Application was filed, Jurisdictional Determinations for SFM-HC were issued by the Corps that determined which portion of the property it had jurisdiction to regulate. *See* 33 C.F.R. § 320.1(a)(6).

[8]     Joint Application for Environmental Resource Permit ("ERP") and Federal Dredge and Fill Permit (Oct. 16, 2006).

impacts together with its ability to successfully mitigate them. When FDEP announced its decision to issue the permit, Lee and Sarasota Counties instituted an administrative challenge resulting in a two-week hearing with more than 25 witnesses, including multiple experts and thousands of pages of exhibits. The Administrative Law Judge ("ALJ") ruled against the counties, and FDEP subsequently issued the Environmental Resource Permit ("ERP") on February 27, 2009.[9] Public hearings were also held at the local level with additional expert testimony regarding potential mining impacts, the outcome of which was the local government's approval.

The Corps was well aware of the extensive scrutiny of SFM-HC by the state and local agencies and made this information part of its review. [EA at 2-5; 3, Exh. 17]. The Corps also completed its own independent three and a half year analysis of the project. During this process, the Corps considered extensive scientific data and studies relating to potential mining impacts, [EA at 2-5, 61],[10] conducted site visits, and held over forty meetings. [Uebelhoer Decl. ¶6]. These involved Mosaic and various agencies, including the Corps, the U.S. Environmental Protection Agency ("EPA"), and the U.S. Fish and Wildlife Service ("FWS"). [EA at 3, ¶ (10), 39]. The subject of these meetings included the 404(b) guidelines, alternatives, stream assessment methodology, wetland and stream mitigation planning, and endangered species. [EA at 5, 29-30].

After these comprehensive reviews, on June 14, 2010, the Corps issued the Permit to Mosaic under Section 404 of the CWA. [App. B]. The Permit has six attachments, which include 2,532 pages of drawings and supporting information demonstrating the detailed review

---

[9] The Final DEP Order, which adopted the ALJ's findings, was affirmed by Florida's Second District Court of Appeal.

[10] Examples of scientific data and analyses considered and evaluated by the Corps include FDEP & SWFWMD, Peace River Cumulative Impact Study (2007); SWFWMD, Peace River Comprehensive Watershed Management Plan (1999 & 2001); SWFWMD, Florida River Flow Patterns and the Atlantic Multidecadal Oscillation (2004); SWFWMD, Southern Water Use Caution Area Strategy), and the Charlotte Harbor National Estuary Program's (CHNEP) Comprehensive Conservation and Management Plan (CCMP).

undertaken by the Corps. Under the Permit, Mosaic will disturb 534.4 acres of low quality wetlands and 56,661 feet of linear streams and ditches, while avoiding 73% of the site's wetlands and 65% of the site's streams. [MFR2 at Tables C-83, 103, and 115]. As mitigation, Mosaic will create 70.9 acres of herbaceous wetlands, 310.3 acres of forested wetlands, 61,016 linear feet of natural stream channels. [EA at 62; Permit at 1]. The Permit also requires permanent conservation easements that will protect and preserve over 2,500 acres of wetlands, uplands, and riparian buffers. [Permit at 1].

<u>ARGUMENT</u>

## I.  LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

To obtain preliminary injunctive relief, Plaintiffs must demonstrate (1) a substantial likelihood of success on the merits; (2) irreparable injury unless the injunction issues; (3) that the threatened injury outweighs the threatened harm the injunction might cause the defendant; and (4) that the injunction would not be adverse to the public interest. *Ala. v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127-28 (11th Cir. 2005). A preliminary injunction will not issue unless the movant establishes each of the four requirements. *Masurek v. Armstrong* 520 U.S. 968, 972 (1997); *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc*, 887 F. 2d 1535, 1537 (11th Cir. 1989). Because preliminary injunctive relief is an "extraordinary and drastic remedy," Plaintiffs' right to relief must be clear and unequivocal. *U.S. v. Jefferson County*, 720 F. 2d 1511, 1519 (11th Cir. 1983). Indeed, the Eleventh Circuit has stated that "there is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case than . . . issuing . . . an injunction." *Miccosukee Tribe of Indians, v. S. Fla. Water Mgmt. Dist.,* 280 F.3d 1364, 1371 (11th Cir. 2002), *vacated on other grounds and remanded*, 541 U.S. 95 (2004).

Here, Plaintiffs have utterly failed to meet their heavy burden on any element. The Corps' actions were anything but arbitrary and capricious, no irreparable harm has been

established, and the consequences of a preliminary injunction would be far-reaching and devastating. Consequently, Plaintiffs' request that this Court substitute its judgment for that of Corps and invoke the drastic remedy of a preliminary injunction must be denied. *See e.g., Tillamook County v. U.S. Army Corps of Eng'rs,* 288 F. 3d 1140 (9th Cir. 2002) (affirming denial of preliminary injunction based on its finding that an EIS was not necessary); *Bering Strait Citizens For Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,* 524 F.3d 938 (9th Cir. 2008) (same); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,* 556 F.3d 177 (4th Cir. 2009) (vacating orders rescinding permits and enjoining activity under the permits where, among other things, the compensatory mitigation plans were sufficient under NEPA and CWA).[11]

## II. PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.

In determining whether Plaintiffs have demonstrated a "substantial likelihood of success on the merits," one overarching principle must guide all aspects of this Court's review: "Federal courts must not usurp the roles of agencies." *DeKalb Stone, Inc. v. County of DeKalb,* 106 F.3d 956, 960 (11th Cir. 1997). A reviewing court is only permitted to set aside a Corps' decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). A court cannot reweigh the evidence or "substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action." *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 542 (11th Cir. 1996). The Eleventh Circuit has held that this standard of review is "exceedingly deferential." *Sierra Club v. Van Antwerp,* 526 F.3d 1353, 1360 (11th Cir. 2008) (emphasis added).

---

[11]    Injunctive relief is not the sole means to ensure compliance with environmental statutes. Requiring compliance with permit conditions, or imposing penalties or fines for violations of environmental laws or the permit can also achieve the same objective. *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 309-310, 320 (1982).

**A.** There is no likelihood of success in demonstrating that the Corps violated NEPA when it determined that an EIS was not required.

