**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| SIERRA CLUB, INC.; PEOPLE FOR PROTECTING THE PEACE RIVER, INC.; and MANASOTA-88, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:10-cv-00564-HLA-JBT |
| UNITED STATES ARMY CORPS OF ENGINEERS; and COLONEL ALFRED A. PANTANO, JR., | ) ) ) ) | |
| Defendants. | ) ) | |

**FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

On June 14, 2010, the U.S. Army Corps of Engineers ("Corps") issued Department of the Army Permit SAJ-1997-4099 ("Permit") to Mosaic Fertilizer, LLC ("Mosaic"), authorizing the discharge of dredged or fill material into waters of the United States in connection with Mosaic's plan to extract phosphate ore from the 10,856-acre South Fort Meade Extension site in Hardee County, Florida ("Project"). Plaintiffs now ask this Court to preliminarily enjoin Mosaic from continuing any work under that Permit – a Permit that the Corps issued following a regulatory process that involved the collection and analysis by the Corps of nearly 100,000 pages of information (including information submitted by Plaintiffs), and in which the Corps extensively analyzed the very environmental concerns raised by Plaintiffs.

The gravamen of Plaintiffs' claim is that the Corps should have issued an environmental impact statement ("EIS") under the National Environmental Policy Act ("NEPA") – rather than the environmental assessment ("EA") that the agency issued, pursuant to its regulations – and that the Permit decision was arbitrary and capricious because it will result in the destruction of 534 acres of wetlands and 10.7 miles of streams. This is but one chapter of a larger story, however, as those gross figures must be considered alongside the Corps' detailed EA of such impacts and its requirement that Mosaic implement a comprehensive mitigation plan, which the Corps concluded will offset any lost function and value of wetlands and streams. Among other things, Mosaic is required to create and protect by conservation easement 481.1 acres of wetlands and 61,016 linear feet of streams, and to grant a conservation easement for 2,020.8 acres in and adjacent to floodplains of the Peace River and its tributaries.

Plaintiffs' motion for preliminary injunction fails to focus on the very Permit and associated 101-page EA that they ask this Court to vacate, and instead would have this Court

overturn the Corps' decision based on a handful of Plaintiffs' affidavits and their selective

readings of correspondence between the U.S. Environmental Protection Agency ("EPA") and the

Corps. Plaintiffs also fail to point to specific deficiencies with the Corps' rationale and to

explain how the administrative record does not support the decision that the Corps reached. *See*

*Camp v. Pitts*, 411 U.S. 138, 141 (1973) (in APA-review cases, "the focal point for judicial

review should be the administrative record" compiled by the agency). In sum, Plaintiffs have

failed to offer "substantial proof" that they are likely to succeed on the merits of their claim and

have not made a "clear showing" that this Court should exercise its equitable discretion,

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), to issue the "extraordinary and drastic

remedy" of a preliminary injunction. *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008).

## STATUTORY AND REGULATORY BACKGROUND

## I.      The National Environmental Policy Act

Congress enacted the National Environmental Policy Act of 1969 in order to foster better

decisionmaking by agencies and more informed public participation with respect to agency

actions that affect humans and the human environment. *See* 42 U.S.C. § 4321; 40 C.F.R. §

1501.1(c). Whenever a federal agency proposes a "major Federal action[] significantly affecting

the quality of the human environment," NEPA requires that the agency first prepare an EIS. 42

U.S.C. § 4332(2)(C); 40 C.F.R. Pt. 1508. But if the significance of the environmental impact is

not apparent to the agency at the outset – as was the case here – then the agency may perform an

EA in order to determine whether preparation of an EIS is necessary. *See* 40 C.F.R. 1501.3,

1501.4(e), 1508.9(a)(1). An EA is a "concise public document" that briefly describes the need

for, alternatives to, and environmental impacts of the proposed federal action. *Id.* § 1508.9(a). If

the agency determines, based on the EA, that the proposed federal action will not significantly

affect the quality of the human environment, it then makes a "[f]inding of no significant impact" ("FONSI"), *Id.* 1508.13, and it need not prepare an EIS, *Id.* § 1501.3.

NEPA "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *accord Sierra Club v. U.S. Army Corps of Eng'rs,* 295 F.3d 1209, 1214 (11th Cir. 2002) (NEPA "is not a substantive environmental statute" and it does not "dictate[] a particular outcome"). Rather, NEPA's "mandate to the agencies is essentially procedural" and is designed "to insure a fully informed and well-considered decision" on the part of the federal agency. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). NEPA requires that a federal agency take a "hard look" at a project's environmental consequences, but the statute does not dictate a substantive result. *Robertson*, 490 U.S. at 350. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Sierra Club v. Van Antwerp,* 526 F.3d 1353, 1360 (11th Cir. 2008) (citations omitted).

## II.     The Clean Water Act

Congress enacted the Clean Water Act ("CWA") in 1972 to respond comprehensively to **the complex problem of restoring and maintaining the "chemical, physical, and biological** integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve these goals, the CWA generally prohibits the discharge of any pollutant except in compliance with one of the CWA's statutory provisions. *See* 33 U.S.C. § 1311(a). The provision relevant to this case – section 404 – authorizes the Secretary of the Army, acting through the Corps, to issue permits for discharges of dredged or fill material into the Nation's waters. *See* 33 U.S.C. § 1344(a).

Federal regulations require that the Corps base its discharge-authorization decisions "on

an evaluation of the probable impacts . . . of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1). Assessing the public interest often involves a "balancing process," *Envtl. Coal. of Broward County v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987), in which the Corps weighs "economic and environmental factors," *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1454 (1st Cir. 1992), including "water quality." 33 C.F.R. § 320.4(a)(1), (d). The Corps must weigh "[t]he benefits which reasonably may be expected to accrue . . . against [the project's] reasonably foreseeable detriments." *Id.* § 320.4(a)(1).

Additional criteria applicable to the Corps' CWA section 404 discharge-authorization decisions are set forth at 40 C.F.R. Part 230. These criteria are referred to as "Section 404(b)(1) Guidelines" because EPA developed them in conjunction with the Corps pursuant to CWA section 404(b)(1), 33 U.S.C. § 1344(b)(1). "If the Corps finds that the permit complies with the Section 404(b)(1) guidelines, the permit 'will be granted unless the district engineer determines that it would be contrary to the public interest.'" *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 542-43 (11th Cir. 1996) (quoting 33 C.F.R. § 320.4(a)(1)). The Section 404(b)(1) Guidelines require the Corps to consider whether the proposed discharge will "cause or contribute to significant degradation of the waters of the United States," by analyzing the effects on, among other things, human health, the aquatic ecosystem, and recreational, aesthetic and economic values. 40 C.F.R. § 230.10(c)(1)-(4). Finally, all appropriate and practicable steps must be taken to minimize potential impacts to the aquatic ecosystem. 40 C.F.R. § 230.10(d); *see also* §§ 230.70-230.77.

