**IN THE UNITED STATES DISTRICT COURT, MIDDLE DISTRICT**

**OF FLORIDA, JACKSONVILLE DIVISION**

SIERRA CLUB, INC.; PEOPLE FOR    Jacksonville, Florida

PROTECTING PEACE RIVER, INC.;    Case No. 3:10-cv-564-J-25-JBT

and MANASOTA-88, INC.,           July 22, 2010

             Plaintiffs,    1:38 p.m.

-vs-                             Courtroom 10 A

UNITED STATES ARMY CORPS OF

ENGINEERS; and COLONEL ALFRED

A. PANTANO, JR., Commanding

District Engineer, U.S. Army

Corps of Engineers,

Jacksonville District,

             Defendants.


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


**TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION**

**BEFORE THE HONORABLE HENRY LEE ADAMS, JR.**

**UNITED STATES DISTRICT JUDGE**

**COUNSEL FOR THE PLAINTIFFS:**

**THOMAS W. REESE**

*Law Office of Thomas W. Reese*

2951 61st Avenue South

St. Petersburg, Florida  33712


**COUNSEL FOR THE DEFENDANTS:**

**J. NATHANAEL WATSON** and **ADAM J. KATZ**

*U.S. Department of Justice*

Environmental Defense Section

P.O. Box 23986

Washington D.C.  20026-3986


**CHRISTINA D. STORZ,** Assistant District Counsel

U.S. Army Corps of Engineers

Jacksonville District

701 San Marco Boulevard

Jacksonville Florida  32207-0019


**DAVID B. WEINSTEIN, KIMBERLY S. MELLO,**

**KERRI BARSH,** and **MATTHEW A. CRIST**

*Greenberg Traurig, LLP*

625 East Twiggs Street, Suite 100

Tampa, Florida  33602-3925

1   **FRANK E. MATTHEWS**

2   Hopping Green & Sams

3   119 South Monroe Street, Suite 300

4   Tallahassee, Florida  32314

5

6   <u>**COUNSEL FOR INTERVENOR**</u>**:**

7   **GREGORY T. STEWART**

8   Nabors, Giblin, Nickerson

9   P.O. Box 11008

10   Tallahassee, Florida 32302-3008

11

12

13   Court Reporter:

14       L. Marie Splane, RDR, CRR,

15       221 N. Hogan Street, #244

16       Jacksonville, Florida   32202

17       Telephone:  (904) 616-6942

18       Internet:  mariesplane@gmail.com

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2    July 22, 2010                                    1:38 p.m.

3                          ---

4          COURT SECURITY OFFICER:  All rise.  The United

5    States District Court in and for the Middle District of

6    Florida is now in session.  The Honorable Henry Lee Adams,

7    Jr. presiding.  Be seated, please.

8          THE COURT:  Good afternoon.  Let's call the case.

9          THE CLERK:  Case number 3:10-cv-564-25-J-TEM.

10   Sierra Club Inc., People For Protecting Peace River Inc. and

11   Manasota-88 Inc., plaintiffs, versus United States Army Corps

12   of Engineers, et al. Counsel, please state your appearance

13   for the record.

14         MR. REESE:  Thomas W. Reese, and I'm representing

15   the plaintiffs.  The lead counsel, Patrick Gallagher in San

16   Francisco, was unable to be here today due to illness of his

17   daughter.

18         THE COURT:  You're representing all of the

19   plaintiffs?

20         MR. REESE:  Yes, sir.  And I would note that the

21   people in the jury box are from six counties and have come up

22   here in support of the plaintiffs' positions.

23         THE COURT:  Who is representing the Corps of

24   Engineers?

25         MR. WATSON:  Your Honor, my name is Nathaniel

Watson. I'm with the United States Department of Justice,

and I'll be representing the United States Army Corps of

Engineers along with my cocounsel, Mr. Adam Katz, also from

the Department of Justice.

THE COURT: Both of you guys are from Washington; is

that right?

MR. WATSON: Yes, Your Honor.

THE COURT: Okay.

MR. WATSON: And with us here also today is agency

counsel Ms. Christina Storz with the United States Army Corps

of Engineers.

THE COURT: Who is representing the colonel?

MR. WATSON: Your Honor --

THE COURT: That's a part of the government's

representation?

MR. WATSON: Yes, Your Honor, we represent him as

well.

THE COURT: Okay. The next I guess is the

intervenor.

MR. WEINSTEIN: Representing Mosaic, Judge, David

Weinstein, Greenberg Traurig in Tampa. To my right, Kim

Mello, Kerri Barsh, and to my left is Frank Matthews, Your

Honor. He's from the Hopping firm in Tallahassee. He's our

cocounsel in the case.

THE COURT: All right.

MR. REESE:  Also present, Your Honor, is from Hardee County, Gregg Stewart, who has sought intervention in this matter.  He's outside counsel.

MR. STEWART:  Nabors, Giblin and Nickerson, Tallahassee, Your Honor.

THE COURT:  All right.  We had a bad day a couple of weeks ago, it was not a couple of weeks ago with telephone calls about this case that appeared to be from counsel which -- and when I say counsel, I'm not pointing to any individual.  I'm not sure we know who they are from, but there were a million questions asked, and those million questions caused -- put the office into kind of a turmoil. So I'm going to ask that you not contact my office, and I'm asking that of counsel.  If you have something you need or a request that you want to make or a question that you want to make, I'm recommending that you file something.  Otherwise, it won't get dealt with.

And if you file something and you style it an emergency, it should be an emergency.  If I determine that it's not an emergency, then the next thing I'm going to consider is the cost in dollars as to what that is going to cost you.  All right?  And I'm not accusing anybody of anything.  I'm just kind of laying down the rules.

When we get all of these calls, we have other things that we need to deal with.  I know most lawyers think their

case is the most important in the world and it probably is

important, but there's a lot of important cases that have to

be dealt with.

All right.  Having said that, are we ready to

proceed?

MR. REESE:  Yes, Your Honor.

THE COURT:  Does the Sierra Club want to tell me why

I should grant a preliminary injunction in this case?

MR. REESE:  Yes, sir.  As was discussed at the

temporary restraining order hearing on July 1st, there are

two cases that are pending before you.  One is the Altman

track case which the Army Corps issued a permit for and now

the South Fort Meade of Hardee County permit.  The Altman

case is 480 acres are being asked or has been permitted for

mining; the South Fort Meade, it's 534 acres and 10.7 miles

of streams.  This is just a part of a very large phosphate

mining activities in the Peace River.

We think that the issue that's really in front of

you is we have presented evidence that there will be

significant harm, it will be irreparable harm and the real

issue is how to frame an injunction to address this issue.

The Army Corps of Engineers issued the permit, but shortly

thereafter, they turned around and granted and agreed with

EPA's request to do an area-wide EIS.  And we direct your

attention to Documents 16-7.

1          THE COURT:  You brought that up and it's contained

2     in your paper and we heard about that the last time.  What is

3     this -- what is the significance on that insofar as your

4     position is concerned?

5          MR. REESE:  Well, specifically the issues on page 2

6     of that document, it talks about the importance of the Peace

7     River Basin, the fact it's 700,000 people --

8          THE COURT:  So if the Army Corps of Engineers -- not

9     the Army Corps of Engineers, but the Environmental Protection

10    Agency disagrees, and I'm not assuming that they disagree

11    with what's done, I gather at this point that they don't

12    disagree with the issuance of this permit; is that an

13    accurate statement?

14         MR. KATZ:  That's an accurate statement, Your Honor.

15         MR. REESE:  It's my understanding, based on the

16    correspondence that's occurred, that the EPA has advised the

17    Corps that they still have concerns about the environmental

18    impact.  They believe -- that letter actually went out

19    shortly before the permit was to be issued.  They actually

20    said what we're not going to do is attempt to veto it.  But

21    they said, we need an area-wide EIS, and they were actually

22    quoted in the newspaper as saying they recognize the need to

23    improve the process and the colonel agreed with them.  And so

24    the colonel of the Corps has --

25         THE COURT:  Does the fact that the EPA have that

1 opinion place some lawful obligation on the Army Corps of

2 Engineers to do anything?

3      MR. REESE:  What it is is the Army Corps has agreed

4 with EPA that the process needs to be improved, that there

5 needs to be an area-wide EIS to address the phosphate

6 impacts.  By doing that, they have essentially made a finding

7 that EPA is correct.  The question becomes what do you do

8 with this permit.  They said they issued the permit because

9 it's been pending for awhile.  Essentially, the permit asks

10 for 21 years, and it was issued as an 18-year permit.

11      The question I believe that the -- the remedy that

12 is before you is with a 18-year permit, is that really

13 appropriate, or should it be less of a permit, and should

14 there be impacts, alternatives of mining the uplands in the

15 interim while this additional information is investigated.

16 And essentially, that gets into detail, the documents -- it's

17 actually one of the Mosaic documents, Document 56-2, and it

18 went into the -- also, the Army Corps determination document,

19 they looked at Alternatives 3 and 4, which had no wetland

20 impacts.

