IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SIERRA CLUB, INC., et al.,

       Plaintiffs,

v.

                                      Case No. 3:10-cv-564-J-25 JBT

UNITED STATES ARMY CORPS OF
ENGINEERS, etc, et al.,

       Defendants.
_____/

## PLAINTIFFS POST-HEARING PRELIMINARY INJUNCTION BRIEF

Plaintiffs appreciate this opportunity to rebut the defenses of the U.S. Army Corps of Engineers ("Corps") and intervernor mining company ("Mosaic").[1] Plaintiffs respectfully submit that their case on the merits is very strong, and to allow the strip mining of wetlands during this proceeding would be unjust. "[M]aintenance of the status quo is the primary purpose of preliminary injunctive relief." *Cate v. Oldham,* 707 F.2d 1176, 1185 (11th Cir. 1983). This is particularly true when the Corps and U.S. Environmental Protection Agency ("EPA") have now agreed to conduct an environmental impact statement ("EIS") on the cumulative impacts of phosphate mining. Plaintiffs state that they are amenable to mediating this matter; however, Mosaic's Notice regarding mediation raises serious doubt of their willingness to compromise.

**I.    Plaintiffs Are Likely to Succeed on the Merits**

   **A. The Corps Violated NEPA**

---

[1] Contrary to the Corps' assertion, Plaintiffs were never informed that they could access any permit documents at the Corps' office, despite multiple exchanges of correspondence. Consequently, this brief is Plaintiffs' first opportunity to cite most of the permit documents.

The Corps' failure to prepare an EIS for a 7,867-acre strip mine permit (the "Permit"), involving the excavation of 543 acres of wetlands and ten miles of streams in a nationally significant ecological area violates the National Environmental Policy Act ("NEPA"). 42 U.S.C. §§ 4321 *et seq*. "[I]f 'any significant environmental impacts *might* result' from an agency's actions, an EIS is required." *Sierra Club v. Van Antwerp*, 2010 WL 2600507 at *6 (D.D.C) (emphasis in original) (citing *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d at 339 (D.C. Cir. 2002)). The *Van Antwerp* decision, issued three weeks ago by the Chief Judge of the U.S. District Court for the District of Columbia, could hardly be more on point.

In *Van Antwerp,* like here, the Corps issued a permit under section 404 of the Clean Water Act allowing the conversion of a large area of wetlands in central Florida (155 acres), relying on an environmental assessment ("EA"), and declining to prepare an EIS. *Id.* at *2. Chief Judge Lamberth found that: "an EIS should have been prepared because the project site has "unique characteristics . . . such as proximity to . . . wetlands . . . or ecologically critical areas. 40 C.F.R. § 1508.27(b)(3). In fact, the project site is directly on top of these unique wetlands.'" *Id.* at *6. Similarly here, there is no dispute that this project is "directly on top of" the headwater wetlands and streams of the Peace River/Charlotte Harbor, aquatic resources of national significance, recognized by Congress, EPA and the state of Florida. (ECF Dkt. 16-4 to 16-8; Dkt. 2).

The failure to prepare an EIS stems from the EA's failure to take a hard look at direct and cumulative impacts. *City of Oxford v. F.A.A.*, 428 F.3d 1346, 1352 (11th Cir.2005).

    i. Significant Direct Impacts

The Corps and Mosaic fail to make a convincing case of **no** significant impacts. *Hill v. Boy,* 144 F.3d 1446, 1449-50 (11th Cir. 1998). Numerous high value wetlands will be mined. At

hearing, the mining company depicted the most degraded streams, but "Permit Instrument Attachment 1g" contains a map that displays numerous higher value wetlands (i.e. having higher WRAP scores) being excavated. Partial Administrative Record (Dkt. 63) (hereinafter "PAR") Doc. (D)(1g), Map C-25. Many of these wetlands will be lost for ten years or permanently.

