**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**SIERRA CLUB, INC**., **PEOPLE FOR PROTECTING
PEACE RIVER, INC**., and **MANASOTA-88, INC**.,

      Plaintiffs,

v.                      Case No. **3:10-cv-564-J-25TEM**

**UNITED STATES ARMY CORPS OF ENGINEERS**
and **COLONEL ALFRED A. PANTANO, JR.**,

Commanding District Engineer, U.S. Army Corps
of Engineers, Jacksonville District,

      Defendants,

and

**MOSAIC FERTILIZER, LLC**,

      Intervenor Defendant.

_____/

## ORDER and PRELIMINARY INJUNCTION

      This Cause is before the Court on Plaintiffs' Motion for Preliminary

Injunction (Dkt. 2), Defendants' oppositions and the supplemental

memoranda filed by all parties.  Also before the Court is Hardee County's

Motion to Intervene (Dkt. 39) which is opposed by Plaintiffs.

      Regarding the Motion to Intervene, a movant is entitled to

intervention when the movant claims an interest relating to a property or a transaction that is the subject of the action, and is so situated that the disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest. Fed. R. Civ. P. 24(a)(2).

Permissive intervention is appropriate where the movant has a claim or defense that shares a common question of law or fact with the action and the intervention "will [not] unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b).

Plaintiffs argue that Hardee County's intervention would be duplicative and burdensome and maintain that the County is more than adequately represented by the Corps and Mosaic in this litigation. Fed. R. Civ. P. 24(a)(2). Plaintiffs point out that Mosaic has filed declarations in this proceeding asserting the County's interests and has agreed to pay for the County's legal representation.

The Court agrees that the County has not established that it would be inadequately represented by the existing parties, a necessary requirement for intervention as of right.  Further, the Court finds that allowing the County to intervene would "unduly delay" and/or complicate

these proceedings; permissive intervention is also denied.

**Background**

On June 14, 2010, the U.S. Army Corps of Engineers (Corps) issued a Clean Water Act Section 404 permit to Mosaic Fertilizer, LLC, authorizing strip mining for phosphate ore on the 10,885-acre "South Fort Meade Extension" site.  The permit extends the geographic area of mining activities presently occurring under a different permit issued by the Corps.

Plaintiffs contend that the Corps issued the June 14 permit in violation of the Clean Water Act (CWA) and National Environmental Policy Act (NEPA) and acted in a manner that was arbitrary, capricious and contrary to law under the Administrative Procedure Act (APA).[1]

The Court issued a temporary restraining order (TRO) on July 1, 2010 (Dkt. 23), which stayed mining activities under the permit.  Plaintiffs now seek to convert the TRO into a Preliminary Injunction.

---

[1] Plaintiffs' claims under the Endangered Species Act were not fully briefed and the Court will not address them in this Order.

**Standard**[2]

Preliminary Injunction

To obtain preliminary injunctive relief, Plaintiffs must demonstrate (1) a substantial likelihood of success on the merits; (2) irreparable injury unless the injunction issues; (3) that the threatened injury outweighs the threatened harm the injunction might cause the defendant; and (4) that the injunction would not be adverse to the public interest. *Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1128* (11th Cir. 2005).

National Environmental Procedures Act

NEPA establishes procedures that a federal agency must follow before taking any action. The agency initially must determine whether the action to be taken constitutes a "major Federal action" - that is, an action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332; see 40 C.F.R. § 1508.18. *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1363 (11th Cir. 2008).

If the agency determines that a proposed activity is a "major Federal

---

[2]  To streamline this Order, the Court will omit most internal citations and quotations.  In addition, it will often refer to an argument made by one defendant as an argument made by the "defendants" rather than differentiating between defendants.

action," the agency must discuss certain issues in a detailed document called an Environmental Impact Statement (EIS). *Id.* at 1360.  On the other hand, if the agency determines that a proposed activity is not a "major Federal action," it must produce a "finding of no significant impact" ("FONSI"), a document "briefly presenting the reasons why an action ... will not have a significant effect on the human environment." 40 C.F.R. § 1508.13.

"Thus, an agency will reach one of two conclusions in an EA: 'either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact ... necessitating no further study of the environmental consequences which would ordinarily be explored through an EIS." *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998).

In evaluating whether the effects on the quality of the human environment are significant, the federal agency should consider, among other things:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(3) Unique characteristics of the geographic area such as proximity
to historic or cultural resources, park lands, prime farmlands,
wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human
environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human
environment are highly uncertain or involve unique or unknown risks.

