**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SIERRA CLUB, INC.; PEOPLE FOR
PROTECTING PEACE RIVER, INC.;
and MANASOTA-88, INC.,

        Plaintiffs,

v.

                                            **Case No.: 3:10-cv-564-J-25JBT**

UNITED STATES ARMY CORPS OF
ENGINEERS; and ALFRED A. PANTANO, JR.,

        Defendants,

and

MOSAIC FERTILIZER, LLC,

        Defendant-Intervenor.

---

### INTERVENING DEFENDANT, MOSAIC FERTILIZER, LLC'S MOTION FOR LIMITED STAY OF PRELIMINARY INJUNCTION PENDING APPEAL

---

David B. Weinstein
Fla. Bar No. 604410
weinsteind@gtlaw.com
Kerri L. Barsh
Fla. Bar No. 443840
barshk@gtlaw.com
Kimberly S. Mello
Fla. Bar No. 002968
mellok@gtlaw.com
Greenberg Traurig, P.A.
625 E. Twiggs St., Ste. 100
Tampa, FL 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900

Frank E. Matthews
Fla. Bar No. 328812
frankm@hgslaw.com
Susan L. Stephens
Fla. Bar No. 986836
susans@hgslaw.com
Hopping Green & Sams, P.A.
123 South Calhoun Street
P.O. Box 6526
Tallahassee, Florida 32314-6526
Telephone: (850) 222-7500
Facsimile: (850) 224-8551

*Counsel for Mosaic Fertilizer, LLC*

**INTERVENING DEFENDANT, MOSAIC FERTILIZER, LLC'S MOTION FOR
LIMITED STAY OF PRELIMINARY INJUNCTION PENDING APPEAL**

Pursuant to Rule 62 of the Federal Rules of Civil Procedure, Intervening Defendant, Mosaic Fertilizer, LLC ("Mosaic"), moves the Court for a limited stay of the preliminary injunction entered on July 30, 2010, pending the resolution of Mosaic's appeal to the United States Court of Appeals for the Eleventh Circuit, filed on August 2, 2010. The limited stay would lift the preliminary injunction only as to Phase I of the mining plan (described below and depicted on Exhibits 1 and 2), which would then proceed pursuant to Mosaic's Clean Water Act ("CWA") Section 404 Permit SAJ-1997-4099 (the "Permit"). Allowing Phase I mining to proceed under the Permit will not impact any wetlands that were not already disturbed prior to entry of the Court's temporary restraining order.

## INTRODUCTION

This Court should enter a limited stay of the injunction pending the appeal because the balance of equities significantly weighs in favor of granting this relief. In its July 30, 2010 Order and Preliminary Injunction ("Order"), this Court stated that economic harm would not result to Mosaic or others because the South Fort Meade ("SFM") mine need not shut down during the duration of the preliminary injunction. Due to a multitude of factors, this is not the case.

While it is true that Mosaic may not need a Section 404 CWA permit to conduct uplands only mining, the federal permit issued in this case is just one of the permits regulating Mosaic's mining operations.[1]  Local and state permits must also authorize

---

[1]  Mosaic would have to obtain a Section 404 CWA permit if it were to conduct uplands only mining with stream crossings, which is Alternative #4 in the EA.  [EA at 22]

Greenberg Traurig, P.A.

Mosaic's mining plans and such activity must be conducted in accordance with those permits. Thus, to implement an uplands only mining plan, Mosaic would first have to study and reengineer uplands only mine and mitigation plans that address, among other things, revised storm water, surface, and groundwater hydrology based on reconfigured mining footprints and clay settling areas. The re-engineered uplands only plans would then require review and approval by local and state agencies. As a result, the process for approval of uplands only mining would take at least six months, and perhaps significantly longer. Consequently, Mosaic cannot undertake uplands only mining at this time and has no choice but to close the SFM mine in September 2010, which has been publicly announced.

Moreover, even if upland only mining could promptly occur from a local and state regulatory standpoint, this approach would nonetheless be infeasible from an environmental and practical standpoint because, (1) draglines can not efficiently maneuver in a shotgun pattern around the wetlands and the ditches and berms that would have to be constructed to protect them, (2) it would create a backfill materials imbalance, (3) it would complicate Mosaic's ability to properly re-establish the upland and wetland topography, which could create hydrological impacts, and (4) it would strand the phosphate ore under wetlands, which would become unmineable.

