**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| SIERRA CLUB, INC.; PEOPLE FOR PROTECTING THE PEACE RIVER, INC.; and MANASOTA-88, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS; and COLONEL ALFRED A. PANTANO, JR., | ) ) ) | Case No. 3:10-cv-00564-HLA-JB **DISPOSITIVE MOTION** |
| Defendants, | ) ) | |
| and | ) ) | |
| MOSAIC FERTILIZER, LLC, | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

**MOTION FOR SUMMARY JUDGMENT**

Eric E. Huber
*Pro Hac Vice* (Colo. Bar no. 40664)
Sierra Club
1650 38th Street Suite 102W
Boulder, CO 80301
(303) 449-5595
fax (303) 449-6520

Marcy I. LaHart, Esq.
Fla. Bar no. 0967009
4804 SW 45th Street
Gainesville, FL 32608
(352) 224-5699
fax (888) 400-1464

ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

Table of Authorities…………………………………………………………………………..i

MOTION FOR SUMMARY JUDGMENT……………………………………………………1

MEMORANDUM OF LEGAL AUTHORITY…………………………………………………...1

I.      NATURE OF THE CASE………………………………………………………………1

II.     STATUTORY AND REGULATORY BACKGROUND…………………………..1

       A.     Clean Water Act…………………………………………………………………..1

       B.     National Environmental Policy Act……………………………………….....3

III.    STATEMENT OF FACTS……………………………………………………………..4

       A.     Ecological Significance of the Peace River Watershed…………………………..4

       B.     Phosphate Mining in the Peace River Watershed…………………………………5

       C.     Mosaic's Mining Operations in Central Florida…………………………………..7

       D.     History of the South Fort Meade Extension Permitting Process and EPA Objections……………………………………………………………………8

       E.     The Corps' Issuance of the EA, FONSI and Permit…………………………..11

IV.    ARGUMENT AND CITATION OF AUTHORITY……………………………………13

       A.     The Corps' Decision to Issue the Permit Violated the CWA and APA……........13

              1.     The Court's Preliminary Injunction Finding and 11th Circuit Order on the CWA Claims……………………………………………………………13

              2.     The Corps Failed to Require Mosaic to Avoid Wetlands to the Maximum Extent Practicable………………………………………………15

                     a.     Facts on the Corps' Inadequate Alternatives Analysis…………..15

                     b.     The Corps' Decision Violated the Regulations and the APA……21

              3.     The Corps' Definition of the Project Purpose Unduly Limited the Consideration of Practicable Alternatives………………………………23

B.      The Corps Failed to Independently Evaluate and
        Verify Mosaic's Information……………………………………………………27

C.      The Corps Violated the CWA, NEPA and
        Applicable Regulations on Public Participation…………………………………31

        1.      The Corps' Decision to not hold Public Hearings was Contrary to
                the CWA, Corps' Regulations, and was Arbitrary and Capricious……...31

                a.      The Corps Violated the CWA…………………………………...31

                b.      The Corps Violated its Regulations and the APA………………32

        2.      The Corps was Required to give Public Notice and
                Comment on its Finding of No Significant Impact………………………35

D.      The Corps' Decision not to Prepare an Environmental Impact Statement
        was Contrary to NEPA, the NEPA Regulations and was Arbitrary and
        Capricious………………………………………………………………………..36

        1.      Because the Project Meets Several of the Factors for Determining
                Significance, the Corps' Decision to not Prepare an EIS was
                Arbitrary and Capricious…………………………………………………36

                a.      The Project Site is in Proximity to Wetlands and
                        Other Ecologically Critical Areas…………………………………37

                b.      It is Reasonable to Anticipate a Cumulatively Significant
                        Impact on the Environment………………………………………38

                        i.      The Project is Related to other Actions with
                                Cumulatively Significant Impacts…………………………38

                        ii.     The Corps Wrongly Relied on the State Water Quality
                                Analysis for its Cumulative Impact Analysis…...………40

                        iii.    Significant Cumulative Impacts are Evident in the
                                Corps' Decision to Prepare the Regional EIS…..………...41

                c.      The Project is Highly Controversial………………………………42

                d.      The Project Impacts are Highly Uncertain and
                        Involve Unknown Risks……………………………………………44

                e.      The Project may Adversely Affect Endangered Species………...44

f. The Corps' Analysis of Impacts on Public Health or Safety was Inadequate…………………………………………45

2. The Corps' Determination that Wetland Reclamation Would Mitigate the Impacts to Insignificance was Arbitrary and Capricious……………46

V. MOSAIC'S RECENT "NOTICE OF AREA 2 UPLANDS MINING" SUPPORTS PLAINTIFFS' CLAIMS OF INADEQUATE ALTERNATIVES ANALYSIS AND REQUIRES A SUPPLEMENTAL EA…………48

VI. CONCLUSION…………………………………………………………………...50

Certificate of Service

# TABLE OF AUTHORITIES

## CASES

*Alaska Wilderness Recreation & Tourism v. Morrison*, 67 F.3d 723 (9th Cir. 1995)..............49

*Alliance for Legal Action v. U.S. Army Corps of Engineers*,
314 F. Supp. 2d 534 (M.D.N.C. 2004)...........................................................................25

*Blue Mountains BioDiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998)..............44

*Buttery v. United States*, 690 F.2d 1179 (5th Cir. 1982)...............................................34

*Citizens Advisory Committee v. U.S. Deptarment of Justice*,
197 F.Supp.2d 226 (W.D. Pa. 2001)..............................................................................35

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991).........................24

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)...................................15

*City of New York v. U.S. Deptarment of Transportation*,
715 F.2d 732 (2d Cir. 1983).....................................................................................24

*City of Oxford, Georgia. v. F.A.A.*, 428 F.3d 1346 (11th Cir. 2005)................................23

*Druid Hills Civic Association v. Federal Highway Administration.*,
772 F.2d 700 (11th Cir. 1985)...................................................................................15

*Fina Oil and Chemical Co. v. Norton*, 332 F.3d 672 (D.C. Cir. 2003)..............................22

*Florida Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236 (M.D. Fla. 2008).....24

*Friends of the Earth v. Hintz*, 800 F.2d 822 (9th Cir. 1986).........................................27

*Fund for Animals, Inc. v. Rice*, 85 F.3d 535 (11th Cir. 1996)...................................31, 33

*Georgia River Network v. U.S. Army Corps of Engineers*,
334 F. Supp. 2d 1329 (N.D. Ga. 2003)..........................................................................42

*Grand Canyon Trust v. Federal Aviation Administration*,
290 F.3d 339 (D.C.Cir. 2002).........................................................................37, 45, 48

*Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257 (10th Cir. 2004)...................22, 27

*Hill v. Boy*, 144 F.3d 1446 (11th Cir. 1998)...................................................36, 46

*Hough v. Marsh*, 557 F.Supp. 74 (D. Mass. 1982)..............................................32, 33

i

*Humane Society of U.S. v. Department of Commerce*,
432 F. Supp. 2d 4 (D.D.C. 2006)……………………………………………...…………40

*Idaho Sporting Congress, Inc., v. Alexander*, 222 F.3d 562 (9th Cir. 2000)……………………49

*Motor Vehicle Manufactu*rers *Association, Inc. v. State Farm Mutual*
*Automobile Insurance Co.*, 463 U.S. 29 (1983)…………………………………20, 23, 33, 44, 45

*National Audubon Society v. U.S. Forest Service*, 46 F.3d 1437 (9th Cir. 1993)……....….…..…30

*National Nutritional Foods Association v. Weinberger*, 512 F.2d 688 (2d Cir. 1975)………....33

*National Wildlife Federation v. Whistler*, 27 F.3d 1341 (8th Cir. 1994)………………………...24

*Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers*,
674 F.Supp.2d 783 (S.D.W.Va. 2009)…………………………………………………………...22

*Peace River/Manasota Regional Water Supply Authority v. IMC Phosphates Co.*,
18 So.3d 1079 (Fla. 2d DCA 2009)……………………………………………………………32, 41

*Sierra Club v. Alexander*, 484 F.Supp. 455 (2d Cir. 1980)……………………………...…34

*Sierra Club v. Johnson*, 436 F.3d 1269 (11th Cir. 2006)………………………………………...34

*Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999)…………………………………...…….............22

*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C.Cir.1983)…………………………………………...37

*Sierra Club v. U.S. Army Corps of Engineers*, 935 F. Supp. 1556 (S.D. Ala. 1996)……………30

*Sierra Club v. Van Antwerp*, 526 F.3d 1353 (11th Cir. 2008)…………………...14, 24, 25, 27, 30

*Sierra Club v. Van Antwerp*, 709 F.Supp.2d 1254  (S.D. Fla. Jan. 30, 2009)…………...14, 25, 30

*Sierra Club v. Van Antwerp*, 719 F. Supp.2d 58 (D.D.C. 2010)……..……………22, 30, 37, 45

*Sierra Club v. Van Antwerp*, 362 F.App'x. 100 (11th Cir. 2010)…………………………14, 22, 25

*Simmons v. Block*, 782 F.2d 1545 (11th Cir.1986)……………………………………..………...22

*Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997)………………24, 30, 49

*Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407 (9th Cir. 1989)………………………24

*Town of Cave Creek v. Federal Aviation Administration*, 325 F.3d 320 (D.C.Cir. 2003)………42

*U.S. v. Akzo Coatings of America, Inc.*, 949 F.2d 1409 (6th Cir. 1991)…………….…………...30

*Utahns for Better Transportation v. U.S. Department of Transporation*,
305 F.3d 1152 (10th Cir. 2002)………………………………….…………………………...28

*Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986)………………………………………...27

*Water Works & Sewer Board of the City of Birmingham v. U.S. Department of Army,
Corps of Engineers*, 983 F. Supp. 1052 (N.D. Ala. 1997)…………………………….…...32

*Winter v. Natural Resources Defense Council*, 129 S.Ct. 365 (2008)…………………….…...42

## STATUTES

5 U.S.C. § 706(2)………………………………………………………………………………….1

5 U.S.C. § 706(2)(A)…………………………………………………………………………...23

33 U.S.C. § 1251(a)………………………………………………………………………………….1

33 U.S.C. 1344……………………………………………………………………………….......2

33 U.S.C. § 1344(a)………………………………………………………………………………...31

33 U.S.C. § 1344(b)(1)………………………………………………………………………….......2

33 U.S.C. § 1344(c)……………………………………………………………………………....11

42 U.S.C. § 4332(C)………………………………………………………………………………….3

## REGULATIONS

33 C.F.R. § 320.4(b)(4)………………………………………………………………………….2

33 C.F.R. § 320.4(d)………………………………………………………………………………40

33 C.F.R. § 320.4(r)……………………………………………………………………….……...2

33 C.F.R. § 325.2 (a)(b)……………………………………………………………………...2

33 C.F.R. Part 325 App. B(8)(f)(2)………………………………………………………….3, 27

33 C.F.R. § 327…………………………………………………………………………..33

33 C.F.R. § 327.4(b)……………………………………………………………32, 33, 34

33 C.F.R. § 332………………………………………………...…………………….46

40 C.F.R. § 230……………………………………………………………………2, 46

40 C.F.R. § 230.1(c)……………………………………………………………………2

40 C.F.R. § 230.5(c)…………………………………………………………………...2

40 C.F.R. § 230.10…………………………………………………………………2, 15

40 C.F.R. § 230.10(a)…..………………………………………………………2, 13, 15

40 C.F.R. § 230.10(a)(2)…………………………………………………………...25

40 C.F.R. § 230.10(a)(3)………………………………………...2, 8, 13, 16, 21, 25

40 C.F.R. § 230.10(c)………………………………………………………………8, 16

40 C.F.R. § 230.10(d)………………………………………………………………8, 16

40 C.F.R. § 230.10(g)………………………………………………………...........8, 16

40 C.F.R. § 230.10(h)…………………………………………………….............8, 16

40 C.F.R. § 1500.1(b)…………………………………………………………....32

40 C.F.R. § 1500.2(d)…………………………………………………………....32

40 C.F.R. § 1501.4……………………………………………………………….3

40 C.F.R. § 1501.4(b)……………………………………………………………32

40 C.F.R. § 1501.4(e)(2)(i)………………………………………………………35, 36

40 C.F.R. § 1502.9……………………………………………………………….49

40 C.F.R. § 1502.14……………………………………………………………...49

40 C.F.R. § 1506.5(a)…………………………………………………………3, 27

40 C.F.R. § 1506.5(b)…………………………………………………………….3

40 C.F.R. § 1506.6……………………………………………………………………………32

40 C.F.R. § 1508.7…………………………………………...........3, 38, 40

40 C.F.R. § 1508.9…………………………………………………………...3

40 C.F.R. § 1508.13……………………………………………………......4

40 C.F.R. § 1508.27…………………………………………………………37, 44

40 C.F.R. § 1508.27(b)…………………………………………………………..37

40 C.F.R. § 1508.27(b)(2)…………………………………………………………..45

40 C.F.R. § 1508.27(b)(3)…………………………………………………………...37

40 C.F.R. § 1508.27(b)(4)…………………………………………………………..42, 48

40 C.F.R. § 1508.27(b)(7)…………………………………………………………3, 4, 38

40 C.F.R. § 1508.27(b)(9)…………………………………………………………..44

**RULES**

Fed. R. Civ. P. 56…………………………………………………………………1

**MISCELLANEOUS**

74 Fed. Reg. 45353 (Sept. 2, 2009)………………………...………...…………………..45

76 Fed. Reg. 9560 (Feb.18, 2011)………………………………………………..6, 12, 36

Fla. Stat. Ann. § 373.414(8)(b)……………………………………………………32, 41

Christine A. Klein, *Bersani v. EPA: The EPA's Authority Under The Clean Water Act To Veto Section 404 Wetland-Filling Permits*, 19 Envtl. L. 389 (1988)…………………...11