The Corps is charged with implementing the CWA permit process to ensure that discharges of any dredged or fill material into navigable waters will not have an unacceptable environmental impact. 33 U.S.C. § 1344. Before the Corps can take action on a permit application, it must follow procedures established by NEPA. Importantly, NEPA only requires the Corps to follow specified procedures; it does <u>not</u> mandate a particular substantive result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("NEPA itself does not mandate particular results, but simply prescribes the necessary process."); *Sierra Club v. Van Antwerp*, 526 F. 3d 1353, 1360 (11th Cir. 2008).

Under NEPA, agencies are usually required to prepare an EA containing sufficient evidence and analysis to determine whether the project's effect on the human environment is significant. 40 C.F.R. 1508.9(a). The EA will either (i) conclude that an EIS is necessary because the proposed project significantly affects the quality of the human environment; or (ii) make a finding of no significant impact ("FONSI"), in which case, no further study of environmental consequences is necessary. 42 U.S.C. § 4332. Moreover, even if the agency finds an impact of true significance, an EIS is still not required if the agency finds that changes, safeguards, or mitigation in the project sufficiently reduce the impact to a minimum. *Id.; C.A.R.E. Now, Inc. v. FAA*, 844 F. 2d 1569, 1575 (11th Cir. 1988). The Corps' regulations clearly state that an "EIS is not always mandatory," and that "most permits will normally only require an EA." 33 C.F.R. § 230.7(a) (emphasis added).

Plaintiffs' contention that the Corps acted arbitrarily and capriciously when it decided not to prepare an EIS is baseless.[12] The Corps took a "hard look" at the potential impacts based

---

[12] This Court cannot find that the Corps' decision is arbitrary and capricious under "hard look" review unless it determines that (i) the decision does not rely on the factors that Congress intended the Corps to consider; (ii) the Corps failed entirely to consider an important aspect of the problem; (iii) the Corps offered an explanation which runs counter to the evidence; or (iv) the decision is so implausible that it cannot be the result of differing viewpoints or the result of the Corps' expertise. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002)

on an evaluation of the past, present, and reasonably foreseeable future actions and considered Mosaic's comprehensive Mitigation Plan before determining that an EIS was not required.[13]  40 C.F.R. § 1508.7.  [EA at 96].  The Corps considered and evaluated extensive research, published materials, and data from various sources, including opinions challenging the scientific basis of the Corps' conclusions.  [EA at 2-5 (noting response to Protect our Watersheds Comment Letter), 6, 10-18; MFR2, §7].[14]  All resources that could potentially be affected were evaluated, with an emphasis on water quality,[15] hydrology, and fish and wildlife habitat.[16]  [EA at 40].  The Corps' EA identifies 49 documents and 27 informational graphics—many of which contain thousands of pages of information—as "among those considered, reviewed, and independently evaluated."  Of critical importance to the Corps was Mosaic's extensive and comprehensive Mitigation Plan, which will not only minimize impacts, but will provide long-term environmental benefits.[17]  [MFR2; MIT2, EA at 2-5, 101].  Based on these facts, there can be no doubt that the Corps took the requisite "hard look" when it determined that the "cumulative and secondary impacts would not be significant."

---

[13]    The Corps conducted its cumulative impact analysis based on the timeframe from July 1, 1977 to 2028, the date when all physical mitigation, reclamation, and mitigation efforts associated with SFM-HC are projected to be completed.  [EA at 39].

[14]    *See supra* fn. 7.

[15]    The Corps reviewed modeling data before concluding that Mosaic has "quantitatively demonstrated no measureable disruption of surface and groundwater cycles will result" from the proposed SFM-HC mine.  [EA at 54].  Modeling was provided by Mosaic as well as an integrated surface and groundwater model developed by the University of South Florida's Center for Modeling Hydrologic and Aquatic Systems.

[16]    In addition, the Corps reviewed multiple studies before finding that the SFM-HC would pose no significant adverse impacts to fish and wildlife habitat.  [EA at 56-58 (referencing, *e.g.*, two studies, one conducted by the Florida Audubon Society, concluding that active clay settling areas are "critically important feeding, resting and overwintering stops for migrating shore birds and ducks")].

[17]    After initially submitting its Mitigation Plan on November 5, 2009, Mosaic responded to multiple requests for additional information and made revisions to the Mitigation Plan based on those exchanges.  *See* Mitigation Plan (Nov. 5, 2009); Mitigation Plan Revision No. 1 (Jan. 4, 2010); Mitigation Plan Revision No. 2 (March 11, 2010); Clarifications to Mitigation Plan Revision No. 2, Figure E-7 (Apr. 7, 2010); Revisions to Mitigation Plan Revision No. 2, pp. 6-1, 6-30, 6-31 and 12-2, Figure C-4 and Table C-59 (Apr. 15, 2010); Clarification to MFR Revision 2 and Mitigation Plan Revision 2, Fourth Re-Issue Appendix C-23 (Apr. 16, 2010).

Given this comprehensive analysis, an EIS simply would not change the results reached under this EA that "this permit action will not have a significant impact on the quality of the human environment." [EA at 96]. As a matter of policy, since 1978, EIS's have typically been prepared for new mines and EA's for extensions of existing mines, like the SFM-HC.[18] [App. F, Vol. I at 2.5]. This is justified, in part, because a new mine, including a beneficiation plant, is a more extensive undertaking with more potential impacts than a mine extension. Therefore, the Corps' decision to prepare an EA is not only supported by law, but is consistent with past agency practices. Indeed, the Eleventh Circuit mandates that an agency's decision regarding the preparation of an EIS be accorded "substantial deference." *Antwerp*, 526 F.3d at 1361.

        **1.**        **Plaintiffs cannot demonstrate that the Corps failed to take a hard look at cumulative impacts based on concerns raised by the EPA.**

Despite, the Corps' "hard look" at the cumulative impacts, Plaintiffs assert that EPA's concerns, standing alone, establish that an EIS should have been prepared.[19] Nothing could be further from the truth. In making these assertions, Plaintiffs disingenuously ignore the following: (1) EPA's concerns were addressed in detail by the Corps and Mosaic, and (2) the EPA decided not to elevate the matter to headquarters for further review, which would have held the permit in abeyance.[20] [MFR 2, § 5]. In fact, the Corps had no legal obligation whatsoever to determine that an EIS was required based on EPA's concerns.[21] *See Bering Strait Citizens,* 524 F. 3d at 957 (the fact that EPA disagreed with Corps' mitigation assessment does

---

[18]     The comprehensive record reviewed by the Corps included a 1978 Areawide EIS Land Use Classification. [EA at 4, ¶ 41].