# FACTUAL AND PROCEDURAL BACKGROUND

The Project is a 10,856 acre phosphate mine located just east of the Peace River, in an area often referred to as "Bone Valley." *See* Dep't of Army Envt'l Assessment and Statement of Findings for Permit SAJ-1997-4099 ("EASOF") at 1 (attached hereto as Ex. 1, pages 1-102); *see also* Mosaic's March 17, 2010 Mem. for Rec. Revision No. 2 ("MFR-2") (attached as Ex. 2, 3, 4, 5, and 6) incorporated by and attached to the EASOF at 1:54. Phosphate mining has taken place in Central Florida for over 100 years. MFR-2 at 1:46.

The Corps issued an environmental assessment and statement of findings and the challenged Permit on June 14, 2010, after numerous site visits, consideration of public and government comments, requests for additional information, and following extensive study. EASOF at 2-5, 10-19. The overall project purpose is to "extract phosphate ore from reserves located within a practicable distance of the existing [] ore [s]eparation/beneficiation plant and supporting infrastructure in order to continue operation . . . at historical production rates." EASOF at 6. Mosaic plans to extract up to 50.379 million short tons of phosphate rock product over a 12-year period by surface mining and disturbing up to 7,687 acres on a 10,856 acre-tract. EASOF at 38; MFR-2 at (ix). More than 75 percent of the native vegetative cover on that tract has already been converted into pastures, groves, row crop fields, roads, cattle ponds, or single family homes. EASOF at 38-39. Of the 10,856 acres, the Project will impact 534.4 acres of wetlands and 56,661 linear feet of mostly first order streams. EASOF at 1-2. Of those 534.4 wetland-acres, about 50 percent are forested wetlands, nearly 45 percent are herbaceous wetlands, and 5 percent of the impacted wetlands are open water wetlands. The Project will temporarily impact 11 acres of wetlands and 1,416 linear feet of streams disturbed by five dragline crossings. EASOF at 2.

After receiving a complete permit application October 16, 2006, the Corps posted a public notice on May 29, 2007. EASOF at 10. The public comment period ended, after 60 days, on August 12, 2007. EASOF at 10. In response to comments received, the Corps requested additional information from Mosaic. EASOF at 11. The Corps also evaluated the permit application, made requests for additional information, and examined data. After completing its EA, the Corps issued the Permit.

## I. The Corps Conducted An Analysis Of Alternatives

Pursuant to Section 404(b)(1) Guidelines, the Corps determined that the Project's purpose, "to extract phosphate ore," was not water dependent. EASOF at 5. The Corps, therefore, analyzed whether Mosaic had clearly demonstrated that there were no practicable alternatives other than alternatives involving discharges into special aquatic sites. EASOF at 19. The Corps considered two sets of alternatives to the proposed Project: the first set ("avoidance" or "offsite" alternatives) analyzed alternative means of obtaining phosphate ore; the second set ("minimization" or "onsite" alternatives) evaluated options for reducing environmental effects and obtaining phosphate ore on the 10,856-acre tract. EASOF at 19-26, 27-30.

The Corps first analyzed the broad range of reasonable offsite alternatives. EASOF at 19-27. These alternatives included purchasing rock from outside Central Florida and shipping it to Mosaic's separation/beneficiation plant, mining outside of Central Florida, and constructing a new or expanded mine elsewhere in Central Florida. EASOF at 19-21. The Corps' determined that these alternatives did not meet the overall project purpose were therefore not practicable. An important factor in that determination was that Mosaic had previously invested $325 million in connection with its South Fort Meade ore separation/beneficiation plant, which is located just across the Polk/Hardee county boundary line. MFR-2, 1-52. That plant was supplied by older,

existing mines and the Project will allow Mosaic to continue operations at the plant after the phosphate ore at older facilities is exhausted.  EASOF at 19-21.

Pursuant to both NEPA and the 404(b)(1) Guidelines, the Corps also evaluated four offsite alternatives which could also supply the existing beneficiation/separation plant.  EASOF at 21–22.  Although these offsite alternatives met the overall project purpose, three were not practicable because of increased transportation and logistical costs, the need to cross over the Peace River, or insufficient quantity of phosphate reserves.  EASOF at 22.  One alternative was practicable, but raised more environmental concerns.  EASOF at 22-23.

Once the Project was selected, the Corps analyzed five onsite alternatives, as directed by section 404(b)(1) Guidelines, to ensure that Mosaic took all practicable steps to minimize potential adverse impacts.  EASOF at 27-29.  "As a result of discussions at approximately 34 meetings over a 1 ½ year time period with the Corps, EPA, and FWS," the Corps determined that On-Site Alternative Analysis Site #2B was the least environmentally damaging practicable alternative.  EASOF at 27-30.  This alternative will result in recovery of 64 percent of the available ore, EASOF at 27, and reduced bayhead wetland impacts by 21 percent, and stream impacts by about 2 percent from Mosaic's May 2009 preferred alternative.  MFR-2 at 3-13.  Accordingly, over 70 percent of all bay systems and 68 percent of streams present on the 10,856 acre tract will be avoided.  MFR 3-12, 3-13.

## II.     The Corps Required Mosaic To Perform Mitigation To Offset Environmental Impacts

The Corps determined that the adopted mitigation plan fully compensates for unavoidable impacts to the waters of the United States.  EASOF at 33, 62.  The Corps examined the "time lag and risk associated with the construction and reconstruction of streams within the watershed."

EASOF at 61-62; *see also* Mosaic's March 10, 2010 Mitigation Plan Revision No. 2 ("Mit Plan-2" included in Ex.'s 5 & 6), incorporated by EASOF, at 6-9, 6-15 - 6-19, and 6-21 - 6-22. The principal components of the mitigation plan consist of: (1) providing a 2,070-acre conservation easement in floodplains adjacent to the Project, to be preserved from mining and subsequent human disturbance; (2) wetlands creation on lands previously impacted by ore extraction or supporting infrastructure, protected by a conservation easement, including 170.9 acres of herbaceous wetlands, 310.3 acres of forest wetlands, and 61,016 linear feet of stream channel; and (3) creation of, in jurisdictional wetlands, 1,416 linear feet of stream channel and up to 43 acres of jurisdictional wetlands and uplands and conservation easement for those lands. Mit Plan-2 at 1-4; *see also* EASOF at 62. The mitigation plan includes an extensive discussion of the pre-mining baseline conditions including vegetation, hydrology, water chemistry, biological data, water quality, and wildlife studies. Mit Plan-2, Chpt. 5.