21      Alternative 3 had none, no stream crossings.

22 Alternative 4 did have stream crossing, and specifically the

23 alternative with allowing stream crossings which would be

24 restored after the drag line crossed the stream would allow

25 59 percent of Mosaic's preferred alternative.  That's a lot

of phosphate. And as an interim, that would allow -- they

don't need to shut down their mining. They have filed

documents saying they will have to stop if any type of

injunction is issued.

We take issue with that. We believe an injunction

can -- the remedy of the injunction can be shaped to allow

them to continue to mine and allow the Army Corps and EPA to

do this area-wide EIS, and then when that is done, and it may

take two or three years, then reevaluate what type of a

permit should be issued. But a 18-year permit at this time

is not appropriate. And that's the remedy that we believe is

appropriate at this point.

When the Army Corps and the EPA agree that there

needs to be an additional evaluation and the process needs to

be modified, that is essentially saying that this current

permit should not be issued for 18 years. We believe that

that would violate the EPA. Essentially, they're saying the

facts show the need to do something different. And at least

to collect the information. Possibly the information that's

collected would come back and say maybe this permit is

appropriate, but it would be after this full analysis, this

hard look, is taken.

And so we believe that at this stage, with all the

cumulative impacts and that's what really the Army Corps

wanted to have evaluated when they agreed with EPA, that list

specifically on the document -- let's see, it's 16-7 -- it talks about the substantial cumulative impacts downstream and the effects on the Charlotte Harbor.  That's one of the things they want to have evaluated.  They want to have the drinking water supply of 700,000 people evaluated in detail. They want to look to see how the impaired waters in the Charlotte Harbor and the total maximum daily loads that are going to have to be developed on those impaired waters, how they're going to be combined and fitted in with all this permitting.

They also specifically stated they wanted FEMA to evaluate and be involved in evaluation of what is going on in the floodplain.  They also said that they wanted to look at the cumulative and secondary impacts of mined lands.

THE COURT:  But I'm still hung up on the fact that at some point the agency wanted to know all of that.  They wanted those questions answered before you proceed, but then they changed their position.  They either changed their position or decided to let this go ahead.  And if those questions were so significant, and they do appear to be significant questions as you frame them, I don't understand why all of a sudden they just go away.  And the effect of that, and what difference does it make at this particular point?  They no longer care about those important questions.

MR. REESE:  Well, there have --

1          THE COURT:  So how does that affect the Army Corps

2    of Engineering process, a permit process?

3          MR. REESE:  When in this case the Corps went ahead

4    and issued the permit, it didn't affect them, they made some

5    modifications in the floodplain, but they essentially issued

6    a permit, 534 acres and 10.7 miles of the stream, and they

7    did it for 18 years.  EPA specifically asked them to phase

8    it.  They specifically said that they -- as information came

9    in, that this 18-year permit needed to be done in phases.

10   That's essentially --

11         THE COURT:  That's what they said initially.

12         MR. REESE:  That's what they said in their last

13   e-mail exchange --

14         THE COURT:  Before the permitting.

15         MR. REESE:  It was like the day before.  I'd have to

16   look up -- it was within a week before the correspondence

17   actually said they still wanted the phasing done.  It has not

18   been done.  NEPA says that you're supposed to take this hard

19   look and get this information before you make the decision.

20   The Corps basically said Mosaic needs to move forward.  There

21   would be impact if they don't get a permit and can't do

22   mining, so we're going to give them a 18-year permit.

23         And that's essentially the issue you're faced with

24   on doing your injunction, how do you phase in the remedy of

25   an injunction.  And our suggestion, it's similar, if not

1  identical to the Corps's or EPA's suggestion to the Corps --

2       THE COURT:  It's more of an issue than just that,

3  isn't it?  The question is, are you entitled to any

4  injunction, and to get to that point, I'd have to find that

5  the Corps of Engineers did something improper or did

6  something it should not have done.

7       MR. REESE:  They have not done a full cumulative

8  impact analysis.  What they've --

9       THE COURT:  But under certain circumstances, they

10  are not obligated to do that.

11       MR. REESE:  Under NEPA they are.  They are required

12  to do that.  They've agreed that they will do it on an

13  area-wide basis, and then the purpose of an area-wide basis

14  is you really look at the whole watershed rather than doing

15  EIS's permit by permit.  And once you do that, and EPA made

16  the comparison to actually what is being done with the

17  Everglades restorations, they actually did the overall

18  Everglades cert, area-wide EIS, and then you break that into

19  subsequent parcels as permits come in.  That's very similar.

20  And they made that for the Peace River.  If you give a 18

21  year permit out, that permit's done.  They have that right to

22  mine 534 acres of wetlands.  They have not demonstrated that

23  they can restore all types of wetlands, and that's one of the

24  issues that's going to be addressed.

25       Specifically, I was reading the memorandums for

summary judgments in the Altman case, and actually the
plaintiffs in that case were arguing how there were actually
findings in the State administrative proceeding on how
certain types of wetlands were found not to be restored.
There were problems with exotics; there were problems on
shallow wetlands; there were problems with mixed hard wood
wetlands and getting them restored.  Those problems continue
to exist, and that's why there's this interrelationship
between the Altman case permit and this South Fort Meade
case.

We recognize that when you do an injunction, you
have to take into balance a lot of competing interests.  And
there are economic interests.  There's a roomful of people
who are here who are concerned about their jobs, and we
respect that and understand it.  That's why we're suggesting
that mining of the uplands in the interim --

THE COURT:  That's always a factor, but it's also a
factor that you're talking about, as I understood, quite a
few miles of streams, quite a few acres, thousands of acres
of wetlands, quite a bit of an impact on the Florida aquifer
also, so there are a lot of other things.

MR. REESE:  Correct.  We think those are very --
excuse me.  We think those are very important facts.  That's
why people that are in the jury box here came all the way
from six counties.  They're concerned about their drinking

water supply; they're concerned about their river and their
harbor and the benefits that that provides. Florida is known
as being a very important place for recreation and outdoor
activities, and that's why Florida is what really -- why
people like it. And it has an economic impact in and of
itself, and drinking water definitely not only has an
economic impact, but it has a health impact. And there's
700,000 people that get their drinking water out of the Peace
River or rely on it.

And to move forward issuing an 18-year permit -- and
this is cumulative with the others. There's other permits.
The Altman permit is a ten-year permit. That case has
actually been pending and I understand for two years in front
of this court. And that's why there needs to be an
injunction in this case now that EPA and the Corps have
recognized and admitted that they need to do an area-wide
EIS.

We've been asking for it for years. EPA has been
asking for it for years. There are cumulative impacts.
There has been a cumulative impact study that has been
partially done, but it wasn't done as fully needed and shows
there have been tremendous loss of wetlands. Over 31,000
acres of wetlands have been lost in-between 1979 and 1999.
There have been wetlands lost since then. And 50 percent of
that, according to that study, were related to phosphate

1 mining.

2 　　　　So these impacts on the Peace River Basin are very

3 large and cumulative impacts are not just present and future

4 impacts, they're past impacts.  And one of the things that's

5 never really been fully addressed by the Corps is how do you

6 determine what the proper base line is, how do you determine

7 when you look at all the past cumulative impacts, how many of

8 those need to be restored and can you allow more.  And so the

9 issues are most that have not been fully addressed.

10 　　　　And I did make a -- have to admit I did make a call

11 to your office yesterday trying to find out how long this

12 hearing might be, and I apologize.  I'm not sure how long the

13 hearing will be, but I would like to have an ability to

14 respond.

15 　　　　THE COURT:  I didn't know about yesterday.  I

16 appreciate your telling me that.

17 　　　　MR. REESE:  I'm being up front.  But I would like to

18 have an ability to respond to --

19 　　　　THE COURT:  I'll give you that.

20 　　　　MR. REESE:  I don't want to take up all the time.

21 　　　　THE COURT:  Let me hear from the Corps of Engineers.

22 　　　　MR. WATSON:  With this Court's permission, Your

23 Honor, we would like to bifurcate any of our argument along

24 the lines of I'll address some of the factual background and

25 procedures and plaintiffs' likelihood of success on the

merits under the National Environmental Policy Act.  And my
cocounsel, Adam Katz, will address their likelihood of
success under the Clean Water Act.

THE COURT:  That's fine.  Let's proceed.  Tell me
what the plaintiff is going to have to establish to get an
injunction against the Corps of Engineers in this case.

MR. WATSON:  Your Honor, the plaintiff has a heavy
burden in this case to establish that they've suffered from
irreparable harm, imminent injury, and particularly as what
was being talked about earlier, a substantial likelihood of
success on the merits.  Now, when they're talking --

THE COURT:  Is the irreparable harm a real issue or
claim of the Corps of Engineers, that they can't establish
here?