The Corps found that wetland and stream mitigation will reduce all impacts below significance. PAR Doc. A pp.33, 62; Dkt. 56 pp. 7-8, 19-23. The Corps accepted Mosaic's claim that this project will only cause the "temporary elimination" of 534 acres of wetlands and wildlife habitat. PAR Doc. (B)(29) pp.6-28; PAR Doc. A p.56. Over 1,500 acres of this "temporary elimination" will be giant waste clay surface impoundments, called "clay settling areas" ("CSAs"). PAR Doc. (D)(2f) Table C-34. USEPA urged the Corps to assess the impact of the CSAs on the hydrology of the Peace River watershed, a critical drinking water supply. Dkt. 16-4, 16-5, 16-7.[2]

The Corps' find of no significant direct impacts is not convincing. First, the Corps utterly failed to address the near term impacts of mining. Aerial photos of the existing South Fort Meade mine site powerfully drive this point home, as they reveal a very barren landscape, with enormous CSA impoundments, at a mine that is over fifteen years old. PAR Doc. (D)(1g) Map C-35B. PAR Doc.__ (2010_03_18 SFM Site Visit);[3] Dkt. 2-App. B; Dkt. 71. The record corroborates that many wetlands and streams at the site will not be reclaimed for ten years or more. Corps' Permit Instrument Attachment 2f shows that, as of 2020, 5,029 acres at the mine will have been disturbed but not reclaimed. PAR Doc. (D)(2f) Table C-37. The mitigation

---

[2] USGS and other research raises similar concerns. PAR Doc. (B)(49)(112309 Letter from POW). The Corps' finding of insignificant CSA impacts relies on one recent piece of research. PAR Doc. (A) at 54-55. This does not resolve the issue to insignificance.
[3] The Corps document titled "2010_03_18 SFM Site Visit" appears on the Corps administrative record disc but was not indexed.

schedule for the Permit leaves many wetlands unreclaimed for over a decade. *Id.* Table E-7. For example, wetland #2 will be mined in 2009 but not reclaimed until 2027; wetland #22 will be mined in 2016 but not reclaimed until 2027. *Id. See also* PAR Doc. (D)(1a) Figure C-37 and Table E-7. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts. 40 C.F.R. § 1508.27(b)(7) (2010).

Second, many types of wetlands are not susceptible to complete reclamation, and the mining company's track record is vastly overstated. Dkt. 8. EPA warned that the Corps' mitigation regime was inadequate to protect the unique resources at stake. (PAR Doc. 16-5, p. 2) ("Avoidance of wetlands is important because mitigation in the form of recreating wetland and tributary systems is rarely able to replace the full range of functions and values of the impacted aquatic resources"); *see also* Dkt. 16-6, pp.3-5. The scientific literature abounds with controversy over the long-term effects of wetland and stream alteration. Legal commentaries on the subject reveal that the National Research Council and the General Accounting Office have both reported on the widespread failure of wetland mitigation. Royal C. Gardner et al, *Compensating For Wetland Losses Under The Clean Water Act (Redux): Evaluating The Federal Compensatory Mitigation Regulation,* 38 Stetson L. Rev. 213, 214-221 (2009).

ii. Significant Cumulative Impacts

In addition to downplaying the direct impacts of this strip mine, the Corps EA found that the cumulative impacts of strip mining in the region are not significant. PAR Doc. A., pp. 38-62. But, the EA failed to articulate "a rational connection between the facts" and this finding. *National Wildlife Federation v. Norton,* 332 F. Supp. 2d at 177 (D.D.C. 2004) (citing *Baltimore Gas & Elec. v. Natural Resources Defense Council,* 462 U.S. at 88). Indeed, after issuing the

Permit, the Corps subsequently announced that it will conduct an EIS on cumulative impacts starting this fall. Dkt. 15, Appx. C. This undermines the Corps' finding of insignificance.