40 C.F.R. § 1508.27(b).

A federal agency must analyze both the direct and the indirect
effects. 40 C.F.R. § 1508.8. "[I]f a finding of no significant impact is made,
the agency must be able to make a convincing case for its finding." *Hill v.
Boy*, 144 F.3d 1446, 1450 (11th Cir.1998).

There are four criteria that a court should consider in determining
whether an agency's decision not to prepare an environmental impact
statement (EIS) pursuant to NEPA is arbitrary and capricious: first, the
agency must have accurately identified the relevant environmental
concern; second, once the agency has identified the problem it must have
taken a "hard look" at the problem in preparing the Environmental
Assessment (EA); third, if a finding of no significant impact is made, the

6

agency must be able to make a convincing case for its finding; and last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum. 42 U.S.C.A. § 4332.

NEPA does not mandate any particular result. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). It is not the role of the reviewing court to substitute its judgment for the judgment of the agency. *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir.1996).

Clean Water Act

Section 404 of the CWA authorizes the Secretary of the Army, acting through the Corps, to issue permits for discharges of dredged or fill material into the Nation's waters. 33 U.S.C. § 1344(a).

The Corps must base its discharge-authorization decisions on "an evaluation of the probable impacts . . . of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1).  Assessing

the public interest often involves a "balancing process," *Envtl. Coal. of Broward County v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987), in which the Corps weighs "economic and environmental factors," *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1454 (1st Cir. 1992).

All appropriate and practicable steps must be taken to minimize potential impacts to the aquatic ecosystem. 40 C.F.R. § 230.10(d).

The regulations provide that "no discharge or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).

A practicable alternative is one that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

Where a project is not water-dependent, such as the one at issue in this case, it is presumed that practicable alternatives exist. 40 C.F.R. § 230.10(a)(3).

When this presumption applies, the applicant must rebut the presumption by "clearly demonstrat[ing]" that a practicable alternative is

not available. *Id.*  Specifically, the permit applicant bears the burden of providing "detailed, clear, and convincing information *proving* that an alternative with less adverse impact is impracticable." *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004)(emphasis in original).

Moreover, the Corps may rely on information submitted by the applicant, but the Corps' regulations do say that when information for an EA is prepared by the applicant, "the district engineer is responsible for independent verification and use of the data, evaluation of the environmental issues, and for the scope and content of the EA." 33 C.F.R. Part 230, App. B § 8(b). See also 40 C.F.R. § 1506.5(b).

"[W]hile the Corps could, and did, base its permit decision exclusively on the information provided by [applicant] the Corps nonetheless had an obligation to independently verify the information supplied to it." *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986).

The CWA requires that the Corps provide notice and an opportunity for public hearings prior to issuing permits, 33 U.S.C. § 1344(a), (b). The regulations provide the Corps with discretion not to hold a hearing if there

is "no valid interest to be served by a hearing," 33 C.F.R. 327.4(b).

"In case of doubt, a public hearing shall be held." *Id.* at (c))**.**

**Analysis**

National Environmental Procedures Act

Plaintiffs first contend that the Corps failed to take a hard look at the direct and cumulative impacts of the proposed permit and thereby violated the NEPA when it decided not to prepare an Environmental Impact Statement (EIS).[3]

Specifically, Plaintiffs maintain that the Corps did not make a convincing case regarding the regional, cumulative effects of phosphate mining, did not address the controversial assumption that the wetlands and streams will be replaced one-for-one, and did not address the fact that even if successful, Mosaic's restoration of the wetlands and streams will not be accomplished for a decade or more.[4]

---

[3]  Plaintiffs contend, *inter alia*, that the significance of destroying large areas of wetlands and streams in critically important areas is "self-evident" especially considering the concerns cited by the EPA, three county commissions and the public.  While this observation appeals to common sense, Plaintiffs must carry their burden of production when requesting a preliminary injunction.

[4]  Plaintiffs have demonstrated there is scientific uncertainty regarding the recreation of wetlands and streams.  This alone, however,

Plaintiffs note that the Corps must consider direct and indirect effects as well as the cumulative impacts of past, present and reasonably foreseeable future actions on the environment.  40 C.F.R. § 1508.25.  Stated differently, significance cannot be avoided by breaking an action into small component parts.

Plaintiffs note that the EPA has outlined serious concerns with the cumulative effects of phosphate mining in the geographic area and requested a regional EIS[5] regarding those cumulative effects and secondary impacts.  The EPA also opined that the impacts were "largely substantiated by Mosaic..." In sum, Plaintiffs contend that the Corps failed

does not demonstrate the Corps' findings lack scientific integrity.  Plaintiffs' evidence is insufficient at this stage in the proceedings to carry their heavy burden, given the degree of deference the Court must accord the Corps' determination.