For these reasons, Mosaic requests a limited stay to allow mining to proceed in Phase I of its existing mine plan only pursuant to the Permit. Because the 8.79 acres of wetlands in Phase I were already disturbed prior to entry of the temporary restraining order, there will be no additional wetland impacts if this Court grants the limited stay. Completing Phase I will

3

allow Mosaic to conduct its mining operations for approximately four months resulting in the continued extraction of phosphate—a critical resource for which there is no substitute.[2] Mosaic will subsequently restore the impacted wetlands in accordance with a mitigation plan approved by the U.S. Army Corps of Engineers ("Corps"). In contrast, absent a limited stay, over 200 jobs will be immediately lost with serious resulting consequences. Therefore, the balance of equities—required to be considered under Eleventh Circuit precedent—weigh heavily in favor of granting a limited stay of the injunction pending the appeal.

This Court need not find that Mosaic has a likelihood of success on appeal in order to issue a stay of the injunction. Rather, all the Court must conclude is that there are serious legal issues to be resolved on appeal. Based on the July 30 Order, it appears that the Court—in rejecting the alternatives analysis performed by the Corps—did not afford the Corps deference. There is no language in the Order finding that the Corps' alternative analysis was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," which is the requisite legal standard. 5 U.S.C. § 706(2) (2010). Instead, the Court independently determined that the Corps' analysis was "incomplete" based solely on deficiencies noted by the Environmental Protection Agency ("EPA"), notwithstanding the facts that (1) the robust record fully supports the Corps' decision, and (2) the EPA did not elevate the matter, and, therefore, consented to the Permit's issuance.

---

[2] This Court stated in its Order that it will expedite the briefing schedule in this case. Therefore, it is possible that merits briefing will be completed and a ruling by this Court issued within this four month time frame. Depending on the progress of the district court proceedings and Mosaic's appeal, Mosaic may request additional relief.

This Court's ruling on the CWA claim not only resulted in a finding of likelihood of success on the merits, but prompted a "stay" of the Permit and remand of the case to the Corps to reconsider its alternatives analysis—a remedy only available on the merits and not at the preliminary injunction phase of this litigation. Thus, Mosaic's appeal presents legal issues that are significant and sufficient to support Mosaic's request for a limited stay. For these reasons, the requirements for a limited stay of the injunction pending appeal have been met.

## ARGUMENT

### I.     THIS COURT SHOULD STAY THE PRELIMINARY INJUNCTION ON A LIMITED BASIS PENDING APPEAL.

Rule 62 authorizes a district court to stay an injunction pending appeal. Fed.R.Civ.P. 62; *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The Eleventh Circuit requires the Court to consider the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton*, 418 U.S. at 776; *Venus Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000); *Isaly Co. v. Kraft, Inc.,* 622 F. Supp. 62, 63 (M.D. Fla. 1985). These factors, however, are not "a set of rigid rules," but "contemplate individualized judgments in each case." *Hilton*, 481 U.S. at 777. In fact, demonstrating a probability of success on the merits is not always required. *Ruiz v. Estelle*, 650 F.2d 555, 565-66 (5th Cir. 1981). Instead, when the movant demonstrates that the balance of equities weighs heavily in favor of

5

granting a stay, the movant need only demonstrate that there is a "substantial case on the merits" raising a "serious legal question." *Id.*; *see Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). These factors have clearly been met here.