Oliver A. Houck, *Hard Choices: The Analysis Of Alternatives Under Section 404 Of The Clean Water Act And Similar Environmental Laws*, 60 U. Colo. L. Rev. 773…………..11

v

**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Sierra Club, People for Protecting Peace River and Manasota-88 hereby move pursuant to Fed. R. Civ. P. 56 for summary judgment in their favor and against Defendants on all claims. As demonstrated in the following Memorandum of Legal Authority, there are no genuine issues of material fact and Plaintiffs are entitled to summary judgment as a matter of law. Defendants' Clean Water Act §404 permit was issued contrary to the Clean Water Act, National Environmental Policy Act, applicable regulations and the Administrative Procedure Act, and therefore must be vacated. 5 U.S.C. § 706(2).

**MEMORANDUM OF LEGAL AUTHORITY**

## I.     NATURE OF THE CASE

Plaintiffs filed this lawsuit against the United States Army Corps of Engineers (the "Corps") contesting the Corps' issuance of a Clean Water Act (CWA) §404 dredge and fill permit authorizing Mosaic Fertilizer, LLC ("Mosaic") to strip mine 7,687 acres in Hardee County, Florida for phosphate ore. The challenged permit authorizes the destruction of 534 acres of wetlands – including 261 acres of forested wetlands and 26 acres of open water - and 56,661 linear feet of streams at Mosaic's "South Fort Meade Extension project." The streams and wetlands that will be destroyed by the strip mining are associated with the headwaters of the Peace River and other streams which drain ultimately into the Charlotte Harbor estuary.

## II.    STATUTORY AND REGULATORY BACKGROUND

### A.     Clean Water Act

The Clean Water Act was enacted by Congress in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, section 404 of the CWA prohibits the discharge of any pollutant, including

dredged spoil or other fill material, into navigable waters unless authorized by a permit. *Id.* § 1344.

The Corps oversees the CWA § 404 permit process and must comply with guidelines promulgated by the U.S. Environmental Protection Agency ("EPA"), which are incorporated into the Corps' own regulations. *Id.* § 1344(b)(1); 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6). The EPA guidelines pertinent to this case are set forth in EPA's § 404(b)(1) regulations, at 40 C.F.R. § 230. The intent behind the regulations is that dredged or fill material should not be discharged if it will result in an unacceptable impact on the aquatic ecosystem. 40 C.F.R. § 230.1(c).

In general, the regulations provide that no discharge of dredged or fill material shall be permitted: (1) if there is a practicable alternative to the proposed discharge; (2) if the discharge causes or contributes to violations of applicable state water quality standards; (3) if the discharge will cause or contribute to significant degradation of the environment; and (4) unless all appropriate steps have been taken to minimize potential adverse impacts. 40 C.F.R. § 230.10. The Corps' regulations also require that destruction of wetlands is to be avoided to the extent practicable. 33 C.F.R. § 320.4(r).

The regulations further provide that "practicable alternatives" include "not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences." 40 C.F.R. §§ 230.5(c), 230.10(a). If a project is not "water dependent," as is the case with phosphate strip mining, the guidelines contain a presumption that a less environmentally damaging practicable alternative exists, and require that the applicant clearly demonstrate that practicable alternatives which would not involve discharge of fill material into special aquatic sites were not available. 40 C.F.R. § 230.10(a)(3).

In addition, the regulations require that when information is prepared by the applicant, it shall be independently evaluated and verified by the Corps as required by 40 C.F.R. § 1506.5(a). 33 C.F.R. Part 325. Under 40 C.F.R. § 1506.5(b): "The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. . . . It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency."

### B.    National Environmental Policy Act

NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") on every proposal for a major federal action which may significantly affect the quality of the human environment.  42 U.S.C. § 4332(C).

To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the lead federal agency first prepares an environmental assessment ("EA").  40 C.F.R. § 1508.9.  An EA must provide sufficient evidence and analysis to determine whether to prepare an EIS.  *Id.*  The lead agency must take a 'hard look' at the relevant environmental concerns and alternatives to the proposed action. *Id*. If the agency concludes in an EA that a project may have significant environmental impacts on the environment, then an EIS must be prepared.  40 C.F.R. § 1501.4.

NEPA also mandates that the lead agency consider "the degree to which the action is related to other actions . . . with cumulatively significant impacts . . ." 40 C.F.R. § 1508.27(b)(7). NEPA defines the "cumulative impact" of mining to mean "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  A federal action will significantly affect the environment "if it is reasonable to anticipate a cumulatively significant impact on the

environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. 1508.27(b)(7).

If an EA concludes that there are no potentially significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a "finding of no significant impact" (FONSI).  40 C.F.R. § 1508.13.  If the agency issues an EA/FONSI, it must make a convincing case for a finding of no significant impact on the environment.

## III.    STATEMENT OF FACTS

### A.    Ecological Significance of the Peace River Watershed

Mosaic's proposed strip mine at the South Fort Meade extension site is located in the headwater wetlands of the Peace River watershed.  This watershed contains highly valuable wetlands, water bodies, riparian, estuarine, and marine habitats, as well as scrub and other upland habitats that perform many important ecological functions. *See, e.g.*, Administrative Record (AR) AR: 2007_07_26 SFM-HC_SAJ_1997_0499_ USEPA_A ltr at 2. [1] The State of Florida and the EPA recognize the tremendous importance of the Peace River watershed, and have designated it as both a Priority Watershed and an Aquatic Resource of National Importance. AR: 2007_08_23 SFM-HC_SAJ_1997_0499_USEPA_B ltr at 2.

The Peace River flows into the Charlotte Harbor National Estuary, downstream of the proposed mine, which depends on freshwater flows from the river. The Charlotte Harbor estuary has been designated by Congress as an "estuary of national significance." AR: 2010_01_15 EPA

---

[1] The Corps submitted the Administrative Record on four discs, which are arranged by date. Disc 1 includes the application and public comments up to 2007_07_12; Disc 2 consists of attachments to Charlotte County's comments up to 2007_07_12; Disc 3 includes additional comments and technical documents up to 2009_11_05; and Disc 4 includes the mitigation plan, comments, the permit and NEPA documents up to 2010_06_28.

Ltr to Corps at 1. Without clean freshwater flows, the estuary cannot remain viable as an incredibly rich ecosystem that supports commercial and recreational fisheries and wildlife. *Id*. These natural resources are essential for the survival of both human and wildlife communities in the watershed, including threatened and endangered wildlife and fish. *Id*.

### B.     Phosphate Mining in the Peace River Watershed

Open pit phosphate mining has a devastating impact on the environment. It alters the natural topography, recharge, drainage patterns and vegetation in the watershed. The process requires the use of huge electrically-powered draglines with booms the length of a football field and buckets the size of a garage that scoop out the overburden to a depth of 25-30 feet. AR: 2007_07_12 Charlotte Cty BCC (1) at 39. The draglines are incredibly loud, use bright lights that are elevated high in the air, and cover nearby houses in dust. McClellan Aff., Doc 7; Kirkland Aff., Doc. 5; AR: 2007_07_13 Sierra Club email.

Once the overburden is completely removed, the draglines excavate the ore layer to a further depth of 25-30 feet. AR: 2007_07_12 Charlotte Cty BCC (1) at 39. The ore is put into shallow depressions, before it is pumped to a beneficiation plant for processing. *Id*. After the ore is separated at the beneficiation plant, the phosphate is pumped into stockpiles for further processing; the sands tailings are returned to the mined areas to partially fill in the deep mine cuts; and the clay is depositing into huge clay settling areas (CSAs) at the mining site. *Id*. Typically, each CSA covers about a square mile and rises 50-65 feet above the ground surface. *Id*. at 40. The deposited clay is allowed to settle and dry, with the wastewater exiting through a series of ditches, until a crust forms over the top and the area is abandoned. *Id*. Mosaic's CSAs take about ten years to fill, another four years to dry, and several decades for the consolidation to be completed. *Id*. These ditch and berm systems have been known to breach and release their

toxic water at other phosphate mines, which can cause catastrophic environmental and property damage as well as injury and/or death. AR: 2009_11_23 POW Letter at 5; Kirkland Aff., Doc. 5 at ¶4. The aftermath of this process includes radioactive phosphate mine wastes that make productive re-use of the mine sites difficult if not impossible. AR: 2009_11_23 POW Ltr at 6; AR: 2010_3_19 POW Ltr(1) at 15. The end result is the utter destruction of the local natural environment from ground surface down to a depth of up to 80 feet and a severe alteration of the local hydrology.

The last comprehensive Environmental Impact Study of the Peace River was completed by the EPA over 30 years ago. 76 Fed. Reg. 9560.   Since then, 31,000 acres of wetlands have been lost in the watershed and a large portion of the region has been declared a Water Use Caution Area due to excessive consumptive uses.   AR: 2010_03_17 SFM MFR Rev 2 (1) at 1-31. Large-scale dewatering of the Peace River watershed's northern sub-basin from mining and other uses has caused a 20 to 50 foot drop in the Floridan Aquifer level. *Id*. This dewatering and associated alteration of natural hydroperiods has caused widespread destruction of native wetland and upland habitat in un-mined areas.   *Id.* Phosphate strip mining and reclamation, including the enormous CSAs, alter and disrupt natural drainage patterns and lower water levels. *Id.* The United States Geologic Survey's investigation confirms the adverse impacts of phosphate mining and clay settling areas on the Peace River. AR: 2010_03_19 POW Ltr(1) at 6-7 and AR: 2010_03_19 POW Letter (19) 2009_USGS Report; AR: 2010_06_08 Ltr to agencies from Sierra Club at 3-4; *see also*, the report by the University of South Florida, Karst Research Group, "Underground Florida: Fieldtrip Guidebook of the West Central Florida Karst," (January 24-28, 2007), which states, *inter alia*, that "[p]hysical effects of phosphate mining on the hydrology of Florida include the reduction or elimination of base flow, reduced surface runoff, lowering of

water levels in the Upper Floridan aquifer, the replacement of natural surface drainage by modified topography and reclaimed ditches and swales." AR: 2009_11_23 POW Letter & Att at 4, Ex. F.

### C. Mosaic's Mining Operations in Central Florida

Mosaic is the one of the largest phosphate companies in the country and the largest owner of phosphate reserves in Central Florida, owning or controlling over 500 million tons of recoverable phosphate rock reserves. AR: 2010_03_17 SFM MFR Rev 2 (1) at 50. Mosaic has operated numerous phosphate mines in the region for many decades. *Id.* Currently, Mosaic operates five phosphate mines in Central Florida. *Id.* at 52. It also operates five ore separation/beneficiation plants in central Florida with a combined capacity to process over 18 million short tons of phosphate per year. *Id.* at 56. Mosaic has pending permits for several additional phosphate mines in Central Florida. *Id.* at 82-83. The Ona Mine would mine a total of 15,527 acres; the Pioneer and West Pioneer tracts would cover 15,932 acres and 8,132 acres, respectively; the Texaco tract would be 4,345 acres; the Pine Level Mine would be 24,060 acres; and the Pine Level Key's Tract 14,075 acres, all in the Horse Creek/Peace River and Myakka River Basins which drain into Charlotte Harbor. *Id.* at 83.