[19]     EPA raised concerns regarding cumulative impacts in three of the six letters sent during the Corps' review of the Permit Application for the SFM-HC.

[20]     *See* Memorandum of Agreement, Part IV, § 1 available at www.epa.gov/wetlands/regs/dispmoa.html (last visited July 14, 2010).

[21]     Under the regulations, one of the considerations in determining whether an EIS should be required is "the degree to which the effects on the quality of the human environment are likely to be highly controversial." However, the law is clear that the term "controversial" is not synonymous with opposition. *See North Carolina v. Fed. Aviation Admin.,* 957 F. 2d 1125, 1133 (4th Cir. 1992).

not create a substantial issue requiring an EIS); *Greater Yellowstone Coalition*, 359 F. 3d at 1257 (concerns raised by EPA on project's impact and a report relied upon by the Corps did not obligate the Corps to conduct an EIS).

Nor is there any merit to Plaintiffs' argument that an EIS should have been prepared because the Corps recently has indicated in June of 2010 that it would "scop[e] and develop. . . a regional EIS for mining activities in South Florida."[22] This decision to undertake at some point in the future a regional EIS of yet undetermined scope does not support a finding that an EIS was previously required for SFM-HC, for which Mosaic began the permitting process in 2003.

Plaintiffs' reliance on the EPA letters is nothing more than Plaintiffs "grasping at straws" in an attempt to undermine the Corps' decision. The EPA letters do not demonstrate that mining the SFM-HC will significantly affect the quality of the human environment requiring an EIS. In fact, the EPA has never disagreed with the Corps' determination that there would be no significant impacts as a result of mining from this Permit. To find that an EIS was required based solely on such correspondence would improperly ignore the voluminous record and the Corps rigorous analysis. Moreover, the Corps was clearly aware of EPA's interest in an AEIS before it issued the Permit, and reasonably elected to make its decision without it. Instead of focusing on the massive record supporting the Corps' decision, Plaintiffs have improperly relied on isolated comments by EPA. This tactic ignores the law, is disingenuous, and is directly contradicted by the overwhelming evidence supporting the Corps' determination that an EIS was not required.[23]

---

[22] The first session on the AEIS is scheduled to occur with regulators later this month. A summit that will include regulators, elected officials, NGO's, industry and the public is scheduled for October 6-7, 2010.

[23] Plaintiffs' claim that the comprehensiveness of the EA demonstrates that an EIS was required is meritless. *See TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F. 3d 852, 862 (D.C. Cir. 2006) (length of EA has no bearing on the necessity of an EIS); *Heartwood, Inc. v. U.S. Forest Service*, 380 F. 3d 428, 433-34 (8th Cir. 2004) (same).

    **2.**    There is no basis for Plaintiffs' claims that the Corps failed to take a hard look at mitigation and reclamation.

When mitigation measures compensate for otherwise adverse environmental impacts, the threshold level of significant impacts is <u>not</u> reached, and an EIS is <u>not</u> required. *C.A.R.E. Now, Inc. v. FAA*, 844 F.2d 1569, 1575 (11th Cir. 1988). Importantly, because environmental impacts are obviously a technical matter within the agency's expertise, the Corps' determination must be afforded substantial deference. *Fla. Keys Citizens Coal, Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1155 (S.D. Fla. 2005). The Eleventh Circuit has held if the Corps has considered the impacts, the mitigation plan, and reasonably concluded that impact would not be significant, its decision is not arbitrary and capricious. *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1248 (11th Cir. 1996). That is exactly what the Corps did in this case.

Specifically, the Corps determined that the SFM-HC project would result in no net loss of wetland functions and values and, consequently, complies with the Corps' wetland policy. 33. C.F.R. pt. 332; 40 C.F.R. pt. 230, subpt. J; E.O. 11990 (May 24, 1977); [EA at 56, 62]. Mosaic's plan, which the Corps accepted, follows the Corps' Wetland Rapid Assessment Procedure ("WRAP"), a Corps-accepted aquatic site assessment technique that provides a functional capacity estimate for the wetlands to be mined and the proposed wetlands to be created resulting in greater wetland functioning after reclamation. [MFR2 at C-38; 6.2.9.; EA at 18, 56]; *see also* Miller, R.E., and B.E. Gunsalus, Wetland Rapid Assessment Procedure (WRAP) Technical Publication REG-001 (1997); *Florida Keys Citizens Coal., Inc.,* 374 F. Supp. 2d at 1156-57 (Corps' assessment of wetland impacts was supported where it relied on Estuarine WRAP). The Permit also requires permanent conservation easements to preserve and protect more than 2,500 acres of wetlands, uplands, and riparian buffers. [Permit at 31-35].

In addition to wetlands mitigation, Mosaic has designed a ACOE reviewed and approved stream mitigation plan to more than offset any temporal loss of stream function and to maintain

or improve the functions of jurisdictional waters of the U.S., including wetlands. [MFR2 at §6.1]. All of the stream channels will be built and sized, with corresponding buffers, according to applicable performance standards. For every foot of stream disturbance, Mosaic will establish 1.08 linear feet of stream mitigation, for a total of 61,016 linear feet of stream channels. [MFR2 at 1.28; Map C-28]. Mosaic will also protect, by means of a conservation easement, an additional 20 miles of stream reaches and adjacent buffers. [*See* MFR2 at §6-1; tbls. C-103, C-115].

The Corps also imposed special conditions specifying compliance timelines and thresholds as well as detailed criteria to ensure successful mitigation of the streams and wetlands. [*See* MFR2 §6-1; EA at 82-88]; s*ee Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993) (Corps did not act arbitrarily or capriciously when it required applicant to implement mitigation plan that would create new wetlands and also required monitoring and supplemental mitigation measures if goals were not met); *Sierra Club v. U.S. Army Corp of Eng'rs.*, 464 F. Supp. 2d 1171, 1207 (M.D. Fla. 2006); *Wetlands Action Network v. U.S. Army Corp. of Eng'rs*, 222 F.3d 1105, 1121-22 (9th Cir. 2000) (noting that special conditions ensured mitigation goals would be met).

Based on this mitigation and reclamation, the Corps found that there would be no "net loss to wetlands" and that the streams would be replaced on a foot for foot basis. [EA at 62]. Additionally, "[u]pon completion of the reclamation, the functional habitat of the SFM-HC tract will increase on the order of 40 percent when compared to current conditions." [MIT2 at 6-9].