In determining the sufficiency of the mitigation plan for stream impacts, the Corps first evaluated changes to the water chemistry, biological integrity, and physical habitat and then considered habitat assessment scores, risk factors, and temporal lag factors in calculating the net stream functional loss/gain. Mit Plan-2 at 6-1 -6-9. To account for time-lag, the Corps will not credit stream mitigation "until the created stream is approved to be connected to the undisturbed downstream network, meaning that the hydrology and water quality performance standards . . . have been met and the mitigation sequence has advanced to final pre-release monitoring." Mit Plan-2 at 6-8 : 6-9. Taking into account the benefits of conservation easement protection of 106,592 linear feet of avoided stream channels, the stream mitigation plan results in a present worth net benefit. Mit Plan-2 at 6-10.

In determining the sufficiency of the mitigation plan for wetland impacts, the Corps

utilized a quantitative functional assessment called Wetlands Rapid Assessment Procedure to calculate the functional loss of impacts to wetlands and the functional gain from the mitigation plan. Mit Plan-2 at 6-12. The WRAP calculation considered both a temporal lag factor and a mitigation risk factor. Mit Plan-2 at 6-13 - 19 and 6-21 - 6-22. The results of the WRAP analysis is a net gain in functional units of forested and herbaceous wetlands. Mit Plan-2 at 6-31.

## III.     The Corps Identified And Examined The Project's Cumulative Effects

The Corps examined cumulative effects across the entire 1,198,165-acre Peace River watershed. EASOF at 38. Nearly 50 percent of the Peace River watershed is used for agriculture, 30 percent is undeveloped, and 10 percent of the is urban or built-up land. EASOF at 38. Phosphate mining accounts for 10 percent of the land use. EASOF at 39. The Corps used a time frame consisting of more than 50 years – from 1977 to 2028 – to evaluate the cumulative impacts. The Corps chose those years because CWA phase III regulatory authority became effective in 1977, and all physical mitigation, ore reclamation, and mitigation will be complete by 2028. EASOF at 39. Although the Corps addressed many other resources potentially affected by the Project, the Corps identified water quality, hydrology, and fish and wildlife habitat as the resources most likely to be negatively impacted by mining activities. EASOF at 40.

As to those concerns, the technical evidence demonstrates no significant water quality impact from the Project, either individually or cumulative. EASOF at 52. Although the Corps concluded that the Project could cause hydrologic alterations, it also found that the mitigation measures Mosaic is required to implement and water quality treatment systems would maintain the flow regime and regional water budget during mining operations. EASOF at 52. The Corps

also examined data concerning land use and reclamation efforts, and concluded that there would be no significant impact to fish and wildlife habitats.  EASOF at 56-57.  Considering all of the present, past, and future mining uses in the Peace River Basin, the Corps determined that cumulative impacts did not reach a "significance threshold."  EASOF at 61.

## STANDARD OF REVIEW

The application of equitable power before a court fully adjudicates a case renders a "preliminary injunction . . . an 'extraordinary and drastic remedy,'" *Munaf*, 128 S. Ct. at 2219 (citation omitted); *Mazurek*, 520 U.S. at 972, whose sole function is "to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  A party requesting a preliminary injunction must therefore proffer "substantial proof" and make a "clear showing" that such extraordinary relief is necessary. *Mazurek*, 520 U.S. at 972.  Preliminary injunctive relief is warranted only where the party seeking the injunction makes a clear showing that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.  *Winter v. NRDC*, 129 S. Ct. 365, 374 (2008); *Ala. v. U.S. Army Corps of Engineers,* 424 F.3d 1117, 1128 (11th Cir. 2005).

Plaintiffs have brought their challenge to the dredge-and-fill permit pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702-706, which provides a standard of review that is "exceedingly deferential" to the Corps.  *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (quoting *Fund for Animals*, 85 F.3d at 541).  Under the APA, the Court must sustain the agency decision unless Plaintiffs demonstrate that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrrogated on*

other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977); *Van Antwerp*, 526 F.3d at 1359-60

(applying "arbitrary and capricious" standard in review of Corps actions under CWA and

NEPA). "It is not the role of the reviewing court to substitute its judgment for the judgment of

the agency." *Sierra Club v. Van Antwerp,* 362 Fed. Appx. 100, 105 (11th Cir. 2010). Moreover,

there is a particularly strong presumption in favor of upholding agency action in cases such as

this where the agency is acting within the scope of its expertise in a technically complex area.

*See, e.g., Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375, 378 (1989); *Ethyl Corp. v EPA*,

541 F.2d 1, 36 (D.C. Cir. 1976) (en banc) (the court "must look at the decision not as the

chemist, biologist or statistician that we are qualified neither by training nor experience to be,

but as a reviewing court exercising our narrowly defined duty of holding agencies to certain

minimal standards of rationality").

## ARGUMENT

Plaintiffs' request for a preliminary injunction to stay the effectiveness of the South Fort

Meade Permit should be denied because Plaintiffs have failed to make a "clear showing" that

such relief is warranted in this case. *Mazurek*, 520 U.S. at 972. Specifically, Plaintiffs cannot

show that they are likely to succeed on the claims that they advance in their motion, nor have

they identified any irreparable harm that they will suffer if the Court denies their request for

relief. Because Plaintiffs have failed to carry their burden, this Court should deny Plaintiffs'

motion for a preliminary injunction.[1]

---

[1] In its July 1, 2010 order granting Plaintiffs' motion for a temporary restraining order, this Court found
that "Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claims that the
Corps issued the permit in violation of CWA and NEPA and acted in a manner that was arbitrary,
capricious, and contrary to law under the Administrative Procedure Act." Docket No. 23 (Order Granting
TRO) at 2. As the Court is aware, Plaintiffs filed a lengthy brief in support of their TRO motion on June
30, and Federal Defendants were afforded little time to prepare a defense or assemble the administrative
record that will serve as the basis for this Court's review. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (in

**I.    Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claims.**

As noted above, the applicable standard of review on the merits of this case is "highly deferential" and "presumes the agency's action to be valid." *Ambach v. Bell*, 686 F.2d 974, 981 (D.C. Cir. 1982) (citing *Overton Park*, 401 U.S. at 419); *see also Sierra Club*, 526 F.3d at 1360. The Corps' permit decision in this case must be upheld as long as the Corps has considered the relevant factors and articulated a rational connection between the facts found and the choice made. *Overton Park*, 401 U.S. at 419. Thus, for purposes of this motion for a preliminary injunction, Plaintiffs must make a "clear showing" that they are likely to overcome the presumption in favor of the Corps' decision to issue the permit.