MR. WATSON:  Your Honor, irreparable harm in the
context of the National Environmental Policy Act has to stem
from a direct procedural injury caused by the failure to have
an environmental impact statement.  And to meet that burden,
plaintiffs have to point to specific problems and things that
they would suffer that would be addressed in an environmental
impact statement that weren't addressed by the Corps's
environmental assessment.  And everything they pointed to was
addressed in detail in the Corps's environmental assessment
in this case.

THE COURT:  All right.  I would think, and it's my

guess, that the biggest problem that they may have is their

likelihood of success on the merits in this case.  But --

MR. WATSON:  Yes, Your Honor.  We believe that they

cannot show a likelihood of success on the merits in this

case.  Specifically, counsel was talking about what they

believe is a need for an environmental impact statement in

this area and referencing statements by the Environmental

Protection Agency.

First, the Army Corps of Engineers specifically

considered the cumulative impacts of this project quite

extensively.  It looked at activities in this basin from 1977

to 2028.  It looked at urban use; it looked at agricultural

uses; and it looked at the impacts of mining, past

reclamation and other activities.  And it looked at this

project within that context.  And when it did, relying on its

own experts and relying on the information before it at the

time of its decision, the Army Corps of Engineers determined

that the cumulative impacts in this case did not rise to the

significant threshold that would trigger an environmental

impact statement.

And the detailed analysis that the Corps conducted

was based on their extensive agency expertise, and that means

that they're entitled to significant and exceeding deference,

because they relied on that expertise, and because it's a

case brought pursuant to the administrative procedures act.

And any claims must be based on the record.  And the record
here before it clearly -- in this case, clearly explains the
actions taken by the Army Corps of Engineers.

Further, to the extent that the EPA thought that
there was any commentary about an environmental impact
statement, the EPA could have elevated that decision and
forced the issue, but ultimately it decided not to do that.
That there was no action by the EPA to require an
environmental impact statement.  And the Corps determined
after a reasoned and careful examination of the issues in
this case, that no environmental impact statement was
necessary.

THE COURT:  Well, what is the effect of the EPA's
overall effort to voice some disagreements or its
disagreements with what -- how this process was proceeding
and some of the substantive issues in this matter?  How does
that impact what the Corps should do?  Is the Corps under an
obligation to do anything with the suggestions or findings of
the EPA?

MR. WATSON:  No, Your Honor.  Unless that goes
through an elevation process or some sort of veto by the EPA,
the Corps is not under that obligation so long as it examines
and explains its decision.  And here there were extensive
collaborations between the EPA and the Army Corps.  In fact,
the Army Corps adopted some of the EPA's suggestions with

regards to the alternative it adopted, preserving one bay

head system and eliminating one stream crossing. And the

Army Corps worked very closely with the EPA as they do in all

of these, because in a Section 44 permit, which is what this

case is about, which is, you know, permission to legally

dredge -- place fill and dredge materials into the waters of

the United States, the Army Corps issues those permits, and

before it does, it consults with various federal agencies.

They consulted with the Fish and Wildlife Service, as well as

the EPA. And the Army Corps' obligation is to reasonably

consider whatever comments come in and explain its decision.

And even if there are disagreements, the Army Corps,

so long as its decision has some rational basis in the

record, and here they've done far more than just present a

rational basis in the record, their decision is entitled to

deference because the National Environmental Policy Act isn't

about a substantive decision. It's about a process and going

through the steps proscribed by Congress before making a

decision. And here the environmental assessment is really a

tool for any federal agency and the Army Corps to determine

whether a specific prosecute project or permit application

does have significant effects on the human environment.

And this case, after reasonable consideration, the

Army Corps determined that there were not significant impacts

on the environment. And to mitigate any potential impacts,

the Corps went through a very detailed process and required

extensive mitigation from the permittee, the defendant

intervenor Mosaic, which will preserve thousands of acres and

conservation easements and insure that there is no net loss

of wetlands or waters of the united stream functions as a

result of this project at any time throughout the project.

THE COURT:  Is that it, counsel?  You want the other

part of this presented now?

MR. WATSON:  Your Honor, if you have any questions

about the Clean Water Act, I'll turn it over to my colleague,

Adam Katz.  Thank you.

MR. KATZ:  Good afternoon, Your Honor.

Just to clarify something I said before, I believe

your specific question was whether EPA affirmatively

recognized that they agree with this permit, whether they

agreed with, and to clarify, EPA and the Corps under a

memorandum of agreement between the two agencies that they

issued pursuant to Section 404(a) of the Clean Water Act,

which is 33 U.S.C. 1344(a), they established procedures when

if EPA disagrees with the Corps' ultimate decision in a case,

it can elevate it first for one level of review, then

another.  And there are multiple levels of review that EPA

can ultimately elevate these decisions.

THE COURT:  Did it take any of that --

MR. KATZ:  EPA did not elevate it, even to the

1  initial level here, Your Honor.

2        There are three specific claims for relief in

3  plaintiffs' motion for preliminary injunction.  First, they

4  argue that an environmental impact statement should have been

5  performed.  They also argue that the Corps's decision here

6  was arbitrary and capricious because the Corps did not

7  consider practicable alternatives and because the Corps did

8  not hold a public hearing.

9        I'd like to note that in plaintiffs' motion for TRO

10  and preliminary injunction, which I believe was 47 pages,

11  they didn't cite once to the very decision document that they

12  now ask you today to vacate.  It's a 101-page document,

13  single-spaced, supported by an over 100,000-page

14  administrative record.  You won't find when you review their

15  brief any citation to the very document that they ask you to

16  exercise your exportable discretion and preliminarily enjoin

17  Mosaic from doing any work pursuant to.

18        I want to address, though, briefly the Corps'

19  decision with regard to alternatives, that is, what the Corps

20  considered when deciding to let this procedure go forward.

21        The Clean Water Act regulations -- and we're going

22  to talk about a lot here, so I'll give you the citations.

23  We're talking at 40 CFR 230.10.  They establish environmental

24  criteria which must be met for activities to be permitted by

25  the Corps under Section 404.  As a practical matter and as it

relates to this case, the requirements can be combined and looked at into three general categories.

First, that the Corps tried to avoid wetlands and streams. Second, to the extent that they can't be avoided, they be minimized. And, third, after that, they go to compensatory mitigation. The Corps followed this precise process here. Again, when you look at plaintiffs' motion for a temporary restraining order and a preliminary injunction, you'll wonder, they don't cite to any specific deficiencies in the Corps's analysis, but instead said the Corps should have done something else.

I'd like to explain now, so that you have a little bigger -- a better perspective of what the Corps actually did here that they're complaining of. You will find none of this in plaintiffs' moving papers.

First, with respect to the first prong, avoidance. The Corps conducted a thorough analysis of four offsite alternatives -- so not at the site that the project is actually going forward to -- to determine how best Mosaic could still obtain a permit but at the same time avoid waters of the United States, avoid impacting any. That's called offsite alternatives analysis.

The Corps, in its experience and its judgment and using its scientific expertise, considered them and decided that those offsite alternatives were not practical. First,

one of these alternatives, again not discussed in plaintiffs'

moving papers, would have required Mosaic to move a dragline,

which is an enormous five-story piece of earth-moving

equipment, across the Peace River.  It would have also

required them to install and utilize slurry pipelines.  It

wouldn't provide sufficient phosphate to meet the project

purpose, or others of these alternatives were impracticable

because of transportation costs, including impacts on major

highways, I believe Route 60 down there near Tampa.  The

Corps considered and rejected a fourth offsite alternative

because of increased environmental concerns.  In particular,

the Corps determined that it would result in more wetlands

losses.

        So after the Corps considered that first step, these

offsite avoidance issues, they then said, well, that's not

practicable; let's take this second step; let's take a look

at on-site alternatives.  And, in essence, what that meant is

the Corps said how can we shrink the environmental footprint

associated with this project and allow it to go forward.  The

Corps reasonably concluded that the existing project, as

required by Section 404(b)(1) of the Clean Water Act,

constituted the least environmentally damaging practicable

alternative.

        The Corps considered various on-site alternatives,

none of which were mentioned in plaintiffs' moving papers,

that would minimize -- Step 2 -- any adverse impacts and
concluded that the selected alternative, one that would only
result in impacts to 7 percent of waters of the United States
on the site, constituted the, in statutory parlance, least
environmentally damaging practicable alternative.  Notably,
plaintiffs cherry picked from certain correspondence among
EPA and the Corps over several years.  I'll note that at the
end, the alternative selected by the Corps avoided impacting
additional wetlands and streams in response to EPA's specific
comments.

Third, the Corps conducted a detailed quantitative
assessment.  I believe plaintiffs' counsel mentioned base
line.  We never knew what the base line was.  Well, the Corps
conducted a detailed quantitative assessment of the functions
and the values of the various waters of the United States on
the site and required that Mosaic fully compensate, fully,
for any unavoidable impacts to offset any losses to wetland
or stream values.  I'm not going to get into detail on this
now, Your Honor, but I believe Mosaic's counsel,
Mr. Weinstein, in a few moments will elaborate on this
comprehensive mitigation plan that the Corps required Mosaic
to implement.