The EA never established a clear baseline for its cumulative impacts analysis– a critical omission[4]– but it found that since 1979, the Peace River Basin has experienced the loss of 31,000 acres of wetlands, declining water quality, significant declines in freshwater flows, and substantial fish and wildlife habitat loss. PAR Doc. A (EA) pp. 48-49. The Corps then oddly concluded that if Mosaic can keep the number of unreclaimed (i.e. barren) mined acres under 25,000, no significant cumulative effects will occur. *Id.* p. 61. The Corps did not articulate a rational connection between the facts and this finding: it is "implausible" that the degradation of tens of thousands of acres of wetlands, streams and forest are an insignificant impact. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

Both the Corps and the mining company argue that their promise to do a new EIS has no bearing on the permit. (Dkt. 56 p.18; Dkt. 51 p.13.) Yet NEPA commands that proposed agency action ensure "that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 249 (1989). The Permit mine is for one of seven large phosphate mines planned for the region. PAR Doc. A (EA at 46-47.) It will be mined for at least the next 20 years, and its cumulative impacts on the Peace River Basin overlap with 8 present mines. (*Id*. at 39, Figure 1.). The Corps must address these impacts in an EIS before

---

[4] The EA states that the time frame for cumulative impact analysis begins July 1, 1977. PAR Doc. A, EA p. 39. However, the EA did not establish a baseline reflecting all mining, urban and agricultural impacts since July 1, 1977. Without establishing the baseline it is not possible to establish whether current conditions are acceptable or whether mitigation of past impacts is necessary.

issuing the Permit. *Sierra Club v. Van Antwerp*, _F. Supp 2d, 2009 WL 6409272 at *10 (S.D.Fla.,2009) (pre-decision analysis required).

### iii. A Highly Controversial Action

Ultimately, the Corps must prepare an EIS because of the substantial controversy over the impacts of this strip mine and the uncertainty of mitigation. "An action is highly controversial [needing an EIS] where there is substantial dispute about the size, nature or effect of a federal action rather than the existence of opposition to a use." *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1333 n.37 (S.D.Fla. 2005) (*citing Ga. River Network v. U.S. Corps. of Army Eng'rs*, 334 F. Supp. 2d 1329, 1338 (N.D. Ga. 2003). In addition to extensive EPA objections (Dkt. 16-4 to 16-8), several coastal counties downstream of the mine, as well as the Charlotte Harbor National Estuary Program, raised "a substantial dispute about the size, nature or effect" of both the direct and cumulative effects of this federal action. *See* PAR Doc. (B)(49) (Sarasota County July 11, 2007 letter; Charlotte County July 12, 2007 letter; CHNEP August 27, 2007 letter). This controversy obligated the Corps to prepare an EIS. 40 C.F.R. § 1508.27(b)(4) (2010).

### iv. EPA's Dispute with the Corps

The fact that EPA did not choose to elevate its dispute with the Corps to EPA Headquarters does not mean that the Corps complied with NEPA or the Clean Water Act. First, EPA indicated in its final letter to the Corps, just one week before the permit issued, that the Permit violates the law. EPA stated that the mining company's own modeling corroborated EPA's concerns over significant secondary and cumulative impacts, and that EPA's request for a

smaller configuration of the project had been ignored. (Dkt. 16-8). Second, EPA's only power to stop a permit is the so-called EPA Headquarters "veto," which is rarely exercised. 33 U.S.C. 1344(c). Although the Corps issues approximately 80,000 permits annually, EPA has used its veto power only 12 times since 1972. http://www.epa.gov/wetlands/pdf/404c.pdf. (Explaining the EPA veto process). The tension between EPA and the Corps has been subject to considerable legal commentary. *See* Oliver A. Houck, *Hard Choices: The Analysis Of Alternatives Under Section 404 Of The Clean Water Act And Similar Environmental Laws,* 60 U. Colo. L. Rev. 773, 774 *et seq.* (1989); Christine A. Klein, *Bersani v. EPA: The EPA's Authority Under The Clean Water Act To Veto Section 404 Wetland-Filling Permits,* 19 Envtl. L. 389 (1988). Here, EPA's reason for acquiescing to the permit at issue was quoted in the press: "Unfortunately, this project had been going on for such a long time, neither the Army Corps nor the EPA felt we could delay it any longer." Dkt. 15 Appx. C. While this may be an expedient compromise between federal agencies, it does not comply with the law.