Nor have Plaintiffs demonstrated, at this stage in the proceedings, that the action is highly controversial because there is substantial dispute about the size, nature or effect of the action.  The Plaintiffs will, of course, have an opportunity to further brief these two issues at a later date.

Plaintiffs also assert that the Corps failed to address the impact the mine would have on neighboring residents.  The Court disagrees with this assertion and finds that Corps sufficiently considered these very issues in its EA.

[5] Plaintiffs note that an EIS should be prepared early enough so that it can contribute to the Corps' decision making process rather than after a permit is granted.

to make a convincing case for its FONSI.

Defendants counter that the Corps specifically addressed each of these issues in its EA and reasonably concluded that there are no significant impacts.  For example, the Corps determined that the revised mitigation plan fully compensates for unavoidable impacts to the waters of the United States and, further, the Corps specifically identified and examined the project's cumulative effects.

While the Court recognizes that Plaintiffs have produced a significant amount of evidence regarding the EIS issue and may be able to eventually demonstrate that the Corps failed to take a hard look at direct and cumulative impacts and thus erred in its FONSI, the evidence produced at this stage in the proceedings is insufficient.[6] Given the deferential standard of review applied to the Corps' decision, Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits as to this point.  The Court will not require the Corps to rescind the permit until it has completed its EIS.

---

[6] In addition, neither the fact that the Corps and EPA have *now* agreed to conduct an EIS on the cumulative impacts of phosphate miniing nor the fact that the Corps prepared a 101 page EA leads the Court to conclude the Corps erred in making its FONSI finding.

*Clean Water Act*

As to the Clean Water Act, the Court will first address Plaintiffs'

argument that the Corps improperly accepted Mosaic's claim that it could

not implement practicable measures to reduce the impact of the mining

on wetlands and streams.  Plaintiffs cite to EPA's technical assessment

that Mosaic had failed to demonstrate less damaging mine configurations

would be economically impracticable.   In addition, Plaintiffs maintain that

Mosaic did not comply with EPA's request to analyze different

combinations of reduced stream crossings.

As noted above, under the CWA, Mosaic was obligated to "clearly

demonstrate" that a practicable alternative is unavailable and, further,

while the Corps may rely on Mosaic's analysis, it must independently

verify same.

Plaintiffs have produced the EPA's January 15, 2010 letter to the

Corps, wherein it noted that Mosaic had not completed its alternatives

analysis.[7] In its May 18, 2010 letter to the Corps, the EPA again opined

_____

[7]   The same letter included a request for a phased permit.
Specifically, Tom Welborn, Chief of the Wetlands, Coastal and Oceans
Branch in EPA Region 4's letter to Colonel Alfred A. Pantano, Jr., stated,
"because of risk and time lag associated with the proposed project, EPA
recommends a phased permit that requires interagency review and

that Mosaic's alternatives analysis was incomplete and otherwise flawed. The letter referred a memorandum generated by EPA economists which explained why Mosaic's alternatives analysis did not comply with NEPA requirements.  According to the economists, Mosaic did not adequately explain why it could not mine with a smaller footprint.

Plaintiffs also cite the EPA's June 8, 2010 letter to the Corps which again noted the incomplete alternatives analysis, "alternative configurations of the preferred project site... have not been addressed..."

According to the Corps, it considered two sets of alternatives to the proposed project: the first set ("avoidance" or "offsite" alternatives) analyzed alternative means of obtaining phosphate ore; the second set ("minimization" or "onsite" alternatives) evaluated options for reducing

---

approval at all governmental levels prior to the next permit phase being issued."

An April 5, 2010 email written by Mr. Welborn to Donnie Kinard, Chief of the Jacksonville Regulatory Division of the Corps appears to continue to recommend a phased permit while acknowledging that the Corps had denied this request.  Regardless it is clear that EPA officials had objected to the permit's duration.

However, the parties have not briefed whether the Corps was obligated to analyze and/or explain its reasons for denying EPA's request to phase the permit.  The Court will not attempt to analyze this issue now but this matter may be addressed by the parties at a later date.

environmental effects and obtaining phosphate ore on the proposed

10,856-acre tract. (EA at 19-26, 27-30).   These alternatives included

purchasing rock from outside Central Florida, mining outside of Central

Florida, and constructing a new or expanded mine elsewhere in Central

Florida.