   A. **The balance of equities weighs heavily in favor of Mosaic, its employees, and others whose livelihoods depend on the phosphate industry or who otherwise benefit from it.**

This Court rejected Mosaic's evidence of economic harm finding "a mere stay of the permit would [not] cause a shutdown" of its mining operations because the "No Action Alternative" will allow for productive uplands only mining for up to two years. (Order at p. 19). Unfortunately, that is simply incorrect. Mosaic's statement to the Corps during the permitting process that uplands only mining could continue for up two years was made solely to demonstrate that this alternative was not a <u>long-term</u> option that would satisfy the project purpose because it would not produce sufficient ore.[3]  [MFR2 at 3-13; §3.4].  And, while uplands only mining might theoretically be possible at some time in the future, it cannot and will not occur in time to prevent the shutdown of the SFM mine. Even if uplands only mining was economically feasible at the South Fort Meade Hardee County Extension ("SFM-HC") (which it is not under current circumstances, as explained below), it would only be possible <u>after</u> appropriate analysis and engineering were completed and resulting mine and mitigation plans were finalized with state and local agencies—the existing plans would not suffice.  [Declaration of Thomas E. Myers, III ("Myers Decl.") at ¶13, attached as Exhibit 3]. That process would take at least six months to complete and perhaps significantly longer.

---

[3]      Given the complex logistics and high fixed costs involved in phosphate mining, it is not economical to engage in high cost production which will deplete a ten year resource in two years—wasting the other eight years of the resource.

Consequently, the South Fort Meade mine will close next month absent a limited stay of the injunction.

**1.    Mosaic cannot mine uplands only in the short term.**

The phosphate mining permitting process requires a thorough, time-consuming analysis of highly complex and technical engineering, hydrologic modeling, biology, geomorphology studies, archaeology studies, and land use planning.  [Myers Decl. at ¶3]. The final mine plan for SFM-HC took approximately seven years to study, develop, refine, and permit  to ensure that (1) there would be no significant environmental impacts; and (2) the entire site could be properly reclaimed in a logical, cohesive, and properly functioning manner[4] that deals with the entire site holistically.[5]  Mining cannot be done in a piecemeal fashion, which is exactly what uplands only mining would entail.  [MFR2 at pp. 1-54 (explaining why large contiguous ore reserves are both economically and environmentally preferable when compared to numerous small discontiguous tracts containing comparable ore reserves)].

In order to mine the uplands only, Mosaic would first have to remove and set aside the overburden[6] (soil covering the phosphate ore) to reach the matrix[7] (the phosphate ore,

---

[4]      A logical and cohesive mining plan is necessary because, among other things, it is difficult to maneuver draglines and relocate slurry pipelines and heavy equipment used for reclamation from place to place. [MFR2, §1.3.3.2.4].

[5]      The studies performed included existing vegetation, wetland delineation and assessments ("WRAP"), wildlife, surface hydrology (base flow, flooding, stream flows and conditions, etc.), groundwater geohydrology, surface and ground water quality, soils, geomorphology, geology, archaeology, mine planning and engineering, site reclamations design, material balances, clay and tailings disposal, wetland creation and mitigation, and post reclamation site land use planning and design.  [Myers Decl. at ¶3].

[6]      The overburden is approximately 23 feet thick.

[7]      The matrix is approximately 14 feet thick.

which is comprised of sand, clay, and phosphate). [Myers Decl. at ¶4]. This is accomplished with electrically powered draglines weighing seven million pounds, which dig deep holes ("mining cuts") approximately 30-55 feet deep to reach the phosphate ore ("ore"). [Myers Decl. at ¶4]. The ore is then extracted from the ground, liquefied with high pressure water, and transported to the beneficiation plant for processing. [Myers Decl. at ¶5]. This leaves the site with a mining cut equal to the depth of the ore removed. [Myers Decl. at ¶5]. The remaining clay, placed in clay settling areas, and sand components ("sand tailings") provide the backfill material, which is necessary to fill the mining cuts. [Myers Decl. at ¶6].

Under a proper mining plan—like the Corps' approved SFM-HC plan—a rigorous engineering analysis called a "materials balance" is performed to ensure that there is a sufficient backfill material to refill the mine cuts and properly perform reclamation activities to mitigate wetland impacts. [Myers Decl. at ¶7]. Importantly, however, with uplands only mining at SFM-HC, there is no space available to construct the clay settling areas. [Myers Decl. at ¶8]. Consequently, the clay would have to be pumped to the Polk County portion of the South Fort Meade site for disposal, and it could not be feasibly returned. [Myers Decl. at ¶8]. As a result, there would be a significant negative materials balance,[8] and the mining cuts could not be adequately filled. [Myers Decl. at ¶9]. This would cause a change in topography (*i.e.*, a drop in the land surface) by approximately 10-15 feet in most of the mined

---

[8] In general, the clay is 50% of the volume of material removed, the phosphate is 15%, and the sand is the remaining 35%. Therefore, Mosaic estimates that under the uplands only mining scenario, it would only have 35% of material removed available to fill the mining cuts causing a negative materials balance of 65%. [Myers Decl. at ¶9].

areas, resulting in either lakes or uplands that are substantially lower than the adjacent wetlands. [Myers Decl. at ¶10].