From 1995 to the present, Mosaic has operated a mine on its 17,500-acre South Fort Meade mine in Polk County. AR: 2010_03_17 SFM MFR Rev 2 (1) at 1-1. Mosaic now seeks to open the mine which is the project at issue in this lawsuit, the new 10,856-acre South Fort Meade extension in Hardee County ("South Fort Meade Hardee County" or "SFM-HC") near the site of the South Fort Meade Polk County mine. *Id.*

**D.    History of the South Fort Meade Extension Permitting Process and EPA Objections**

The Corps published its notice of the proposed permit for the South Fort Meade extension mine on May 29, 2007. 2007_05_29 Public Notice w_drawings.

On July 26, 2007, EPA wrote a letter to the Corps recommending denial of the permit because of its deficiencies and the severe environmental impacts associated with the mine. AR: 2007_07_26 USEPA_A ltr.[2] The EPA pointed out that the Peace River, its watershed and tributaries within and neighboring the project site were "aquatic resources of national significance." *Id.* at 2. It also stated that, "[g]iven the high functional level of the ecosystems affected by this project, the large acreage of impacts associated with the proposed project, and the potential for significant impacts to the Peace River and downstream estuaries which may result in significant cumulative adverse impacts, EPA requests that this project be subject to a rigorous application of the [CWA] Guidelines." *Id.* The EPA found that Mosaic's application violated the guidelines in several respects, including 40 C.F.R. §(consideration of alternatives); § 230.10(c)(significant degradation of waters); § 230.10(d)(minimization of adverse impacts); and § 230.10(g) and (h)(cumulative impacts).

In a letter dated August 23, 2007, EPA again laid out its opposition to the proposed Permit. AR: 2007_08_23 USEPA_B ltr. EPA raised numerous additional concerns, including the fact that the Peace River Watershed supplies drinking water to hundreds of thousands of people in southwest Florida and is largely responsible for maintaining the ecological integrity of the Charlotte Harbor estuary system. AR: 2007_08_23 USEPA_B ltr at 2. The EPA noted that: a) "Avoidance of wetlands is important because mitigation in the form of re-creating wetland and

---

[2] For the sake of clarity, citations to Administrative Record on the EPA letters will be by date and description of the letter. Also for the Court's convenience attached hereto as Exhibit C is a list of documents principally relied upon by Plaintiffs with their Administrative Record cites.

tributary systems is rarely able to replace the full range of functions and values of the impacted water resources...In particular, we believe that all wetlands adjacent to and tributaries contributing to the Peace River should be avoided;" b) "a cumulative effects analysis should be provided for the entire Peace River watershed and include an analysis of the overall mining activities that are currently underway and/or planned for this watershed;" and c) "EPA finds this project will have substantial and unacceptable adverse impacts on ARNI….Therefore, we believe the permit for the project, as currently proposed, is not approvable at this time." *Id.* 1-3.

The downstream counties affected by the project joined EPA in voicing their concerns. In the summer of 2007, the County Board of Commissioners for Sarasota, Lee and Charlotte Counties wrote to the Corps and requested a public hearing on the proposed mine, noting their concern over the cumulative impacts of widespread phosphate mining in the region. AR: 2007_07_11 Sarasota County Letter; AR: 2007_08_10 Lee County_request for public hearing letter; and AR: 2007_07_12 Charlotte Cty BCC (1). Charlotte County's comments were particularly detailed and totaled over 100 pages, and included many volumes of attachments. *Id.* Nevertheless, the Corps refused the counties' request for a hearing.

On January 15, 2010, EPA wrote another letter to the Corps criticizing the Mosaic's December 2009 response and reiterating EPA's serious concerns with the permit. AR: 2010_01_15 EPA Ltr to Corps. EPA noted that, in more than two-and-a-half years since EPA's objection letters, Mosaic had refused to coordinate with EPA to address its concerns. AR: 2010_01_15 EPA Ltr to Corps at 2. Again, EPA stressed the significance of the wetlands, noting that over 700,000 people rely on the Peace River watershed for their drinking water supply. AR: 2010_01_15 EPA Ltr to Corps at 1. It further stressed the national importance of the Charlotte

Harbor National Estuary, and noted that EPA has spent millions of dollars on its protection and restoration. *Id.*

On March 10, 2010, EPA again wrote the Corps and stressed the need for an area-wide EIS to address the cumulative impacts of phosphate mining in the region. AR: 2010_03_10 EPA Ltr to Corps.

On June 8, 2010, EPA wrote the Corps once again, responding to Mosaic's reports that purported to address EPA's concerns, particularly Mosaic's Memorandum for the Record-Revision No. 2. The EPA reiterated that its "concerns regarding project purpose and alternative configurations of the preferred project site, that would result in a reduction of impacts to waters of the U.S., (minimization) have not been addressed." Addendum to AR, Doc. 131-1 at p. 1.

The EPA's June 8th letter also incorporated and attached a memorandum from EPA economists from EPA headquarters dated May 18, 2010. The EPA economists found that "it is clear that EPA's request for 'an analysis of different combinations and/or a reduced number of stream crossings, the resulting deliverable product from each scenario, and the ability to meet or not meet project purpose under each scenario' has still not been met." (The Corps inadvertently omitted the economist report from the June 8th letter in the original Administrative Record, but has filed the complete letter with the EPA economist report attached with its Notice of Addendum to Administrative Record [Doc. 131 (May 5, 2011)] as Doc. 131-1. Hereafter the June 8th letter and EPA economist report are cited as "Addendum to AR, Doc. 131-1 at p. ___.")

Although EPA maintained its opposition to the Permit, the June 8, 2010 letter indicated that EPA "[did] not intend to further elevate the permit decision." *Id.* at 1. That does not mean EPA was satisfied, much less that the Corps complied with NEPA or the Clean Water Act. EPA's only power to stop a permit is the so-called EPA Headquarters "veto," which is rarely

exercised. 33 U.S.C. § 1344(c). Although the Corps issues approximately 80,000 permits annually, EPA has used its veto power only 12 times since 1972. http://www.epa.gov/wetlands/pdf/404c.pdf. (Explaining the EPA veto process). The tension between EPA and the Corps has been subject to considerable legal commentary. *See* Oliver A. Houck, *Hard Choices: The Analysis Of Alternatives Under Section 404 Of The Clean Water Act And Similar Environmental Laws,* 60 U. Colo. L. Rev. 773, 774 *et seq.* (1989); Christine A. Klein, *Bersani v. EPA: The EPA's Authority Under The Clean Water Act To Veto Section 404 Wetland-Filling Permits,* 19 Envtl. L. 389 (1988).

In fact, the June 8, 2010 letter clearly stated that despite EPA's decision not to elevate the permit, "information received by EPA subsequent to our January 15, 2010 letter has still not completely addressed EPA's concerns with the proposed project. Specifically, concerns regarding project purpose and alternative configurations of the preferred project site that would result in a reduction of impacts to waters of the U.S. (minimization) have not been addressed." Addendum to AR, Doc. 131-1 at p. 1.

### E.  The Corps' Issuance of the EA, FONSI and Permit

The Corps could have used the two year period between EPA's 2007 comments and Mosaic's 2009 MFR-1, or the following year, to hold public hearings as the counties and members of the public requested, and to prepare an Environmental Impact Statement on the mine, but neither of these were done. Despite holding over 30 meetings with Mosaic and other state and federal agencies over the course of the multi-year permitting process, the Corps never held a public hearing on the Permit.

The day after EPA's final June 8, 2010 comment letter, the Corps wrote EPA and informed it that it was issuing the Permit. 2010_06_09 SFM-HC EPA 3c. The Corps did not

mention or respond to EPA's January or June, 2010 letters or the EPA economists' report. *Id.* In a handwritten note on the letter the Corps' District Commander stated the Corps would prepare a "regional" Environmental Impact Statement on phosphate mining—although that EIS would come after the South Fort Meade extension permit. *Id.*

On June 14, 2010, the Corps issued its final Environmental Assessment (EA) and Finding of No Significant Impact (FONSI), which constituted its decision not to prepare an Environmental Impact Statement for the South Fort Meade extension Mine. 2010_06_14 SFM_EASOF_attachments at 96-97. (Hereafter this is referred to as the Corps' "EA" with page number, *e.g.* EA at 96.)

The Corps issued the EA and FONSI without any prior public notice or opportunity for comment. At the same time, it issued the Permit to Mosaic to strip mine 7,687 acres at the South Fort Meade extension mine. This Permit authorized the destruction of 534 acres of wetlands and 10.7 miles (56,661 linear feet) of streams in the headwaters of the Peace River and Charlotte Harbor estuary. AR: 2010_06_14 DA Permit SAJ-1997-4099 Instrument. Again, the Corps gave no public notice of the issuance of the Permit.

Roughly a week after the issuance of the Permit, the Corps publically announced its intention to do the area-wide Environmental Impact Statement, which environmental groups, downstream counties, and the EPA had been requesting for years. On June 25, 2010, the Corps announced that it would conduct a comprehensive study of the cumulative impacts of phosphate mining on the entire Peace River watershed. This notification was published in the Federal Register on Feb.18, 2011. 76 Fed. Reg. 9560. Ironically, however, the impact study came too late to provide insight into the mine application for the South Fort Meade extension that inspired it.

## IV.    ARGUMENT AND CITATION OF AUTHORITY

### A.    The Corps' Decision to Issue the Permit Violated the CWA and APA

#### 1.    The Court's Preliminary Injunction Finding and 11th Circuit Order on the CWA Claims

In the July 30, 2010 Preliminary Injunction Order this Court stated that it performed a "careful review" of the record, set forth the applicable regulations governing the Corps' action, discussed the many technical comments by the EPA that "memorialize the deficiencies" in the Corps' analysis of alternatives, and found that Plaintiffs were likely to succeed on their claim that the Corps' analysis under the CWA was insufficient.  Doc. 88 at 7-10, 13-16. The Court found "Plaintiffs have met their burden in demonstrating that Mosaic did not clearly show less damaging alternatives were impractable." Doc. 88 at 16.  Thus the Court found likely violations of 40 C.F.R. § 230.10(a)("no discharge or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem"); and 40 C.F.R. § 230.10(a)(3) (where a project is not water dependent, such as the one at issue in this case, "practicable alternatives that do not involve special aquatic sites are presumed to be available unless clearly demonstrated otherwise.").

However, the 11th Circuit found that this Court "based the entry of the preliminary injunction entirely on letters from the [EPA] which expressed concerns with the permit, and failed to apply the arbitrary and capricious standard in evaluating the Corps' practicable alternatives analysis. While the [EPA] letters may prove to be helpful in evaluating the ultimate merits of the Clean Water Act claim, the full record will need to be analyzed through the deferential lens mandated by the Administrative Procedure Act to determine whether the Corps

13

came to a rational conclusion." 11th Cir. Order at 2-3.[3]

This case is now postured similarly to the remand after the 2-1 decision in *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1366 (11th Cir. 2008). That involved a limestone mine in Florida where the 11th Circuit vacated a summary judgment against the Corps because, *inter alia*, the district court had not afforded the Corps due deference. *Id.* at 1359. Like the 11th Circuit opinion in this case, the *Van Antwerp* majority did not offer an opinion on the merits of whether the Corps complied with the CWA. *Van Antwerp*, 526 F.3d at 1363. However, Judge Kravitch's dissent did find violations on the merits. *Id.* at 1367-68 (finding that the Corps had violated the CWA's alternatives analysis regulations; the project had been defined in such a way as to preclude consideration of practicable alternatives; and that the Corps had failed to independently verify the applicant's information). On remand, the district court clarified that it was applying "deferential review" of the Corps action, and again found against the Corps. *Sierra Club v. Van Antwerp*, 709 F.Supp.2d 1254, 1263-67 (S.D. Fla. Jan. 30, 2009). That was affirmed in *Sierra Club v. Van Antwerp*, 362 F.App'x. 100 (11th Cir. 2010). This Court should reach a similar result. In fact, this case is even stronger, as the record here contains a series of technical comments by EPA that provide analysis and affirmative evidence that the Corps' alternatives analysis was arbitrary and capricious.

---

[3] The 11th Circuit also vacated the preliminary injunction because it found the remand of the permit to the Corps was a final order. 11th Cir. Order at 2. This Court did that "in an effort to expedite this matter based on Mosaic's arguments... [and] the remand was designed to shorten the time frame between a ruling on the merits and a re-issuance of the permit in some form." Doc. 102 at 3.