<blockquote>

a)     The Corps properly determined that Mosaic could successfully reclaim the wetlands and streams.

</blockquote>

Despite the planned mitigation and reclamation, Plaintiffs nevertheless claim that Mosaic's ability to reclaim streams and wetlands is uncertain and controversial. [Motion at 13-15]. That is false. The overwhelming evidence considered by the Corps squarely demonstrates otherwise. [EA at 43-44, 54-55, 56-58, 62; MIT2, §6.3]. Among other things, the Corps noted

that "of the 36,400 acres of native cover present prior to mining," 30,625 acres have been successfully reclaimed in the Peace River Basin. [EA at 44]. The Corps further found that "the rate of reclamation and mitigation now essentially equals the rate of mining on a basin-wide cumulative basis, such that the acreage of land in mining is relatively constant" and that the "total acreage of mined land not yet reclaimed and mitigated has been decreasing steadily since 1993." [EA at 48-49]. The Corps determined that Mosaic can and will reclaim the wetlands and streams on at least a foot for foot basis relying on the Mitigation Plan and Mosaic's history of reclamation success. [MIT2 at 6-4, 6-8, 6-21-6-22]. Most of the streams to be impacted are less than three to four feet wide and one foot or less deep and flow only intermittently or seasonally. [MFR2, §1.2.1.3]. In fact, because of the already degraded condition of this site from agricultural activities, Mosaic's proposed Mitigation Plan, which includes preservation, creation, and enhancement of the site, is more than sufficient to offset the unavoidable environmental impacts, and will actually benefit the environment. [Cantrell Decl. ¶¶18-20].

In fact, Mosaic has received numerous awards for its past successes. [MFR2; MIT2 § 6-32-6-35]. Both experts and FDEP have acknowledged Mosaic's successful implementation of advanced and innovative reclamation technologies and techniques. [MFR2; MIT2 § 6-32-6-33; EA at 49, 51, 55; Cantrell Decl. ¶¶13, 18, 20]. In fact, a recent evaluation by FDEP confirms the effectiveness of Mosaic's state of the art reclamation techniques.[24] [Cantrell Decl. ¶¶13, 18, 20].

The only materials Plaintiffs submit to attempt to refute this evidence are (1) an affidavit filed by a purported expert retained by Plaintiffs after the Permit was issued; and (2) FDEP Rate of Reclamation Report—July 1, 1975 - December 31, 2008 ("ROR"). Plaintiffs' position that these documents demonstrate that reclamation is highly uncertain borders on the absurd, and is nothing more than a continued attempt to create a new record. *See Camp v. Pitts*, 411 U.S. 138,

---

[24] *See* FDEP Bureau of Mining & Minerals Regulation's Evaluation of Reclaimed and Released Mining Parcels, presented to the Peace River Basin Management Advisory Committee on September 30, 2009, available at http://www.dep.state.fl.us/water/mines/docs/prbmac/wetlandeval.pdf.

142 (1973) ("focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").

First, Plaintiffs' self-serving expert declaration that the Corps did not possess at the time of its decision should be given little, if any, credence. *See Van Antwerp*, 526 F. 3d 1353 (11th Cir. 2008) (refusing to allow supplementation with evidence not available to the agency when it prepared its record of decision). Not only was it clearly prepared solely for this litigation, but it completely ignores the record facts and analysis done by the Corps. *See Mooreforce, Inc. v. U.S. Dep't of Transp.*, 243 F. Supp. 2d 425 (M.D.N.C. 2003) (noting that expert affidavit that did not rely on a review of the administrative record did not offer sufficient evidence that agency had abused its discretion). Indeed, it does not appear that Plaintiffs' purported expert visited the SFM-HC, conducted wetland assessments on the site, or is knowledgeable about or knows of the actual site conditions. Nevertheless, Plaintiffs hope that his uninformed opinions of questionable credibility will support their unfounded contention. It should not. Otherwise, the Corps' careful evaluation and reasoned conclusions that an EIS was not required "would be for naught . . . by simply filing suit and supplying an affidavit by a hired expert . . . reaching a different conclusion." *See Friends of Magurrewock, Inc. v. U.S. Army Corps of Eng'rs*, 498 F. Supp. 2d 365, 376 (D. Maine 2007).

Second, Plaintiffs' use of the ROR is entirely misleading. Historically, FDEP has required complete reclamation of an entire reclamation unit prior to release.[25] This precludes the release of areas that are already reclaimed but are part of reclamation units where active mining operations are occurring (*e.g.*, clay settling areas, transportation corridors and mining infrastructure). For these active mining sites, of which Mosaic has several, release occurs at the end of the life of the mine. Contrary to Plaintiffs' misleading assertions, the accurate measure of the restoration success is the number of acres mined for phosphate that have been reclaimed to

---

[25] Upon "release" to FDEP, Mosaic has no further obligations under the Permit relative to the reclamation unit.

mandatory standards, which is nearly 70% according to the ROR and the Reclamation Study undertaken by FDEP. [Cantrell Decl. ¶¶ 14-16].[26]

        **b)**        **The Corps properly determined that the temporary impact to wetlands and streams would not be significant.**

Plaintiffs incorrectly state that replacement of the wetlands and streams will not occur for 10 years or more. [Motion at 15]. In reality, the Mitigation Plan requires Mosaic to commence reclamation activities in phases as mining is completed on certain areas of the SFM-HC. [EA at 65-67]. Wetlands must be built and functioning by the beginning of the 10-year monitoring period. In fact, the evidence demonstrates that wetland and stream function can return almost immediately once built, regardless of when the site is administratively released from further monitoring under the permit conditions. [EA at 3(17)]. In addition, performance standards must be met for a period of 5 years to be considered successful," and therefore impacted areas will have to be replaced and operating in compliance with performance standards in less than 5 years to satisfy the 10 year release period. [EA at 82-83, 86-87]. Moreover, incorporated into the Mitigation Plan is a painstakingly detailed time lag factor to account for deferred impacts. [MIT2 at § 6.2.1.3 and tbls. C-48, C-51]. Thus, Plaintiffs' contention that there is a 10-year lag between the first impact to the site and reclamation is flatly wrong.