Plaintiffs have failed to carry that heavy burden. Plaintiffs first contend that the Corps violated NEPA by failing to prepare an EIS for the Permit. Pl.'s Br. at 7-16. However, as reflected in the EA and administrative record, the Corps conducted an extensive analysis of the environmental impacts of the Project and reasonably concluded that the action will not have a significant impact on the quality of the human environment. Next, Plaintiffs allege that the Corps failed to require that Mosaic avoid wetlands to the "maximum extent practicable" because the Corps failed to perform "an empirical demonstration" to support its finding that certain other alternatives would be "economically impracticable." Pl.'s Br. at 16-20. The CWA and its implementing regulations, however, contain no such requirement, and Plaintiffs do not allege that the Corps might have chosen a different alternative had it undertaken an empirical demonstration here. Finally, Plaintiffs' allege that the Corps' decision should be overturned

---

APA cases, "the focal point for judicial review should be the administrative record" compiled by the agency). Federal Defendants will lodge an electronic copy before the July 22 hearing of a partial administrative record for the challenged permit (the full record may exceed 100,000 pages).

based on the agency's conclusion that no valid interest would be served by holding a public hearing. Pl.'s Br. at 20. This claim, too, is meritless because the Corps determined that it had sufficient information about the proposed Project without a hearing and, in any event, Plaintiffs do not allege that they were denied an opportunity to be heard by the Corps or that the Corps' ultimate determination in this case would have been different if a public hearing had been held.

### A.    Plaintiffs are not likely to succeed on the merits of their NEPA claims.

Plaintiffs would have this Court dismiss the conclusion of the Corps – the agency charged by Congress with responsibility to make permit decisions for the category of activity at issue here – that Mosaic's mining of phosphate at the South Fort Meade Extension site would not significantly impact the environment. But the problem here is that Plaintiffs raise general grievances with the substance of the Corps decision, and NEPA does not mandate particular results: it merely imposes procedural requirements on federal agencies. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). In particular, Plaintiffs complain: (1) of the Corps' cumulative impact analysis; (2) the mitigation obligation the Corps imposed on Mosaic as a condition of the permit; (3) they believe the mitigation plan will not work; and (4) that the Corps did not do enough to address noise, light, dust, and water impacts associated with Mosaic's mining. Pl.'s Br. at 10-11. The Corps specifically addressed each of these issues in its EA, EASOF at 38-62 (cumulative impacts), 33-35, 61-62, 63-94 (mitigation), 32, 58 (noise, light, and dust), and reasonably concluded that there are no significant impacts associated to trigger an EIS. The Corps' conclusions are supported by the record, numerous studies, and the agency's careful analysis. NEPA requires no more.

Plaintiffs' arguments are primarily disagreements with the Corps' substantive conclusions. For example, Plaintiffs claim the Corps "fail[ed] to address the very severe impacts

. . . including noise, dust, . . ." but goes on to explain, in their view, that "[t]he Corps' sole response to these concerns is the imposition of a requirement for noise and dust berms." Pl.'s Br. at 11, 16. That is a substantive, not procedural, disagreement with the Corps' decision. *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756 (2004) ("NEPA imposes only procedural requirements on federal agencies . . . ."); *Sierra Club, Inc. v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1214 (11th Cir. 2002) (NEPA is "not a substantive environmental statute which dictates a particular outcome if certain consequences exist.") And the judgment of whether the agency has satisfied NEPA's "particular bureaucratic decision making process" requires reviewing courts to consider "the entire administrative record." *Sierra Club*, 295 F.3d at 1216.

It would be easy to confuse a project's size and complexity discussed in the Corps' 101-page EA – and the South Fort Meade Permit anticipates a sizeable and complex project – with the different inquiry about presence of significant environmental impacts. *TOMAC v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006) ("The simple point here is that the length of an EA has no bearing on the necessity of an EIS."); *LaFlamme v. FERC*, 945 F.2d 1124 (9th Cir. 1991) ("[w]e find no error in the EA's length or complexity"); *see also Winter v. NRDC*, 129 S.Ct. at 376 ("hard look" demonstrated by "the issuance of a detailed, 293-page EA.").[2]

This Circuit uses a four-part test to determine whether an agency's finding of no significant impact is arbitrary and capricious, and requires (1) that the Corps accurately identify the relevant environmental concerns; (2) that the Corps take a "hard look" at the relevant

---

[2] Plaintiffs' assert that the Corps decision to forego preparation of an EIS was arbitrary and capricious because the EA's 101-page length alone suggests that the impacts were significant. Pl's Br. at 10. But in *Sierra Club v. Marsh* – a case cited by Plaintiffs – the court of appeals explained that an environmental assessment's "length, complexity, and controversy . . . do not by themselves show that the . . . conclusion – 'no significant impact' – is correct, nor do they show it is incorrect."). 769 F.2d 868, 875 (1st Cir. 1985). Other Circuits have stated that such a rule would "create perverse incentives." *TOMAC*, 433 F.3d at 862; *cf. Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 434 (8th Cir. 2004).

environmental concerns; (3) that the Corps make a convincing case for its FONSI; and (4) if the Corps does find an impact of true significance, it must determine that changes or safeguards in the project sufficiently reduce the impact to a minimum. *Hill v. Boy*, 144 F.3d 1446, 1449-50 (11th Cir. 1998) (footnote and citations omitted).