Against this backdrop and in light of the fact that
Sierra Club has failed to cite to any particular deficiency
in the Corps's analysis that it asks this court to vacate,

it's clear that they've failed to meet their heavy burden of establishing that the Corps' decision was arbitrary and capricious.

Sierra Club separately alleges, but I think it overlaps to some degree, that the Corps' permit decision here was arbitrary and capricious, and, therefore, that this court should vacate it and remand it to the agency because the Corps did not independently perform what it refers to in its brief as an empirical demonstration to support the Corps' consideration of whether the project is economically impracticable.

As an initial matter, I'll point out that Sierra Club has cited no authority for the proposition that the Corps, or any other agency for that matter, is ever required to perform an empirical demonstration of economic practicability, and the United States has taken the time and looked for it, and we are aware of no finding, persuasive or otherwise, authority that requires that.

Sierra Club also fails to allege why the Corps's permit decision here would have been any different had the Corps undertaken this empirical demonstration, or even to suggest what it should have been, what this empirical demonstration should have consisted of. There can be no doubt again with this second claim under the Clean Water Act, that Sierra Club has failed to meet its heavy burden of

making a clear showing that it is likely to succeed on the
merits of that claim.

Sierra Club's final claim in which they ask this
court to exercise its equitable discretion is that the Army
Corps of Engineer violated the Clean Water Act by not holding
a public hearing.  There simply is no merit to that argument.
The Corps's regulations and the Eleventh Circuit case law
have made clear that the Corps is not required to hold a
public hearing in cases such as this when the district
engineer -- that's Colonel Pantano that you mentioned
before -- when the district engineer determines that no valid
public interests would be served by holding a hearing.

Well, again, had plaintiff cited to the very
document they ask you to vacate, they would realize that the
district engineer made this precise finding:  Each issue
raised in the comments was either insubstantial or had
previously been presented to and considered by the Corps,
and, therefore, no valid interests would be served in a
hearing.

That's available at Exhibit 1 page 95 to the United
States's opposition to this motion for preliminary
injunction.

This discretionary decision, which is both supported
by the record, is entitled to deference.  The record again,
Your Honor, is something that I want to stop and discuss

here.  And in these EPA cases, judicial review is limited to
the record, and that's particularly so here when determining
the likelihood of success on the merits.  The record which is
well over 100,000 pages and we will not provide to your court
in paper --

THE COURT:  I would appreciate that.

MR. KATZ:  -- will demonstrate all of this.  Other
pages of that document not cited in the moving papers.  I
will draw your attention to Exhibit 1, at pages 15 and 16.
The district engineer outlined all public comments.  He noted
the date they were received, and he noted whether the
commenter had requested a hearing.  Nine commenters requested
a hearing including Sierra Club.

Turn the page.  Page 16 through 18 of that same
decision document that they ask you to vacate, the district
engineer outlined all issues raised in those letters and
where specifically the Corps addressed the precise issues in
the administrative record.  Against this backdrop there is
just no way that they can establish a likelihood of success
on the merits.

I also should point out that neither Sierra Club nor
its members, and I'm referring to Sierra Club as all
plaintiffs here, Your Honor, allege that they were denied any
opportunity by the Corps to be heard.  They don't explain
what they could have articulated orally at a public hearing,

but could not present in their comment papers. And I think
it would be a hard argument for them to sell, giving the
voluminous number of documents that they submitted to the
Corps that comprised this over 100,000-page administrative
record.

I'd now like to just briefly address the issue of
irreparable harm and to explain why Sierra Club has failed to
meet its burden of making a clear showing that its members
will likely suffer irreparable harm, absent an injunction. I
think that its claim for irreparable harm can really be
understood as twofold. First, an argument that they're going
to suffer irreparably under NEPA, and, second, an argument
that they're going to suffer irreparably under the Clean
Water Act, and I'll address those in turn briefly.

Plaintiffs allege under NEPA as Mr. Watson
explained, that the Corps' decision to issue a permit here,
without conducting an EIS, which is an environmental impact
statement, was arbitrary and capricious. This court need
look no further than the Supreme Court's most recent case law
this term, which was not cited in plaintiffs' brief, which
proves why that issue must fail as a matter of law.

The Supreme Court just made clear last year that an
injunction is never an appropriate remedy for an allegation
that an agency violated NEPA by failing to perform an EIS, an
environmental impact statement, without plaintiffs first

explaining what, quote, perspective environmental harms and
potential mitigating measures, unquote, the EA failed to
consider but the Corps would have considered in an EIS.

Sierra Club has failed to allege any prospective
environmental harms or any potential mitigating measures that
the Corps would have addressed in an environmental impact
statement, but that the Corps did not already address in its
101-page environmental assessment and the supporting
100,000-plus-page environmental record.  That case that I'm
citing, Your Honor, which is cited in both of ours and
intervenor Mosaic's brief, is Winter versus NRDC, 129 Supreme
Court 365.

Plaintiffs' second issue with regard to irreparable
harm focuses on the Clean Water Act, and they claim that they
will suffer irreparably based on its theory that this
mitigation plan, which Mr. Weinstein will discuss in a few
moments, will some day in the future fail; it won't meet the
stated objectives.  This claim is just far too speculative to
justify what the Supreme Court and the Eleventh Circuit have
repeatedly called the extraordinary and drastic relief of a
preliminary injunction.

And I think it goes without saying, but I'll mention
it briefly, Sierra Club does not even allege that its members
will suffer irreparably based on the Corps' decision not to
hold a public hearing.  They don't even bother to allege

that, Your Honor.  As Mr. Watson has explained with respect
to the Corps' reasoned decision with respect to this project,
that when taking into account mitigation, it will not result
in significant environmental impacts, that decision is
entitled to deference.

Moreover, as I just explained, Sierra Club has
failed to meet its heavy burden with respect to the Clean
Water Act claims or its allegations of irreparable injury,
but the Supreme Court has emphasized emphatically, in these
past two terms, both in the NRDC case I just cited to you and
Monsanto which was decided I believe on June 22nd, Your
Honor, that a plaintiff when seeking an injunction, must
carry its burdens for each factor, not just one, not two, not
three, but all four.  And the Supreme Court has also
explained that environmental litigation is no exception.
Plaintiffs have failed to meet their heavy burden of
establishing that they're entitled to the extraordinary and
drastic remedy of an injunction.

I believe that Mr. Weinstein from Mosaic will now
address any issues that I may not have touched on and will
also address the balance of equities and public interest
standards.

THE COURT:  Mr. Weinstein.

MR. WEINSTEIN:  May I proceed, Your Honor.

Judge, if you can indulge us for just a moment,

we've got some diagrams we want to put up.

Plan B is the ELMO, if you want to.  I apologize.
Just one moment.

THE COURT:  Let's hope it works.

MR. WEINSTEIN:  Technology is always a challenge,
Your Honor.

THE COURT:  We've had a running battle with this
system for the last year.

MR. WEINSTEIN:  Is the system winning?

THE COURT:  Yes, it's winning.  I think you better
warm the ELMO up.

MR. WEINSTEIN:  Yes, sir.

There we go.  We can just answer.  Thank you very
much.

THE COURT:  The younger they get, the better they
are.

MR. WEINSTEIN:  First slide, please.

Your Honor, thank you for your patience.

First, I note that as the court is well aware, this
is a four-part test:  Substantial likelihood of success on
the merits and irreparable harm which the government has
addressed.  We'll talk about irreparable harm today too, Your
Honor, and tell you why the Sierra Club and the rest of the
plaintiffs can't possibly carry their burden of showing
irreparable harm.  There is none.  But Sierra Club and the

other plaintiffs, Judge, have completely failed to address
balancing of harms and considerations of public interests,
and they've got to clearly carry their burden on both of
those elements to be entitled to injunctive relief.  They
haven't in their papers, they haven't in any declarations
filed, and they certainly haven't in argument today.

First, Judge, this project won't cause irreparable
harm to the environment.  The contrary is true.  What the
plaintiffs haven't told you is this area has been heavily
degraded by 60 years of agricultural activity.  And as a
result of the avoidance, the conservation easements, the
reclamation and mitigation that Mosaic is required to do --
and, Judge, counsel for the government talked about the
mitigation plan that's at issue in this case.  This is the
mitigation plan that Mosaic is required by law and by permit
to perform.  And as a result of all of this, Judge, there
will be improved quality of wetlands on the property.

THE COURT:  Isn't a part of the plaintiffs' argument
is that Mosaic's record of performing this mitigation is
pretty bad?

MR. WEINSTEIN:  That's their argument, Judge, and
it's wrong.  It's contrary to the Corps' finding below.  It's
contrary to the administrative law judge's finding in the
State proceeding which is incorporated in this record.  What
plaintiffs haven't told you, among other things, Your Honor,

1  is that these issues about water quality and water quantity,

2  they litigated through an entire trial in the State

3  proceeding and they lost. And they appealed that decision to

4  the Second District Court of Appeal and they lost. And a lot

5  of that record is incorporated into the federal record and it

6  was reviewed by the Corps.