B.     **The Corps Violated the Clean Water Act**

A team of economists from EPA Headquarters sharply criticized the Corps and Mosaic for completely ignoring their request that the company explain why it could not mine with a smaller footprint, i.e. with reduced stream crossings. Dkt. 16-8. This goes to the heart of the permit's Clean Water Act compliance. The regulations require that all appropriate steps must be taken to minimize impacts to wetlands. 40 C.F.R. 230.10(d) (2010). In *Van Antwerp*, the developer claimed that it could not reduce the size of its footprint on wetlands because to do so would reduce its return on investment to below 8%. The court held that this violated the Clean Water Act because: "the applicant (1) never proved that an 8% rate of return was necessary and

7

(2) never proved that even if an 8% rate of return was necessary, that the costs provided by the applicant were accurate." *Id.* at *10.

Here, the record established by the Corps and Mosaic is much thinner. On January 15, 2010, EPA requested that the company demonstrate why some iteration of a reduced footprint mine would not be viable, with somewhere between the full number of stream crossings desired and no stream crossings. Dkt. 16-6 p. 3. The mining company responded to this letter but completely ignored EPA's request. PAR Doc. (B)(30) at pp. 8-9 (Response on March 10, 2010, to the U.S. Environmental Protection Agency ("EPA") letter dated January 15, 2010). EPA's final correspondence with the Corps, issued just one week before the permit issued, took them to task for this omission, stating that this task was not completed and was "completely ignored." Dkt. 16-8, pp. 1, 5. The Corps must be reversed. An agency action is arbitrary and capricious "if the agency …entirely failed to consider an important aspect of the problem…." *State Farm*, 463 U.S. at 43 (1983); *City of Oxford v. F.A.A.*, 428 F.3d at 1352 (11th Cir.2005).

## II.     Plaintiffs Will Suffer Irreparable Harm in the Absence of an Injunction

The excavation of ecologically significant wetlands and streams constitutes irreparable harm. Again, aerial photos of the existing mine site powerfully drive this point home. PAR Doc. (D)(1g) Map C-35B; Dkt. 2, App. B; Doc. 71 Plaintiffs' Request for Judicial Notice, Exs. A and B.); PAR Doc.__ (2010_03_18 SFM Site Visit). Such harm to the environment, particularly a unique watershed such as the Peace River Basin, trumps the short-term financial loss from suspending a project. Environmental injury, by its nature, "can seldom be adequately remedied by money damages and is often . . . irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987). *See also Nat'l Wildlife Fed. v. Marsh*, 721 F.2d 767, 786 (11th Cir. 1983) (irreparable injury demonstrated where absent injunction, wetlands would be

8

destroyed). As explained above, strip mining will cause, at a minimum, significant loss of wetlands for the next ten years.

The Corps' reliance on *Winter v. Natural Resources Defense Council*, 129 S.Ct. 365 (2010) is nonsensical. *Winter* in no way stands for the proposition that Plaintiffs will not suffer irreparable harm. In *Winter*, the District Court entered a tailored injunction prohibiting the Navy from conducting training with sonar except under specified conditions. *Id.* at 366. The Navy acquiesced to most of these conditions and appealed only two out of six conditions. *Id.* at 368. The Supreme Court expressly acknowledged the plaintiffs irreparable harm (risk to marine mammals) but held that national security interests outweighed this harm. *Id.* at 378.[5]

**III. The Balance of Hardships Favors an Injunction**

The mining company has essentially laid down an ultimatum: either it gets to mine according to an illegal permit or it will shut down and wreak havoc on its workers and the local community. (Dkt. 51). Mosaic is an enormously wealthy corporation which exports the majority of its phosphate product. PAR (B)(49)( 2009_11_23 POW Letter & Att.pdf) at pp. 9-10. The company cannot tie the court's hands; over EPA's objection they have refused to explore a smaller footprint mine, and should not be allowed to manipulate the equities. "The self-inflicted nature of [defendant's] harm ... weighs in favor of granting preliminary injunctive relief." *Utahns for Better Transportation v. U.S. Dept. of Transp.*, 2001 WL 1739458, *2 (10th Cir. 2001) (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 806 (3d Cir.1998). *See also Dunkin' Donuts Franchised Rest. LLC v. D & D Donuts, Inc.,* 566 F. Supp. 2d 1350, 1361-62 (M.D. Fla. 2008).