In finding these alternatives impracticable, the Corps noted

"Mosaic had previously invested $325 million in connection with its South

Fort Meade ore separation/beneficiation plant, which is located just

across the Polk/Hardee county boundary line. That plant was supplied by

older, existing mines and the Project will allow Mosaic to continue

operations at the plant after the phosphate ore at older facilities is

exhausted." (MFR-2, 1-520).  The EA stated that the four offsite

alternatives met the overall project purpose but three were not practicable

because of increased transportation and logistical costs, the need to

cross over Peace River, or insufficient quantity of phosphate reserves.

(EA at 22). One alternative was practicable, but raised more

environmental concerns. (EA at 27-29).

The Corps also maintains that it did adopt the bayhead and stream

crossing minimizations recommended by the EPA in the January 15,

2010 letter. (EA at 27-29). The Court notes that page 27 of the EA lists "on site alternative #2B- EPA 1/15/2010 recommendations" and Page 28 states that the January 15 letter requested that the applicant minimized [sic] the bayhead system located in Sections 10 and 11... the Applicant...determined that dragline crossing #6... could be avoided."

A careful review of this evidence demonstrates that Mosaic and the Corps did indeed analyze several of the EPA's concerns and, further, modified the permit based on these particular concerns.  However, it is also clear that both Mosaic's alternatives analysis, as well at the Corps verification of same, was incomplete.

The cited EPA letters memorialize the deficiencies and the Defendants have failed to adequately rebut this evidence.   Thus, Plaintiffs have met their burden in demonstrating that Mosaic did not clearly show less damaging alternatives were impractable and even if it did, the Corps failed to independently verify Mosaic's findings.

Accordingly, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits regarding their claim that the Corps

failed to adequately address the available alternatives.[8]

Plaintiffs also argue that the Corps violated the CWA by failing to hold a public hearing on the proposed permit. The Clean Water Act mandates an opportunity for public hearings. The Plaintiffs note that the project was controversial as evidenced not only by public and county opposition, but by the opinions of the EPA and notes that "[i]n case of doubt, a public hearing shall be held." 33 C.F.R.§ 327.4(c)). However, the Corps rejected several requests for a public hearing, concluding that the "issues raised by the public have been addressed by the Corps or have been found to be insubstantial..." (EA at 95).[9]

Under the regulations, the Corps has discretion to deny a hearing request if it determines it has the information necessary to reach its decision and there is no valid interest to be served by holding a hearing. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 545 (11th Cir. 1996). The Corps notes that Plaintiffs have failed to demonstrate that they were unable to submit their comments and evidence.

---

[8] This is not to say that Mosaic will be unable to satisfy its burden and demonstrate that there are no practicable alternatives on remand.

[9] In its EA, the Corps listed the comments received and categorized them. (EA page 15-18).

The Court recognizes the Corps' considerable discretion in this area and need not decide whether the Corps' refusal to conduct a hearing would by itself necessitate a stay of the permit because a remand is otherwise necessary. *Hough v. Marsh*, 557 F. Supp. 74, 79-80 (D.C. Mass.1982).   The Court finds that a public hearing should be conducted in conjunction with the remand.

*Preliminary Injunctive analysis*

After finding that Plaintiffs have demonstrated a likelihood of success on the merits regarding their claim that the Corps violated the CWA by failing to sufficiently address the available alternatives, the Court must also analyze the irreparable injury, balance the respective harms and determine whether the injunction would be adverse to the public interest.[10]

As to irreparable injury, the Court agrees with Plaintiffs that the excavation of ecologically significant wetlands and streams often constitutes irreparable harm. *Nat'l Wildlife Fed. v. Marsh*, 721 F.2d 767, 786 (11th Cir. 1983).

Even if the Corps is correct that Plaintiffs' arguments regarding

---

[10] In this particular case, the elements generally overlap one another.

18

restoration and mitigation of the wetlands and streams are speculative, the fact remains that even if the restoration is successful there is a significant time lag between the mining activity and the restoration completion; in many cases, restoration will not be accomplished for a decade or more.   Further, the EPA itself expressed concern about the time lag when urging the Corps to issue a phased permit.

Mosaic counters that it, as well as Hardee County, will be economically harmed and if the mine is shut down but has not demonstrated that a mere stay of the permit would cause a shutdown. Further, Plaintiffs contend that the EA demonstrates that this Court could enter an injunction without significant negative economic consequences.

As noted in the EA, even the "No Action Alternative" allows Mosaic to continue its South Fort Meade mining operation, albeit in a restricted area.[11]

Regarding the public interest, Plaintiffs argue that "[t]he counties of Lee, Charlotte and Sarasota take issue with the permit for many reasons,

---

[11] "The EA demonstrates that the No Action Alternative (avoiding all wetlands) would still allow up to two years of productive mining at the site on over 1,000 acres and the "Stream Crossings Only" alternative, would allow the company to recover somewhere between 31% and 55% of the recoverable ore on over 4,000 acres."

not the least of which is their desire to protect their drinking water....Indeed, the Corps regulations themselves define wetland protection as a paramount public interest: 'Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest.' 33 C.F.R. § 320.4(b)(1) (2010)."