Absent a properly studied plan with an appropriate mitigation design, the movement of surface water over the land and groundwater through the soil would not be restored to support the function of the adjacent wetlands. [Myers Decl. at ¶10]. Consequently, the engineering analysis would have to be recalculated to address these conditions and ensure proper execution of reclamation activities that are consistent with the applicable standards. [Myers Decl. at ¶12]. This could require modification to Mosaic's other permits following significant consultation with state and local agencies. [Myers Decl. at ¶13]. Therefore, uplands only mining cannot be commenced in the short-term, and it is uncertain whether it could ever be implemented. [Myers Decl. at ¶15].

### 2. Uplands only mining in the short term is not economically feasible.

Uplands only mining at SFM-HC in the short-term would neither be economically feasible nor a responsible use of phosphate—a valuable, limited, and strategic natural resource. Uplands only mining would strand substantial phosphate reserves that would otherwise be extracted from below the adjacent wetlands and which could not be recovered later. [Myers Decl. at ¶16]. This is because much of the wetlands would be isolated due to the inability to adequately and timely fill mine cuts adjacent to wetlands, precluding the return of draglines to these areas. [Myers Decl. at ¶16]. In addition, because uplands only mining involves relatively small, isolated parcels of property, ore recovery is diminished significantly due to the irregular mine cuts that would be necessary and the fact that a

Greenberg Traurig, P.A.

protective ditch and berm system would need to be constructed to protect the adjacent wetlands. [Myers Decl. at ¶17]. This is in addition to the loss of reserves under the wetlands themselves. [Myers Decl. at ¶17].

Not only would a substantial amount of reserves be lost, but production costs would be prohibitively high. [Myers Decl. at ¶¶18]. Phosphate production is a high volume, low margin business. However, under optimal mining conditions, the South Fort Meade mine is Mosaic's lowest cost producer. [Myers Decl. at ¶18]. Due in part to fixed costs with only one or two draglines operating in the uplands only—compared to the four draglines that would operate under the existing mine plan—production costs would increase by 170 to 400 percent over current South Fort Meade production costs. [Myers Decl. at ¶19]. This also creates increases in production costs as compared to average cost at other mining operations by 120 to 300 percent. [Myers Decl. at ¶19]. This is a substantial incremental increase in Mosaic's phosphate rock mining cost far in excess of what is normally and reasonably incurred at this mine or at Mosaic's other mine operations. [Myers Decl. at ¶19].

**3.    Mosaic will restore the wetlands disturbed as a result of Phase I mining under a Corps approved mitigation plan.**

The balancing of equities weighs heavily in favor of a stay of the injunction pending the appeal. *Isaly,* 622 F. Supp. at 63; *Sierra Club v. U.S. Army Corps of Eng'rs,* 2007 WL 402830, *1 (M.D. Fla. 2007). The SFM mine will be shut down next month and over 200 Mosaic employees will lose their jobs, resulting in profound harm to them and their families. [*See* Dkt. Nos. 49, 50, 58, Rahm Decl. at ¶11(a), Butler Decl. at ¶5]. Additionally, over time the decrease in phosphate extraction likely will result in closure or production curtailment at

Greenberg Traurig, P.A.

one or more of Mosaic's fertilizer production plants exacerbating both direct and indirect job losses[9] and causing further harm, including the loss of hundreds of millions of dollars in economic benefits to Hardee County.[10] [Rahm Decl. at ¶11(c); MFR2 at 2-13].