2. **The Corps Failed to Require Mosaic to Avoid Wetlands to the Maximum Extent Practicable**

a. **Facts on the Corps' Inadequate Alternatives Analysis**

Although the APA review is deferential, and an agency's decision is entitled to a presumption of regularity, "that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *Druid Hills Civic Ass'n v. Federal Highway Admin.*, 772 F.2d 700, 714 (11th Cir. 1985). Applying that standard, it is apparent that the Corps's issuance of the Permit was contrary to regulations, especially 40 C.F.R. §230.10. The Administrative Record includes the EPA letters, Mosaic's responses thereto, the Corps' EA, and other evidence that support this Court's earlier finding that the Corps' alternatives analysis was "incomplete" and violated 40 C.F.R. § 230.10(a); see Doc. 88 at 16.

The Corps' analysis essentially boiled down to one basic proposition: that Mosaic can mine all of the approximate 50 million metric tons of recoverable phosphate on the site, because to require anything less would be impracticable based on a set of undefined costs and logistical problems associated with mining less ore. EA at 26-28. In fact, the alternative chosen by the Corps actually <u>increased</u> the amount of wetlands to be impacted (534 acres) over the amount of wetlands that would have been impacted under Mosaic's preferred alternative (498.9 acres). *Id*. at 27 table 8. This violates the basic mandate of the CWA regulations.

The EPA analysis, Mosaic's responses, and the Corps' EA demonstrate that the Corps' alternatives analysis did not meet the regulatory requirements. For instance, in its July 26, 2007 letter EPA found that Mosaic's application violated the regulations in several respects. First, Mosaic had failed to demonstrate that there were no practicable alternatives

that would not involve discharge of fill material into special aquatic sites in violation of 40 C.F.R. § 230.10(a)(3). AR: 2007_07_26 USEPA_A ltr at 2. Second, EPA found that Mosaic violated 40 C.F.R. § 230.10(c) because the project would "cause or contribute to significant degradation of waters of the U.S." *Id*. at 2-3. Third, EPA found a violation of 40 C.F.R. § 230.10(d) because Mosaic had not taken "appropriate and practicable steps… which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id*. at 3 (*quoting* 40 C.F.R. § 230.10(d)). Finally, EPA found that Mosaic violated 40 C.F.R. § 230.10(g)-(h) by failing to consider the many cumulative and secondary impacts associated with phosphate mining in the area. *Id*. Due to these substantial and unacceptable adverse impacts on the Peace River Watershed, EPA recommended denial of the project. *Id*.

Mosaic did not respond to EPA's concerns for almost two years, and in May of 2009 submitted a Memorandum for the Record (MFR) purporting to address them. AR: 2009_05_14 SFM 404 (1)-(7). Mosaic amended its MFR on August 7, 2009 (MFR-2). AR: 2009_08_07 Section 1-4. On December 15, 2009, Mosaic wrote a letter to EPA and the Corps, mainly justifying why the project remained largely unchanged in the face of EPA's many objections. AR: 2009_12_15 Mosaic RAI Response. For example, in response to the Corps' request to "provide a thorough discussion on minimization steps that have been taken to minimize impacts to bayhead systems," Mosaic explained that the bayhead wetlands were "included in the mining plan and not avoided… due to the very large loss of phosphate minerals beneath and adjacent to this wetland that would occur is this resources were avoided… [and] the range of economic values indicates that the cost per acre of bayhead if avoided, would be substantial." *Id*. at 5-8. In other words, Mosaic stated that it would not avoid these ecologically-important wetlands and streams because avoidance would cost

more and reduce its profits.

On January 15, 2010, EPA wrote another letter to the Corps criticizing Mosaic's December 2009 response and reiterating EPA's serious concerns with the permit. AR: 2010_01_15 EPA Ltr to Corps. EPA noted that, in more than two-and-a-half years since EPA's objection letters, Mosaic had refused to coordinate with EPA to address its concerns. *Id.* at 2. Again, EPA stressed the significance of the wetlands, noting that over 700,000 people rely on the Peace River watershed for their drinking water supply. *Id.* at 1. It further stressed the national importance of the Charlotte Harbor National Estuary, and noted that EPA has spent millions of dollars on its protection and restoration. *Id.* EPA restated many of its concerns in detail, for example:

> a ) "no minimization of impacts to wetlands or streams has been incorporated into the proposed project since EPA provided objection letters in 2007";
>
> b) "the applicant does not present iterative combinations of a reduced number of stream crossings;"
>
> c) "all impacts to the Lake Dale stream [should] be avoided, since it is also one of the higher functioning streams on-site;" and
>
> d) "EPA does not believe that the applicant has fully minimized their impacts, we are concerned that the two forms of mitigation being offered are the least desirable."

*Id.* at 3-4.

EPA also requested that all impacts to the bayhead swamps be avoided due to their importance and Mosaic's inability re-create them. *Id.* at 3.

On March 10, 2010 Mosaic issued its response to EPA's January, 2010 comment letter. AR: 2010_03_11 Mosaic response to EPA letter. But rather than address EPA's concerns, Mosaic attempted to discredit them and downplay any environmental impact. Mosaic contested the notion that phosphate mining in the Peace River watershed has caused cumulative adverse impacts, or that this project would add to those impacts. AR: 2010_03_11 Mosaic response to

EPA letter at 2. For example, Mosaic argued that: a) the 1,514 acres of clay settling areas (CSAs) would not be a permanent impact to the landscape (*Id*. at 9); b) there is no scientific uncertainty whether these types of wetlands can be re-created (*Id*. at 12); and c) it would not perform an economic analysis to validate its claim that there were no other "practicable" minimization options (*Id*. at 10). Although Mosaic agreed to avoid one stream (no. 6) and 72.7 percent of the bayhead wetlands, *Id*. at 7, 10; it did not contain alternatives that would reduce the project's footprint and did not address rates of return or projected revenue associated with those alternatives. *Id*.

Mosaic then issued its second revision of the Memorandum for the Record (MFR-2) in March of 2010. AR: 2010_03_17 SFM MFR Rev 2 (1). In its section on §404(b)(1) alternatives, Mosaic lists some increased costs for mining reserves more than 10 miles from the beneficiation plant, but it included no rate of return or other economic analysis. *Id*. at 2-19 thru 2-22. It dismissed EPA's request for avoidance of all bayhead wetlands and streams because it "would require at least an additional 22 miles of ditch and berm systems, which would significantly increase the cost to operate these systems." *Id*. at 3-11. Thus, this alternative was rejected based on an unquantified cost increase. Mosaic also dismissed it because it would limit the project to 43% of the site, which allegedly left an insufficient "quantity of reserves." *Id*. at 3-12. But Mosaic provided no information on profit, rate or return or other economic information on whether it could achieve the purpose while avoiding more or different combinations of wetlands.

On April 28, 2010 the Corps responded to EPA with a one-page letter that mentioned EPA's 2007 letters and environmental effects, but did not address EPA's January 15, 201 letter, and said nothing about the alternatives analysis. AR: 2010_04_28 SFM-HC Corps_3a3b EPA.

On June 8, 2010, EPA responded to the Mosaic report and MFR-2. It reiterated that its

"concerns regarding project purpose and alternative configurations of the preferred project site, that would result in a reduction of impacts to waters of the U.S., (minimization) have not been addressed." Addendum to AR, Doc. 131-1 at p. 1. The EPA further found that: a) "concerns outlined in EPA's letter dated August 23, 2007, regarding secondary and cumulative impacts to the Peace River Watershed are largely substantiated by Mosaic through modeling efforts and have not been validated through an independent review;" and b) "EPA's request for 'an analysis of different combinations and/or a reduced number of stream crossings, the resulting deliverable product from each scenario, and the ability to meet or not meet project purpose under each scenario' was not completed." *Id*.

The EPA's June 8th letter attached and incorporated a memorandum from EPA economists from EPA headquarters. Addendum to AR, Doc. 131-1. The EPA economists found that "it is clear that EPA's request for 'an analysis of different combinations and/or a reduced number of stream crossings, the resulting deliverable product from each scenario, and the ability to meet or not meet project purpose under each scenario' had still not been met." *Id.* at 3. In addition, they found: a) the permit "does not analyze any iterative combinations of a reduced number of stream crossings or other on-site alternatives matched to Mosaic's ability to meet them;" and b) "the alternatives introduced in this section do not address on-site alternatives to extraction areas or methods." *Id.* at 4.

The EPA economists' report blasts Mosaic's unsupported assertions regarding the impracticability of alternatives for its lack of underlying data, evidence, or citations. For example, the EPA economists noted that Mosaic's feasibility analysis, which rejected other sources of phosphate, said nothing about the impact of using other sources on Mosaic's revenue or profit. *Id.* at 5. Mosaic's restriction to the 10 mile radius from the existing plant was not an

analysis at all, EPA found, it "was just a list of costs," and "without any idea of how these relate to revenue or other concerns, they say nothing about practicability or feasibility. This analysis is therefore fundamentally incomplete." *Id.* The economists also used the model relied on in Mosaic's MFR-2 and found it showed the opposite of Mosaic's findings, that is the mining would actually have a "net negative economic impact" on Hardee County. *Id.*

The Corps did not respond to EPA's June 8, 2010 letter or the EPA economist report. Instead, on June 9, 2010 the Corps wrote EPA, again only mentioning the 2007 letters. AR: 2010_06_09 SFM-HC EPA 3c. The Corps informed EPA that it had completed its review and was issuing the permit, and it provided EPA with the EA. *Id.*

However, the content of the EA confirms that EPA's objections were not addressed or resolved. For starters, the Corps EA only mentions EPA's 2007 letters as comments. It does not mention EPA's January 15, 2010 or June 6, 2010 letters, much less the EPA economist report. It simply did not address the economic issues raised by EPA. Therefore, the Corps "overlooked an important aspect of the problem," which alone renders its decision arbitrary and capricious. *Motor Vehicle Mfr's Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Corps did consider five on-site alternatives in the EA. Alternative #1 was Mosaic's preferred alternative, which provided for 64% of ore recovery and approximately 50 mm tons. The Corps' chosen Alternative, #2B, likewise had 64% of ore recovery and approximately 50 mm tons. However, #2B actually had the greatest wetlands impacts in terms of acreage of any alternative considered. EA at 27.[4]

---

[4] The Corps misstated "Alternative 2B" as "EPA 1/15/2010 recommendations." EA at 27. That was not EPA's 1/15/10 recommendation since it did not satisfy EPA's call for no destruction of bayhead wetlands, complete avoidance of all impacts to the Lake Dale Stream, or foregoing mining in sections 10 and 11 of the mine plan. See 1/15/10 EPA letter and attachment thereto.

As for rejecting the other three alternatives, the Corps essentially accepted Mosaic's claims that it would not make enough money if it were required to mine less intensively, without requiring an empirical demonstration that such an approach would be economically impracticable. For example, the Corps rejected Alternative 4, which would allow Mosaic access to 4,604 acres and approximately 50% of the ore that Mosaic sought in its preferred alternative (no. 1). But the Corps' only explanation for rejecting this was that "this site alternative would limit areas mineable." EA at 28. Alternative 2A was EPA's recommendation for avoidance of all bayhead wetlands and 51 stream segments, which the Corps rejected based on the MFR-2 section discussed above. And the Corps rejected Alternative #3, the "no action alternative," which provided for mining 1,033 acres, or approximately 15% of the property, solely because it would allegedly "not allow the Applicant to extract the necessary quantity of phosphate reserves to fulfill the project purpose." EA at 28. Ultimately, the EPA was right: The Corps based its rejection of alternatives based on unspecified costs, and "[w]ithout any idea of how these costs relate to revenue or other concerns, they say nothing about practicability or feasibility"; the Corps did not "analyze any iterative combinations of a reduced number of stream crossings or other on-site alternatives matched to Mosaic's ability to meet them"; and "the alternatives introduced in this section do not address on-site alternatives to extraction areas or methods." Addendum to AR, Doc. 131-1 at pp. 4-5.

### b. The Corps' Decision Violated the Regulations and the APA

The above facts show that contrary to 40 C.F.R. § 230.10(a)(3) the Corps did *not* require Mosaic to "clearly demonstrate that practicable alternatives were not available." Where, as here,

---

AR: 2010_01_15 EPA Ltr to Corps. The EPA made it clear in its final letter to the Corps that its objections had *not* been satisfied. Addendum to AR, Doc. 131-1.

a project is not water dependent, the applicant bears the burden by providing "detailed, clear and convincing information *proving* that an alternative with less adverse environmental impact is impracticable." *Van Antwerp*, 362 Fed. Appx. at 106 (emphasis in original)(quoting *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004)).