        **c)**        **Plaintiffs' oblique reference to the Corps' purported failure to consider the effect of the clay settling areas on the sites' hydrology is baseless.**

Contrary to Plaintiffs' assertions, the Corps adequately considered the effect of clay settling areas on the site's hydrology and determined that there would no significant impact. [EA at 54]. Indeed, the hydrologic analysis underwent rigorous scrutiny. [MFR2 §5.5.5.7.2]. The hydrology of the site, both before and after mining conditions, has been studied in exhaustive

---

[26]     Moreover, even if these documents were entitled to some credence, which they are not, the law is settled that "when an agency base[s] a finding of no significant impact upon relevant and substantial data . . . evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious." *Wetlands Action Network*, 222 F.3d at 1120-1121.

detail. [EA at 50, 53-55]. No significant impacts to water quality or quantity were determined in the modeling analysis or independently determined by the Corps. [EA at 53-56]. Further, FDEP's issuance of the state Environmental Resource Permit constitutes the water quality certification required under Section 401 of the CWA. That certification provides assurances that the proposed mining operations will not violate state water quality standards approved by EPA and is entitled to substantial deference under the Corps' regulations. 33 C.F.R. § 320.4(d).

> **d)** The evidence demonstrates that there will be no significant impacts to threatened or endangered species.

Plaintiffs' assertion that mining the SFM-HC will have significant impacts on threatened or endangered species is also incorrect. In the 86-page Biological Opinion, the FWS concluded that potential impacts to endangered species on the site (indigo snake, caracara, or wood stork), would be temporary and would not jeopardize their continued existence. [FWS, Biological Opinion, South Fort Meade Mine (May 28, 2010) ("BiOp"), at 69 75-77, 78-80) (referenced in EA at 12)]. These findings were based upon evaluations conducted for the direct, indirect, and cumulative effects in the area, the status of the species, and the reasonable and prudent measures proposed by Mosaic (including the establishment of conservation easements, reclamation, and ongoing monitoring). [BiOp at 80-86]. The FWS notes further that, due to the degraded nature of the wetlands, Mosaic's proposed preservation and mitigation that Mosaic proposes will enhance the suitability of the site for foraging habitat for wood storks. [BiOp at 70-71]. Therefore, Plaintiffs' contention that mining will harm endangered species ignores the proposed mining plan, mining configuration, and conclusions of the FWS—which recognize that mining will avoid native habitat areas that provide refuge for wildlife as mining progresses.

Greenberg Traurig, P.A.

**3.** The Corps addressed the impacts on neighboring residents.

Relying solely on two biased statements from individuals who oppose mining, Plaintiffs claim that those living in the vicinity of the mine will be subjected to noise, dust, and 24 hour lighting. [Motion at 16]. Plaintiffs' argument borders on the frivolous.

The Corps considered the potential impacts to neighbors as part of their public interest evaluation, and found that the impact was negligible. [EA at 31-37]. Moreover, local ordinances—not the Corps—regulate levels of noise and dust emitted during mining operations. An exhaustive Development Regional Impact ("DRI") public hearing process determined that the potential noise, dust, and lighting impacts from Mosaic's proposed mining activities on the SFM Tract were within regulatory limits. [EA at 2(3); MFR2 8]. Nevertheless, in response to public concerns about noise and dust, Mosaic agreed to construct noise and dust berms. These will be constructed in a later mining phase when the mining activities begin near residential properties. Plaintiffs have cited no law whatsoever to support its position that the Corps' conduct in addressing this issue violates NEPA.

**B.** Plaintiffs have no likelihood of success on their CWA claims.

The Court must consider Plaintiffs' CWA claims through the same deferential lens of the APA applicable to the NEPA analysis. *Van Antwerp*, 526 F.3d at 1363. The Corps may grant a permit when, after considering a wide range of factors, it determines that the benefits of the project outweigh any harm to the resource. 33 C.F.R. § 320.4(a). In making this "public interest" determination, the Corps' role is to balance the need for the project, as defined by the applicant, against the environmental harm. The agency is in the best position to determine which impacts are relevant to performing the balance. *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976). Importantly, if the Corps finds that the permit application complies with the 404(b)(1) guidelines, the Corps must issue the permit "unless the district engineer determines that it would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

    **1.**     The Corps carefully considered a reasonable range of alternatives with less adverse environmental impacts.

Under the CWA, there is a presumption that alternatives exist when the proposed project is not "water dependent." 40 C.F.R. §230.10(a)(3). In this circumstance, the Corps must rebut a presumption that there are practicable alternatives with less adverse environmental impact. *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994).

"An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. §230.10(a)(2); *Fla. Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1243-44 (M.D. Fla. 2008) (noting Corps' obligation to consider project purpose in issuing Section 404 permits). Here the overall project purpose, as restated by the Corps, is as follows:

> The overall project purpose is to extract phosphate ore from reserves located within a practicable pumping distance of the existing SFM-PC ore separation/beneficiation plant and supporting infrastructure in order to continue the operation of the SFM-PC separation/beneficiation plant at historical production rates.

[EA at 6].

Importantly, phosphate mining can only take place where sufficient quantity and quality of phosphate rock reserves exist and can be extracted at a reasonable cost, *i.e.*, within a practicable pumping distance of the existing beneficiation plant. [MFR2 at 2-10]. Taking into consideration the overall project purpose, the Corps carefully and thoroughly considered seven specific alternatives. [MFR2§ 2.2]. In evaluating the alternatives, the Corps looked in depth at an array of factors, including the adequacy of the geologic reserves, land size, zoning, proximity to infrastructure, costs, and potential environmental impacts. [*Id.*] After conducting a comprehensive analysis, the Corps determined that mining on the SFM-HC was the only feasible and practicable alternative. [MFR2 at 2-27].

Once the Corps made this determination, it required Mosaic to undertake on site "appropriate and practicable" steps to further minimize impacts to wetlands.[27] *See* 40 C.F.R. 230.10(d). In accordance with the Corps' request, Mosaic undertook an "avoidance and minimization" evaluation, and the Corps determined that impacts will be reduced by (1) utilizing the existing beneficiation plant and, to the extent possible, the existing clay settling areas; (2) avoiding a bayhead swamp that is directly connected to the main stem of the Peace River floodplain to eliminate a stream crossing;[28] [EA at 28] (3) avoiding approximately 73% of the site's wetlands; and (4) complying with the comprehensive Mitigation Plan. [EA at 28, 65-66]. The Corps concluded that even through "wetland alteration is necessary to realize the project purpose[,]" there will be "minimal adverse environmental impacts as a result of the compensatory mitigation." [EA at 62]. In fact, because of Mosaic's extensive on-site avoidance and minimization efforts, Mosaic will leave approximately 36% of the phosphate reserves undisturbed. [EA at 27, 29, tbl. 8].