Here, the Corps accurately identified and took a "hard look" at the relevant environmental concerns, ranging from conservation, aesthetics, impacts to wetlands, economics, fish and wildlife values, water supply and conservation, water quality, property ownership, and the needs and welfare of people. EASOF at 32-37. MFR-2, Section 6. For example, the Corps considered the need for the proposed project, EASOF at 6, a reasonable range of alternatives, including the no-action alternative, EASOF at 19-28, the environmental impacts of the proposed action, including cumulative and secondary impacts, EASOF at 38-61, and mitigation of unavoidable impacts to waters of the United States, EASOF at 33-35, 61-62, 63-94. The Corps also relied upon substantive studies, EASOF at 98-100, independent examination and verification, EASOF at 2-5, 18, 19, and its own technical expertise when it concluded there were no significant impacts. EASOF at 96. Where, as here, an agency bases its decision on its technical expertise, courts provide an especially high level of deference. *See, e.g., Marsh*, 490 U.S. at 377; *City of Oxford v. F.A.A.*, 428 F.3d 1346, 1352 (11th Cir. 2005) ("The reviewing court . . . must [] defer to the agency's technical expertise."); *N. Buckhead Civic Ass'n v. Skinner*, 903 F2d 1533, 1539 (11th Cir. 1990) ("agencies' decisions on the adequacy of . . . data should not be set aside unless arbitrary and capricious.")

1.    <u>The Corps made a convincing case for its finding of no significant impact</u>.

To satisfy NEPA's cumulative impacts requirement, an agency must identify the impacts of the Project "in conjunction with any other, related actions" and "consider the environmental impacts of future actions that are foreseeable." *City of Oxford*, 428 F.3d at 1354; *see also Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 78 (D.D.C.) ("an agency must "reasonably identif[y] and discuss[] various impacts"), *aff'd*, 11 Fed. Appx. 3 (D.C. Cir. 2000).  Cumulative impacts are environmental impacts that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."  40 C.F.R. § 1508.7.  Even though one project might be "individually minor" the Corps must examine "collectively significant actions taking place over a period of time."  *Id.*  An action is reasonably foreseeable if it is "sufficiently concrete for the agency to gather information useful to itself and the public."  *City of Oxford*, 428 F.3d at 1353.  That examination "involves an almost endless series of judgment calls," so the courts defer to the expertise of agencies.  *Coal. on Sensible Transp., Inc. v. Dole*, 826 F. 2d 60, 66 (D.C. Cir. 1987) (upholding agency's cumulative impacts analysis because it sufficiently alerted the public "to any arguable cumulative impacts"); *see also Marsh*, 490 U.S. at 377.

Here, the Corps undertook an extensive review of the potential cumulative impacts in Peace River watershed – some 1,198,165 acres – examining data about the cumulative effects of phosphate mining and other activities on water quality, hydrologic alterations, fish and wildlife habitat, stewardship, and reclamation.  EASOF at 38-61.  For example, the Corps considered the Florida Audubon Society's two-year study of avian use of mined land, which found that unreclaimed mined pits, spoil piles, active clay settling areas, and reclaimed wetlands provided "varied, rich, and productive habitats for a large number of bird."  EASOF at 57.  The Corps also

identified past actions on lands other than phosphate mines, past actions on former phosphate mines, currently operating phosphate mines, and reasonably foreseeable future developments, including proposed phosphate mines.  EASOF at 40-47.  In addition, the Corps also examined the affected environment, including the total acreage within the Peace River watershed that had been mined but not reclaimed, that had been reclaimed, or that was being actively mined.  EASOF at 47-52.  And the Corps analyzed the cumulative effects on water quality, water supply, wildlife populations, cultural resources, public safety, and electrical energy.  EASOF at 52-60.  Finally, the Corps used a significance threshold to determine that the cumulative and secondary impacts of the Project are not significant.  EASOF at 60-61.

Plaintiffs also argue that the Corps' decision was arbitrary and capricious because EPA did not fully concur with the Corps' approach to analyzing and determining the significance of cumulative effects.  Even assuming that there was meaningful disagreement between the Corps and EPA, this argument fails because it assumes that the Corps must adopt a particular substantive position as a result of the NEPA process.  The Corps and EPA share responsibility for implementing the CWA's dredge-and-fill permit program, *see, e.g.*, 33 U.S.C. § 1344(b)(1), (c), and the Corps affords "full consideration and appropriate weight . . . to all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise."  33 C.F.R. § 320.4(a)(3).  At the same time, comments from EPA by themselves establish that the Corps acted unreasonably:  What counts is that "the Corps considered [EPA's] initial concerns, addressed them, and explained why it found them unpersuasive."  *California Trout v. Schaefer*, 58 F.3d 469, 475 (9th Cir. 1995) (internal quotation marks and citation omitted).  In this Circuit, where the "lead agency" – here the Corps – makes "a reasoned decision based on its evaluation of the significance, or lack of significance, of the information submitted

by commenting agencies," it is entitled to deference and may opt to "rely on the reasonable opinions of its own qualified experts." *N. Buckhead Civic Ass'n*, 903 F.2d at 1539 (citing *Marsh*, 490 U.S. at 377). Notably, Plaintiffs do not allege that the Corps failed to consider the information submitted by EPA and, in fact, the record here shows that the Corps and EPA consulted on many occasions, and that the Corps acknowledged and responded to EPA's concerns, and EPA supported the Corps' approach. *E.g.,* Ex. 7 (April 28, 2010 Corps Letter to EPA); Ex. 8 (June 9, 2010 Corps Letter to EPA)2010 email exchange between EPA and the Corps, Exhibit 9 (June 9, 2010 Corps Letter to EPA). Moreover, Plaintiffs fail to mention that the Corps ultimately adopted the bayhead and stream-crossing minimizations recommended by EPA on January 15, 2010.[3] EASOF at 27-29.

Finally, the Plaintiffs turn to speculated about an region-wide EIS that might be performed in the future. Pl.'s Br. at 12-13. First, Plaintiffs offer no explanation of how a EIS would alter the Corps conclusion that the cumulative impacts for this project were not significant. Second, Plaintiffs' argument stops short of identifying any deficiencies in Corps' analysis relative to what a future EIS might address. Third, if an agency must refrain from issuing reasoned EAs, that stand on their own, while waiting on an regional impact statement, it would create a perverse incentive that discourages area-wide EIS. Fourth, that the Corps might choose to conduct a region-wide environmental impact statement does not mean the cumulative impacts are significant, or that the Corps' analysis is flawed. And Finally*,* Plaintiffs do not

---

[3] Even if EPA might have denied the permit had Congress delegated dredge-and-fill permitting authority to it, that does not automatically render the Corps' considered judgment to issue this Permit arbitrary, capricious, contrary to law, or an abuse of discretion. *See Marsh*, 490 U.S. at 378 ("[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts" even if a reviewing court might find another view more persuasive).

explain why an injunction is the appropriate remedy in such a case, even though the Supreme Court held that an injunction was not necessary after an EA was set an aside for a pending environmental impact statement. *See Monsanto Co. v. Geertson Seed Farms*, No. 09-475, 2010 WL 2471057, at *5 (June 21, 2010). Each of Plaintiffs' arguments in this regard is far too speculative to warrant the drastic remedy that they seek.