7         So these issues -- this isn't something that has

8  just come up, Judge. This is seven years down the line with

9  respect to this project. And this project was reviewed on

10  the local level, Judge; it was reviewed on the State level;

11  it's been reviewed by the Corps and EPA. And everyone has

12  agreed at the end of the day that this is a good project and

13  it will have net environmental benefits, not harm. And

14  specifically, Your Honor, not some of -- you know, a

15  subjective view by Mosaic, but if you looked at improved

16  wetland quality and improved stream quality -- and many of

17  these are objective standards that the Corps calculated using

18  WRAP and other measurements.

19         With respect to these wildlife corridors that are

20  going to be created, Judge, over 1,000 acres of new wildlife

21  corridors. With respect to the perpetual conservation

22  easements --

23         THE COURT: One other issue that I think the

24  plaintiff raised was the period of time that this mitigation

25  was even supposed to commence. I think there was a concern

1  about that, wasn't it, counsellor?

2         MR. REESE:  Correct.

3         THE COURT:  That was part of the argument?

4         MR. REESE:  Yes, sir, the last time.

5         THE COURT:  Yes.

6         MR. WEINSTEIN:  And the WRAP scores that I had just

7  referred to, Judge, are discounted, and they have built into

8  the equation the time lapse and the risk that mitigation

9  won't be complete.  So when we talk about WRAP scores and

10  winning on that, which we do handily, the time lapse is

11  already built in.

12         And the statistics, Judge, and I'll show you some

13  pictures that are going to be worth a thousand words and

14  maybe a million statistics, but the plaintiffs are trying to

15  tell you that only 28 percent of the lands have been

16  reclaimed, and that's just not true, Judge.  And the reason

17  that that statistic is so misleading is that the way the

18  State of Florida does this, lands don't get released back to

19  the State of Florida once they're reclaimed until all mining

20  activity on that site is complete.  So we're going to show

21  you pictures of beautiful reclaimed wetlands that's been done

22  as the project is completed in phases, that is absolutely

23  reclaimed, but it doesn't get counted in that statistic,

24  Judge, because the activities are still ongoing at that

25  project.

In fact, we've got in the record, Your Honor, the declaration of Rick Cantrell who is the top State regulator during this entire time period. What Mr. Cantrell has sworn to this court is that the quality of wetlands that Mosaic is releasing back to the State is reclaiming is even higher than the wetlands they're disturbing. The technology has come a long, long way, Your Honor, and the wetlands that are disturbed will be brought back in a condition that's better than when we started. And we're going to show you some actual photographs of that.

To the prongs, Judge, of balancing of harms and consideration of public interests, we have over 70 declarations in the record from employees, many of whom are here and will lose their jobs if an injunction issues, from contractors and suppliers to Mosaic who are in the same position. Many of those folks are here today. From the United Way, Judge, of Hardee County, whose 64 percent of the budget for the United Way of Hardee County, 64 percent comes from Mosaic, and they will have to cut all the Red Cross and other programs if this injunction issues. So what plaintiffs haven't told you is the balancing of harms, both with respect to Mosaic and the plaintiffs that the court has to weigh and with respect to considerations of public interests are heavily, heavily weighted in Mosaic's favor and cannot be overcome by the plaintiffs.

                    Judge, I'd like to talk a little bit, if I may, just
for a moment about the importance of this product.

                    One more slide, please.

                    This product, this phosphate rock, Judge, is made
into phosphate fertilizer, and that phosphate fertilizer
accounts for 40 to 60 percent of the United States' grain
production, 40 to 60 percent.  Mr. Borlaug -- and this quote
here is referred to in the federal record.  This man is one
of six or seven in the history of the country, Judge, to win
the Nobel Prize, the Presidential Medal and the Congressional
Medal.  This says it all.  What the issue is, is to feed
6.6 billion people, and without chemical fertilizer, it can't
be done.

                    THE COURT:  I assume you're standing for a reason,
counsel?

                    MR. REESE:  Yes, sir.  We objected to the motion to
bring computers into the room because we asked the question
were they going to be making a Power Point presentation that
went beyond the record, and that's what they're doing.  I was
told out in the hall that there were very few things.  I now
see that there are quotes from people.  I do not know if this
is in the record.

                    MR. WEINSTEIN:  I'll be happy to identify, Judge, as
we go along, exactly where all of this comes from so the
record is very clear.

          THE COURT:  So you aren't going to throw him a book
with 100,000 pages over there, are you?  You're going to tell
him where it is; is that right?

          MR. WEINSTEIN:  I'm going to tell him where it is, I
promise you.

          MR. REESE:  But we did not see the Power Point
presentation and we did not have any real description of what
it was about.

          THE COURT:  This is pure argument, counsel.  The
decision has to be based on what is in the record anyway.

          MR. REESE:  Thank you.

          MR. WEINSTEIN:  And Professor Alley's declaration is
in the record, Judge, and what he says is without this
product, you cannot sustain the world population in terms of
agriculture.

          Next.

          Phosphate is -- there's no artificial substitute,
Judge.  This is it.  It's an essential element.  Plants have
to have it; animals have to have it; people have to have it.
And we can't make it.  It comes from the ground and that's
it.  And what is really important to understand, Judge, with
respect to the project purpose and alternatives is that there
is no excess capacity available in the U.S. or global
markets.  And the citations you see there for the record are
to the MFR-2, which is another large volume sitting on the

table over there.  This is right out of the federal record.

Next, please.

I'll move quickly through these, Judge.  I've talked about them before.  But it's not just the quantity of jobs, 1,500 jobs that would be lost, it's the quality of jobs.  The average job here Mosaic would pay is $61,000 a year, when the statewide average is 34.  And that doesn't even put the -- tell the whole story, Your Honor, because Hardee County is next to last in the state in terms of average wages.  So these aren't just jobs for Hardee County, these are great jobs.

Next, please.

And I won't take you through all of these, Judge.  I know your time is short.  But these declarations which are in the record are mostly handwritten, and they're from the heart, Judge, and they are heartwrenching.  There are declarations from folks who have a spouse on the heart transplant list who without the insurance wouldn't get the transplant.  There are folks who have a child on the way that needs open heart surgery, and without insurance may not have it.  There's a declaration in the record, Mr. Lindsay Smith, a utility operator, says he's got 13 adopted children and 3 grandchildren.  His family would be devastated by the issuance of this injunction.  We won't take you through them, but they're there and they're in the record.

1          Comparable facts.

2          Next, please, Matt.  Hold right there.

3          Comparable facts from the unions, Judge, who say,

4   not only are these folks going to lose their jobs, but

5   because of the state of the economy, they're not going to

6   find other ones, and not for $61,000, that's for darn sure.

7   And Hardee County, Judge -- ranked fourth -- this is the

8   site, Judge -- and I'm going to show you where it is, one

9   picture being worth a thousand words.  With the sites in

10  Hardee County, it's an extension, a continuation of the Polk

11  County sites.  The Polk County part of the mines north of the

12  County Line Road and Hardee County; South Ford Meade is on

13  the south side of the road, but it's a continuation of the

14  same mine.  Fourth in the state in poverty; seventh in the

15  state for students eligible for the free lunch program; 66

16  out of 67 in the counties for average wage earnings.  So with

17  respect to considerations of public interest for Hardee

18  County, Sierra Club can't possibly carry its burden here.

19          Next.

20          And it's not just the dollars, Judge.  Mining is the

21  highest and best use of this property, and don't take our

22  word for it.  That's in a study that Hardee County

23  commissioned, and it's referred to in the Hardee County

24  declaration which is in the record.

25          And in addition to being the highest and best use,

there's a conservation easement that's very important to
Hardee County, and they talked about it in their declaration,
and that's going to get lost.  There's $135 million in
infrastructure, economic development and wages that will be
lost.  There's $42 million, Judge, in direct funding from
Mosaic to the county, $42 million that will be lost; 5
million has already been -- there's a $5 million payment that
was due that hasn't been paid and will not be paid.  It won't
be due, Judge, unless this mine goes forward.  And an
additional $93 million in wages.

     Next, please.

     The same with Polk County, Judge.  Not just Hardee
is affected, but Polk County has put in a declaration -- it's
in the record -- and they say they're going to get hurt.

     Next, please.

     The Tampa Port Authority.  The judge is well aware
of the importance of JaxPort here in this community.  The
Port of Tampa is the largest port in the state, Your Honor,
bigger than JaxPort, largest cargo port -- excuse me -- and
it's the Tampa Bay's largest economic contributor.  And what
the port has said, and their declaration is in the record,
67,000 of the 96,000 jobs that are related to phosphate -- of
the 96,000 jobs the port creates, 67,000 of 96,000 are
phosphate.  This mine alone, Judge, the South Fort Meade
mine, is 28 percent of the revenue for the port.

Twenty-eight percent.  And the port director has said that

any action that impedes Mosaic's ability to mine will result

in a significant detrimental impact to the port that will

extend through the whole Tampa Bay region.

Next.