---

[5] Similarly, the Corps' argument at hearing that Plaintiffs in a NEPA case suffer no redressable injury misstates settled law to the contrary. *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173-74 (11th Cir. 2006).

The record shows that this Court could enter an injunction requiring the mining company to avoid wetlands and keep its employees at work. The Corps and mining company admit that the No Action alternative (avoiding all wetlands) would still allow up to two years of productive mining at the site on over 1,000 acres. PAR Doc. (B)(29) at 3-13 (2010_03_17 SFM MFR Rev 2(1); PAR Doc. A (EA p.27). Another option, the "Stream Crossings Only" alternative, would allow the company to recover somewhere between 31% and 55% of the recoverable ore, on over 4,000 acres. *Id.*

## IV.  The Public Interest Favors an Injunction

This case certainly reflects a vigorous debate over the public interest of phosphate strip mining, and not everyone is on the mining company's side. The counties of Lee, Charlotte and Sarasota take issue with the permit for many reasons, not the least of which is their desire to protect their drinking water. PAR Doc. 49 (Sarasota County July 11, 2007 letter; Charlotte County July 12, 2007 letter). The Charlotte Harbor estuary is itself an economic engine. PAR Doc. (B)(49) (2009_11_23 POW Letter) at p. 10. Indeed, the Corps regulations themselves define wetland protection as a paramount public interest: "Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1) (2010). *Cooper v. Wisdom*, 440 F. Supp. 1027, 1030 (S.D. Fla. 1977). ("It is undeniable that the public has a strong interest not only in the preservation of the marine ecology, but also in the proper functioning of the Corps of Engineers in granting its permits").

In closing, Plaintiffs ask that the Court enter an injunction tailored to allow the mining company to excavate non-wetland areas while this case is adjudicated on the merits.

Respectfully submitted this 26th day of July, 2010.

           s/ Pat Gallagher_____
Pat Gallagher
*Pro Hac Vice* (Cal. Bar No. 146105)
Sierra Club
85 Second Street, 5th Floor
San Francisco, CA 94105
T: (415) 977-5709
F: (415) 977-5793
pat.gallagher@sierraclub.org


           s/ Brad E. Kelsky
Brad E. Kelsky, Esq. (Trial Counsel)
*Pro Hac Vice* (Fla. Bar No. 0059307)
Law Offices of Brad E. Kelsky, P.A.
10189 Cleary Blvd., Suite 102
Plantation, FL 33324
T: (954) 449-1400
F: (954) 449-8986
bradkelsky@Kelskylaw.com


           s/ Thomas W. Reese
Thomas W. Reese, Esq.
Florida Bar No. 310077
Attorney At Law
2951 61st Avenue South
St. Petersburg, FL 33712
T: (727) 867-8228
TWReeseEsq@aol.com
MDFL Bar Member

**CERTIFICATE OF SERVICE**

      I am a citizen of the United States of America and a resident of the City and County of San Francisco; I am over the age of 18 years and not a party to the within entitled action; my business address is 85 Second St, 2nd Floor, San Francisco, California.

      I hereby certify that on July 26, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system , and that the persons listed below were served via transmission of a Notice of Electronic Filing through the CM/ECF system:

David Barnett Weinstein
Kimberly Staffa Mello
Greenberg Traurig, LLP
625 E Twiggs St, Suite 100
Tampa, FL 33602-3925
Email: WeinsteinD@GTlaw.com
MelloK@GTlaw.com

Frank E. Matthews
Hopping, Green & Sams, PA
119 S Monroe St - Ste 300
Tallahassee, FL 32301
Email: frankm@hgslaw.com

Joseph Nathanael Watson
Environment & Natural Resources Division
Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Email: joseph.watson@usdoj.gov

Kerri Barsh
Greenberg Traurig, LLP
Suite 2400
1221 Brickell Ave
Miami, FL 33131
305/579-0772
Email: barshk@gtlaw.com

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 26, 2010 in San Francisco, California.

                                              s/ Sara Breckenridge
                                              Sara Breckenridge