The Corps counters that Plaintiffs ignore the effects that an injunction may have on "the regional economy or the role of phosphate to the Nation's agriculture industry."  However, as to the National role of phosphate, this argument assumes that an injunction will force Mosaic to severely curtail, or even cease its mining activities.   As to the regional economy, the Court again acknowledges the potential economic effects of an injunction and takes this issue very seriously.[12]

While the Court recognizes that Hardee County and Mosaic may be economically impacted if the permit is stayed during remand, the Court must balance this harm against the harm asserted by Plaintiffs.  Further,

_____

[12] The Court intends to expedite its normal case management schedule to decide this case on its merits in a reduced timeframe. The Court requests that the parties meet and attempt to agree to such a schedule and notify the Court within 15 days regarding same.

Defendants have failed to provide evidence that backs up many of its dire

predictions.[13]

_____

[13] Sections of Mosaic's brief regarding the public interest are titled...
"Devastating effects on the local economy," "Significant Impacts on the
Agricultural Industry and World Food Supplies" and "Negative Impacts on
the Environment."

First, it appears that many of Mosaic's predictions and statistics are
based on flawed assumptions.  For example, Mosaic argues that "the
shutdown of the SFM mine would negatively impact... the United Way."
The granting of a preliminary injunction will not, of course, force Mosaic to
immediately shut down the South Fort Meade mine.  Nor will an injunction
force Mosaic to cease contributions to the United Way.

Mosaic cites statistics regarding the number of jobs that indirectly
support the phosphate industry without tying these statistics to the relief
requested here.  Clearly, even complete denial of the permit at issue will
not shut down the phosphate industry; the proposition that an injunction will
create a loss of "1,400 jobs.... in addition to those jobs lost by Mosaic
employees" is wholly unsupported.

And as previously noted, the No Action Alternative allows Mosaic to
continue its mining operation for a significant period of time.

Further, Plaintiffs persuasively argue that "over EPA's objection
[Mosaic] refused to explore a smaller footprint mine, and should not be
allowed to manipulate the equities."  Plaintiffs note that the "self-inflicted
nature of a defendant's harm" may weigh in favor of granting preliminary
injunctive relief.

Lastly, the Court notes that Mosaic's assertion that the *granting* of
injunctive relief will cause negative impact to the environment is
speculative at best and disingenuous at worst.  Clearly, Plaintiffs, the EPA
and others that have voiced objections to the permit based on potential
environmental harm have valid objections, even if Mosaic disagrees with

The Court has considered the competing interests of the public as well as the balance of harms and finds that remand appropriately takes these interests into consideration. The Court need not consider the Stream Crossings Only alternative because it appears that staying the permit for the limited duration discussed in this order (effectively instituting the No Action Alternative) will not significantly hamper Mosaic's ability to operate its business.

In sum, the Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits on their claims that the Corps issued the permit in violation of the Clean Water Act and that without a Preliminary Injunction, Plaintiffs and the environment will suffer irreparable harm which outweighs any harm to Defendants.  Lastly, the Court finds that the public interest favors the issuance of a Preliminary Injunction to protect the environment while the permit decision is remanded to the Corps. Plaintiffs are not required to post a bond as this is public interest litigation and Plaintiffs do not have a financial interest in the outcome.

---

same.

22

Accordingly, it is **ORDERED**:

1. Hardee County's Motion to Intervene (Dkt. 39) is **DENIED**.

2. Plaintiffs' Motion for a Preliminary Injunction is **GRANTED in part**; this case is remanded to the Corps of Engineers to adequately conduct an alternatives analysis;

3. Defendants, all of its agents, officers, employees and attorneys, as well as Mosaic Fertilizer, LLC and its agents, officers, employees and attorneys are preliminarily restrained and enjoined from conducting any activities in reliance on Corps permit SAJ-1997-4099, including but not limited to any excavation, dredging, filling or other alteration of jurisdictional waters of the United States at the South Fort Meade Extension site until the requisite alternatives analysis is accomplished in accordance with this Order and a permit is reissued by the Corps or, alternatively, this case is decided on its merits in Mosaic's favor.

**DONE AND ORDERED** this 30th day of July, 2010 at 7:00 p.m.

HENRY LEE ADAMS, JR.
United States District Judge

Copies to:
Counsel of Record