In balancing the parties' interests, the profoundly troubling consequences of a shutdown of the mining operations at SFM-HC—which provides approximately one-third of Mosaic's total phosphate production[11]—must be weighed against the fact that (1) <u>no</u> additional wetlands impacts will occur if the stay is issued, and (2) the approximately nine wetland acres that have already been disturbed will be reclaimed. The Corps—who is entitled to the utmost deference—has already approved Mosaic's comprehensive mitigation plan.[12] This mitigation plan will be performed if no changes to the existing the mine plan are required after this case is resolved on the merits. In fact, it is uncontroverted that (1) the

---

[9]    This Court's Order states that "Mosaic cites statistics regarding the number of jobs that indirectly support the phosphate industry without tying the statistics to the relief requested here." [Order at p. 21, fn. 13]. However, the declarations from the suppliers and contractors establish that a shut down of the mine will result in immediate job losses. [*See, e.g.,* Ronnie Hendrick Decl. at ¶7 (if Mosaic is prohibited from further mining, it will mean that Bul-Hed Corporation would cease to exist sometime in the near future and 55 employees will be searching for jobs at a time when jobs are non-existent); Simon Decl. at ¶7 (the inability to continue working at the South Fort Meade Mine will immediately result in approximately 20 JVS Contracting's full-time and insured employees being laid off from work)].

[10]    Mosaic has committed in excess of $42 million over a ten year period for funding of infrastructure and economic development in Hardee County, predicated on Mosaic's ability to mine there. [Albritton Decl. at ¶6]. An initial $5 million payment was not paid on July 14, and will not come due unless the project goes forward. [*Id.*]. This funding and the tax revenue generated from Mosaic's business are vitally important to Hardee County, which has been designated by the Florida Legislature as a Rural Area of Critical Economic Concern. [*Id.* at ¶3(a)].

[11]    Mosaic extracts approximately 16 million tons of phosphate per year. Ten million tons are extracted from two of Mosaic's currently operating mines in Florida, one of which is SFM. The SFM mine has over five million tons of phosphate production every year. The remaining production comes from several smaller mines that have no ability to replace the SFM production. [Myers Decl. at ¶18]. Therefore, the inability to mine the phosphate rock at the SFM-HC in the long-term will have significant impacts on the overall extraction of phosphate needed to support the nation's food supply. [Rahm Decl. at ¶11].

[12]    In fact, this Court expressly noted that—even though Plaintiffs adduced evidence of scientific uncertainty, presumably through their retained expert, Mr. Winchester—Plaintiffs failed to meet their burden of demonstrating that the Corps findings on reclamation "lacked scientific integrity." [Order at p. 10-11, fn. 1].

wetlands and streams on the SFM-HC have been severely disturbed by agricultural activities that have been ongoing since the 1940's and are, therefore, of generally low quality; (2) Mosaic's plan, which the Corps accepted, follows the Corps' Wetland Rapid Assessment Procedure ("WRAP"), and demonstrates that the wetlands to be created will have greater wetland functioning after reclamation;[13] and (3) incorporated into the mitigation plan is a painstakingly detailed time lag factor that complies with WRAP to account for deferred impacts. [MIT2 at § 6.2.1.3 and tbls. C-48, C-51; MFR2 at C-38; 6.2.9.; EA at 18, 56; Cantrell Decl. ¶¶6, 8; BiOp at 71]. Moreover, the Permit's special conditions and detailed criteria ensure that the Project is tightly controlled and reclamation goals are met.[14] [Permit 4-7, 39].

Furthermore, even if the final outcome of this litigation necessitates modifications to the existing mine plan or prevents additional mining at SFM-HC, Mosaic will still be required to develop to the Corps' satisfaction a mitigation plan that will restore the already impacted wetlands in Phase I. [Myers Decl. at ¶20]. Importantly, because the Corps has already approved a mitigation plan for the entire SFM-HC, there is no reason to believe that a greatly reduced mitigation plan cannot be successfully executed, particularly given Mosaic's history of successfully reclaiming wetlands. [MIT2 at 6-4, 6-8, 6-21, 6-22, 6-32, 6-33, 6-35; EA at 49, 51, 55; Cantrell Dec. at ¶¶ 13, 18-20]. In addition, Mosaic has already posted a

[13] Indeed, the Corps, other agencies, and respected scientists have concluded that Mosaic can and will successfully reclaim the wetlands and streams resulting in long-term environmental benefits. [EA 62; MIT2 6-9 – 6-10; BiOp. at 70-71; Cantrell Decl. ¶20].