The Corps' failure to comply with the regulations renders the agency's action arbitrary and capricious. "[T]he failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct," and "courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." *Simmons v. Block,* 782 F.2d 1545, 1549-1550 (11th Cir.1986) (citations omitted) (affirming decision to set aside agency action as arbitrary and capricious where agency "followed neither course of action specified in the regulations"). It is unacceptable for an agency to "[i]nterpret[ ] a regulation in a manner that robs it of all meaning." *Sierra Club v. Martin,* 168 F.3d 1, 5-7 (11th Cir.1999). [5]

The Corps action here is analogous to *Sierra Club v. Van Antwerp*, 719 F. Supp.2d 58, 68 (D.D.C. 2010), which found a Corps' determination that practicable alternatives with less impacts did not exist was arbitrary and capricious. The developer there claimed that it could not reduce the size of its footprint on wetlands because to do so would reduce its return on investment to below 8%. The court held that this violated the regulations because: "the applicant (1) never proved that an 8% rate of return was necessary and (2) that the costs provided by the

---

[5] Other courts have also recognized that agency deference does not shield the agency from a finding that it violated regulations or was otherwise arbitrary and capricious. *See Ohio Valley Env. Coal. v. U.S. Army Corps of Engineers*, 674 F.Supp.2d 783, 801 (S.D.W.Va. 2009)(Corps' determination that application was complete and contained sufficient information contrary to regulations was not due substantial deference); and *Fina Oil and Chemical Co. v. Norton*, 332 F.3d 672 (D.C. Cir. 2003)(court will reject agency interpretation that is plainly erroneous or inconsistent with the regulation).

applicant were accurate." Here, the record established by the Corps and Mosaic is even thinner since no rate of return was even discussed.

Finally, the Court must "set aside" the Corps' action in this case pursuant to the APA because it was "arbitrary and capricious." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious where the agency has "*entirely failed to consider an important aspect of the problem*, offered an explanation for its decision that runs *counter to the evidence before the agency*, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr's Ass'n*, 463 U.S. at 43 (emphasis added); *City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1352 (11th Cir. 2005). Courts must set aside agency actions under the APA where an agency fails to "examine the relevant data and articulate *a satisfactory explanation* for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfr's Ass'n*, 463 U.S. at 43 (emphasis supplied) (internal quotations omitted). That succinctly describes the Corps action in this case. The Corps "overlooked an important aspect of the problem" since it disregarded the EPA economist report; it acted "counter to the evidence before the agency" since it acted contrary to the evidence supplied by the EPA regarding the deficient alternatives analysis; and it failed to offer "a satisfactory explanation" for its rejection of alternatives.

### 3. The Corps' Definition of the Project Purpose Unduly Limited the Consideration of Practicable Alternatives

Mosaic defined the project purpose as mining ore from land within a 10 mile radius from the pre-existing South Fort Meade separation/beneficiation plant at levels sufficient to allow the plant to continue to process 6.6 mm tpy of recoverable phosphate rock. EA at 5. The Corps re-defined the overall project purpose as follows:

***Overall Project Purpose [40 C.F.R. § 230.10(a)]:*** The Corps believes that the Applicant's stated purpose and need unduly limited the range of alternatives that could potentially be evaluated, therefore, the Corps has redefined the overall project purpose as stated below follows.

***<u>The overall project purpose is to extract phosphate ore from reserves located within a practicable pumping distance of the existing SFM-PC ore Separation/beneficiation plant and supporting infrastructure in order to continue operation of the SFM-PC separation/beneficiation plant at historical production rates.</u>***

EA, pp. 5-6 (emphasis in original).

The Corps has discretion to characterize a project's purpose in the first instance, but it cannot define a project in such a way as to preclude less damaging alternatives under the CWA. *See e.g., Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir.1989) ("Obviously, an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable."); *Nat'l Wildlife Federation v. Whistler*, 27 F.3d 1341, 1345 (8th Cir. 1994)(determining project purpose is "central" to practicable alternatives analysis); *Florida Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1244 (M.D. Fla. 2008)(citing Corps' Standard Operating Procedures that the statement of project purpose "must not be 'so restrictive as to preclude all discussion of alternatives.'"). If the Corps defines the project in an overly narrow manner, it is an abuse of discretion. *Van Antwerp*, 526 F.3d at 1366.[6]

---

[6] *See also Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 667, 670 (7th Cir.1997)(holding that that the Corps' unduly narrow statement of project purpose resulted in a failure to consider other reasonable alternatives); *City of New York v. U.S. Dept. of Transp*. 715 F.2d 732, 743 (2nd Cir. 1983) ("an agency may not narrow the objective of its action artificially and thereby circumvent the requirement that relevant alternatives be considered"); and *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)."). Although these were NEPA cases, both NEPA and the CWA involve the evaluation of alternatives whose

Although the *Van Antwerp* majority did not reach the issue of project purpose, Judge Kravitch found that the Corps abused its discretion by defining the project in such a way as to preclude application of 40 C.F.R. § 230.10(a)(3), which presumes that a practicable alternative is available if a project is not water dependent. That was because the Corps essentially defined the project's "basic purpose" as "mining *this* limestone out from under *these* wetlands." *Id.* at 1367 (emphasis in original). On remand, the district court reached the same holding while applying the deferential standard of review. *Van Antwerp*, 709 F.Supp.2d at 1263-67. That was affirmed in *Van Antwerp II*, 362 F.App'x at 107.

The Corps made a similar error in this case. 40 C.F.R. § 230.10(a)(2) states that "an alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes*." (Emphasis added). By defining the overall project purpose in this case to allow all ore extraction "within a practicable pumping distance" of the beneficiation plant to continue "historical production rates" indefinitely, the Corps defined the project in such a way that there could be no practicable alternative other than mining the maximum amount of ore in this site.

The Corps used this narrow definition of purpose to reject several off-site alternatives on the grounds that they did not meet the project purpose, *e.g.* purchasing rock from outside the Central Florida Phosphate District, mining outside central Florida, constructing new or expanding an existing mine, and mining Polk County East of the Peace River. EA at 21-22. The Corps also found that three of the five on-site alternatives did not meet the project purpose

---

legitimacy is based on a properly framed statement of project purpose. *See Alliance for Legal Action v. U.S. Army Corps of Engineers*, 314 F. Supp. 2d 534, 547-48 (M.D.N.C. 2004) (equating NEPA's reasonable alternatives analysis with the CWA's practicable alternatives analysis, while noting their procedural and substantive differences).

because they did not recover the maximum amount of ore. *Id*. at 27 (table 8). (The other two were Mosaic's alternative and the chosen alternative, both allowing 64% ore recovery – the maximum amount of any alternatives considered.) The "No-Action" alternative was rejected solely because it "would not allow the Applicant to extract the necessary quantity of phosphate reserves to fulfill the proposed project purpose." *Id*. at 28.

Like the Corps, Mosaic used the project purpose to find that there was no possible alternative to mining this site, that there were no less damaging alternatives within the site, and to justify its usage of the site for waste disposal/clay settling areas even though that usage was not included in the definition of purpose. *See e.g.,* AR: 2010_03_17 p. 2-27; and *id.* at 3-6 ("Failure to recover these reserves would cause Mosaic not to meet the project purpose."); i*d*. at 3-11 ("EPA's recommendation reduces the mineable area to the point that the project purpose could not be fulfilled."); *id*. at 3-12. ("[E]xtraction of this quantity of reserves would not meet the project purpose.").

Thus, under the Corps' defined purpose, there could never be a practicable alternative to mining ore under the wetlands. By defining the project to mine enough ore to satisfy "historic levels of production" *ad infinitum*, the Corps essentially defined the project as being the extraction of all possible ore that could be mined and transported to the plant, until all ore is exhausted, regardless of whether the ore is under wetlands. By defining the purpose to ensure that no less-damaging alternative could possibly exist, the Corps rendered the regulation that requires a presumption of less damaging alternatives a nullity.

Finally, there is no genuine issue that the project that was approved by the Corps contains elements that were not within the stated purpose and need for the project. For instance, the purpose and need statement does not include using wetlands for waste disposal, but under the

Permit wetlands would be destroyed for use as huge waste disposal or clay settling areas. Compare map C-3 (AR: 2010_06_14 Permit Instrument Attachment 1d at 4) to CRP Map 3 (AR: 2006_10_10 SFM_CRP App(4) at 9).  Therefore, the Permit must be vacated and the Corps' purpose and need statement revised to account for this non-corresponding use of the property.

> **B.     The Corps Failed to Independently Evaluate and Verify Mosaic's Information**

In the Preliminary Injunction this Court noted the Corps has a duty under the Corps' regulations and the NEPA regulations to independently verify the information submitted by Mosaic. Doc. 88 at 9,13. *See* 33 C.F.R. Part 325 (requiring the Corps to document in the record its "independent evaluation of the [applicants'] information and its accuracy, as required by 40 C.F.R. § 1506.5(a)," which requires independent evaluation and that the applicants information "be verified by the agency.").

The case law requires that "[w]hen information for an EA is prepared by the applicant, 'the district engineer is responsible for independent verification and use of the data, evaluation of the environmental issues, and for the scope and content of the EA." *Friends of the Earth v. Hintz, 800 F.2d 822, 835 (9th Cir. 1986).* [7] Thus, "while the Corps could, and did, base its permit decision exclusively on the information provided by [the applicant], the Corps nonetheless has an obligation to independently verify the information supplied to it." *Id.*; *and see Van Antwerp, 526 F.3d at 1368* (Kravitch, J, concurring part and dissenting in part) ("when information submitted by an interested party is 'specifically and credibly challenged as inaccurate, the Corps has an independent duty to investigate.'" (c*iting Van Abbema v. Fornell, 807 F.2d 633, 642 (7th Cir. 1986)* and *Greater Yellowstone Coalition, 359 F.3d at 1269.*

---

[7] *Hintz, 800 F.2d at 831* cited 33 C.F.R. Part 230 as the source of the independent verification requirement; however the correct current cite for that requirement is 33 C.F.R. Part 325.

This Court found that the Corps violated that duty: "Thus, Plaintiffs have met their burden in demonstrating that . . . the Corps failed to independently verify Mosaic's findings." Doc. 88 at 16. While the 11th Circuit's opinion did not address this aspect of the Preliminary Injunction Order, the Administrative Record supports this Court's finding.

First, Mosaic's increased cost was the Corps' reason for rejecting *on-site* alternatives, such as EPA's alternative and the "stream crossing only" alternative. EA at 27-28. Although Mosaic stated these alternatives would cost more, it did not provide the amount of the costs. See AR: 2010_03_17 SFM MFR Rev 2 (1) at 3.3.1.6. And the Corps did no independent verification of those costs. That does not satisfy the agency's duty. See *Utahns for Better Transp. v. U.S. Dept of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002), in which the Court found the agency's NEPA review was inadequate since it had not verified cost estimates of an alternative to a highway improvement project, noting that the cost information was "more than a technical requirement" given that cost was offered as a justification for rejecting the alternative. *Id.*

Second, the Corps rejected several off-site alternatives based on costs, citing MFR-2 sections 2.2.1.2, 2.2.2.2, and 2.3.2.2. EA at 19-22. But Mosaic did not give an amount of these costs. AR 2010_03_17 at pp. 2-6, 2-7, and 2-10 thru 2-13. The Corps' EA contains no verification of those unspecified costs. EA at 19-22.

Third, the Corps accepted Mosaic's claim that any area outside the 10 mile radius of its existing ore separation/beneficiation plant was uneconomical and therefore not practicable. *Id*. at 6, 19-21. Mosaic's MFR-2 contains some cost estimates on this. AR: 2010_03_17 at pp. 2-20 thru 2-22. But, as EPA objected, it is just a list of costs. Addendum to AR, Doc. 131-1 at p. 5. The Corps simply stated its conclusion that it had found the 10 mile radius acceptable for Mosaic's Altman mine permit. EA at 6. That is insufficient since the Altman record is not in this

Administrative Record, and this record does not contain independent analysis or verification by the Corps.