Given the Corps' exhaustive analysis, it is clear that—as a result of proper review—the adverse effects have been avoided and minimized in accordance with the CWA. Plaintiffs have completely failed to refute the overwhelming evidence other than their reliance on isolated facts taken out of context of the entire record. Instead, Plaintiffs simply state in a conclusory fashion that "EPA's correspondence demonstrates that the Corps utterly failed to discharge its obligations under the CWA." Accepting Plaintiffs' argument would require that a court find a violation of the CWA every time the EPA expressed concern about an alternatives analysis. This is not and never will be the law.

---

[27] Plaintiffs falsely assert that Mosaic and the Crops increased the amount of wetlands disturbed after conducting their analysis. To the contrary, the wetland acres impacted were reduced from 560 to 534 acres. [Table C-38, MFR-1 and MFR2; MFR2, §. 1.5.2]

[28] This was done, in part, based on concerns expressed by the EPA.

**2.** The Corps' decision not to hold a public hearing was neither arbitrary nor capricious.

Under CWA regulations, "[i]f the Corps determines that it has the information necessary to reach a decision and that there is 'no valid interest to be served by a hearing,' the Corps has the discretion not to hold one." 33 C.F.R. §327.4(b); *see also Fund for Animals*, 85 F.3d at 545 ("[t]he applicable regulations provide the Corps' discretion to hold hearings on permit applications on an 'as needed' basis."); *Friends of the Payette*, 988 F.2d at 997 (holding that the Corps was not required to hold a public hearing when it had already received extensive comments and was "aware of strong support on both sides").

Here, Plaintiffs' criticism of the Corps' decision not to hold a public hearing is unfounded. Indeed, its sole support is an affidavit of Mr. Gallagher, the Legal Director for the Sierra Club and counsel in this case, who proclaims that the "Corps ignored them all." His self-serving statement is directly contradicted by the record. The Corps clearly considered the requests, which were based on various environmental concerns, and thoroughly addressed them in the EA.[29] [EA at 15-18 (depicting charts demonstrating that public concerns were addressed)]. In fact, the Corps unequivocally states that "upon a thorough review of the submitted comments, the Corps found that substantial issues raised have been considered by Corps during the evaluation," and, therefore, "there is no valid interest to be served by a hearing to address these issues." [EA at 95]. Moreover, there was ample opportunity to participate in the many public hearings at the local and regional level.[30] This Court should defer to the Corps' determination not to hold a public hearing. *Antwerp*, 526 F.3d at 1361; *Fund for Animals*, 85 F.3d at 545.

---

[29] On May 29, 2007, the Corps issued a Public Notice relating to Mosaic's Permit application. [EA at 10]. The Corps received public comments in response to this public notice, which Mosaic responded to in detail.

[30] During FDEP's review, it received public comments and concerns regarding SFM-HC, which were considered.

Greenberg Traurig, P.A.

**III.** PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM.

The U.S. Supreme Court has clearly held that a NEPA violation does not, in and of itself ,establish irreparable harm. *Monsanto Co. v. Geertson Seed Farms*, -- S.Ct. --, 2010 WL 2471057, *3 (2010) (moving party in NEPA cases must satisfy four part test for injunctive relief). Indeed, to allow an agency's purported failure to evaluate thoroughly the environmental impact of a proposed action to establish irreparable injury would be directly contrary "to traditional equitable principles." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Therefore, for Plaintiffs to meet their burden of establishing irreparable harm, the alleged environmental harm <u>must</u> be substantiated. *Id.; Winter v. Natural Res. Defense Council*, 129 S. Ct. 365 (2008) (mere possibility of injury will not suffice). Indeed, this Court has stated that "a showing of irreparable harm is the *sine qua non* of injunctive relief." *Shell Oil Co. v. Altina Assoc., Inc.*, 866 F. Supp. 536, 541 (M.D. Fla. 1994). Plaintiffs have failed to meet this heavy burden.

Plaintiffs contend that irreparable harm has been demonstrated because of the alleged impacts to the streams, wetlands, and endangered species.[31] [Motion at 20]. Plaintiffs are wrong. Courts hold that if the mitigation required by the permit is sufficient to compensate for the environmental impacts, plaintiffs cannot demonstrate irreparable harm. *Sierra Club v. U.S. Army Corps of Eng'rs*, 2005 WL 2090028 (D.N.J. 2005); *see also Citizens Alliance to Protect Our Wetlands v. Wynn*, 908 F. Supp. 825 (W.D. Wash. 1995). In *Sierra Club*, the court held that the Corps' actions were not arbitrary and capricious because the administrative record demonstrated that the Corps and other agencies considered the environmental consequences and concluded that the planned mitigation was sufficient. *Id.* at * 19. Consequently, the court concluded that Sierra Club did not "sustain their burden of demonstrating a clear showing of irreparable harm." *Id.*

---

[31] Plaintiffs also claim that their members will suffer "loss of enjoyment of the local environment to loss of their enjoyment to their homes and loss of property value." [Motion at 21]. None of these unsubstantiated facts— even if they were true—can establish irreparable harm. Plaintiffs have brought this action purportedly in the public interest allegedly to protect the environment. Consequently, allegations of purely personal harms should not be considered by this Court.

No different result should be reached here. The overwhelming evidence gathered and evaluated by the Corps, other agencies, and respected scientists establishes that the mitigation is sufficient and Mosaic has the ability to successfully reclaim the wetlands and streams. [MIT2 at 6-32 - 6-33]. In fact, Richard W. Cantrell, Former Deputy Division Director of FDEP, stated as follows:

> The SFM-HC reclamation plan will largely restore the streams damaged by the sixty years of intensive agricultural use on the SFM-HC property and will replace wetlands based upon an acre for acre basis.

[Cantrell Decl. ¶9]. Mr. Cantrell has no doubt that Mosaic will be successful in fulfilling the requirements of the reclamation plan. [*Id.*]. His opinions are based not only on his extensive experience in phosphate mining regulation, but his multiple visits to SFM-HC and Mosaic reclamation sites. [*Id.* at ¶5]. Moreover, because of the highly degraded condition of the site, the reclamation will not only restore the current functions of the on-site streams and wetlands, but it will also result in long term environmental benefits to endangered species. [EA at 62; MIT2 at 6-9 – 6-10; BiOp. at 70-71; Decl. of Cantrell ¶20].