2. <u>The Corps' Determination that the Permit's mitigation requirements will reduce any impacts to a minimum was reasonable.</u>

Even where a major federal action would otherwise result in significant environmental impacts, an EIS is unnecessary when mitigation measures compensate for the otherwise adverse environmental impacts. *C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1575 (11th Cir. 1988). Although Plaintiffs assert that the Corps ignored "considerable empirical evidence, scientific controversy, and uncertainty," Plaintiffs do not identify such "considerable" evidence, nor do they allege to have offered it during the extensive public comment period, in which they participated. Rather, Plaintiffs' submit an affidavit from Brian Winchester, who declares that in his opinion Mosaic has not previously "demonstrated ability to successfully reclaim or recreate" wetlands. Doc. No. 8, ¶ 29. On the other hand, the Corps examined Mosaic's track record of mitigation over 30 years. Mit Plan-2, 6-31. The Corps considered published articles evaluating Mosaic's wetland reclamation efforts, MFR-2, 6-33-34, hydrological models, and relevant literature. EASOF at 98-100. Mr. Winchester's disagreement proves nothing. There is no battle of experts in NEPA cases, and the Corps may rely on any methodology that has a rational basis. *Citizens for Smart Growth v. Peters*, No. 07-14122-CIV, 2010 WL 1817332, at *7 (S.D. Fla., May 3, 2010) (citing *Druid Hills Civic Ass'n, Inc. v. FHWA*, 772 F.2d 700, 771 (11th Cir. 1985)). The Corps methodology (albeit different from Plaintiffs' preferred result) was no doubt

rational.

The EA explains the cumulative benefit of the Permit's wetlands and stream mitigation requirements. EASOF at 61-62; *see also* Mit Plan-2, Chapter 6. Pursuant to the relevant regulatory guidance for wetlands, "the objective is to provide, at a minimum, one-to-one functional replacement" – accomplished here using a quantitative assessment method – and that means "no net loss of functions, with an adequate margin of safety to reflect anticipated success." *See* Corps Regulatory Guidance Letter No. 02-2, *Guidance on Compensatory Mitigation Projects for Aquatic Resource Impacts Under the Corps' Regulatory Program Pursuant to Section 404 of the CWA and Section 10 of the Rivers and Harbors Act of 1899* (2002) at 3, *available at* http://www.usace.army.mil/CECW/Pages/rglsindx.aspx. For streams, the Corps bases stream mitigation on functions "where sufficient functional assessment is feasible," but use a one-to-one replacement of linear feet of stream where functional assessment is not practical. *Id.* The sufficiency of stream mitigation was assessed here using a combination of classification systems, functional assessments, indices, and metrics. Mit Plan-2, Chapter 6.

Where, as here, "an agency base[s] a finding of no significant impact upon relevant and substantial data, the fact that the record also contains evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious." *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1120-21 (9th Cir. 2000); *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1543 (11th Cir. 1990) ("agencies' decisions on the adequacy of . . . data should not be set aside unless arbitrary and capricious.") Plaintiffs' declaratory statements point to no procedural errors in the Corps' adoption of the proposed mitigation plan. EASOF at 98-100. And although Plaintiffs' criticize the adopted onsite mitigation plan as impacting more wetlands, they do not acknowledge that it addresses EPA's

request to reduce impacts to bayhead wetlands nor do they acknowledge Mosaic's prior success with mitigation efforts. *See, e.g.*, MFR-2, 6-32 (noting awards for Mosaic's mitigation/reclamation efforts); MFR-2, 6-33 (noting published studies evaluating Mosaic mitigation sites).

Plaintiffs also misread the Corps' treatment of clay settling areas: The Corps did not state that more research is "necessary to determine the true hydrologic impacts." Pl.'s Br. at 15. Instead, the Corps acknowledged public research which supported its approach and acknowledged that the research did not explain every aspect of "the flow paths and rates into surrounding landscapes." EASOF at 55; *N. Buckhead Civic Ass'n,* 903 F.2d at 1539 (agencies can rely on their own experts). Likewise, Plaintiffs' claim the Corps' findings "lack scientific integrity," Pl.'s Br. at 15, but they fail to elaborate on why that is or identify the specific studies that the Corps should have but failed to consider. Pl's Br. at 15.

The mitigation will include: creation of 170.9 acres of herbaceous wetlands; 310.3 acres of forested wetlands; 61,016 linear feet of stream channels; restoration of 43 acres of wetlands and uplands; a conservation easement on 2,020.8 acres of floodplains adjacent to impacted floodplains; and a conservation easement of 521.8 acres for wetlands, uplands, and riparian buffers near the Project. EASOF at 62. Considering the anticipated mitigation benefits, the Corps reasonably concluded that the permitted activities will not have a significant impact on the quality of the human environment. EASOF at 96. *See, e.g., Sierra Club v. Corps*, 295 F.3d at 1220 ("[G]iven the alterations to the project and the mitigation plan, the environmental impacts of the Parkway were no longer significant. We have previously affirmed the validity of such a decision, where, as here, the mitigation measures are a condition of agency approval.").

The Corps also addressed the potential for time lag between impacts to waters of the

United States and successful mitigation.  Mit Plan-2 at 6-8 - 6-8, 6-15 - 6-19.  Notably, the wetland mitigation plan follows the WARP procedure, which is a quantitative method of calculating wetland functions and values, and provides an analysis to balance wetlands functions lost with wetlands functions gained.[4]  Mit Plan-2 at 6-12.  Because the Corps is entitle to rely on its own experts, and did so, *Marsh*, 490 U.S. at 377, Plaintiffs have failed to establish a likelihood of showing that the Corps' mitigation plan is arbitrary and capricious.

       3.      <u>The Corps identified and accurately assessed the impacts on the Projects' neighbors.</u>

Plaintiffs' also claim that the Corps failed to address the concerns of "neighboring residents," including concerns of "24-hour lighting, noise, dust and disruption of their water supply."  Pl.'s Br. at 15.  A simple reading of the Plaintiffs' own brief belies this argument.  For example, Plaintiffs write that the Corps imposed "a requirement for noise and dust berms."  Pl.'s Br. at 16.  The Corps also addressed concerns regarding disruption to adjacent water supplies. EASOF at 51-53.  Further, the State of Florida determined that the Project would not "adversely impact an existing legal withdrawal" of water,  MFR-2, 6-17, and found that the Project would "have no primary effect on the underlying water systems" mining will occur "solely in the surficial aquifer on the SFM-HC site" and by removing existing agricultural uses would "over time, improve the quality of the surficial aquifer beneath the site."  MFR-2, 6-17.  Plaintiffs' have not met their burden to establish a substantial likelihood of success on the merits of their NEPA claims.