And from Hardee and Polk County, Judge, to the

regions of the state, the Florida legislature has determined

that the extraction of phosphate is important to the economic

well-being of the state and the needs of society, Florida

Statute 378.202.  It's a loss of $86 million in tax revenue

to the state if mining doesn't proceed.  And that's the cite

to the MFR again, Judge, for the record.

With respect to the country, this mine, Judge, is

almost 20 percent of the phosphate rock that makes phosphate

fertilizer for this country.  And that amount of rock that's

turned into fertilizer is enough to sustain the entire U.S.

corn production for nine years.  6.5 trillion pounds of corn

could be grown with the phosphates from that -- the

fertilizer that's made from the phosphate from that mine.

And not all of it goes to the domestic market, Judge.  Two

billion of it gets exported.  So the effect of an injunction

would be to increase our trade deficit by $2 billion.

Charitable entities:  The United Way is here today,

Judge, in person because of the importance of this, but

interestingly and importantly, 64 percent of Hardee County's

United Way budget comes from the South Fort Meade mine.  And
that's interesting, Judge, because right now we're mining in
Polk County.  So, one, it shows how much Mosaic gives, even
though it's not in Hardee County yet, but -- in force, but it
would be as a result of this mine.  And the United Way has
said they'd have to cut Red Cross; they'd have to cut Early
Learning Coalition; they'd have to cut the YMCA in Hardee
County.  They can't possibly carry their burden on
considerations of public interest.

Next -- move quickly through this -- we've got
declarations from farmers as far away as Indiana and Illinois
that say, without the project, fertilizer prices are going to
go up, crop yields are going to go down, prices are going to
go up and the food security of our nation will be hurt.  If
we've got to depend on foreign producers for phosphate,
Judge, we're going to be in the same boat with our food as we
are with our oil and gasoline.

Next.  I'll move very quickly through this, Judge.

More than 375 jobs will be lost just on some of the
suppliers and contractors of Mosaic who are sitting out in
front of Your Honor this morning.

Advance to 21, please.

These are all in the record, Judge.

Judge, on the -- as a result of the TRO the court
entered, Mosaic sent out a warn notice, the court is well

aware, to union members, a notice of layoffs.  Now, what is important to note, Judge, is those layoffs had been pending -- the situation had been brewing since May, because what the plaintiffs haven't told you is that the Polk County side of the mine, Judge, it's just about mined out.  Three of the four draglines are down, it's over.  The fourth dragline, just mining very minimally productive ore.  So that mine is almost over.  These folks' jobs were in jeopardy, and Mosaic carried them along in anticipation of this permit.

When the TRO entered and the war notices went out, Mosaic's stock dropped over $1 billion in one day, $1 billion in one day.  And this isn't some academic number to somebody reading the Wall Street Journal.  This is the pension and retirement funds that were hurt all around the country.  The biggest loser, Judge, the retired teachers of Ohio lost 2.1 million, almost $2.2 million in a single day.  Retirees from California, Texas, Wisconsin, Ontario, Pennsylvania, Kentucky and New York lost significant sums.

Judge, I want to tell you, so the court is apprised, the stock's bounced back from that day, but it's bounced back because the -- you know, the market has taken a look at the government's briefs, it's taken a look at Mosaic's briefs.  The issues are now joined and it's --

THE COURT:  Are you citing the stock market on legal argument, counsel?

         MR. WEINSTEIN:  I'm saying, Judge, that the market
accurately assesses the risks.  And if it -- if $13 million
are lost in one day on a TRO that's only going to last 28
days, then it's absolutely reasonable to assume that the
market losses from a preliminary injunction would be
dramatically worse than this.

         Next, please.

         It's $52 million a month in phosphate that will be
lost.  And importantly, Judge, one other thing that the
plaintiffs haven't explained is the beneficiation plant, you
know, they harvest -- they extract the ore, it goes to a
beneficiation plant before it's made into fertilizer.  But
one of the real reasons for this project and this location
is -- I'll show you on the map -- is that so Mosaic can use a
plant that's already there.  The plant has got $325 million
invested in it, which is important, but that doesn't tell the
whole story, Judge, because if they can't use that plant,
it's got to build another plant somewhere.  The replacement
cost is 600 million, so we're almost to a billion now.  And
siting a new plant elsewhere, Judge, would have environmental
impacts.  Mosaic is trying to avoid those impacts by using
the existing plant.

         Next, please.

         Now, if I may, Your Honor, I'd just like to orient
the court very quickly in terms of where the site is.  It's

in what is called the Bone Valley.  That's where, you know,
most of the phosphate in this country is located in the Bone
Valley.  And what this chart tells you, Judge, and this is
C-12 from the federal record, for the record, Diagram C-12,
and all we've done here is color it, Your Honor, to make it
easier to see in the courtroom.  But all this brown, it's
either mined, gone, or it's inaccessible because folks are
living there.

So the mine that we're talking about, if the court
sees the light blue and the dark blue to the right of this
egg-shaped figure, the top which is almost all mined out is
the Polk County portion, and the dark blue is the Hardee
County portion.  And we're -- where my colleague Mr. Crist is
moving around the pointer there, that's where this mine is.
The only other reserves, Judge, that you see in green there,
these proven reserves, they're not permitted.  And it takes
seven years on average, seven years, Judge, to permit.  So
there's no option; there's no alternative.

Next, please.

I'll skip quickly through this because the
federal -- Justice Department lawyers took the court through
all of the record cites about the court taking a very hard
look at cumulative impacts, and that's what this shows.  They
took a look at over a million acres.  It's all in the EASOF,
Judge.  It's all in the decision document.  And whether that

document was called EIS or whether that document was called

EA, doesn't change the result.  The Corps took a look, a very

hard look.  And this diagram is C-116, for the record.

Next, please.

Here is a closeup of the mine, Judge.  And what it

shows you where you see the -- it turned from light green --

I'm sorry, light blue to dark blue.  That's County Line Road.

So that divides Polk County to the north from Hardee County

to the south.  And all Mosaic is doing here is continuing to

mine across the road.

And, by the way, with respect to the issue of EA

versus EIS, one, the regulations say EAs will be used most of

the time; and, two, as a matter of practice, new mines,

brand-new mines have typically gotten EISs.  But mine

extensions like this, Judge, over time, they get EAs.  And so

what has happened here is entirely consistent with the past

practice of the Corps of Engineers.  And the site's been

studied, scrutinized, improved for over seven years, not just

by the Corps of Engineers, but EPA, U.S. Fish and Wildlife,

FDEP, Hardee County local government, an administrative law

judge and the Second District Court of Appeal.

And that final order, Your Honor, by -- it was a

recommended order by ALJ, as the court knows.  It then

becomes a final order of the department, affirmed by the

Second District.  Paragraph 91 and 92 of that, for the

record:  No adverse water quality impacts, no adverse water

quantity impacts.  So after a full-blown trial, Judge, we had

a judge find that their concerns are not well-founded.  And,

in any event, the court took the -- the Corps took a very,

very hard look at them.

Next, please.

Now, Judge, I'll spend just a couple minutes and

show you sort of before and after of the site, what they

haven't told you.  They haven't told you that this site's

been degraded by 60 years of intensive agriculture.  There

are roads through it, there are manmade ditches through it.

There's not one perennial stream that will be disturbed as a

result of this project, not one.  That means, Judge, that

none of the streams that will be disturbed even have water in

them all year round.  They flow mostly just based upon

rainfall.

And the top state regulator, Mr. Cantrell, whose

declaration is in the record, this is what Mr. Cantrell, not

Mosaic, this is what Mr. Cantrell has said about this site.

Some of the most polluted streams with respect to

sedimentation in central Florida.  Some of the most polluted

streams in central Florida, severely impacted biological

function, fragmented wildlife corridors and criss-crossed by

ditches.

And one picture being worth a thousand words.  And,

Judge, these are not in the federal administrative record,
they're simply demonstrative, and we submit them on the prong
of consideration of public interest only.  This is a
cross-reference to Paragraph 6 of the Cantrell declaration.
These are heavy agricultural impacts, Judge, and the
conservation easement, 2500 acres plus that Mosaic will grant
will protect against this kind of impact.

Next.

Now, Judge, looking square in the center of this
picture, this is stream segment 24 D.  This is one of the
streams that would be disturbed by mining and then restored.
There's no water in that stream.  It's just a ditch, Judge.
It's been channelized by agriculture.  You see the cows
waving -- waving -- standing in the background -- that would
really be something, Judge, if you saw them waving.  Standing
in the background.  But there's no water in that stream.

Next, recreational impacts.

Next, tons of hurricane damage.  What this
photograph shows, Your Honor, is all trees knocked down from
Florida hurricanes.  And down at that bottom right there and
cross-reference to Paragraph 6 of the Cantrell declaration,
that's an orange grove.  The property's already impacted.

Next.  This is stream segment 25 E, Judge.  It's a
mess.

Next.  Stream segment 18 I, it's a mess.