[14] These include (1) annual compliance reviews by federal agencies (including EPA) with the power to stop mining; (2) adherence to a detailed mitigation schedule; (3) the power to suspend, modify, or revoke the permit at any time; and (4) the requirement to post a bond equal to 110% of past and future mitigation costs on a rolling three-year basis. [Permit 4-7, 39].

bond equal to 110% of the estimated mitigation costs over the next **three years** of operation. [MFR2 at §6.1]. Thus, there is clearly more than sufficient financial security for the **four months** of mining that would take place under Phase I.

   **B.**  **There is a substantial case on the merits involving a serious legal question.**

   This Court "[h]aving decided for [Plaintiffs] on the facts and the law," may well "not [be] disposed to find that [Mosaic] now enjoys a likelihood of success on the appeal." *Ruiz,* 650 F.2d 566 ("[i]f a movant were required in every case to establish that the appeal would probably be successful, the Rule would not require it to be presented to the district judge who has already decided the merits of the legal issue against the movant"). However, no such finding is required.[15] The balancing of equities are "heavily tilted" in favor of a limited stay, and, consequently, there is no requirement that this Court find "ultimate success by the movant is a mathematical probability." *Sierra Club*, 2007 WL 402830 at *1-2 (M.D. Fla. 2007). Rather, a stay is warranted if the appeal raises "a substantial case on the merits" involving "serious legal questions." *Ruiz*, 650 F.2d at 565-66. That standard has clearly been met.

   The partial administrative record filed prior to the injunction hearing contained overwhelming evidence demonstrating that the Corps conducted a proper CWA alternatives analysis and, as a result, its decision was not "arbitrary or capricious." "An alternative is practicable if it is "available and capable of being done after taking into consideration cost,

---

[15]  Even if such a finding were required, Mosaic has demonstrated likelihood of success on appeal as set forth below.

Greenberg Traurig, P.A.

existing technology, and logistics in light of overall project purposes." 40 C.F.R. §230.10(a)(2).  Importantly, the alternatives analysis <u>must</u> be viewed in connection with the project purpose, <u>which has not been challenged</u>, and is clearly defined as follows:

> to extract phosphate ore from reserves located within a practicable pumping distance of the existing SFM-PC ore separation/beneficiation plant…in order to continue the operation of the SFM-PC separation/beneficiation plant at historical production rates.

[EA at 6]; *Fla. Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1243-44 (M.D. Fla. 2008) (noting Corps' obligation to consider project purpose in issuing Section 404 permits).  Based on this project purpose, the Corps underwent an almost three year process of working with Mosaic to exhaustively evaluate both offsite and on-site alternatives to determine which was the "least environmentally damaging practicable alternative" that could meet the project purpose.

Despite this extensive review, this Court found that "Mosaic did not show clearly less damaging alternatives were impracticable."  The Court's ruling was based on EPA's contention that the alternatives analysis was "incomplete" because "alternative configurations of the preferred project site…have not been addressed."  [Order at p. 14]. However, there is no legal requirement that the Corps accept EPA's position.  Instead, the Corps is only required to consider EPA's comments when determining if a permit should issue.  That was clearly done here.  Indeed, this Court correctly acknowledged that Mosaic and the Corps "did indeed analyze several of the EPA's concerns, and, further, modified the permit based on some of these particular concerns."  [Order at p. 16; MFR2 at pp. 3-8, 3-12;

Greenberg Traurig, P.A.

December 15, 2009 Correspondence from Mosaic to the Corps; March 10, 2010 Correspondence from Mosaic to the Corps].

First, Mosaic specifically analyzed as a mining alternative (listed as Alternative #2A) EPA's 2007 request that "all wetlands adjacent to the and tributaries connected to the Peace River be avoided." [Gallagher Affidavit ("Gallagher Aff.") at Exh. E]. This alternative impacted 10.7 acres of jurisdictional wetlands, involved 11 stream crossings, and 4,400 linear feet of streams, but would not allow for clay settling areas and would significantly decrease the amount of recoverable reserves. The Corps rejected this alternative as impracticable "due to reducing the minable reserve areas and costs and logistical constraints due to the construction of the ditch and berm system and clay settling areas…." [EA at 27-28; MFR2 at § 3.3.1.6].