Fourth, the Corps accepted Mosaic's MFR-2 opinion of a positive socioeconomic effect, without any analysis or explanation. EA at 32, 40. The record contains a Hardee County economic report, which was based on Mosaic's information, and a study by the University of Florida on this subject. The EPA economists specifically questioned the University of Florida report, stating it did not "explicitly cite any multipliers related to phosphate mining and *could therefore not be verified*." Addendum to AR, Doc. 131-1 at p. 4 (emphasis supplied). In addition, both reports were based on the IMPLAN model. AR: 2008_04_21 Economic Analysis at pdf. 11; AR: 2010_04_08 email _RAI_ Response at pdf. 2. The EPA noted that an economist at the University of Miami, Richard Weisskoff, used the IMPLAN model to show that mining would have a net negative impact on Hardee County. *Id.* The EPA concluded that since his analysis was tailored directly to Hardee County, it was superior. *Id.* In addition, Plaintiffs provided the Corps with a report by Dr. Weisskoff discussing the negative economic impacts and long-term net job loss to Hardee County from phosphate mining. AR: 2010_06_08 Ltr to agencies from Sierra Club at pdf p. 16. However, the Corps did not mention the EPA economist report or Dr. Weisskoff's analysis in the EA. It also did not address the how the positive economic forecasts were based on re-use of the mined property, which is an invalid assumption due to its radioactivity. AR: 2009_11_23 POW Ltr at 6; AR: 2010_3_19 POW Ltr(1) at 15. Thus, the Corps did not meet its obligation to independently evaluate and verify Mosaic's socioeconomic information.[8]

---

[8] Prof. Weisskoff's study referred to by EPA is attached as Exhibit A. Although not part of the Administrative Record, it can be considered because it shows that the Corps "failed to discuss adequately some reasonable alternative," "swept stubborn problems or serious criticism under

Fifth, since Mosaic refused to supply any information on economic feasibility, *i.e.* any information on revenue or profit, there was no information for the Corps to verify. *See* Addendum to AR, Doc. 131-1 at p. 5.

Sixth, and finally, EPA informed the Corps that Mosaic's modeling of impacts to the Peace River watershed had not been validated through independent review. Addendum to AR, Doc. 131-1 at p. 1. But the Corps did not perform an independent analysis or review of that modeling, even after EPA called it into question.

This renders the Corps' EA and permit contrary to the regulations. *See Van Antwerp*, 526 F.3d at 1368 (Kravitch, J., concurring part and dissenting in part)(finding the permit violated the CWA where the applicant's conclusions on alternatives were repeated nearly verbatim in the Record of Decision and there was no indication the Corps independently verified the applicant's information or conclusions); *Van Antwerp*, 709 F.Supp.2d at 1266 (finding the Corps' violation of the independent verification requirement in mining alternative analysis, "or at least the record is silent as to any such effort"); *and Van Antwerp*, 719 F. Supp.2d at 71-72 (finding violation where Corps had not independently verified the mining applicant's analysis of the cost of alternatives). *See also Simmons*, 120 F.3d at 669-70 ("Alternatives might fail abjectly on economic grounds, but the Corps and, more important, the public cannot know what the facts are until the Corps has tested its presumption.").

---

the rug," and constitutes "newly discovered evidence which undermines the soundness of the agency's decision." *Sierra Club v. U.S. Army Corps of Engineers*, 935 F. Supp. 1556, 1566 (S.D. Ala. 1996) (relying on *National Audubon Society v. U.S. Forest Service*, 46 F.3d 1437, 1447 (9th Cir.1993 and *U.S. v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1429 (6th Cir.1991.

**C.    The Corps Violated the CWA, NEPA and Applicable Regulations
on Public Participation**

**1.    The Corps' Decision to not hold Public Hearings was Contrary to
the CWA, Corps' Regulations, and was Arbitrary and Capricious**

This Court previously declined to rule on "whether the Corps' refusal to conduct a hearing would by itself necessitate a stay of the permit because a remand is otherwise necessary…," but found that "a public hearing should be conducted in conjunction with the remand." Doc. 88 at 18.  The 11th Circuit took no position on the public hearing claim. 11th Cir. Order at 3 n. 2.

**a.    The Corps Violated the CWA**

The Corps violated CWA, 33 U.S.C. § 1344(a), which provides the Corps may issue section § 404 permits "after notice and opportunity for public hearings."  Despite eight requests for public hearings, including requests by Plaintiffs and the downstream counties, Lee, Sarasota and Charlotte, the Corps issued the Permit without holding any public hearings. EA at 95.

The Corps does have some discretion to "forgo *further* public hearings" under circumstances where: 1) information was generated in a "public hearing" under the state process; and 2) the Corps reasonably determines that it has the information necessary to reach a decision based on information from the prior public hearing(s) and written comments.  *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 545 (11th Cir. 1996).  However, in the instant case there were no public hearings under the State permit process. Even if there were, the Corps' explanation for foregoing a public hearing did *not* include "information generated from these hearings," as did the Corps' decision in *Rice*. *Id.* The EA contains no mention of information obtained by the Corps from other public hearings.  The only reference in the EA to public participation is the comments in response to the May 29, 2007 public notice.  Doc. 56-1 at 10, 95.

Lee and Sarasota counties did challenge the State permit for the South Fort Meade extension in a state administrative hearing. *See*, AR: 2009_02_27 FDEP ERP No. 0221122-004(6). However, that was not a hearing at which the *public* could present information, nor is there any indication the Corps relied on it since it did not mention it in the EA. Moreover, that was not a sufficient hearing on the federal permit because cumulative impacts cannot, as a matter of law, be raised in state hearings on phosphate mining and reclamation plans. *See, Peace River/Manasota Regional Water Supply Authority v. IMC Phosphates Co., 18 So.3d 1079, 1088 (Fla. 2d DCA 2009)*(citing Fla. Stat. Ann. §373.414(8)(b)(holding in hearing on a phosphate mine permit that the administrative law judge did not err in excluding proffered evidence of cumulative impacts on the Peace River). Where evidence omitted in a state hearing would be relevant to issues in the Corps' § 404 permit decision, as occurred here, the state hearing cannot be substituted for the public hearing required by the CWA. *Hough v. Marsh, 557 F.Supp. 74, 80 (D. Mass. 1982).*

### b. The Corps Violated its Regulations and the APA

The Corps' public hearing regulation states:

> [A]ny person may request, in writing, . . . that a public hearing be held to consider the material matters at issue in the permit application or with respect to Federal project. . . . Requests for a public hearing under this paragraph shall be granted, unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing. The district engineer will make such a determination in writing, and communicate his reasons therefor to all requesting parties.

33 C.F.R. § 327.4(b).[9]

The Corps' decision that there is "no valid interest to be served by a public hearing" is judged by the arbitrary and capricious standard. *Water Works & Sewer Board of the City of*

---

[9] The NEPA regulations also require public participation. 40 C.F.R. §§ 1500.1(b), 1500.2(d), 1501.4(b), and 1506.6.

*Birmingham v. U.S. Dep't of Army, Corps of Engineers*, 983 F. Supp. 1052, 1059 (N.D. Ala. 1997).    In deciding whether the Corps has abused its discretion, the Corps must take into account the statutory mandate for public hearings found in CWA § 404(a). *Rice*, 85 F.3d at 545; *Hough*, 557 F.Supp. at 79-80 (requiring public hearing on remand and noting that legislative history of Clean Water Act indicates strong congressional desire that public have input in decisions and that opportunity to submit documents does not constitute a public hearing).

In this case, the Corps' district engineer's entire explanation for not holding a hearing is in the EA at page 95. He stated the Corps responded to comments in the EA—but overlooked or ignored that the EA does not mention EPA's 2010 comments. He also found, without explanation, that the objections to relying on Mosaic's information were "insubstantial."  He then repeated the regulatory language as his conclusion: "Given that the issues raised by the public have been addressed by the Corps or have been found to be insubstantial, the Corps has determined, per 33 C.F.R. § 327, that there is no valid interest to be served by a public hearing and therefore the requests are denied."

The duty of a court reviewing agency action under the APA's "arbitrary or capricious" standard is to ascertain whether the agency articulated a rational connection between the facts found and the decision made.  *Motor Vehicle Mfr's Ass'n*, 463 U.S. at 43; *Martin*, 168 F.3d at 5. The APA requires the agency to "provide a thorough and comprehensible statement of the reasons for [a] decision." *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 701 (2d Cir. 1975), *cert. den.* 423 U.S. 827.  In this case however all the district engineer did was parrot the regulation and state his conclusion. EA at 95.  That is not an adequate explanation under the APA. Nor does it meet the requirement of 33 C.F.R. § 327.4(b) that the Corps' district engineer "communicate his reasons" for denying the hearing.

Furthermore, the district engineer did not give any reason why the "public" could not provide additional information at a public hearing other than what the Corps received in response to the public notice. He was wrong because the Corps only took public comment in response to its public notice of May 29, 2007. AR: 2007_05_29_PN_saj-1997-4099a. That notice did not contain any information on alternatives, mitigation or cumulative impacts. *Id*. It stated that the compensation plan had not been finalized and Mosaic's information had not been verified. *Id.* And, the EA reveals that the project was revised substantially in the years following the public notice, as to the project boundary, stream and wetlands impacts, mining plan, and mitigation plan. Doc. 56-1 at 19. Hence, the public comments could not and did not address these matters, particularly since the Corps gave no public notice or opportunity to comment on the EA. Allowing the public to address this new information provides a "valid interest to be served by a public hearing." 33 C.F.R. § 327.4(b).

Defendants might argue that there is no showing *Plaintiffs* were denied sufficient opportunity to be heard or that a public hearing would change the Corps' ultimate decision. But that misconstrues the purpose of the public hearing, which is to give the public, not just Plaintiffs or those who commented, a chance to provide information to the Corps at the hearing. *See, Buttery v. United States*, 690 F.2d 1179, 1176 (5th Cir. 1982)("The 'public hearings' language in section 404 was, in fact, written into the statute to protect the public, not permit applicants."); and *Sierra Club v. Alexander*, 484 F.Supp. 455, 470-71 (N.D.N.Y.), *aff'd mem.*, 633 F.2d 206 (2d Cir. 1980) (reason for public hearings by federal agencies is to elicit "input" from the public to assist agency in determining whether a proposed act is in the public interest).

The 11th Circuit rejected an analogous argument in *Sierra Club v. Johnson*, 436 F.3d 1269 (11th Cir. 2006). There, the EPA argued Plaintiffs lacked standing to challenge an air

emissions permit for lack of public notice because Plaintiffs had commented, and there was no proof that any member of the public who did not comment would have commented had proper notice been given. *Id*. at 1276. The Court rejected that argument and held it was enough that proper notice could have led to additional public input, which could have led to improvements in the permit. *Id*. at 1279. Similarly, it was arbitrary and capricious in this case for the Corps to conclude that the only attendees of a public hearing would be those that had already submitted comments, and that no new information could be provided at a public hearing.

### 2. The Corps was Required to give Public Notice and Comment on its Finding of No Significant Impact

The Corps issued its Finding of No Significant Impact (FONSI) without any prior public notice or opportunity for comment. That violated 40 C.F.R. § 1501.4(e)(2)(i), which requires FONSIs be given a 30 day public review and comment period before the final decision is made, when "[t]he proposed action is, *or is closely similar to*, one which normally requires the preparation of an [EIS] under the procedures adopted by the agency pursuant to § 1507.3." (Emphasis added.) For example, in *Citizens Advisory Comm. v. U.S. Dept. of Justice*, 197 F.Supp.2d 226 (W.D. Pa. 2001), the court held the agency had to make its FONSI available for a 30-day public review period because even if the construction of a private prison would not be considered a new federal prison construction, which normally requires an EIS, "it is easily 'similar' to such a project, which is all the CEQ regulations require." *Id.* at 246-247 n.18. (Emphasis added.)

The South Fort Meade extension is closely similar to other projects for which the Corps has prepared EISs. Exhibit B hereto is a list from the Federal Register of seven phosphate mines in central Florida plus six other phosphate mines for which the Corps decided to prepare EISs. In addition, the Corps decided to prepare the area-wide EIS on phosphate mining to address the

cumulative impacts of three proposed phosphate mines in the region, Ona, Mosaic's Four Corners Surface Tract, and CF Industries' South Pasture extension. 76 Fed. Reg. 9560. The applications for these mines were pending before the Corps issued the instant FONSI. In addition, Exhibit B contains two other mines displacing wetlands in Florida where the Corps decided to prepare EISs. Because the Corps found these other projects were due Environmental Impact Statements, it should have allowed public review and comment on this FONSI. 40 C.F.R. § 1501.4(e)(2)(i).