Finally, not only are Plaintiffs' bare assertions of irreparable harm belied by the facts, but the Permit conditions themselves address any legitimate concerns. First, under its detailed, 42-page Permit, the Corps, EPA, and FWS perform an annual compliance review, and each agency has the power to stop mining if Mosaic fails to comply. [Permit at 4-5]. Second, mitigation must be performed under a detailed mitigation schedule, which is not required by any rule, and which can also halt mining if Mosaic fails to comply. [Permit at 6-7]. Third, the Corps may reevaluate the Permit at any time if circumstances warrant and can suspend, modify, or revoke the Permit. [Permit at 39]. Finally, the Permit incorporates the financial responsibility conditions of the ERP, which require that Mosaic demonstrate financial responsibility equal to 110% of the

estimated mitigation costs over the next three years of operation plus any accumulated mitigation, and remaining monitoring and maintenance costs. [Permit at 4; ERP at 9].

Based on these facts, there clearly is no irreparable harm. In fact, Plaintiffs' only attempt to undermine the planned mitigation and reclamation is through the affidavit of their purported expert, Mr. Winchester. This Court should reject outright Plaintiffs' ill-conceived invitation to rely on its "hired gun" instead of the contrary overwhelming evidence properly relied upon by the Corps.

**IV. THE BALANCE OF HARDSHIPS WEIGH AGAINST ISSUING A PRELIMINARY INJUNCTION.**

The balance of hardships requires the plaintiff to establish that the threatened injury to it outweighs the harm the requested preliminary injunctive relief may cause to the defendant. *Global Tel*Link Corp. v. Scott*, 652 F. Supp. 2d 1240, 1247 (M.D. Fla. 2009). Here, the balancing of hardships clearly favors Mosaic. Plaintiffs have made no credible showing of irreparable harm, while the harm to Mosaic is clear. *Sierra Club*, 2005 WL 2090028 at *19 (balance of hardships favored defendants who had made an enormous financial commitment to the project).

Presently, all of Mosaic's mining operations are operating at or near their rock production capacity with no opportunity for meaningful production increases. [Rahm Decl. ¶10]. As a result, Mosaic cannot compensate for shortfalls at the SFM mine if a preliminary injunction issues. *Id.* Operations must begin in Hardee County to ensure the necessary phosphate rock production. *Id.* Without sufficient phosphate rock, economic losses would ensue. [*Id.* ¶11]. In fact, if an injunction is entered, the SFM mine would shut down in whole or in part. [Rahm Decl. ¶11(a)]. This would occur because the costs of operating the mine and beneficiation plant would be infeasible to continue with the reduced level of rock that could be produced without the Permit. *Id.* The costs to suspend operations at the mine and maintain the idle assets are approximately $2,500,000 per month. [*Id.* ¶11(b)].

Greenberg Traurig, P.A.

The shut down of the mine would also result in the layoff of up to 221 employees—all of whom received WARN notices—with a combined average payroll over $1,000,000 per month.[32]  These individuals would likely have no recourse but to obtain unemployment benefits. [Rahm Decl. ¶11(a)].    Moreover, some of these employees depend on their health insurance benefits for critical medical procedures, including care for a disabled spouse who is a candidate for a heart transplant and care for an unborn child who will require open heart surgery.  *See* Notice of Filing Declarations of Mosaic Fertilizer, LLC's Employees; Notice of Filing Declarations of Union Representatives, filed contemporaneously.

Over time, the loss of rock production from the SFM mine would also result in adverse impacts to Mosaic's plants where phosphate rock is converted into fertilizer.  [*Id.* ¶11(c)]. Following loss of rock production from the SFM mine, the lack of sufficient phosphate rock could result in the closure or significant reduction of production rates at Mosaic's plants, causing additional job losses for Mosaic's employees.  [*Id.* ¶11(c)].  The economic losses from a reduction in fertilizer production could be significant because Mosaic would have to reduce sales of its phosphate fertilizer and animal feed products.  [*Id.* ¶11(e)].

**V.    THE REQUESTED INJUNCTION IS NOT IN THE PUBLIC INTEREST.**

The U.S. Supreme Court has accorded substantial weight to this factor stating the district courts, "in exercising their sound discretion," should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 129 S. Ct. at 376- 77.  If Mosaic is not permitted to mine it would have grave public consequences.  In fact, the Florida Legislature has expressly declared that "the extraction of phosphate is important to the continued economic well being of the state and to the needs of society."  § 378.202, Fla. Stat.

---

[32]    A total of 26 Mosaic employees have filed declarations attesting to the hardships that would result if they lost their jobs.  *See* Notice of Filing Declarations of Mosaic Fertilizer, LLC's Employees; Notice of Filing Declarations of Mosaic Fertilizer, LLC's Union Representatives.

A.      Devastating effects on the local economy.

In Hardee County, the harm from an injunction would be devastating to the County and its citizens. Mosaic has committed in excess of $42 million over a 10-year period for funding of infrastructure and other economic development under a Development Agreement with the County. [Albritton Decl. ¶6]. The initial $5 million payment was due on July 14, 2010, subject, however, to all necessary permits being in place and not being revoked or otherwise held in abeyance. *Id.* These funds are particularly important to Hardee County, which has been designated as a Rural Area of Critical Economic Concern.[33] [§ 288.0656, Fla. Stat.; Albritton Decl. ¶3(a)].

In addition, Hardee County residents are highly dependent, directly and indirectly, upon a limited number of regional employers, such as Mosaic. [*Id.* ¶¶9, 10]. Mosaic employs more than 260 workers at the SFM mine, approximately 110 of whom currently reside in Hardee County. [*Id.* ¶8]. Moreover, Mosaic's activities generate substantial revenue for both Hardee County and local businesses that provide goods or services to Mosaic or otherwise benefit from its activities. [*Id.* ¶9]. In fact, Hardee County has calculated an economic benefit of over $93 million during mining and reclamation. [*Id.* ¶10]. This contribution results from increased economic activity engendered by Mosaic's expenditures, as well spending by employees and vendors in the County. [*Id.*].