---

[4] Plaintiff's claim that replacement mitigation "would not occur for ten years or more."  Pl.'s Br. at 15. Some aspects of the mitigation must be completed in less than two years.  EASOF at 66.  And the projects must meet all standards by the 10th year of monitoring, if not sooner.  Pl.'s Br. at 65-92.

**B.      Plaintiffs are not likely to succeed on the merits of their CWA claims.**

1.      The Corps adequately analyzed various alternatives to the Project.

Plaintiffs first argue that the Corps' decision to issue the permit was arbitrary and capricious because the Corps did not perform "an empirical demonstration" to support its finding that certain other alternatives would be "economically impracticable."  *See* Pl's Br. at 16. Plaintiffs, however, cite no authority for the proposition that the Corps is required to perform an empirical demonstration on the economic practicability of each alternative; they fail to explain what such an empirical demonstration must consist of and how it differs from the analysis that the Corps undertook in its EA; and they fail to allege that the Corps might have reached a different alternative had it undertaken an empirical demonstration here.  Given these shortcomings in Plaintiffs' argument, and in light of the highly deferential standard of review applicable here, Plaintiffs have failed to satisfy their burden of making a "clear showing" that they are likely to succeed on the merits of their CWA claim.  *Mazurek*, 520 U.S. at 972.

During the permitting process, the Corps examined in great detail the practicability of the Project and various onsite and offsite alternatives, and concluded that the Project was the least environmentally damaging practicable alternative.  EASOF at 6-7, 17-30, MFR-2 at Section 1, Section 2.  The Corps considered various offsite alternatives, but determined that only one other was practicable because each other alternative was either too costly, did not have enough phosphate ore to satisfy the project purpose, or posed greater environmental impacts.  EASOF at 19-23.  *See* 33 C.F.R. § 320.4(a)(1) (in considering whether a particular alternative is practicable, the Corps may weigh "[t]he benefits which reasonably may be expected to accrue . . . against [the project's] reasonably foreseeable detriments").  The remaining practicable offsite alternative, like the alternative that the Corps ultimately selected, was within a 10-mile radius of

an existing separation/beneficiation plant owned by Mosaic. EASOF at 23. However, the Corps determined that that alternative was not the least environmentally damaging as "a similar or greater acreage of wetlands is expected to be impacted" at this site than would be impacted by the Project and there is a greater proportion of total rangeland and upland forest habitat at this alternative site than at the Project site. EASOF at 25.

Moreover, Plaintiffs' suggestion that the Corps failed to require that Mosaic minimize impacts to waters of the United States, Pl. Br. at 16, fails to cite the Corps' EA that discusses in great detail these precise issues. *See* EA page 19-26, 62. For example, the selected alternative reduced bayhead wetland impacts by 21 percent and stream impacts by about 2 percent from Mosaic's May 2009 preferred alternative. MFR-2 at 3-13; see also EASOF at 62. Accordingly, over 70 percent of all bay systems and 68 percent of streams present on the 10,856-acre tract will be avoided. MFR 3-12, 3-13. Secondary impacts to waters of the United States were also minimized by, for example, requiring preservation and conservation easement protection of over 2,000 acres of floodplain areas, EASOF at 62, and requiring fencing of these conservation areas. MFR-2 at 6-30. The Corps required many minimization techniques to reduce secondary impacts to waters of the United States, such as utilizing existing clay settling areas and infrastructure and construction of ditch and berm system to contain fill from surrounding ecosystems, EASOF at 62, MFR-2, Sections 3 and 6. The total impacts to waters of the United States of 534.4 acres represents about 7 percent of the total mining disturbance or 5 percent of the entire project site. MFR-2 at 3-4. Thus, through minimization of on-site impacts, the Project effectively impacts 93 percent uplands and only 7 percent waters of the United States.

Plaintiff also urge this Court to grant preliminary injunctive relief on the basis that the Project will result in the destruction of 534 acres of wetlands and 10.7 miles of streams in the

headwaters of the Peace River and Charlotte Harbor estuary. *See* Pl.'s Br. at 4. Here, the Corps concluded that compensatory mitigation would be necessary to offset unavoidable impacts to aquatic resources. EASOF at 61-62. The Corps recognized that the Project will impact certain wetlands and streams, but concluded that the mitigation and reclamation plan that Mosaic will implement – which requires, among other things, Mosaic to protect by conservation easement 481.1 acres of created wetlands and 61,016 linear feet of created streams, to restore 43 acres of wetlands and uplands and 1,416 linear feet of streams, and to grant a conservation easement for 2,020.8 acres in and adjacent to floodplains of the Peace River and its tributaries – will offset any lost function and value of wetlands and streams. EASOF at 62; MFR-2 Section 6 and March 10, 2010 Mitigation Plan Revision 2. This finding was eminently reasonable.

Finally, Plaintiffs selectively cite to two of the several dozen letters that EPA and the Corps exchanged about this project between 2007 and 2010, and urge this Court to conclude that the Corps' decision to issue the permit was arbitrary and capricious, because "EPA's numerous and ongoing objections indicate that the Corps failed to comply with the Clean Water Act." Pl. Br. at 18. As explained above, Plaintiffs' claim is based on a fundamental misunderstanding of the agencies' shared responsibility under the CWA and on snippets from a much larger record that Plaintiffs mistakenly believe summarize the full extent of the interagency deliberative process that preceded the final Corps Permit.

        2.      <u>The Corps reasonably exercised its discretion not to hold a public hearing</u>.

Plaintiffs have failed to make a "clear showing" that they are entitled to injunctive relief based on the Corps' decision several years ago not to hold a public hearing on the permit application. Under the Corps' regulations, "[i]f the Corps determines that it has the information necessary to reach a decision and that there is 'no valid interest to be served by a hearing,' the

Corps has the discretion not to hold one." *Fund for Animals v. Rice*, 85 F.3d 535, 545 (11th Cir.