1          Next.  Stream segment 20 C.  And this is a DEP.

2     This is the Florida Department of Environmental Protection's

3     exhibit, Judge, from the state administrative proceeding,

4     again, offered to show the balancing of harms and

5     considerations of the public interest only.  But it's a mess.

6          Next.  This project, Judge, as the court has

7     correctly found in the EASOF, is the least environmentally

8     damaging practicable alternative.  Let's put some hard

9     numbers to that, Your Honor.  It avoids -- this project

10    avoids 73 percent of the wetlands on that property; 73

11    percent won't be touched at all.  And interestingly,

12    quantitatively, Your Honor, the WRAP score, the objective

13    score the government uses of the wetlands that are going to

14    be avoided is 68.  The wetlands that are going to be impacted

15    are 55, qualitatively.

16          So what is going to be impacted, Your Honor, is much

17    lower quality wetlands.  More than 65 percent of the streams,

18    including all the perennial streams, 100 percent will be

19    avoided.  And with respect to the DEP stream habitat

20    assessment, the ones that are going to be impacted, Judge,

21    are 68.  The ones that are going to be avoided are 122,

22    almost twice as good.  The project avoids 70 percent of all

23    bay systems.  And this avoidance, Judge, which the Corps, you

24    know, exhaustively looked at, results in 36 percent of the

25    available ore being left in the ground.  That's avoidance,

1   Your Honor.  36 percent of the ore, worth more than

2   $54 billion, will be left in the ground as a result of being

3   careful with the environment here.

4          Next, please.  2,636 acres of wetlands, streams and

5   uplands will be protected forever with the perpetual

6   conservation easement.  The project will continue to use the

7   beneficiation plants so it won't have to be built elsewhere.

8   The project will continue to use some of the Polk County clay

9   settling areas so they won't have to be built elsewhere.

10  There will be a ditch and berm system to protect streams,

11  wetlands and the neighbors.

12         And this is what the Corps found, and it did so

13  reasonably.  And, of course, the finding is entitled The

14  Great Deference.  "The proposed work should result in minimal

15  adverse environmental impacts.  The benefits of the project

16  outweigh the detrimental impact.  The project would result in

17  a no net loss of wetland functions and value."  No net loss.

18  And that's the EASOF at page 62.

19         Next.  And this is pre- and post-mining, Judge.

20  This is C-3 on the left from the MFR-2 for the record.  And

21  right is C-20 and C-29 from the record combined.  What it

22  shows you before and after, Your Honor, is the systems not

23  only get restored, but they get restored in a more cohesive,

24  logical, functional fashion.  And what you see in that either

25  brown or orange, Judge, you know, sort of comes down both

sides and surrounds those wetland systems, that's the

conservation easement which means, Your Honor, unlike today,

you know, those are going to be protected forever.

Next.  In sum, Judge, with respect to the balancing

of harms and consideration of public interests, degraded

wetlands and streams will be replaced by better ones.  The

ditches we showed you, that -- you know, I guess they're

technically streams.  Where I grew up, Judge, we called those

ditches, but ditch streams will be replaced by natural

sinuous streams.  And not only that, Judge, there will be an

additional half a mile of streams.

Improved water quality, improved water flow.  225

acres of lakes and marshes that don't exist today.  The blue

you see on the diagram.  Interestingly, Judge, there are no

natural lakes in Hardee County.  But Hardee County

eco-tourism -- and there's a declaration in the record --

they like these streams.  They say they're -- I mean, these

open water habitat is what it's called, Judge.  It's a lake.

But they say they're a very high quality, suitable for

eco-tourism, and there are going to be 225 of them, acres

created.

3400 contiguous acres of wildlife corridors.  So

instead of it being chopped up, it's all logically done,

Judge, so the wildlife can move along these wetlands and do

so in a protected fashion, and almost 2,700 acres of

conservation easements.

Next, please. And that's the Hardee Lakes declaration, Judge, where Hardee is saying that eco-tourism and recreation. And the first one pulled is right out of Mr. Cantrell, the DEP regulator's declaration. And this is key to why they can't win on the merits, and it's key to why there's a consideration of public interests, and that is that, according to DEP, the average -- and this is an objective score of reclaimed wetlands is of higher quality than the average score of the wetlands that have been impacted since 2004.

So the way they're done today -- we talked about courtroom technology, Judge, wrestling with it in the very beginning of this, but technology continues to move forward, and the reclamation technology today is so good, the wetlands are better than where they started.

And one picture, Matt, please.

Next. Will you get 38 for me.

It's okay. I'll work around it.

Oh, here we go. 39. 1.1, please.

This is a very interesting "one picture is worth a thousand words," Your Honor, because according to the plaintiffs' papers, this wetland you're seeing with your own eyes, it doesn't exist. And it doesn't exist because it hasn't been released to the State yet. And it hasn't been

released to the State because there's still mining going on.
This is South Fort Meade, Judge.  This mine on the Polk
County side, Mosaic is not done mining yet, but it's
reclaimed as it goes along.  They finish a section of mining
and then they reclaim.  This is a beautiful wetland reclaimed
just across the road in Polk County on this very same site,
and it's done.  And the court can see it.

Next.  Another consideration of public interests
lie, Judge, another beautifully reclaimed wetland.

And all the way, Matt, to the -- Ducks Unlimited,
please.  That would be 41.

There's a declaration in the record.  You've heard
from some of the NGOs from Sierra Club and People for
Protecting Peace River, but not everybody agrees.  And the
wetlands, according to Ducks Unlimited, wetlands reclaimed
after phosphate mining provide excellent hunting grounds for
duck and other outdoor recreational activities.

And then they attach to their declaration -- next,
please -- and these are -- these are exhibits of the Ducks
Unlimited declarations in the record.  Beautifully restored
wetlands, bountiful wildlife.

Next.  With respect to cumulative impacts, Judge, to
put this in historical perspective, years ago, reclamation
wasn't required, and it is today.  And what this graph is
showing you is that these historical impacts, the cumulative

impacts, they're actually being reversed over time.  The

graph is going down.  Mosaic added 10,000 functional acres

between 1995 and 2010.  It will add another 10,000 acres

between this year and 2025.

Next.  Almost done, Your Honor, and I appreciate

your patience.  The permit itself offers significant

protections to the environment, Judge, not just the Corps'

process on the front end, it's all the stringent permit

conditions that Mosaic is required by law to live with.

Every year there's a compliance review by the Corps, by EPA

and Fish and Wildlife.  And they can shut this mine down,

Judge, if they don't like what they're seeing.

Mitigation that I talked about earlier, all of this

detailed mitigation plan has got to be performed on schedule.

And, Judge, there's a bond posted for 110 percent of

the estimated mitigation cost.  It's a rolling 3-year

average.  So if suddenly we woke up tomorrow morning and

Mosaic was gone -- it's not going to happen -- but if it were

gone, the money is sitting there in a performance bond,

posted in an amount sufficient to pay for the mitigation if a

third-party contractor came in and did it.

THE COURT:  What does the estimated mitigation cost,

if you know?

MR. WEINSTEIN:  5.3 million.  Three years.  So it's

a rolling three years.

And finally, Judge, the standard for injunctive relief, the court is well aware, it's an extraordinary and drastic remedy. And the Eleventh Circuit has said there's no power, the exercise of which is more delicate, requires greater caution, deliberation, discretion, or is more dangerous in a doubtful case than issuing an injunction. And as counsel for the government made clear, the Supreme Court has made it abundantly clear that these standards apply to environmental cases as well. The Eleventh Circuit has stated the court must reserve review of the Corps' work here, its decisions, with an exceedingly deferential standard.

They simply haven't carried their burden, Judge. There's no irreparable harm. You've seen it with your own eyes. The property is going to be better as a result, 60 years of agricultural degradation, to a beautifully restored property. 27 -- 2600 acres protected forever in a conservation easement; more streams, better streams, better wetlands.

The balancing of harms, Judge. Employees, their union, the contractors, their employer, pension and retirement funds, Hardee County, Polk County, Port of Tampa, the State of Florida, the federal defendants. Judge, it's unusual in a case that you see such a varied constituency, all of these different folks, local, state and federal, all standing together. But they're standing together in this

case, Judge, and they're standing before you, and they're all saying the same thing.  This is a good project; it got a really hard look; it had seven years worth of scrutiny at every different level.  These quality issues were litigated, and Mosaic and the government prevailed.  It was appealed and they prevailed.

The balancing of harms, Judge, tilts heavily, heavily, towards the denial of this injunction.  There's a recent case out of this court.  It was Judge Corrigan, decided just about 90 days ago, Middle District, of course, Jacksonville Division, as the court is well aware.  It's an injunction case involving contact lenses, Judge, but a patent case in which the court found that there had been infringement, clear infringement by a competitor, a direct competitor.  And the court notes that intellectual property rights enjoy their highest level of protection when asserted against a direct competitor in the market, which is exactly what happened in Judge Corrigan's case.  But what the court ruled is that millions of innocent contact lens users would have to go back to the doctor, be refitted; there would be inconvenience; there would be the possibility of harm; and that the considerations of public interest were so great that -- would be too great to permit, and ruled that the plaintiff had failed to carry its burden of proving that the public interests would not be disserved by a permanent

injunction, and denied it, even in the face of a clear

intellectual property infringement.