Second, based on EPA's request in its January 15, 2010 correspondence, Mosaic agreed to eliminate from its mine plan a stream crossing and an additional 65.5 acres, which was comprised of a bayhead system located adjacent to the Peace River.[16] [MFR2 at p. 3-13; Gallagher Aff. at Exh. F; March 10, 2010 Correspondence from Mosaic to the Corps]. This resulted in a loss of 508,000 short tons of reserves. [MFR2 at p. 3-13]. The Corps ultimately accepted this alternative (listed as Alternative #2B) as the least environmentally damaging practicable alternative. [EA at 27-28, 29 (specifically recognizing that Mosaic re-evaluated

---

[16]      EPA requested that Mosaic avoid stream crossing number five. In response, Mosaic provided documentation that eliminating this crossing would force Mosaic to abandon 95 acres of reserves located south of crossing number five because they could not be reached without crossing the stream in that location. Thus, Mosaic's evaluation concluded that avoidance of temporary impacts to 4.63 acres of low to medium quality wetland vegetation at this crossing is not practicable when balanced against the cost of sacrificing 95 acres of mineable phosphate rock reserves. [MFR2 §3.2.6 at Map C-16; §3.3.2 at p. 3-13 and Appendix C-32 (showing wetland quality at stream crossing area)].

the need for all stream crossings and determined that dragline crossing #6 located in Section 24 could be eliminated)]. In addition, the Corps explained the reasons that the remaining three alternatives considered could not both avoid wetland impacts and meet the project purpose. [EA at 27-30].

Nevertheless, at the end of Corps' rigorous review process, EPA still believed that Mosaic should consider additional alternatives with less stream crossings to determine if a smaller footprint would have less environmental impacts.[17] [Gallagher Aff. at Exh. H]. EPA's position ignores (1) the thorough iterative development of the alternatives analysis done at the behest of the Corps, which it considered and independently verified; and (2) the fact that Mosaic extensively analyzed its ability to achieve the overall project purpose by eliminating additional stream crossings as well as various other on-site alternative mining configurations.[18] [MFR at § 3.0; MFR (Revision 1); December 15, 2009 Correspondence from Mosaic to the Corps; Response to December 7, 2009 Verbal RAI; MFR2; April 15, 2010 Correspondence from Mosaic to EPA]. Importantly, the alternatives analysis undertaken by Mosaic demonstrated that the elimination of additional stream crossings would reduce Mosaic's ability to access sufficient reserves to the point where the project

---

[17]    This June 8, 2010 letter attaches an internal memorandum generated by EPA economists that questions the data provided by Mosaic related to costs and economics. However, the Corps thoroughly considered and independently evaluated Mosaic's data. Moreover, there is no legal requirement to undertake an economic analysis. In fact, EPA has made it abundantly clear that under the 404(b)(1) CWA Guidelines, what is a "practicable alternative" is based on costs, not economics. 45 Federal Register 85339 (December 24, 1980).

[18]    For instance, if the stream crossing over Parker Branch was eliminated, all of the reserves in the uplands to the east of Parker Branch could not be recovered. If the crossing at Little Charlie Creek at Section 24 was eliminated, all of the reserves in the area to the east and south of Little Charlie Creek could not be recovered. If the crossing at Little Charlie Creek in Section 26 was eliminated, all of the reserves at the south end of SFM-HC could not be recovered. All of this information is contained in MFR-2, which specifically responded to EPA's request to consider elimination of stream crossings. [MFR2 § 3.2.6; Map C-16].

would be impracticable. [Map C-16 in MFR2 (demonstrating the portions of the tract that would be rendered inaccessible without the proposed crossings)].