> **D. The Corps' Decision not to Prepare an Environmental Impact Statement was Contrary to NEPA, the NEPA Regulations and was Arbitrary and Capricious**

This Court found that while "Plaintiffs have produced a significant amount of evidence regarding the EIS issue and may be able to eventually demonstrate that the Corps failed to take a hard look at direct and cumulative impacts and thus erred in its FONSI, the evidence produced at this stage in the proceedings is insufficient." (Doc. 88 at 12). The 11th Circuit took no position on this issue. 11th Cir. Order at p. 3 n. 2. However, this Court now has the full Administrative Record on which to base its decision. That shows that this project satisfies many of the significance factors that require the Corps to prepare a full EIS, and that the Corps improperly relied on controversial and uncertain wetlands reclamation mitigation measures to conclude that this project would have no significant impacts.

> **1. Because the Project Meets Several of the Factors for Determining Significance, the Corps Decision to not Prepare an EIS was Arbitrary and Capricious**

NEPA requires the Corps to have taken a "hard look" at the problem in preparing the EA. *Hill v. Boy,* 144 F.3d 1446, 1450 (11th Cir. 1998). If a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. *Id.*

Under the NEPA regulations, the significance of an action is determined by evaluating both the context of the action and the intensity of the impact. 40 C.F.R. § 1508.27. The applicable regulation provides ten factors to be considered in evaluating significance. 40 C.F.R. § 1508.27(b). If any one or more of these factors are present, an EIS is required. *See Grand Canyon Trust v. Federal Aviation Administration, 290 F.3d 339, 340 (D.C.Cir. 2002)*("If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* agency action is taken.")(emphasis in original); *Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C.Cir.1983)*(same). *And see, e.g., Van Antwerp, 719 F. Supp.2d at 65-68*, in which the district court applied these factors to a Corps' permit for a Florida real estate project and found that because several of the factors of 40 C.F.R. § 1508.27(b) exist, preparation of an EIS was required.

### a.  The Project Site is in Proximity to Wetlands and Other Ecologically Critical Areas

An EIS should have been prepared because the project site has "unique characteristics ... such as proximity to ... wetlands ... or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). Not only will this project lie in "proximity" to wetlands and ecologically critical areas; it is directly *on top* of these unique wetlands and will completely destroy at least 534 acres of wetlands and over 10 miles of streams.  AR: 2010_6_14 DA Permit SAJ-1997-4099 Instrument.

The project is also in proximity to "other ecologically critical areas." The Peace River watershed is a Priority Watershed and an Aquatic Resource of National Importance (ARNI). AR: 2007_08_23 USEPA_B ltr at 2. It flows into the Charlotte Harbor National Estuary, downstream of the proposed mine, which depends on freshwater flows from the river. The Charlotte Harbor estuary has been designated by Congress as an "estuary of national significance."  These natural

resources are essential for the survival of both human and wildlife communities in the watershed, including threatened and endangered wildlife and fish. *Id*.

> **b.** **It is Reasonable to Anticipate a Cumulatively Significant Impact on the Environment**

>> **i.** *The Project is Related to other Actions with Cumulatively Significant Impacts*

An EIS should have been prepared because the project "is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... undertakes such other actions." 40 C.F.R. § 1508.7.

In this case, the other actions in the Peace River watershed include past, present and future phosphate mines, as well as urban development and the agricultural conversion of land into groves, pastures, and row crop production with associated groundwater usage. EA at 40-48. The Corps recognized these actions are related to the proposed project because they are in the same watershed and impact the same resources, including wetlands, water quality, hydrology, and wildlife habitat. *Id.* at 40.

The record is replete with information on the severe cumulative impacts of phosphate mining on the region. *See, e.g.*, Statement of Facts *supra* Section at pp. 5-7, 8-10. The Corps' EA itself describes the devastating impacts of past phosphate mining and other causes on the Peace River Watershed: a) the loss of 343 miles of streams; b) the loss of 38.5% of wetlands, totaling 136,000 acres; c) the loss of 71% of acres of upland habitat totaling 591,000 acres; and d) the decline in the Florida aquifer of 20 to 50 feet. EA at 48. A large portion of the region has been declared a Water Use Caution Area due to excessive consumptive uses. *Id.* Groundwater

levels have declined significantly, lakes and rivers suffer from chronic water quality problems, mining and other uses are replacing native habitat, freshwater flows have declined and changed locations, and priority fish and wildlife habitat loss includes freshwater wetlands loss of 38 percent. *Id.* at 49.

A report by the University of South Florida states, *inter alia*, that "Physical effects of phosphate mining on the hydrology of Florida include the reduction or elimination of base flow, reduced surface runoff, lowering of water levels in the Upper Floridan aquifer, the replacement of natural surface drainage by modified topography and reclaimed ditches and swales." AR: 2009_11_23 POW Letter & Att. The State of Florida Department of Environmental Protection's 2007 Peace River Cumulative Impact Study confirmed the adverse cumulative impacts of phosphate mining, among other sources, on the Peace River. AR: 2007_07_12 Charlotte Cty Bcc_Attachment J(1) at 1-1; (2) at 2-27 thru 2-34; (4) at 4-4, 4-5, 4-74. The U.S. Geologic Survey investigation confirmed these impacts. AR: 2010_03_19 POW Letter (1) at 6-7 and AR: 2010_03_19 POW Letter (19) 2009_USGS Report.

Charlotte County's comments, at pages 10, 22, and 28-43 also describe in detail these significant cumulative impacts and provide volumes of supporting evidence:

> Phosphate mining reduces surface water flows and runoff by impounding and cutting areas out of the drainage basin, by creating more open surface water areas that lose water to [evapotranspiration]  and by creating a number of clay settling areas along river banks, which significantly impede horizontal surface and groundwater flow to streams and rivers.  The overall effect of constructing clay settling areas and placing cast overburden near the surface is to raise groundwater levels, which exposes the water to increased [evapotranspiration].  Clearly, phosphate mining has played some role in the historical decline of freshwater flows in the Peace River.

AR: 2007_07_12 Charlotte Cty BCC (1) at 33.

The record also establishes that the proposed South Fort Meade extension would add to the cumulative unreclaimed wetlands in the area.  As of 2009, there were 25,215 acres of

unreclaimed mined lands. EA at 48. Mosaic has only reclaimed 28 percent of the total wetlands destroyed by its previous mines and four percent of the original South Fort Meade mine. AR: 2010_02_09 EMAIL 1 2008 Rate of Reclamation Report at 6, 10. As this Court has found, Mosaic's reclamation of the wetlands that would be destroyed by the South Fort Meade extension would not occur for decades. Doc. 88 Order on PI at 19.

In addition, Mosaic's plans include six more massive phosphate mines totaling tens of thousands of acres. EA at 46-47. However, the Corps excluded four of these mines from its cumulative impact analysis because they are not scheduled to be mined until after 2028. *Id.* That was contrary to the regulations, which require consideration of "reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

Despite these significant cumulative impacts, the EA inexplicably concludes that there are *no* significant cumulative impacts associated with the proposed mine. EA at 62. However, a cumulative impacts analysis cannot merely recite the history of impacts and then conclude that the impacts will be minimal. *The Humane Soc. of U.S. v. Dep't of Commerce*, 432 F. Supp. 2d 4, 21-22 (D.D.C. 2006).

        ii.      *The Corps Wrongly Relied on the State Water Quality Analysis for its Cumulative Impacts Analysis*

The Corps analysis of cumulative impacts to water quality in the Peace River was especially inadequate. The Corps abided by 33 C.F.R. § 320.4(d)'s directive that § 401 certifications by state agencies are conclusive for purposes of the CWA. Florida's § 401 certification is insufficient to satisfy the Corps' "hard look" obligations *vis a vis* cumulative water quality impacts because under statute the State does not consider cumulative impacts in its wetlands permitting. *See Peace River/Manasota Reg'l Water Supply Auth.,* 18 So. 3d at 1086-89 (citing Fla. Stat. Ann. § 373.414(8)(b)). And see the State Administrative Law Judge's findings

on Mosaic's Ona phosphate mine, explaining that by statute the State never considers cumulative impacts in its permit.  AR:2007_07_12 Charlotte Cty BCC_Attachment A-2(2) at ¶863 (pdf p. 378).

An examination of the EA confirms that the Corps relied on the § 401 certification for the substance of its analysis of cumulative water quality impacts. EA at 35-36 and especially 52. The only other EA section that mentions water quality is not an evaluation of the cumulative impacts on water quality, nor is it comprehensive—it is a half-page summary of water quality improvement efforts in the region followed by an unsupported conclusion that those efforts "can reasonably be expected to mitigate the historical water quality impacts."  EA at 50.

iii.    *Significant Cumulative Impacts are Evident in the Corps' Decision to Prepare the Regional EIS*

Significant cumulative impacts from this project are evident from the Corp's decision to conduct a Programmatic, Area-wide or Regional EIS on the cumulative effects of phosphate mining immediately following the issuance of the South Fort Meade permit.  The EPA wrote at least five letters to the Corp explaining that "a current, area-wide Environmental Impact Statement is most needed in order to address the extensive cumulative impacts and changes to these watersheds due to the phosphate mining industry." AR: 2010_01_15 EPA Ltr to Corps at 1; AR: 2007_07_26 USEPA_A ltr; AR: 2007_08_23 USEPA_B ltr; AR: 2010_03_10 EPA Ltr to Corps; Addendum to AR, Doc. 131-1. The downstream counties, as well as several other commenting organizations, echoed EPA's requests in comments. AR: 2007_07_11 Sarasota County Letter; AR: 2007_07_12 Charlotte County Letter.

Roughly a week after the issuance of the South Fort Meade extension permit, the Corps finally agreed to conduct the regional EIS. Based on this record it is apparent that the Corps deliberately waited until the South Fort Meade extension permit was out the door before agreeing

to examine the cumulative impacts of phosphate mining. This violates NEPA's requirement that the agency's hard look at environmental impacts must come *before* the project decision, not after the wetlands and streams have been destroyed. *Winter v. Natural Resources Defense Council, 129 S.Ct. 365, 390 (2008)*.

### c. The Project is Highly Controversial

An EIS should also have been prepared because of the "degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). "The term 'controversial' refers to cases where a substantial dispute exists as to the size, nature, or *effect* of the major federal action rather than to the existence of opposition to a use." *Town of Cave Creek v. Federal Aviation Administration, 325 F.3d 320, 331 (D.C.Cir. 2003); Georgia River Network v. U.S. Army Corps of Engineers, 334 F. Supp. 2d 1329, 1338 (N.D. Ga. 2003)*.

The proposed South Fort Meade extension mine is "significant" as a matter of law because it is highly controversial in at least three respects. First it is hotly disputed whether Mosaic's proposed reclamation of wetlands on mined-out lands can be offset, or whether reclaimed wetlands are the functional equivalent of the natural wetlands that would be destroyed by the mine. This is especially controversial for bayhead wetlands. *See, e.g.,* EPA's comments, AR: 2007_08_23 USEPA_B ltr at 2; Charlotte County comments at AR: 2007_07_12 Charlotte Cty BCC (1), at 17-18, 52-53.

Second, there is a significant controversy surrounding the socioeconomic impacts of the project. The EPA economists found that the mine would have a net negative economic impact on Hardee County. *See* Addendum to AR, Doc. 131-1 at pp. 4-5. Plaintiffs attached to their comments the report of Dr. Richard Weisskoff, which establishes the negative impact and long-

term loss of jobs in Hardee County due to phosphate mining. AR: 2010_06_08 Ltr to agencies from Sierra Club at pdf p. 16. Charlotte County also explained that "the long-term negative impacts of phosphate mining outweigh the short term economic benefits of severance taxes and job creation." AR: 2007_07_12 Charlotte Cty BCC (1), at 27. These directly contradict the Corps' conclusion that "socioeconomic resources are most likely to be beneficially impacted by the mining activities," EA at 40. At a minimum they demonstrate the "highly controversial" nature of this subject.

Third, the impact of phosphate mining on flow in the Peace River watershed is highly controversial. While the Corps found that the proposed mine would have no effect upon water flows, the record is filled with evidence to the contrary. For example, EPA found that "[a] mining project of this geographical size and ecological magnitude will create significant impacts in the Peace River and Charlotte Harbor estuarine system and will alter the quantity, quality and timing of freshwater delivery to these systems."  AR: 2007_08_23 USEPA_B ltr at 2.  Charlotte County submitted volumes of evidence, transcripts and administrative findings that show phosphate mining reduces surface water flows and runoff by impounding and cutting areas out of the drainage basin and by creating the enormous clay settling areas that impede surface and groundwater flows to streams and rivers. AR: 2007_07_12 Charlotte Cty BCC (1) at 34-36, 39-40. The U.S. Geologic Survey investigation confirmed this. AR: 2010_03_19 POW Letter (1) at 6-7 and AR: 2010_03_19 POW Letter (19) 2009_USGS Report.