In 2010 alone, in addition to the initial $5,000,000 payment, Mosaic's SFM mine would generate for Hardee County approximately $128,000 in ad valorem tax revenues, $15,000 in monitoring fees, $310,000 in tangible tax revenues, and $1,600,000 in severance tax. [*Id.* ¶13]. These revenues would constitute a vital source of funding for County government to provide critical services and opportunities to local residents and businesses. [*Id.* ¶9]. Moreover, even though Hardee County is ranked 66th out of the 67 Florida counties for average earnings per

---

[33]      *See also* http://www.dos.state.fl.us/grants/redi/designation.cfm (last visited July 7, 2010).

year, approximately 80% of the SFM mine's employees are or would be compensated in excess of the statewide average of approximately $34,000 per year.[34]  [*Id.* ¶8].

The shutdown of the SFM mine would also negatively impact Mosaic's suppliers, contractors, and others, such as the United Way, who rely on the mine's operation for their living and support.[35]  An economic study conducted by CRA International estimates that for every 1 direct job in the phosphate industry there are an additional 6.5 jobs which support the industry activity.  [Rahm Decl. ¶11(d)].  Based on this ratio, over 1,400 jobs would be lost in addition to those jobs lost by Mosaic employees.  [*Id.*]

**B.**  Significant impacts on the agricultural industry and world food supplies.

Mosaic sells fertilizer and animal feed ingredients on a global basis, and its products accounted for approximately 48% of U.S. production during fiscal 2009.  According to the USGS Mineral Industrial Survey for 2009, U.S. phosphate rock production totaled 27.8 million tonnes.  Consequently, the average rock production from the SFM-HC represents 18% of the entire production of U.S. phosphate rock.  [Rahm Decl. at ¶9].  It is also estimated that SFM-HC will supply 18% of all phosphate finished products in the U.S. over the next 7 years.  [MFR2 at 1-48].  It is estimated that the SFM-HC reserves will support production of approximately 116 billion bushels of corn.  [MFR2 at 1-48].

Thus, the loss of SFM mine rock production would cause a dramatic reduction in annual U.S. phosphate rock production.  [Vroomer Decl. ¶8(b)].  This could ultimately influence global fertilizer markets creating product shortages and price increases that would damage farmers and

---

[34]  *See* University of Florida, County Rankings 2009 (16th ed. Jan. 2010) (the "FCR").  In addition, Hardee County is ranked fourth out of 67 counties in terms of Florida poverty estimates, (FCR tbl. 5.6), seventh in the state for public school students eligible for reduced-price lunches (FCR tbl. 4.2), first in terms of percentage of students with specific learning disabilities (FCR tbl. 4.4).  *Id.*

[35]  Mosaic has filed the declarations of 14 of its suppliers and contractors, all of whom could lose substantial business if this injunction issues, contemporaneously with this Memorandum.  *See* Notice of Filing Declarations of Mosaic Fertilizer, LLC's Suppliers, Vendors, and Contractors.  Mosaic has also contemporaneously filed declarations from the Tampa Port Authority and the United Way.  *See* Notice of Filing Declarations of Public Entities and Non-Profit Organization.

potentially impact U.S. and world food supplies. [*Id.* ¶8(c)]. A large jump in phosphate prices and a corresponding decline in phosphate use could jeopardize global grain and oilseed production and play a significant role in causing another spike in agricultural commodity prices similar to the crisis in 2008. [Rahm Decl. ¶12].

**C.** Negative impacts on the environment.

Plaintiffs' request for extraordinary relief to prevent the unsubstantiated allegations of environmental harm is meritless based on Mosaic's comprehensive Mitigation Plan and planned reclamation. [*See* Mosaic's Opposition Brief at §§ II(A) and II(A)(2)]. In fact, the permanent preservation will result in a "substantial benefit to the State of Florida and its citizens that could be lost if the project does not go forward." [Cantrell Decl. ¶20; Permit 31-35]. *See Sierra Club*, 2005 WL 2090028 at * 20 (noting that public interest will be served by the permanent preservation of the 587 acre Empire Tract). Therefore, Plaintiffs' hasty actions of rushing into court to enjoin Mosaic's mining activities on the SFM-HC Tract—either without the true facts or deliberately ignoring them—will, if successful, prevent the environment from benefitting from the preservation, mitigation, and reclamation that will be achieved on the site. Plaintiffs' zealous efforts are, therefore, contrary to the public's interest in protecting the environment.

CONCLUSION

For the foregoing reasons, Mosaic Fertilizer, LLC respectfully requests that this Court enter an Order Denying Plaintiffs' Motion for Preliminary Injunction.

(Attorney's Signature Appears on the Following Page)

Dated:  July __, 2010     Respectfully submitted,

*/s/ David B. Weinstein*
David B. Weinstein
Fla. Bar No. 604410
weinsteind@gtlaw.com
Kerri L. Barsh
Fla. Bar No. 443840
Kimberly S. Mello
Fla. Bar No. 002968
mellok@gtlaw.com
GREENBERG TRAURIG, P.A.
625 E. Twiggs St., Ste. 100
Tampa, FL  33602
Telephone: (813) 318-5700
Facsimile:  (813) 318-5900

and

Frank E. Matthews
Fla. Bar No. 328812
frankm@hgslaw.com
Susan L. Stephens
Fla. Bar No. 986836
susans@hgslaw.com
HOPPING GREEN & SAMS, P.A.
123 South Calhoun Street
P.O. Box 6526
Tallahassee, Florida 32314-6526
Telephone: (850) 222-7500
Facsimile: (850) 224-8551
*Counsel for Mosaic Fertilizer, LLC*

*TPA 511,451,633*

## CERTIFICATE OF SERVICE

I certify that on July _____, 2010, the foregoing was electronically filed with the Clerk of

Court via the CM/ECF system, which will send a notice of electronic filing to counsel of record,

and by U.S. Mail to the following individuals:

Brad E. Kelsky
Law Offices of Brad E. Kelsky, P.A.
10189 Cleary Blvd., Ste. 102
Plantation, FL 33324

Pat Gallagher
Sierra Club
85 Second St., 5th Floor
San Francisco, CA 94105

Susan L. Stephens
Hopping, Green & Sams, PA
123 South Carolina St.
P.O. Box 6526
Tallahassee, FL 32314-6526

/s/ David B. Weinstein
Attorney

Greenberg Traurig, P.A.

TPA 511,451,633