1996) (citing 33 C.F.R. § 327.4(b), and explaining that these regulations provide the Corps

discretion to hold hearings on permit applications on an "as needed" basis).[5]

Here, the Corps received nine written requests to hold a public hearing, but ultimately

determined that either the issues raised in each was insubstantial or had been considered by the

Corps and, therefore, no valid interest would be served by holding a public hearing. EASOF at

15, Table 2; *see also* 33 C.F.R. § 327.4(b). This factual finding, rooted in the Corps's expertise,

must be given deference. *Env'tl Coal. of Broward County, Inc. v. Meyers*, 831 F.2d 984, 986

(11th Cir. 1987). Like in *Fund for Animals*, the Corps here determined that a public hearing was

unlikely to generate any new information that was not already in the Corps's possession. 85

F.3d at 545; EASOF at 95 and 16-18, Table 3. Further, Plaintiffs, who were active participants

in the regulatory process, fail to demonstrate that their written comments were an insufficient

opportunity to be heard or that the Corps' ultimate determination would have been different if a

public hearing had been held. Therefore, the Court should defer to the Corps' decision not to

hold a public hearing on this permit application.

## II. Plaintiffs Have Not Demonstrated That Irreparable Harm is Likely in the Absence of an Injunction.

In the context of a preliminary injunction, the Supreme Court recently made clear in

*Winter* that a plaintiff must "demonstrate that irreparable injury is likely in the absence of an

injunction." 129 S. Ct. at 375. Even in the face of a clear violation of a statute whose purpose is

---

[5] Contrary to Plaintiffs' suggestion (Pl's. Br. at 20), nothing in the Eleventh Circuit's decision in *Rice* suggests that the Court's holding is limited to those circumstances when the state decides to hold a public hearing. Rather, the Rice court recognized that the Corps was not required to hold a public hearing if it determined that a hearing "was unlikely to generate any new information that was not already in the Corps's possession." 85 F.3d at 545.

to protect the environment, a Plaintiff must demonstrate actual harm to justify an injunction, and a court is not mechanically obligated to grant an injunction for every violation of environmental law. *Monsanto Co.,* *12 (rejecting the view that "an injunction is the proper remedy for a NEPA violation except in unusual circumstances" and stating that "[n]o such thumb on the scales is warranted"); *Winter v. NRDC*, 129 S. Ct. at 381 ("an injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course"). Moreover, the Eleventh Circuit has explained that an injunction cannot issue unless "irreparable harm is likely" and has specifically noted that "[e]nvironmental litigation is not exempt from this requirement." *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983).

NEPA requires that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Methow Valley Citizens Council*, 490 U.S. at 349. "Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." *Winter*, 129 S. Ct. at 376. Here, however, where Plaintiffs have failed to identify which "prospective environmental harms and potential mitigating measures" the EA failed to consider. *Winter*, 129 S. Ct. at 376. Likewise, Plaintiffs' complaints about the Corps' adopted mitigation measures are too speculative amount to imminent and irreparable harm. Plaintiffs' allegations speculate that: (1) the mitigation plan will fail; (2) the monitoring efforts will not identify potential problems; and (3) any corrective measures taken will not successfully mitigate impacts. Allegations of environmental harms that are "extremely speculative, both in logical connexity and in space of time" are not sufficient to demonstrate irreparable harm, *Fla. Wildlife Fed'n v. Goldschmidt*, 506 F. Supp. 350 (S.D. Fla. 1981), and do not justify "extraordinary and drastic" injunctive relief. *Munaf*, 128 S. Ct. at 2219.

Moreover, Plaintiffs do not claim that they will suffer imminent, irreparable injury based on the Corps failure – several years ago – to exercise its discretion and hold a public hearing. *See, e.g., Canal Auth. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (preliminary injunction "not available unless the plaintiff carries his burden . . as to all of the four prerequisites").

## III.    The Balance Of Equities And Public Interest Favor Denying Injunctive Relief.

Here, Plaintiffs repeat their assertions of harm to the environment.  But the public interest standard must be evaluated "separately from and in addition to 'whether the applicant [for stay] will be irreparably injured absent a stay.'"  *NRDC v. Winter*, 502 F.3d 859, 863 (9th Cir. 2007) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)), *aff'd*, 129 S. Ct. 365 (2008).  Although Plaintiffs address general environmental concerns related to the pubic interest, they do not address all of the public interest factors addressed in Corps' EA, as discussed above.  Pl.'s Br. at 22.  Ultimately, the Corps' determined that the Permit was not contrary to the public interest and that the negative impacts could be offset via mitigation.  EASOF at 31-37.  The Corps found that the Permit would have a beneficial effect on:  (1) conservation interests, via conservation easements; (2) the regional economy, via jobs and taxes; (3) recreation, via limited recreation on lands preserved by conservation easements adjacent to Paynes Creek State Park; (4) food and fiber production, because phosphate is needed to produce fertilizer and animal feed supplements; and (5) the Nation's mineral needs, as well as royalties to the federal government from the mining on 551 acres of the Project site.  EASOF at 31-36.

As demonstrated by the immense administrative record, the process to review a permit application under CWA section 404 is complex – it involves, among other things, public notice anc comment requirements; agency responses to public comments; coordination with other federal, state, and local agencies; independent analysis and verification of an applicant's

-28-

submittals, numerous studies, substantial commitments from agency staff and experts; and site visits – and involves substantial agency resources. If the Permit is enjoined, without a substantial showing from Plaintiffs, it may discourage the public from confidently relying on reasoned agency decisions made in accordance with the law.

A preliminary injunction here will harm not only the government, but also may harm the "regional economy" because the phosphate industry "contributes significantly to the tax base of the County and provides local jobs." EASOF at 32. Although Mosaic is best situated to explain how its business and employees might be harmed by an injunction, the Corps specifically found that this project benefits the public because "an uninterrupted source of phosphate" will be available to the United States economy at a competitive price. EASOF at 36-37.

## CONCLUSION

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter*, 129 S. Ct. at 376, and is not available in this Circuit "unless the plaintiff carries his burden of persuasion as to all the four prerequisites." *Canal Authority*, 489 F.2d at 576. Plaintiffs have failed to meet their burden of proof and their motion for a preliminary injunction should be denied.

Respectfully submitted,

*/s/ Adam J. Katz*
Adam J. Katz
J. Nathanael Watson
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 23986-3986
Washington, DC 20026-3986
Telephone: (202) 514-2689
Facsimile: (202) 514-8865
Email: adam.katz@usdoj.gov

July 15, 2010

## CERTIFICATE OF SERVICE

I certify that on July 15, 2010, I filed the foregoing NOTICE OF APPEARANCE OF
COUNSEL with the Clerk of Court via the CM/ECF system, which will send a notice of
electronic filing to counsel of record.

<i>/s/ Adam J. Katz</i>