And, Judge, they haven't proved substantial

likelihood or irreparable harm, but certainly on the

balancing of harms under the precedent of this court, the

harm that they allege is speculative, that maybe Mosaic might

possibly not be able to reclaim this.  The pictures have

shown you that's not true.  The affidavit of Mr. Cantrell

told you that's not true.  Mosaic has reclaimed, it can

reclaim, and it will reclaim.

But with respect to balancing of harms, there's

nothing speculative about these folks.  There's nothing

speculative about the harm that would be suffered by Hardee

County; there's nothing speculative about the harm that would

be suffered by the United Way; there's nothing speculative

about the harm that would be suffered by the Port of Tampa;

and there's nothing speculative about the harm to the State,

to the agriculture industry, or to almost 20 percent of

production of rock for phosphate fertilizer in this country.

That's all very real harm, Judge, for very real people, and

it compels the denial of this injunction.

THE COURT:  All right.  Let me hear from the

plaintiff, will get the last word.

MR. REESE:  Thank you, Your Honor.

I direct your attention to Document 17-1, which is

the Corps' memorandum for record.  Page 28, when they have

considered Alternative 4, which is that they would still have

access to over 50 percent of the rock that Mosaic wants, the

Corps never really stated why that was being denied.  They

did not state anything other than Mosaic wants to mine more

rock.  That's not the basis.

And we specifically direct your attention to the

case that came out of the district for the D.C. Circuit.  It

was by Chief Judge Lambert.  That is Document 65-1.  The very

similar issue came up where the Corps just had their permit

in Pasco County rejected, basically there because the Corps

arbitrarily took the applicant's 8 percent return rate as

what had to be done.  They never examined it; didn't explain

why they took 8 percent.  They just took it.  And that's what

the Corps routinely does.  They take the applicant's economic

analysis and accept it.  And that's specifically what the EPA

in their June 8th letter criticized.  That's right before the

permit issued.  That's Document 16-8.

They basically send a two-page letter from the

acting regional administrator, and when the acting regional

administrator, Region 4, sends a letter to the Corps

basically saying, you ignored the economic analysis and here

is the study which is attached to it, which is a memorandum

from EPA headquarters, economic analysis.  It's basically

saying these questions were never answered.  They just took

1  it.

2          And that is the fundamental problem.  They don't

3  look at alternatives.  They don't determine why all wetlands

4  have to be mined.  Wetlands -- phosphate mining of a wetland

5  is -- that is not one of the -- it's not a necessary use of

6  the property.  It's assumed that the property has -- can be

7  avoided by not mining it.  And that is specifically what

8  they're not getting into that issue, because they're not

9  looking at the economics behind it.  They're saying that it's

10 not a practical alternative for economic reasons, but they

11 don't do the economic analysis.  And that's what EPA would

12 like them to do in this EIS that's coming about.

13         And we specifically think that the economic issues,

14 all this from the Power Point presentation about the impact

15 to the community, if a properly designed preliminary

16 injunction allows mining of the uplands while the EIS is

17 being determined, that economic impact is not going to occur.

18 And we never suggested that the benefication plant had to be

19 closed.  We were suggesting mining the uplands.  And that was

20 specifically addressed and presented to you in the July 1st

21 TRO hearing, that they could mine the uplands.  They've never

22 come in and said they can't mine the uplands.  They haven't

23 presented any evidence to that regard, and the Corps doesn't

24 have any evidence.  They didn't make that determination.

25 Under the EPA their decision document, it's got a fundamental

flaw in it, and that is what needs to be reversed.

Also, an interesting fact is Mosaic talks about the effect, when they say we're going to shut down our four draglines and shut down our benefication plant, what effect it has on their stock. They actually looked to see what their stock value has done since 2005. It's actually gone up 178 percent. They're a very profitable corporation.

THE COURT: I can tell, by all of the lawyers in the room.

MR. REESE: And they also mentioned -- we did not have the opportunity to get into great detail about a lot of the Corps' determination document because we didn't get it until Friday when we filed the complaint on the following Wednesday, very short time period. They had suggested that we could have gone and looked at it in some of their pleadings, but actually, the e-mail exchange, we had asked for it, and they did not suggest to go look at it at the office. They suggested they were going to be putting it up electronically, and we'd have it. Well, it just took a while and we kept waiting, so there's been a delay.

But this aerial photograph actually shows the Polk mine. And at the very bottom of it, that is actually the county line in-between Polk and Hardee County. They're talking about they're going to continue South Fort Meade mine into Hardee County. And you can see essentially what

1 phosphate mining looks like.

2      I once heard one of their attorneys described at a

3 DEP workshop, it looks like the far side of the moon.  It

4 really is moonscape.  They go out and dig it up, and they

5 dig -- where they're digging, they really dig it, and it

6 takes quite a while to get restoration of it.  The fact that

7 you get lakes out there doesn't necessarily mean that lake is

8 going to be good recreational activities.  And that's one of

9 the issues that's going to have to be examined, is that

10 actually going to be good public recreational activities.

11      THE COURT:  How is the reclamation proceeding on

12 that portion of the mining operation that's shutting down

13 because of lack of rocks, as I understand it?

14      MR. REESE:  I'm not -- excuse me, I did not --

15      THE COURT:  I think counsel indicated that a number

16 of folks are being laid off from some mine operation, I think

17 it's the Polk County mine operation.

18      MR. REESE:  I understand that they have represented,

19 and I believe it's correct, that they are running out of

20 rock, but I don't think they've had the -- three of their

21 draglines currently are inactive.  One is active, but they

22 can move --

23      THE COURT:  Had reclamation started in that area

24 since the mining is winding down?

25      MR. REESE:  It's my understanding it has.

1          THE COURT:  And how far has it progressed?

2          MR. REESE:  That, I cannot give you a precise figure

3  at this point.  Reclamation is under a separate State

4  statute, and reclaiming it doesn't mean you're putting it

5  back to preexisting conditions.

6          THE COURT:  Well, you can't --

7          MR. REESE:  Basically, you're leveling it out.

8          THE COURT:  -- can you?

9          MR. REESE:  Pardon?

10         THE COURT:  You can't reclaim it until it's put back

11 into some --

12         MR. REESE:  Till they pump -- yes, correct.  But

13 they will be able to actually take those draglines into

14 Hardee County and do mining.  They don't need to be closing

15 down.  That's the point that we've been trying to make, is

16 that they can mine the uplands, and in fact --

17         THE COURT:  But if they've shut down three pieces of

18 this equipment out of four and they're only using one

19 equipment, that does suggest that it's about to shut down,

20 doesn't it?

21         MR. REESE:  They have created that situation.

22         THE COURT:  Oh, they've created that.  Okay.

23         MR. REESE:  Your order, temporary restraining order,

24 did not stop them from going into Hardee County and mining

25 uplands.  In fact, your injunction could even give them

authorization to make temporary crossings of any streams that are necessary. And they would have access to approximately 59 percent of the rock that they were going to mine under the 18-year permit. And what we were suggesting is that rather than have an 18-year permit, that there be a requirement that this permit be limited to the time period until the EIS, area-wide EIS is done and that they be in -- only doing temporary stream crossings and mining uplands in that time period, rather than getting an 18-year permit.

THE COURT: Anything else?

MR. REESE: Well, they did mention the mine extensions, and that's the reason I was making a reference to the Polk County South Fort Meade mine. They called it just an extension. They basically correctly stated, because it is a mine extension -- the Corps does not do EISs, the Corps just does EAs. They see it just as a continuation, business as usual, and just keep opening up more area. And that is the problem that the EPA has identified. And that -- I understand that the colonel agreed with EPA. We're going to do an area-wide EIS, and we're going to change our procedure as a result of that area-wide EIS. You can't just continue to do it as normal business. And there is a real problem there.

But I mentioned Judge Lambert's order with regard to the Cypress Creek. That was a mall up in South Pasco on

```
1  I-75.  There is a similarity there.  Cypress Creek is
2  actually a tributary to Hillsborough River, and Hillsborough
3  River is the City of Tampa's drinking water.  Much of that is
4  happening in the Peace River and there is that similarity.
5          But I would just repeat again, I think we have shown
6  that there is substantial likelihood of very significant
7  irreparable harm and that this needs to be looked at through
8  a shorter permit and upland mining in the interim.
9          THE COURT:  All right.  I'll take a good look at it
10  and get something out to you as quick as I can.  Thank you
11  very much.
12          MR. WEINSTEIN:  Thank you, Judge.
13          (Proceedings concluded at 3:12 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA  )

JACKSONVILLE DIVISION       )

     I hereby certify that I was authorized to and did report the foregoing proceedings and that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated therein.


                    /s/ L. Marie Splane

                    L. MARIE SPLANE,
                    Certified Realtime Reporter
                    Registered Diplomate Reporter