Based on these facts, the Corps' decision should be given the deference required by law. There is nothing in the CWA Guidelines that requires the Corps to consider each and every possible iteration or combination of mine plan configurations. Otherwise, EPA could essentially veto any CWA permit by simply stating that more alternatives should be considered—without elevating the matter to Headquarters. This would be directly contrary to the Memorandum of Agreement Between the Environmental Protection Agency and the Department of Army which provides that the Corps is "solely responsible for making final permit decisions…including final determinations of compliance with the Corps permit regulations." [Memorandum of Agreement Between the Environmental Protection Agency and the Department of Army, http:www.epa.gov/wetlands/regs/dispmoa.html#5 (August 11, 1992)].

Despite the uncontroverted facts and law, this Court found that the alternatives analysis was "incomplete" resulting in a "stay" of the permit and remand—a remedy only available on the merits and not during the preliminary injunction phase. [Order at p. 16 (ruling that the analysis was "incomplete" and "[t]he cited EPA letters memorialize the deficiencies and the Defendants have failed to adequately rebut this evidence)]. As a result, the Court's Order effectively vetoes the permit based on EPA's expressed concerns. For this reason alone, substantial and significant issues are raised by Mosaic's appeal.

Greenberg Traurig, P.A.

## CONCLUSION

For the reasons set forth above, Mosaic respectfully requests this Court to grant its request to conduct limited Phase I mining pursuant to the Corps' Permit. Mining under Phase I will not impact any wetlands that were not already disturbed prior to the temporary restraining order. And those wetlands will be restored in accordance with a Corps approved mitigation plan. Not only will a stay prevent significant job losses and other serious economic harms, but it will allow Mosaic to continue to extract phosphate—a critical resource for which there is no substitute. This is the only way these harms can be avoided because, as explained above, uplands only mining cannot prevent the closure of the South Fort Meade mine. Finally, the layoffs necessitated by the September 2010 closure of the South Fort Meade mine will begin on August 23, 2010. Consequently, Mosaic respectfully requests a ruling on this Motion in advance of that date, if possible.

## RULE 3.01(g) CERTIFICATION

Pursuant to Rule 3.01(g), Local Rules, Middle District of Florida, Mosaic's counsel has conferred regarding this Motion with the following counsel of record: (1) Adam Katz, Trial Attorney, U.S. Department of Justice, counsel for the Corps of Engineers and Colonel Alfred A. Pantano, Jr., who stated that the Federal Defendants do not object to Mosaic's continued work in accordance with the terms and conditions in the Permit; and (2) Eric Huber, counsel for Plaintiffs, who stated that he would have to consult with his clients and then inform Mosaic's counsel of their position. Accordingly, Mosaic's counsel will promptly

supplement this certification when Mr. Huber reports Plaintiffs' position regarding this Motion.

Dated: August 11, 2010                    Respectfully submitted,

/s/ David B. Weinstein
David B. Weinstein
Fla. Bar No. 604410
weinsteind@gtlaw.com
Kerri L. Barsh
Fla. Bar No. 443840
Kimberly S. Mello
Fla. Bar No. 002968
mellok@gtlaw.com
**GREENBERG TRAURIG, P.A.**
625 E. Twiggs St., Ste. 100
Tampa, FL  33602
Telephone: (813) 318-5700
Facsimile:  (813) 318-5900

and

Frank E. Matthews
Fla. Bar No. 328812
frankm@hgslaw.com
Susan L. Stephens
Fla. Bar No. 986836
susans@hgslaw.com
**HOPPING GREEN & SAMS, P.A.**
123 South Calhoun Street
P.O. Box 6526
Tallahassee, Florida 32314-6526
Telephone: (850) 222-7500
Facsimile: (850) 224-8551
*Counsel for Mosaic Fertilizer, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 11, 2010, the foregoing was electronically filed with the Clerk of Court via the CM/ECF system, which will send a notice of electronic filing to counsel of record, and by U.S. Mail to the following individuals:

Brad E. Kelsky
Law Offices of Brad E. Kelsky, P.A.
10189 Cleary Blvd., Ste. 102
Plantation, FL 33324

Susan L. Stephens
Hopping, Green & Sams, PA
123 South Carolina St.
P.O. Box 6526
Tallahassee, FL 32314-6526

*/s/ David B. Weinstein*
Attorney

Greenberg Traurig, P.A.