The Corps' EA was arbitrary and capricious because it does not even acknowledge the existence of these controversies. Therefore, the Corps "entirely failed to consider an important aspect of the problem," which renders its decision arbitrary and capricious under the *Motor Vehicle Mfr's Ass'n*, 463 U.S. at 43;  *and see*, *Georgia River Network*, 334 F. Supp. 2d at 1338

(if a showing of a substantial dispute is made, the agency must consider the dispute and address those concerns in its final decision).

**d.**     **The Project Impacts are Highly Uncertain and Involve Unknown Risks**

The impacts of the proposed mine are further significant as a matter of law because the reclamation of wetlands, and hence "the possible effects on the human environment," are "highly uncertain [and] involve unique or unknown risks." 40 C.F.R. § 1508.27. This Court previously held that "Plaintiffs have demonstrated there is scientific uncertainty regarding the recreation of wetlands and streams." Doc. 88 at 10 n.4. Because there is a high level of uncertainty regarding the functionality of reclaimed wetlands on mined out lands, the Corps has a duty to conduct an EIS. *See*, *e.g.*, *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (decision not to prepare EIS found arbitrary and capricious where independent report raised substantial dispute concerning likelihood and significance of environmental effects).

**e.**     **The Project may Adversely Affect Endangered Species**

Another significance factor is "[t]he degree to which the action *may* adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27(b)(9)(emphasis supplied). The record demonstrates that the project has the *potential* of adversely affecting several endangered species, including Indigo snakes, Audubon's crested caracaras, and woodstork habitat. *See, e.g.*, EA at 10. This potential is all that is necessary to require preparation of an EIS under NEPA. *See*, *Grand Canyon Trust*, 290 F.3d at 339; *Van Antwerp*, 719 F. Supp.2d at 66.

In addition, the project may affect critical habitat for the endangered Smalltooth sawfish ("Sawfish"), which is an estuarine fish that requires shallow coastal waters of warm seas for survival. After the Corps' public notice for this project, but before the Permit issued, on

September 2, 2009, the National Marine Fisheries Service formally designated the Charlotte Harbor Estuary Unit and portions of the Peace River as critical habitat for the Sawfish under the Endangered Species Act. 74 Fed. Reg. 45353 (Sept. 2, 2009). Charlotte County previously had submitted evidence to the Corps demonstrating that the proposed mine would impact these areas by reducing freshwater flows to Charlotte Harbor estuaries, increasing salinity inside the Harbor. AR: 2007_07_12 Charlotte Cty BCC (1) at 4. The EPA also submitted evidence of this impact, stating that the project "will cause significant degradation of aquatic resources… that could result in adverse effects on the surrounding waters, including loss of aquatic and estuarine habitat, disruption of water-dependent species' life-cycles… and reduced water quality and quantity for …downstream estuaries." AR: 2007_08_23 USEPA_B ltr. Following the critical habitat proposal, and again after critical habitat was designated, Plaintiffs pointed out to the Corps that impacts to Sawfish habitat had not been analyzed and that it was necessary for the Corps to do so in its NEPA documents. AR: 2009_07_01 POW ltr re_SFM (1) at 7; AR: 2009_09_18 Ltr to Corps & EPA from Sierra Club at 7.

Nevertheless, the Corps' EA is completely silent on impacts to the Sawfish and its critical habitat. Therefore, the EA was arbitrary and capricious because, once again, it "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfr's Ass'n*, 463 U.S. at 43.

### f. The Corps' Analysis of Impacts on Public Health or Safety was Inadequate

The Corps also failed to consider adequately the nuisance impacts of the mine on persons living nearby. Under 40 C.F.R. § 1508.27(b)(2) the Corps is required to consider "the degree to which the proposed action affects public health or safety." Defendants might argue that these were considered in the EA at 31-37, however that shows the Corps relegated these concerns to

"aesthetics" and dismissed them simply because the applicant "took steps" to address them. *Id.* at 32. That is not a sufficient analysis of significance for NEPA purposes.

### 2. The Corps' Determination that Wetland Reclamation Would Mitigate the Impacts to Insignificance was Arbitrary and Capricious

A court can set aside an EA if the agency has not shown that, even if there are significant impacts, "an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum." *Hill,* 144 F.3d at 1450. In this case, the Corps' FONSI is only two conclusory sentences, which do not explain why the Corps found the project would have no significant impact. EA at 96. To the extent the Corps claims that there were no significant impacts due to Mosaic's reclamation plans, those were sufficiently uncertain and contrary to the record, hence they do not render the impacts of this project insignificant. *See* sections IV.D.1.c and d of this brief, *supra*.

Corps regulations and the "no net loss policy" require, at a minimum, a one acre to one acre "functional replacement" of destroyed wetlands. *See,* 33 C.F.R. § 332 and 40 C.F.R. § 230. There is strong evidence in the record of a substantial controversy and high uncertainty concerning the functionality of wetlands that are recreated after the land has been destroyed by phosphate mining, especially regarding bayhead wetlands. The EPA warned the Corps that the mitigation regime for the South Fort Meade extension was inadequate to protect the unique resources at stake because of the uncertainty surrounding Mosaic's ability to replace them. It stated:

> Avoidance of wetlands is important because mitigation in the form of re-creating wetland and tributary systems is rarely able to replace the full range of functions and values of the impacted aquatic resources.

AR: 2007_08_23 USEPA_B ltr at 2. Charlotte County also objected to Mosaic's claim that it can successfully reclaim destroyed wetlands:

Bay heads and other seepage swamps are one of the hardest ecosystems to restore because they have inundation and seepage components that is difficult to reproduce, the trees are usually mature with very little seed production and the muck soil takes a long time to develop, usually at the rate of 1 inch per thousand years.

AR: 2007_07_12 Charlotte Cty BCC (1), at 52-53.

Charlotte County submitted in this Administrative Record the findings of the State Administrative Law Judge on Mosaic's Ona phosphate mine, which held that Mosaic does not have the ability to successfully reclaim bay swamps. *Id.* at 17-18, 53. For instance, the ALJ found: "no successful reclamation of bay head swamps has ever taken place, except under circumstances inapplicable to [this mine]"; there was no "reasonable assurance that [Mosaic] will reclaim a functional hydroperiod and inundation depths for [wetland] E008"; and "For all their hydrological and biological importance, bay swamps have not been reclaimed except under circumstances inapplicable here." AR: 2007_07_12 Charlotte Cty BCC_Attachment A-2(2) at ¶¶704,741 and 882.

EPA also found that "there is continued uncertainty regarding the success of wetland creation or other habitat development……the level of risk and lag time are especially high and long for streams." AR: 2010_01_15 EPA Ltr to Corps at 3-5. For instance, Mosaic's application shows wetland # 2 is in the South Fort Meade extension Phase I. *See* AR: 2010_06_14 Permit Instrument Attachment2d at 4. But it would not be reclaimed until 2026. *Id.* at 2. Even if it was possible for Mosaic to recreate these wetlands one-for-one, they would still be lost at least for the short to medium term. AR: 2007_07_26 USEPA_A ltr, AR: 2010_01_15 EPA Ltr to Corps, AR: 2010_03_10 EPA Ltr to Corps, EA at 1-2, 10, 13-15.

In addition, Mosaic is seeking to mine these wetlands before it has reclaimed the wetlands from its previous mining. According to the State of Florida's Reclamation Report,

Mosaic has only reclaimed 28 percent of the wetlands destroyed by its total mining and only four percent of the first South Fort Meade site. AR: 2010_02_09 EMAIL 1 2008 Rate of Reclamation Report at 6, 10.

Despite all of the evidence casting serious doubt on Mosaic's ability to recreate bay wetlands, the Corps found no significant impact in part because there would be "no net loss of wetlands" and "no net loss of wetland functional values." EA at 56. Because the Corps did not address this contrary evidence in its EA, its finding of no significant impact was arbitrary and capricious. At a minimum, there is a significant controversy on this issue, and that alone required the Corps to prepare an EIS. 40 C.F.R. §1508.27(b)(4); *Grand Canyon Trust*, 290 F.3d at 340.

## V. MOSAIC'S RECENT "NOTICE OF AREA 2 UPLANDS MINING" SUPPORTS PLAINTIFFS' CLAIMS OF INADEQUATE ALTERNATIVES ANALYSIS AND REQUIRES A SUPPLEMENTAL EA

On April 19, 2011 Mosaic filed its Notice of Area 2 Uplands Mining (Doc. 118) ("Notice") that indicates Mosaic intends to mine the upland 700-acres of what it calls "Area 2." Mosaic claims that a § 404 permit is not required to mine the Area 2 uplands because it can conduct the mining in a way that will not impact jurisdictional wetlands. Doc. 118.

Mosaic's Notice supports Plaintiffs' existing Counts I and II, which allege the Corps did not adequately analyze all reasonable alternatives that would minimize the impacts to wetlands in violation of the CWA, NEPA and implementing regulations. This shows the Corps' original analysis was arbitrary and capricious because: a) the No Action alternative was improperly defined since it did not include this 700 acres and the ore that could be mined from it; and/or b) the Corps' overlooked this large, significant alternative. Considering that Mosaic's "Phase I" is taking approximately six months to mine 200 acres, Area 2 would allow Mosaic to mine and keep its beneficiation plant operating for at least another 18 months. It is an example of the other

"iterative combinations . . . of on-site alternatives" with less impacts that EPA asked the Corps to consider, and which the Corps refused to consider. AR: 2010_06_08 EPA Ltr to Corps. "'The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Simmons*, 120 F.3d at 670, *quoting* *Alaska Wilderness Recreation & Tourism v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995).

As a result of Mosaic's Notice, Plaintiffs have moved to amend their Complaint to add one new claim, Count IV, as this constitutes new information and a change to the project that requires a Supplemental EA.  Doc. 130.  Agencies must prepare supplements to EISs if there are "substantial changes in the proposed action" or "significant new circumstances or information" that are "relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9.  This applies equally to EAs.  *Idaho Sporting Congress, Inc., v. Alexander, 222 F.3d 562, 566 (9th Cir. 2000).* Mining Area 2 constitutes a substantial change in the project and significant new information relevant to environmental concerns, as it expands the baseline no action alternative by approximately 70%. This changes the entire context of the alternatives analysis, which "is the heart of the environmental impact statement" and Environmental Assessment. 40.

In addition, mining the Area 2 Uplands requires changing the mine plan in several ways. First, Mosaic will change the order in which the mining areas are developed.  Compare Notice to Map C-16. AR: 2010_06_14 Permit Instrument Attachment 1e at 34.  Second, it changes the mine plan by adding a new access corridor through which the draglines will access Area 2, which will likely have adverse impacts.  Compare Notice to Map C-16. *Id.*  Third, it requires Mosaic to move the ditch and berm system.  Compare Notice of Area 2 Mining to Map C-21. AR: 2010_06_14 Permit Instrument Attachment 1g at 1.

Finally, a supplemental EA is necessary because the possibility of mining Area 2 by itself without a §404 permit was not considered in the EA, but this action will impact the wetlands within and adjacent to Area 2. See EA, at 7-8 ("[a]lthough upland fill is not subject to the jurisdiction of the Corps, fill would not be placed in uplands but for the placement of fill into waters of the U.S., including wetlands."); Decl. of Thomas Myers, Mosaic's Assistant Vice President (Doc. 96-3) at ¶¶ 11-15 (describing materials imbalance and harm to wetlands from mining uplands).

## VI.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court enter summary judgment for Plaintiffs and against Defendants, and that the Corps' CWA § 404 permit for the South Fort Meade Extension be vacated.

Respectfully submitted, this 6th day of May, 2011.

**/s/ Eric E. Huber**
Eric E. Huber
*Pro Hac Vice* (Colo. Bar no. 40664)
Sierra Club
1650 38th Street Suite 102W
Boulder, CO 80301
(303) 449-5595
fax (303) 449-6520

**/s/ Marcy I. LaHart**
Marcy I. LaHart, Esq.
Fla. Bar no. 0967009
4804 SW 45th Street
Gainesville, FL 32608
(352) 224-5699
fax (888) 400-1464

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of May, 2010, I electronically filed the foregoing by using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

**/s/ Eric E. Huber**
Eric E. Huber