**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SIERRA CLUB, INC.; PEOPLE FOR PROTECTING PEACE RIVER, INC.; and MANASOTA-88, INC.,

Plaintiffs,

Case No.: 3:10-cv-564-J-25JBT

v.

UNITED STATES ARMY CORPS OF ENGINEERS; and ALFRED A. PANTANO, JR.,

Defendants.

---

# MOSAIC FERTILIZER'S RESPONSE AND DISPOSITIVE CROSS MOTION FOR SUMMARY JUDGMENT

---


David B. Weinstein
Fla. Bar No. 604410
weinsteind@gtlaw.com
Kerri L. Barsh
Fla. Bar No. 443840
barshk@gtlaw.com
Kimberly S. Mello
Fla. Bar No. 002968
mellok@gtlaw.com
**GREENBERG TRAURIG, P.A.**
625 E. Twiggs St., Ste. 100
Tampa, FL 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900

Frank E. Matthews
Fla. Bar No. 328812
frankm@hgslaw.com
Susan L. Stephens
Fla. Bar No. 986836
susans@hgslaw.com
**HOPPING GREEN & SAMS, P.A.**
123 South Calhoun Street
P.O. Box 6526
Tallahassee, FL 32314-6526
Telephone: (850) 222-7500
Facsimile: (850) 224-8551

*Counsel for Mosaic Fertilizer, LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF THE FACTS ........ 3

I. PHOSPHATE MINING IN CENTRAL FLORIDA ........ 3

II. THE SOUTH FORT MEADE TRACT. ........ 3

III. THE CLEAN WATER ACT PERMIT PROCESS. ........ 4

IV. THE CORPS' DECISION TO ISSUE THE PERMIT. ........ 4

ARGUMENT ........ 5

I. THE CORPS COMPLIED WITH THE CWA. ........ 6

A. The project purpose was properly defined. ........ 6

B. The Corps thoroughly examined practicable alternatives. ........ 7

1. The Corps evaluated seven off-site alternatives ........ 8

2. The Corps evaluated five on-site alternatives. ........ 8

3. The Corps selected the EPA's 2010 alternative as LEDPA. ........ 11

C. EPA's concerns were clearly considered. ........ 11

D. The Corps properly considered cost in its practicable alternatives analysis. ........ 12

1. The Corps selected appropriate cost metrics, relevant to the proposed project, in performing its alternatives analysis. ........ 12

2. The Corps conducted a through analysis of costs relevant to LEDPA. ........ 14

II. THE CORPS MET ALL REQUIREMENTS FOR PUBLIC PARTICIPATION. ........ 16

A. No public hearing was required on the Permit application. ........ 16

B. The EA/FONSI did not require public notice ........ 17



TPA 511,542,127

III. THE CORPS COMPLIED WITH NEPA. 19

A. The Corps independently evaluated all record information. 19

B. The Corps' decision not to prepare an environmental impact statement was neither arbitrary nor capricious. 21

1. NEPA does not require preparation of an EIS in all circumstances. 21

2. The Corps complied with the CEQ regulations. 21

(a) The fact that Project is in close proximity to wetlands and other ecologically important areas does not require an EIS. 23

(b) The Corps properly analyzed cumulative impacts. 23

(i) The Corps considered the Project's relationship to other actions in assessing cumulative impacts. 24

(ii) The Corps properly considered water quality issues in analyzing cumulative impacts. 25

(iii) The Corps' decision to prepare an area-wide EIS has no bearing on the cumulative impacts of this Project. 26

3. The Project is not highly controversial under NEPA standards. 27

4. The Project impacts are not highly uncertain and do not involve unknown risks. 28

5. The Corps did not ignore impacts relevant to the smalltooth sawfish. 28

6. The Corps adequately analyzed public health and safety. 31

C. The Corps properly decided that wetland reclamation would mitigate the impacts such that the significance threshold was not reached. 31

IV. PLAINTIFFS' ARGUMENTS REGARDING AREA 2 MINING ARE MERITLESS. 35

CONCLUSION 35

CERTIFICATE OF SERVICE 37

## TABLE OF AUTHORITIES

**Cases**

*Arkansas Wildlife v. U.S. Army Corps of Eng'rs*,
431 F.3d 1096 (8th Cir. 2005) .......... 23, 24

*Baltimore Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983) .......... 21, 31

*Bering Strait Citizens v. U.S. Army Corps of Eng'rs*,
524 F.3d 938 (9th Cir. 2008) .......... 11

*C.A.R.E. Now, Inc. v. Fed. Aviation Admin.*,
844 F.2d 1569. 1572 (11th Cir. 1988) .......... 19, 22

*Cal. Trout v. Schaefer*,
58 F.3d 469 (9th Cir. 1995) .......... 12

*Citizens Advisory Comm. v. U.S. Dept. of Justice*,
197 F. Supp. 2d 226 (W.D. Pa. 2001) .......... 18

*Coliseum Square Assoc., Inc. v. Jackson*,
465 F.3d 215 (5th Cir. 2006) .......... 22

*Conservation Law Found. v. Fed. Energy Reg. Commission*,
216 F.3d 41 (D.C. Cir. 2000) .......... 13

*Conservation Law Found. v. Fed. Highway Admin.*,
827 F. Supp. 871, 888 (D.R.I. 1993) .......... 17

*Envt'l Coalition of Broward Cty. v. Myers*,
831 F.2d 984 (11th Cir. 1987) .......... 31

*Fla. Clean Water Network, Inc. v. Grosskruger*,
587 F. Supp. 2d 1236 (M.D. Fla. 2008) .......... 6, 9

*Friends of Earth v. Hintz*,
800 F.2d 822 (9th Cir. 1986) .......... 19, 20

*Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*,
988 F.2d 989 (9th Cir. 1993) .......... 17

*Fund for Animals, Inc. v. Rice*,
85 F.3d 535 (11th Cir. 1996) .......... 8, 11, 16

*Greater Yellowstone Coalition v. Flowers*,
359 F.3d 1257 (10th Cir. 2004) .......... 11

*Heartwood, Inc. v. U.S. Forest Serv.*,
380 F.3d 428 (8th Cir. 2004) .......... 19, 22



*TPA 511,542,127*

*Hill v. Boy*,
144 F. 3d 1446 (11th Cir. 1998) ........ 21

*Indiana Forest Alliance, Inc. v. U.S. Forest Serv.*,
325 F.3d 851 (7th Cir. 2003) ........ 27

*Louisiana Wildlife Federation v. York*,
761 F. 2d 1044 (5th Cir. 1985) ........ 6, 9

*Murray Energy Corp. v. FERC*,
629 F.3d 231 (D.C. Cir. 2011) ........ 19

*Nat'l Wildlife Federation v. Whistler*,
27 F. 3d 1341 (8th Cir. 1994) ........ 6

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) ........ 22

*Norelus v. Denny's, Inc.*,
629 F.3d 1270 (11th Cir. 2010) ........ 1

*North Buckhead Civic Ass'n v. Skinner*,
903 F.2d 1533 (11th Cir. 1990) ........ 5, 15, 21

*Northwest Envt'l Defense Center v. Wood*,
947 F. Supp. 1371 (D. Oregon 1996) ........ 28

*Oceana, Inc. v. Evans*,
384 F. Supp. 2d 203 (D.D.C. 2005) ........ 29

*Oceana, Inc. v. Evans*,
389 F. Supp. 2d 4 (D.D.C. 2005) ........ 29

*Pamlico-Tar River Foundation v. U.S. Army Corps of Eng'rs*,
329 F. Supp. 2d 600 (E.D.N.C. 2004) ........ 13, 14

*Pension Benefit Guar. Corp. v. LTV Corp.*,
496 U.S. 633 (1990) ........ 6

*Preserve Endangered Areas v. U.S. Army Corps of Eng'rs*,
87 F.3d 1242 (11th Cir. 1996) ........ 32, 35

*Puma Speaks v. Hodel*,
562 F. Supp. 82 (D. Haw. 1983) ........ 22

*Sierra Club v. U.S. Army Corps of Eng'rs*,
295 F.3d 1209 (11th Cir. 2002) ........ 28

*Sierra Club v. U.S. Army Corps of Eng'rs*,
464 F. Supp. 2d 1171 (M.D. Fla. 2006) ........ 6, 31, 33, 34

*Sierra Club v. Van Antwerp*,
526 F.3d 1353 (11th Cir. 2008) ........ 5

*Sierra Club v. Van Antwerp*,
719 F. Supp. 2d 58 (D.D.C. 2010) .......... 14

*Sylvester v. U.S. Army Corps of Eng'rs*,
882 F.2d 407 (9th Cir. 1989) .......... 7

*Water Works and Sewer Bd. v. U.S. Army Corps of Eng'rs*,
983 F.Supp. 1052 (N.D. Ala. 1997) .......... 17

*Wetlands Action Network v. U.S. Army Corp of Eng'rs*,
222 F.3d 1105 (9th Cir. 2000) .......... 34

**Statutes**

33 U.S.C. § 1344(q) .......... 12

5 U.S.C. § 706(2) .......... 5

**Regulations**

33 C.F.R. § 230.4 .......... 23

33 C.F.R. § 230.6 .......... 18

33 C.F.R. § 230.7 .......... 18

33 C.F.R. § 320.4 .......... 13, 26

33 C.F.R. § 325 .......... 19

33 C.F.R. § 325.1 .......... 19

33 C.F.R. § 325.2 .......... 19

33 C.F.R. § 325.3 .......... 19

33 C.F.R. § 327.4 .......... 16

33 C.F.R. § 332.3 .......... 32

40 C.F.R. § 1501.4 .......... 17, 18, 21

40 C.F.R. § 1506.5 .......... 19

40 C.F.R. § 1507.1 .......... 18

40 C.F.R. § 1507.3 .......... 18

40 C.F.R. § 1508.27 .......... 22

40 C.F.R. § 1508.7 .......... 23

40 C.F.R. § 230.10 .......... 6, 7, 8, 19

40 C.F.R. § 230.93 .......... 32

40 C.F.R. § 404 .......... 12

45 Fed. Reg. 85336 .......... 6, 8
45 Fed. Reg. 85359 .......... 13
74 Fed. Reg. 45353 .......... 29
76 Fed. Reg. 9560 .......... 27

## INTRODUCTION

Plaintiffs challenge the Clean Water Act ("CWA") Section 404 permit ("Permit") issued by the US Army Corps of Engineers ("Corps") to Mosaic Fertilizer, LLC ("Mosaic") to extract phosphate from its South Fort Meade Hardee County Extension site ("SFM-HC"). The Permit for the SFM-HC project ("Project") was issued after years of federal administrative proceedings and many additional years of state and local reviews. It is based on a 250,000+ page Administrative Record ("AR" or "record"), which the Corps thoroughly discussed and analyzed in its 101-page Environmental Assessment and Statement of Findings ("EA"). The Permit restricts mining to only 63% of Mosaic's property, preserving natural conditions on the remaining 37%. It also imposes stringent limitations and requirements, including extensive mitigation and reclamation obligations, and rigorous special conditions to ensure compliance.

Plaintiffs filed this action in June 2010, and this Court entered its Order and Preliminary Injunction on July 30, 2010 (Dkt. 88) (the "Order"). In the Order, the Court ruled that Plaintiffs were not entitled to injunctive relief on their NEPA claim.[1] The Court did, however, enter a preliminary injunction ("Injunction") based on the Environmental Protection Agency's ("EPA") view "that the Corps failed to adequately address the available alternatives." The Eleventh Circuit Court of Appeals vacated the Injunction and set aside the remand of the Permit, holding that the Corps' Permit decision was not given proper deference and the EPA letters did not establish a CWA violation.[2]

---

1 This Court held that "[g]iven the deferential standard of review applied to the Corps' decision, Plaintiffs [] failed to demonstrate a substantial likelihood of success on the merits" on their claim that the Corps' FONSI decision was erroneous. The Court also ruled that "neither the fact that the Corps and EPA have *now* agreed to conduct an [area wide] EIS nor the fact that the Corps prepared a 101 page EA leads the Court to conclude that the Corps erred in making its FONSI finding." Thus, the Court ruled that it would "not require the Corps to rescind the permit until it has completed its [area wide] EIS."

2 *See Norelus v. Denny's, Inc.*, 629 F.3d 1270, 1288 (11th Cir. 2010) (appellate court's factual findings and legal conclusions, whether determined explicitly or by necessary implication, are binding on the district court).

Consequently, the Eleventh Circuit remanded the case to this Court to analyze the full AR "**through the deferential lens mandated by the Administrative Procedure Act to determine whether the Corps came to a rational conclusion**."

There is no doubt, based on the years of thorough analysis reflected in the massive AR, that the Corps' Permit decision was proper. Plaintiffs cannot prevail based on the dispassionate and deferential review of the record required by law, so they attempt to paint a distorted picture of environmental devastation, which will ***never*** occur. But hyperbole cannot satisfy Plaintiffs' heavy burden of proof in this Administrative Procedure Act ("APA") case. Perhaps most surprising is Plaintiffs' continued reliance on the EPA letters. Not only were EPA's views fully considered by the Corps, but revisions were made to Mosaic's mine plan based on them, further minimizing wetland and stream impacts. Further, consistent with the Eleventh Circuit's mandate, relief cannot be afforded under the CWA based on EPA's views alone. Plaintiffs, therefore, attempt to prop up their arguments with isolated documents cherry-picked from the extensive AR in a misguided effort to portray the Corps as having failed to meet its legal obligations. Because the Corps considered those items and thereby discharged its legal obligations, these isolated documents fall far short of carrying Plaintiffs' burden. Finally, Plaintiffs continue to ignore the substantial deference afforded the Corps under binding precedent and, instead, again invite this Court to improperly substitute its judgment for that of the agency. This Court should reject Plaintiffs' second improvident invitation and reach the only conclusion thoroughly supported by the law and the record: the Corps' decision to issue the Permit was neither arbitrary nor capricious. Defendants are therefore entitled to summary judgment.

## STATEMENT OF THE FACTS[3]

### I. PHOSPHATE MINING IN CENTRAL FLORIDA.

Phosphate is essential for plant growth, crop production, and livestock health. It is a limited natural resource for which there is no synthetic substitute. (AR201498).[4] In addition, phosphate mining is critically important to local and regional economies. (AR201504). Accordingly, the Florida Legislature recognizes that "[t]he extraction of phosphate is important to the continued economic well-being of the state and to the needs of the society." (AR201504); See § 378.202, Fla. Stat.

Our country's most important phosphate reserves are located in the Central Florida Phosphate District ("CFPD"), which has been mined since the 1880s. (AR201485; AR201631; AR216916). Since 1975, when the state implemented comprehensive regulations requiring reclamation of mined lands and replacement of disturbed wetlands, phosphate mining has been subject to stringent regulations and scrutiny at the federal, state, and local levels. (AR201485). The Corps has expressly determined that phosphate mining impacts have been reduced and eliminated because of the implementation of "various regulatory programs, proactive initiatives by mine operators, and advancements in mining and reclamation technologies." (AR216927).[5]

### II. THE SOUTH FORT MEADE TRACT.

Mosaic, a leading producer of phosphate-based crop nutrients and animal feed ingredients,

---

[3] A chart showing the documents from the record cited in Mosaic's Cross Motion for Summary Judgment, along with their corresponding AR cites, is set forth in Exh. A.

[4] "The application of phosphorus-containing fertilizers is second only to water and air in terms of plant needs and is responsible for 40 to 60 percent of total United States production" of corn, wheat, soybeans and rice, and is also critical to growing citrus, other fruit, and vegetables. (AR201498).

[5] Plaintiffs' contentions implying otherwise are a mixture of misleading juxtaposition of partial information from studies. For example, the Peace River Cumulative Impact Study ("PRCIS") identifies drawdown of water supply as an issue but concludes that mining accounted historically for less than 5% of that impact. (AR103938-104320). Nevertheless, Plaintiffs imply that mining is the primary cause.

currently operates four mines in Central Florida.[6] (AR201502). The South Fort Meade ("SFM") mine comprises two parcels: 17,232 acres in Polk County ("SFM-PC"); and 10,856 acres at SFM-HC. (AR201456, 201512). The SFM mine includes a beneficiation plant, four draglines, pipeline systems, and supporting infrastructure. (AR201456). Under Mosaic's SFM mine plan, SFM-HC mining was to follow as SFM-PC reserves became depleted. (AR201456-59).

## III. THE CLEAN WATER ACT PERMIT PROCESS.

After more than three years of state and federal pre-application reviews (AR216880), Mosaic submitted its SFM-HC Permit Application in October 2006 ("Application"). *Id.* The Corps published public notice of the Application in May 2007, and subsequently received comments from individuals and groups, including Plaintiffs, each of which was responded to before the Permit issued. (*Id.*).[7] The Corps' review process was exhaustive and included 5 site visits; 35 meetings with Mosaic and regulatory agencies (including EPA); 12 requests for additional information to Mosaic ("RAIs"); 37 public comment letters; 52 submittals from Mosaic; and tens of thousands of pages of studies, analyses, and data on technical environmental issues. (Exh. B). Through this process, the Corps extensively analyzed the environmental issues presented by the Application.

## IV. THE CORPS' DECISION TO ISSUE THE PERMIT.

Based on its thorough analysis, the Corps concluded that while Mosaic's mining activities would necessarily cause "short-term disruption," "successful implementation of the proposed reclamation plan will result in long term benefits through the restoration and preservation of habitat." (AR216910). The Corps also concluded that because of Mosaic's extensive mitigation and

---

[6] In 2007, Mosaic's production accounted for just under one-half of U.S. phosphate production. (AR201502).

[7] While the Application was pending, Mosaic obtained state and local approvals to mine at SFM-HC, including from Hardee County and the Florida Department of Environmental Protection ("FDEP"). (AR201511).

reclamation, there "will be no net loss of wetland functions." (AR216911). In fact, Mosaic's Mitigation Plan (AR197471-201292) will not only avoid environmental impacts, but also will provide long-term environmental benefits for the degraded streams and wetlands at SFM-HC, which have been severely disturbed by over 75 years of agricultural activities. (AR197506-33; AR214486; AR216916).[8] The Corps also concluded that "[t]he public will benefit" from "an uninterrupted source of phosphate," "at competitive prices," and "[i]ndividuals will remain employed in their current positions" at the SFM mine. (AR216914). On these and other bases, the Corps issued a permit to Mosaic to mine 6,877 acres of the 10,000+ acre SFM-HC track (approximately 63%), subject to stringent environmental conditions, including mitigation. (AR214633-75).

## ARGUMENT

The APA's "arbitrary and capricious" standard, which governs this action, provides the "least latitude in finding grounds for reversal." 5 U.S.C. § 706(2). Thus, a court cannot disturb an administrative decision merely because it "is unhappy with the result reached." *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990). Because of this "***exceedingly deferential***" standard, "[t]he court's role is to ensure that the agency came to a rational conclusion, ***not*** to conduct its own investigation and substitute its own judgment for the administrative agency's decision." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (emphasis added). There are sound reasons for this well-established principle of deference. The Corps has been issuing Section 404 permits for almost 40 years. Not only is the Corps expert in its regulatory program, but

8 Of the 534 wetland acres to be disturbed, only approximately 180 acres have a WRAP score greater than 0.6; 328 acres are low quality wetlands with WRAP scores of 0.6 or less, including upland cut ditches (10 acres), cattle ponds (14.5 acres), and wet pasture (51 acres) (AR202107). In addition, the site has no lakes or conservation easements. Post-mining, the property will have conservation easements on 2,633 acres (AR214664), 179 acres of lakes (AR136284), 3,414 acres of contiguous wildlife corridor, and 481 acres of wetlands with WRAP scores of 0.6 or higher (AR216911). In addition, the site has no lakes or conservation easements.

its long experience with permitting phosphate mining gives the Corps special knowledge regarding this industry.[9] *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 651-52 (1990) (agencies charged by Congress with interpreting and enforcing particular statutes have expertise that courts do not). Indeed, particular deference must be given to the Corps' informed decision where, as here, it includes issues of science, technical expertise, or complex environmental statutes. *Sierra Club v. U.S. Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1182 (M.D. Fla. 2006).

## I. THE CORPS COMPLIED WITH THE CWA.

The CWA issue presented is whether the Corps properly selected the least environmentally damaging practicable alternative ("LEDPA"), in compliance with EPA's Section 404(b) Guidelines ("Guidelines"). 40 C.F.R. § 230.10(a). The Guidelines afford flexibility for the exercise of judgment on a case by case basis. 45 Fed. Reg. 85336 (Dec. 24, 1980).[10] LEDPA involves two separate determinations: the selected alternative must be practicable and the least environmentally damaging. There is no question that the Corps conducted a proper LEDPA analysis.

### A. The project purpose was properly defined.

Determining the project purpose is central to the practicable alternatives analysis. *Nat'l Wildlife Federation v. Whistler*, 27 F. 3d 1341, 1345 (8th Cir. 1994). Not only is it permissible for the Corps to consider the applicant's objective, it has a duty to do so. *Fla. Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1243-44 (M.D. Fla. 2008) (noting Corps' obligation to consider project purpose in issuing Section 404 permits); *Louisiana Wildlife Federation v. York*, 761 F. 2d 1044, 1048 (5th Cir. 1985) (same). Here, the Corps rejected Mosaic's proposed project purpose,

---

[9] For example, the Corps identified 20 phosphate mines (and regulatory personnel assigned to them) at a September 2009 project meeting with EPA, demonstrating the agency's broad experience regulating the phosphate industry. (AR178833-178834).

[10] *See also* Corps and EPA 1993 Memorandum: Appropriate Level of Analysis Required For Evaluating Compliance with the Section 404(b)(1) Guidelines for Alternatives Requirements, Section 3.

concluding that it "unduly limited the range of alternatives…" and redefined it as follows:

> …to extract phosphate ore from reserves located within a practicable pumping distance of the existing SFM-PC ore Separation/beneficiation plant and supporting infrastructure in order to continue operation of the SFM-PC separation/beneficiation plant at historical production rates.

(AR216883-216884).

Plaintiffs assert that this definition prohibits all practicable alternatives "other than mining the maximum amount of ore in this site." (Plaintiffs' Motion for Summary Judgment (Dkt. 133) ("PMSJ") at 25). That is patently false. The Corps Permit requires Mosaic to leave ***approximately 37% of the available reserves undisturbed.*** (AR216905-07) (emphasis added). Notably, the Corps considered twelve different alternatives before reaching that conclusion.[11] Plaintiffs' hyperbole and mischaracterization is meritless, where, as here, the Corps established an appropriate project purpose against which to measure alternatives. *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989) (where project purpose is legitimate, Corps must be afforded the deference it is due.)[12]

**B. The Corps thoroughly examined practicable alternatives.**

Plaintiffs would have the Court ignore the definition of LEDPA, which provides that "an alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. §230.10(a)(2). The Corps' practicable alternatives analysis "is not susceptible to numerical precision, but instead requires a balancing of the applicant's needs and environmental concerns." *Fund for Animals, Inc. v.*

[11] The Corps actually considered more than these twelve alternatives through discussions with the EPA, Mosaic, and internally, but concluded that the twelve alternatives were a reasonable, rational number for its analysis. See Exh. B.

[12] Plaintiffs have offered no other plausible "project purpose," given that the Application sought authorization to mine phosphate ore where reserves are located. This is not a situation where an applicant might have a wide range of locations for its enterprise, for example, building a shopping center. Because phosphate is found in limited locations, it is perfectly rational that the project purpose would relate to that area.

*Rice*, 85 F.3d 535, 543 (11th Cir. 1996).

**1. The Corps evaluated seven off-site alternatives.**

To satisfy both NEPA and the Guidelines, the Corps evaluated seven off-site alternatives.[13] (AR216897-904). Three of these would discontinue operation of the SFM beneficiation plant once phosphate reserves were depleted at SFM-PC, including (1) importing phosphate rock from foreign suppliers, (2) mining outside of Central Florida, and (3) constructing new mines or expanding existing ones in Central Florida. (AR201518). Because these alternatives would preclude using the SFM beneficiation plant and, therefore, could not satisfy the project purpose, the Corps reasonably concluded they were impracticable. (AR216898-99). The remaining four alternatives involved possible tracts of land east and west of the Peace River in Polk and Hardee Counties. These alternatives were rejected based on a myriad of factors, including unfairly denying Mosaic the right to utilize its substantial investment in its beneficiation plant, prohibitive transportation costs, environmental concerns (*e.g.*, slurry and dragline crossings over the Peace River), technological constraints, and insufficient reserves. (AR216897-908). The Corps conducted a more searching examination of the 3C Ranch site in Hardee County not owned by Mosaic, but concluded that, even if available, mining it would not have less adverse impact on the environment. (AR216903). Plaintiffs make no claim that the Corps' analysis of these off-site alternatives was flawed.

**2. The Corps evaluated five on-site alternatives.**

The five on-site alternatives the Corps considered encompassed an appropriate mix of wetland and stream avoidance and practicable mining options, clearly satisfying the appropriate range

[13] Where a proposed project is subject to NEPA and the Corps is the permitting agency, the documentation prepared to satisfy NEPA's requirements generally provides the information necessary for evaluating alternatives under the CWA guidelines. 40 C.F.R. § 230.10(a)(4), (5) (2005); 45 Fed. Reg. 85336, 85340 (Dec. 24, 1980).

for determining LEDPA. *See Fla. Clean Action Network,* 587 F. Supp. 2d at 1248-49 (Corps was not required to consider existing alternatives that do not meet the legitimate components of the overall project purpose). Of the five on-site alternatives the Corps evaluated, three were determined not to be "practicable" because of increased costs, logistical constraints, environmental impacts, and significant loss of mineable reserves.[14] (AR216904-06). The remaining two alternatives were found to be practicable. *Id.*

**No Action Alternative.** The Corps determined that this upland only alternative was not practicable because it would limit mining to 1,033 acres, leaving 46 million tons of phosphate reserves unmined and mining would end after two years. (AR216905-06). In addition, it would have detrimental socioeconomic impacts. (AR201560).

**Crossing Only Modified No Action Alternative.** This alternative involved crossing (*i.e.*, impacting) jurisdictional areas to access adjacent uplands for mining. The Corps determined that this 4,064 acre mining footprint would not provide for sufficient clay settling areas and allowed recovery of only 31% of the phosphate at SFM-HC. (AR201561; AR216905-06).

**EPA's 2007 Alternative.** At EPA's suggestion, the Corps considered a mine plan that would avoid all wetlands adjacent to and tributaries contributing to the Peace River. While avoiding stream segments totaling 57,799 linear feet, this alternative would have required two additional stream crossings. (AR201557; AR216905-06). The Corps concluded that this alternative would not result in "discernable benefits to the aquatic environment"" and would be "impracticable" because the avoidance would "restrict Mosaic's ability to . . . store the clay" and, thus, "reduces the mineable area

---

[14] Plaintiffs cannot change the record with their hyperbole about whether Mosaic makes a profit. (PMSJ at 21). *York*, 761 F.2d at 1047-1048 (rejecting environmental organizations' claim the Corps improperly granted permit by interpreting "practicable alternative" to mean "profit maximizing alternative" where there was no record evidence to support their argument).

to the point that the project purpose could not be fulfilled."[15] (AR136698-703; AR161207-10). Implementation would also require at least an additional 22 miles of a ditch and berm system at significantly increased costs. Moreover, the "benefits provided to the downstream aquatic ecosystem by properly functioning headwater streams would not be realized."[16] (AR178226; AR201557; AR216905-06).

**Mosaic's Preferred Alternative.** Mosaic's Preferred Alternative described in the Memorandum for Record-Revision 1 ("MFR-1") proposed to mine approximately 6,938 acres at SFM-HC, including 560 acres of wetlands and 60,430 linear feet of streams. (AR178220; AR196538). This alternative would largely avoid disturbance of the high quality remnant natural systems and would disturb primarily wetlands that have been severely degraded by agriculture. (AR178187-204).

**EPA's 2010 Alternative**.[17] In September 2009, the Corps held a three-day meeting involving EPA and Mosaic to review permitting issues in detail. (AR178818-78). Subsequently, on January 15, 2010, EPA suggested another on-site alternative, requesting that "the bayhead swamp that is directly connected to the mainstem of the Peace River's floodplain and where mining occurs closest to the floodplain be avoided," that one "stream crossing ... be eliminated," and that "all impacts to [the] Lake Dale stream be avoided." (AR196668-70). Based on EPA's concerns, Mosaic developed a revised alternative that avoided and protected the bay swamp and avoided an additional

---

[15] Mining would be restricted to fewer than 3400 acres, leaving nearly 29 million tons unmined. (AR178226-27).

[16] Plaintiffs ignore the fact that avoiding all stream segments would preserve numerous severely eroded channels, which are no longer connected to historical floodplains. Thus, erosional deposition of sediment into the Peace River and Little Charlie Creek flood plains would continue. (AR201557-58).

[17] This alternative, although not precisely what EPA suggested, is referenced as the EPA 2010 Alternative because it was developed to address concerns EPA raised in 2010.

stream crossing, such that all bayhead communities adjacent to the Peace River would be avoided and protected. (AR201559-60). The alternative removed an additional 65.5 acres from mining, causing the "loss of 508,000 short tons of product." (AR201560).

### 3. The Corps selected the EPA's 2010 alternative as LEDPA.

The Corps concluded that the EPA 2010 Alternative, and the associated mitigation, "would be the least environmentally damaging practicable alternative." (AR216907). Its decision was reached after "appropriate and practicable" steps were taken to minimize the potential adverse wetland impacts. *Fund for Animals*, 85 F.3d at 544. Ultimately these efforts resulted in ***preserving over 70% of all bay systems and avoiding 68% of streams on SFM-HC***.[18]

## C. EPA's concerns were clearly considered.

Plaintiffs continue to urge this Court to find that the Corps' actions were arbitrary and capricious based almost entirely on non-binding comments by EPA. EPA, however, is not the decision maker and its comments do ***not*** merit special weight or deference when reviewing the Corps' decision. *Bering Strait Citizens v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 957 (9th Cir. 2008) (fact that EPA disagreed with Corps' mitigation assessment does not create a substantial issue requiring an EIS); *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1275 (10th Cir. 2004) (EPA concerns about project's impact did not obligate Corps to conduct an EIS). Rather, the Corps "*is* ***solely responsible*** for making final permit decisions," including final determinations of compliance with the Corps' permit regulations and the Guidelines.[19] (Emphasis added).

---

[18] Plaintiffs falsely assert that this alternative increased the amount of wetlands disturbed (PMSJ at 15), when, instead, they were reduced from 560 to 534 acres. (AR178220; AR201512-13; AR202107). The 498 acres is based on older surveys and appears only in documents prior to the MFR-1, which did not reflect updates to jurisdictional determination lines.

[19] Under the Corps and EPA's Memorandum of Agreement, the EPA "may provide comments to the Corps identifying its views regarding compliance" with CWA guidelines, which the Corps must fully consider." 33

Accordingly, the Eleventh Circuit has made it clear that while the EPA letters "***may*** prove helpful in evaluating the ultimate merits of the Clean Water Act claim," "the full record [must] be analyzed through the deferential lens mandated by the Administrative Procedure Act to determine whether the Corps came to a rational conclusion." (Opinion at 3) (emphasis added.) Nevertheless, Plaintiffs continue to base their case on EPA comments and futilely devote approximately ***nine pages*** of their brief to them (PMSJ at 8-11, 16-20). At the same time, Plaintiffs fail to acknowledge that the AR establishes that EPA participated in the process and that its concerns were fully considered, including its requests for minimization and different iterations of the mine plan.[20] *Cal. Trout v. Schaefer*, 58 F.3d 469, 475 (9th Cir. 1995) ("the Corps considered [EPA's] initial concerns, addressed them, and explained why it found them unpersuasive"). EPA could have elevated the matter, but did not.[21]

**D. The Corps properly considered cost in its practicable alternatives analysis.**

**1. The Corps selected appropriate cost metrics, relevant to the proposed project, in performing its alternatives analysis.**

The role of "costs" in conducting the practicable alternatives analysis is expressly addressed in the regulatory history of the Guidelines. Although the draft Guidelines used the word "economic," EPA purposefully chose to delete that word when it promulgated the final Guidelines in 1980. In the preamble to the final regulations, EPA explained that it was replacing the word "economic" from the

---

U.S.C. § 1344(q); Memorandum of Agreement Between Envtl. Prot. Agency and Dep't of the Army. *See* http://www.epa. gov/wetlands/regs/dispmoa.html#5 (Aug. 11, 1992). That is exactly what was done here.

20 Distilled to its core, Plaintiffs argue that, based on EPA's concerns, the Corps failed to consider enough iterations of Mosaic's mining footprint. (AR196670). But, if mining only 4,064 acres is not practicable, other iterations with more avoidance and less mineable reserves clearly would not be practicable either. The Corps is not required to engage in a futile exercise to comply with the required LEPDA analysis.

21 EPA can, in fact, elevate matters if it chooses to do so and Plaintiffs' contention that the EPA rarely does so is disingenuous. EPA had two administrative mechanisms by which it could have elevated the issues. First, EPA—as noted by Plaintiffs—could have exercised its veto powers, which it rarely does. Second, EPA could have elevated the issue under 40 C.F.R. § 404(q) 1992 Memorandum of Agreement between the two agencies if EPA believed that the project would "result in unacceptable adverse effects to aquatic resources of national importance." *See* (http:// www.epa.gov/owow/wetlands/regs/dispmoa.html). EPA did not exercise its rights under either mechanism.

proposed definition of "practicable" with the word "cost," specifically so that the practicable alternatives test would avoid delving into financial standing or private investment. 45 Fed. Reg. 85359, 85339 (Dec. 24, 1980); *see also* 33 C.F.R. § 320.4(q) (this is consistent with the Corps' regulations, which specifically require it to defer to an applicant's private investment decisions).[22] EPA specified that an alternative is not practicable if it is "unreasonably expensive to the applicant." *Id.* at 85343.

Here, because phosphate mining can only occur where reserves exist, the Corps identified the relevant metrics for practicability of alternatives to relate not to Mosaic's profit, but to the costs of extracting phosphate, including (1) Mosaic's $325 million investment in the SFM beneficiation plant, and (2) the cost of failing to recover sufficient phosphate ore to allow the plant to operate at historic rates.[23] (AR 216883-84). These are rational, appropriate metrics for the practicable alternatives standard. *See Pamlico-Tar River Foundation v. U.S. Army Corps of Eng'rs,* 329 F. Supp. 2d 600, 614-15 (E.D.N.C. 2004) (§ 404 permit for phosphate mining activities upheld as LEDPA to allow applicant to "use its phosphate reserves, and the resources acquired to mine those reserves, in a cost effective manner.").[24]

---

22 Respecting private sector economic decisions is fundamental to the Corps' regulatory program. 33 C.F.R. § 320.4(q) (when private enterprise applies for a permit, it will generally be assumed that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place).

23 The Corps also considered other costs, including those associated with increased rail and truck transportation, retrofitting of facilities, additional equipment inventory, and costs to acquire property. (AR216899-901).

24 The court also held that the Corps' less-detailed discussion of a particular alternative was adequate given its conclusion that the alternative was "unreasonably expensive" due to a longer pumping distance, lower quality of ore, highway access issues, and increased impacts to nearby properties. *Id.* at 613 (costs associated with rejected alternative estimated to be $444.4 million more than the proposed action and $354 million more than the alternative ultimately selected for the permit); *see also Conservation Law Found. v. Fed. Energy Reg. Commission*, 216 F.3d 41, 46 (D.C. Cir. 2000) (FERC appropriately considered costs of alternatives with increased environmental protection).

Plaintiffs' reliance on *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 58 (D.D.C. 2010) is misplaced. (PMSJ at 22). It does not require the Corps to look to a project's "rate of return." Rather, "rate of return" was considered as a feasibility (not cost) figure to determine whether the proposed project would be able to obtain the financing required to proceed.[25] *Id.* at 69-70. The decision does ***not*** stand for the proposition that "rate of return" is a mandatory or even suitable way of measuring "cost."

**2. The Corps conducted a through analysis of costs relevant to LEDPA.**

To question the Corps' approach in evaluating costs, Plaintiffs selectively rely on a May 2010 memorandum written by EPA's National Center on Environmental Economics ("NCEE"). (Addendum to AR, Dkt. 131-1). This NCEE memo was first delivered to the Corps as an attachment to EPA's June 8, 2010 letter, advising the Corps that EPA did ***not*** intend to pursue further reviews of its concerns. (AR217970-72). After more than three years of review, the NCEE memo marked the first time that EPA raised ***any*** questions regarding the Corps' review of costs.[26] Thus, it is not surprising that the Corps did not expressly mention this late arriving June 8, 2010 EPA "sign off" letter in its EA, particularly since the Corps' approach to "costs" was legally correct.

Not only was the NCEE memo delivered at the eleventh hour, but it reveals that its authors were unfamiliar with or ignored the AR.[27] The record establishes that the Corps carefully considered

---

[25] In *Van Antwerp*, the applicant claimed that it could not obtain financing for the proposed project unless it could demonstrate to investors that it would obtain at least an 8% rate of return. Thus, rate of return was a suitable metric there because it acted as a threshold for costs from the project proponent's perspective.

[26] The memo provided supplemental EPA comments on Mosaic's March 10, 2010 letter to EPA responding to EPA's January 15, 2010 letter, enclosing MFR2, on which NCEE also commented. Basically, this was an after-thought "quickie review" from an EPA office that was largely uninvolved in the multi-year SFM-HC permit review process. Certainly, had EPA felt the NCEE issues were significant, it could have raised them in a more timely and thorough manner.

[27] The NCEE has publicly acknowledged that the "cost" element of the practicable alternatives regulation does **not** require an economic analysis, and has argued that the regulation should be amended to include this requirement. At an EPA-sponsored Conference on the State of the Science of Phosphate Mining, March 29,

the costs associated with the Project and its alternatives, including the completion and analysis of several economic impact studies.[28] Relying on the NCEE report, Plaintiffs allege that the Corps' alternatives analysis was deficient because Mosaic failed to provide "an empirical demonstration that such an approach would be economically impracticable." (PMSJ at 21). Not only is this not the legal standard, Plaintiffs grossly mischaracterize the AR. In ruling out alternatives as impracticable, the Corps identifies sections of the MFR2 containing detailed discussions of the rationale. (AR216898-99; AR201541-44). Certainly, each item in the voluminous AR did not need to be restated in the EA itself. *See Skinner*, 903 F.2d at 1543. Logistical challenges discussed in detail include the need for additional dragline and slurry pipeline crossings of the Peace River and regulatory hurdles associated with mining on state-owned lands. (AR201541).[29]

Plaintiffs' other assertions also have no merit. First, Plaintiffs claim that the Corps' rejection of other phosphate sources (including importation) failed to consider their impact on Mosaic's revenue or profit again confuses the regulations' requirement to consider "costs" with Plaintiffs' desire for a broader economic analysis. (PMSJ at 19). The Corps reasonably rejected these alternatives as impracticable because they would not allow Mosaic to utilize its $325 million beneficiation plant and would not meet the project purpose. (AR216884).[30] Second, Plaintiffs

---

2010, the authors of the NCEE memo did a presentation recognizing that the "current interpretation" of "practicable" was to consider cost, not economics. *See* http://www.chnep.org/Events/EPA_phosphate/PhosphateMining2011.asp (containing presentation).

[28] *See, e.g.*, (AR135502-41; AR178131-345; AR201521; AR202726-54; AR202757; AR214349-63; AR214406-13).

[29] Some of these logistical hurdles would likely make certain alternatives not only impracticable but impossible, *e.g.*, where the ore was not sufficiently thick or where Mosaic could not acquire rights to use the necessary land from its owners. (AR201539-45).

[30] In determining what constitutes a practicable pumping distance, the Corps accounted for Mosaic's interest in continuing to use its beneficiation plant which required a $325 million capital investment (AR216884), and it permissibly excluded alternatives outside of a 10-mile radius because the Corps concluded that pumping phosphate matrix, clays, and sand tailings in a slurry pipeline more than 10 miles would increase capital,

question the Corps' conclusion that alternatives requiring slurry to be pumped more than 10 miles to the beneficiation plant would be impracticable. (PMSJ at 18, 28). However, the record shows that significant operational hurdles associated with downtime for multiple pumps meant that pipelines beyond 10 miles would generally have less than 54% availability. (AR201537-39).[31] Finally, NCEE's criticism of the failure to address "revenue brought in by the additional mining outside the 10 mile boundary as a result of these costs" (AR217972) misses the point completely. Alternatives that would have required mining more than 10 miles from the SFM beneficiation plant were evaluated to ***avoid*** mining closer to the plant, and would, therefore, have shifted—not expanded—the mining area. Accordingly, the mineable reserves and associated revenue would not increase as the distance from the plant increased. Plaintiffs are simply wrong on the law and the facts.

## II. THE CORPS MET ALL REQUIREMENTS FOR PUBLIC PARTICIPATION.

### A. No public hearing was required on the Permit application.

When the Corps reasonably determines that it has sufficient information to reach a decision, it can decline to hold a hearing. *Fund for Animals*, 85 F.3d at 545 ("The applicable regulations provide the Corps discretion to hold hearings on permit applications on an 'as needed' basis. If the Corps determines that it has the information necessary . . . and that there is 'no valid interest to be served by a hearing,' the Corps has the discretion not to hold one."); 33 C.F.R. § 327.4(b). Here, the Corps

---

operating, and power costs to such a significant degree that the project would be impracticable. (AR201537-39). The yearly power cost for a ten-mile pumping system is approximately $7.2 million. (AR201538). The pipeline system's power costs increase as does its distance and number of pumps. See (AR201538-39). In addition to the increased power costs, significant expenditures are required for the pumps themselves and associated electrical gear, totaling approximately $1 million per pump. These costs are compounded by those associated with set-up, pipelines, and maintenance required to keep the system pumping from greater distances. (AR201538-39.)

[31] NCEE and Plaintiffs dismiss the explanation for the 10-mile practicability limitation contained in MFR2 § 2.3.1 as "just a list of costs." (PMSJ at 28; Addendum to AR, Dkt. 131-1 at 5). The record however, shows Mosaic (1) provides estimates of equipment costs and annual power costs associated with pipelines greater than 10 miles (AR201537-39); and (2) provides a thorough discussion explaining the decreasing system availability as additional pumps are added to the pipeline system. (AR201538).

issued a detailed public notice at the outset of this process, and numerous persons and groups submitted comments. (AR031616; AR162025). The Corps determined after a full record review over a 3½ year period, which included more than 34 meetings and consideration of all comments received, that no valid interest would be served by holding a public hearing. (AR216893-96; AR216907-16; AR216973-75; Exh. B). Such consideration through non-pubic meetings and information collection demonstrates the Corps' decision not to hold a pubic meeting was rational.[32] Whenever the Corps decides that a hearing need not be held, the result is always that some members of the public will not be heard, but that alone is not a reason to hold a hearing. Thus, Plaintiffs' "straw man" arguments (PMSJ at 33-34) about who ***might*** have spoken at a hearing are irrelevant. Moreover, given Plaintiffs' reliance on EPA comments—which were repeatedly addressed by the Corps in the AR—Plaintiffs cannot credibly complain that the Corps was unaware of those concerns.

Recognizing "the Corps' considerable discretion in this area," this Court did not decide Plaintiffs' public hearing claim at the Preliminary Injunction stage. (Order at 18). Now, based on the complete AR, it is clear that the Corps' determination is rational, supported in fact, and should be upheld.

### B. The EA/FONSI did not require public notice

Plaintiffs' argument that the Corps was required to provide public notice and a 30-day opportunity for comment on its EA and FONSI misconstrues 40 C.F.R. § 1501.4(e)(2). That regulation suggests ***limited*** circumstances, not present here, where an agency ***may*** establish

---

[32] *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 997 (9th Cir. 1993) (no public hearing required where Corps "was aware of strong support on both sides" and had made a "thorough analysis of all the relevant factors."); *Water Works and Sewer Bd. v. U.S. Army Corps of Eng'rs*, 983 F.Supp. 1052, 1061 (N.D. Ala. 1997) ("[T]he Corps, within its appropriate range of discretion, determined that the problems were adequately presented and did not require public hearing for additional statement and clarification); *Conservation Law Found. v. Fed. Highway Admin*. 827 F. Supp. 871, 888 (D.R.I. 1993) (no abuse of discretion where Corps held informal meetings).

procedures making a FONSI available for public review for 30 days.[33] Subsection e(2)(i) does not apply because the SFM-HC permit action is not "closely similar" to Corps' actions normally requiring an EIS. To the contrary, the Corps' NEPA procedures identify actions normally requiring an EIS and those normally requiring an EA, specifying, "[m]ost permits will normally require only an EA." 33 C.F.R. § 230.7(a). Thus, this permit action was not similar to actions that normally require an EIS. *See* 33 C.F.R. § 230.6 (listing actions normally requiring an EIS). That some permit decisions have an EIS does not change the fact that the regulations expressly provide that permits are normally processed with an EA.[34]

The CEQ regulations allow the agency to decide, in its NEPA procedures, which actions normally do or do not require an EIS. The "limited circumstances" exception for making a FONSI available for public comment is directly governed by those agency NEPA regulations. This is consistent with the fact that the CEQ regulations authorize agencies to develop their own NEPA implementing procedures, subject to CEQ review and approval, and expressly "allow each agency flexibility in adapting its implementing procedures." 40 C.F.R. § 1507.1. Only a few CEQ requirements must be included in agency NEPA procedures, and the "30 day notice" provision for a FONSI is optional. *See* 40 C.F.R. § 1507.3(b)(1). Plaintiffs' assertion that the Corps should have

---

[33] Those limited circumstances are (i) the proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or (ii) the nature of the proposed action is one without precedent. 40 C.F.R. § 1501.4(e).

[34] Plaintiffs' reliance on *Citizens Advisory Comm. v. U.S. Dept. of Justice*, 197 F. Supp. 2d 226 (W.D. Pa. 2001) is misplaced. (PMSJ at 35). There, the Bureau of Prisons' NEPA regulations stated that construction of new facilities was a project type that normally required an EIS. The government tried to defend its failure to publish notice of its FONSI by arguing that the action at issue did not fall under that regulation, which the Court rejected. *Id*. at 246-47. No such facts are present here.

offered the FONSI for a 30-day period of public comment is completely meritless.[35] The Corps acted in accordance with its regulations and, therefore, its action should be upheld.

## III. THE CORPS COMPLIED WITH NEPA.

NEPA requires the Corps to take a hard look at the whether the proposed project will "significantly" affect the environment. *Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 431 (8th Cir. 2004); *C.A.R.E. Now, Inc. v. Fed. Aviation Admin.*, 844 F.2d 1569. 1572 (11th Cir. 1988). An agency meets its "hard look" requirement if it has "examined the relevant data and articulated a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Murray Energy Corp. v. FERC*, 629 F.3d 231, 235 (D.C. Cir. 2011) (citations omitted). That is exactly what the Corps did here when it conducted an in-depth review of possible impacts to wetlands, streams, and wildlife, and detailed its findings in the EA.

### A. The Corps independently evaluated all record information.

NEPA regulations require agencies to independently evaluate information submitted by an applicant and to be responsible for its accuracy. 40 C.F.R. § 1506.5(a); 33 C.F.R. Part 325, Appendix B, Sec. 8(f). The applicant has the primary burden of providing sufficient information for its application. 33 C.F.R. § 325.1(d), (e); 40 C.F.R. § 230.10(a). If the Corps believes that it needs additional information, then "the applicant will be given the opportunity" to provide it. 33 C.F.R. § 325.2(a)(3). "An EA may be based entirely upon information supplied by the applicant." *Friends of Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986) (upholding Corps' independent review of applicant's information where it made multiple requests for additional reports from applicant, consulted regulatory agencies, and analyzed information). *Id.* at 834-35. Consequently, it is no

[35] While Plaintiffs complain in passing that the Corps issued the Permit without providing public notice, they offer no legal argument to support their claim. (PMSJ at 12). Of course, the only public notice the Corps must give is on the permit application, not on its permit decision. *See* 33 C.F.R. § 325.3.

surprise and certainly no error that the record contains substantial information provided by Mosaic.

The Corps has the discretion to decide how it will use its substantial expertise in phosphate mine permitting to independently verify an applicant's information. Here, the Corps examined Mosaic's information through multiple RAIs, meetings, site visits, and other conferences.[36] (Exh. B). *Id.* at 835. The AR and the Corps' affirmative declarations make it clear that the Corps independently assessed Mosaic's information.[37] Nowhere do Plaintiffs demonstrate that Mosaic's information was wrong, invalid, or otherwise unreliable.

Plaintiffs' claim that the Corps failed to independently review six specified issues is untenable. The only contention that warrants more discussion (because it is not otherwise addressed in this Motion) is their assertion regarding overall (positive) socioeconomics effects.[38] The AR, however, shows a thorough evaluation of these effects. Apparently, neither NCEE nor Plaintiffs closely reviewed the ECONorthwest analysis, which was specifically calibrated to socioeconomic effects for Hardee County. (AR213793-832).[39] Instead, Plaintiffs rely on one paragraph of the NCEE

---

[36] *See, e.g.,* (AR216880-83) (listing documents independently reviewed by Corps); (AR216883-84) (independent review of project purpose and need, including data concerning proximity to beneficiation plant); (AR216897) (same); (AR216907) (independent "verification of information provided by the Applicant" for 404(b) assessment). The text accompanying these sections of the EA demonstrate the Corps' independent evaluation.

[37] The EA alone identifies 49 documents and 27 informational graphics—many of which contain thousands of pages of information—as "among those considered, reviewed, and independently evaluated." (AR216880-979).

[38] *See* Mosaic's Brief at I(B), *supra*; (addressing Corps' extensive independent review of onsite alternatives); Mosaic's Brief at I(D), *supra* (addressing Corps independent review of information about cost and impacts of mining more than 10 miles from beneficiation plant); Mosaic's Brief at I(D), *supra*; (demonstrating that Plaintiffs' claim that there was insufficient verification related to "economic feasibility" is meritless because they apply the wrong legal standard); *see* Mosaic's Brief at III(B)(2)(b)(ii) (demonstrating that the Corps' independently verified record regarding Peace River impacts). In addition, Plaintiffs' claim that the Corps did not verify the explanation that ditch and berm systems, if longer and more complex, will cost more is meritless. Numerical proof is not required. Finally, there was not insufficient detail regarding offsite alternatives, including their costs. The text cited by Plaintiffs describes comparative costs, which need not be presented to the dollar. (AR201523-30).

[39] The AR reflects review and evaluation of this ECONorthwest Report to assure its accuracy. (AR202726-54; AR201521; AR202755).

memo, which suggested that other economists might disagree with this information. (PMSJ at 29).[40] Not only does this Court have no way to evaluate this claim,[41] but the argument presents a classic "battle of the experts," in which the Court must defer to the agency's rational decision. *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.").

### B. The Corps' decision not to prepare an environmental impact statement was neither arbitrary nor capricious.

#### 1. NEPA does not require preparation of an EIS in all circumstances.

The law is settled that an agency can meet all of its NEPA duties with an EA. An agency can use its EA to reach one of two conclusions: (1) the project requires an EIS; or (2) the project will have no significant impact on the environment, so no EIS is required. *Hill v. Boy*, 144 F. 3d 1446, 1450 (11th Cir. 1998). In the second instance, the agency must issue a finding of no significant impact ("FONSI") explaining its decision. 40 C.F.R. § 1501.4(e); 1508.13. Agencies enjoy broad discretion in determining the significance of potential environmental impacts. *Skinner*, 903 F.2d at 1538. Thus, an EA is a "gateway analysis" to allow an agency to review environmental impacts and decide, with consideration of mitigation, if they will be significant.

#### 2. The Corps complied with the CEQ regulations.

The CEQ regulations list ten considerations that agencies should take into account when

---

[40] The state-wide jobs figure that NCEE claims is the result of "opaque transfers of multipliers from a more general application" and not tailored specifically to Hardee County was intended to be a separate economic projection. Mosaic provided the Corps with University of Florida data to account for the fact that the ECONorthwest's Hardee County study did not include economic benefits outside of Hardee County.

[41] The NCEE memo referenced unspecified work by Richard Weisskoff of the University of Miami that allegedly evaluated economic benefits in a manner different from what NCEE reviewed. (AR217971). This analysis was not attached to the NCEE Memo - and there is no evidence that the Corps ever saw it. The document provided in Plaintiffs' Exhibit A is extra-record material that should be stricken. (Dkt. 134, at fn. 2; Dkt. 138); *see also* Federal Defendants' Motion to Strike (Dkt. 138) and Mosaic's Joinder (Dkt. 139).

taking a "hard look" at whether a project will have "significant environmental impacts." *Heartwood*, 380 F.3d at 431; 40 C.F.R. § 1508.27. These factors, however, do not constitute categorical rules that alone determine whether the impact is significant. *Coliseum Square Assoc., Inc. v. Jackson*, 465 F.3d 215, 233 (5th Cir. 2006). Thus, all that must be demonstrated is that the factors were in some way addressed and evaluated by the agency; whether this is done in factor-by-factor fashion is irrelevant. *Id.* at 233-34.

Plaintiffs' claim that the Corps did not comply with this directive is disingenuous. First, Plaintiffs claim that a finding of significance under one of the CEQ factors mandates an EIS is wrong. (PMSJ at 37); *Puma Speaks v. Hodel*, 562 F. Supp. 82, 85 (D. Haw. 1983) (CEQ factors standing alone do not mandate an EIS). The key inquiry is how the Corps evaluated the factors and whether its decision, on the record and considering mitigation, is well reasoned and rational. Second, Plaintiffs ignore the fact that otherwise significant impacts can be reduced to insignificance with mitigation. *C.A.R.E. Now*, 844 F.2d at 1575 (when mitigation compensates for otherwise adverse environmental impacts, the significance threshold is not reached); *see CEQ Guidance, Mitigation*.[42] Instead, all Plaintiffs have done is "cherry pick" documents from this massive 250,000+ page AR that express different opinions regarding environmental impacts. That, however, does not render the Corps' decision arbitrary and capricious. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) ("Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that the project is highly controversial or highly uncertain").

---

[42] http://ep.hss.doe.gov/currentdevelopments/docs/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf.

**(a) The fact that Project is in close proximity to wetlands and other ecologically important areas does not require an EIS.**

Proximity to wetlands is plainly insufficient to establish significance: otherwise, ***all*** projects requiring Section 404 permits would automatically require an EIS, which clearly is not the law. *See*, 33 C.F.R. § 230.4(d). Moreover, the Corps not only considered the environmental effects of the Project on the wetlands, streams, and Peace River, but that was its primary focus throughout the permitting process, in addition to stringent permit terms designed to protect and mitigate these resources. Therefore, Plaintiffs' assertion that "[a]n EIS should have been prepared" simply "because the project site has 'unique characteristics . . . such as proximity to . . . wetlands . . . or ecologically critical areas'" is baseless. (PMSJ at 37-38).

**(b) The Corps properly analyzed cumulative impacts**.

A cumulative impact is the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. Determining whether cumulative impacts are "reasonably foreseeable" is the Corps' province, and courts "see no reason to second guess their judgment." *Arkansas Wildlife v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1102 (8th Cir. 2005). That, however, is exactly what Plaintiffs request of this Court: to second guess the Corps' judgment and reach a different conclusion based on Plaintiffs' unsupported assertion that the record is "replete" with "severe cumulative impacts of phosphate mining." (PMSJ at 40).[43] Plaintiffs' argument is nothing more than a disingenuous effort to select a few documents from the AR to assert that the Corps did not take a "hard look" at cumulative impacts.

[43] For example, Plaintiffs disingenuously warn that the EA describes "devastating impacts of past phosphate mining and other causes on the Peace River Watershed." PMSJ at 38. In fact, the EA actually states that these impacts "may be, ***at least in part***, attributable to phosphate mining." (AR216926). (emphasis added).

#### (i) The Corps considered the Project's relationship to other actions in assessing cumulative impacts.

SFM-HC is located in the Peace River basin, which contributes freshwater flow to Charlotte Harbor. (AR201483). Agricultural activities have been ongoing since the 1940s and are the principal land use. In fact, nearly 50% of the basin is in agriculture use, 30% is undeveloped, and 10% is urban or built-up land. (AR216917). Phosphate mining, which has been ongoing since the 1880s, accounts for only 10% of the land use. In examining the cumulative effects of mining, the Corps evaluated the entire 1,198,165 acre Peace River Basin using a more than 50 year period from 1977 to 2028. (AR216916-17). The Corps selected those years because the CWA phase III regulations became effective in 1977, and all mitigation and reclamation for SFM-HC will be completed by 2028.[44] (AR216917).

The Corps took a "hard look" at potential cumulative impacts by considering and evaluating extensive research, published materials, and data. (*See* Exh. C). All resources that could potentially be affected were evaluated, with an emphasis on water quality, hydrology, and fish and wildlife habitat.[45] (*See id.*) The Corps identified past actions on lands other than phosphate mines, past actions on former mines, currently operating mines, and reasonably foreseeable future developments, including proposed phosphate mines. (AR216918-216925). It also examined the affected environment, including the total acreage within the Peace River basin that had been mined but not reclaimed, that had been reclaimed, or that was being actively mined. (AR216925-930). This extensive evidence was evaluated considering the present, past, and future uses in the basin. The Corps also used a

---

[44] Plaintiffs' claim that the Corps erred in excluding four of six phosphate mines from its cumulative impact analysis because no mining is scheduled for those four mines until 2028 has no credence. (PMSJ at 40). Because all mitigation and reclamation for the SFM-HC will be completed by 2028, there was no reason for those four mines to be included in the cumulative impact analysis.

[45] Other resources included air quality, water supply, cultural and historical resources, socioeconomic resources, public safety, and energy needs. (AR216918).

significance threshold to determine that the cumulative and secondary impacts of the Project are not significant. (AR216938-39). After this comprehensive analysis, the Corp determined that cumulative impacts did not reach a "significance threshold." (AR216916-39). Plaintiffs have offered no information that the Corps failed to consider and, thus, cannot credibly challenge the Corps' rational cumulative impacts analysis.

**(ii) The Corps properly considered water quality issues in analyzing cumulative impacts.**

The Corps thoroughly evaluated water quality issues before it issued the Permit, including the hydrology of the site both before and after mining, and including information relied on by Plaintiffs. (AR216928; AR216931-33). This includes the 2007 PRCIS, which concludes that current mining practices do ***not*** impact water quality or quantity. (AR103938-104320). In addition, the Corps specifically noted the comprehensive water quality restoration programs currently in place for the upper Peace River Basin and found that they "can reasonably be expected to mitigate the historical water quality impacts." (AR216928). Moreover, the Corps considered water flows in the Peace River, and found that mining at SFM-HC would not impact water quantity in river or downstream to Charlotte Harbor. (AR201577-79; AR201634-35; AR216932).

Water quality issues for this Project were also fully vetted by the Florida Department of Environmental Protection and then again in a state administrative proceeding in which there was an express finding by the Administrative Law Judge ("ALJ") ***that mining the SFM-HC would not negatively impact the water quality in the Peace River Basin***. (AR135816-17).[46] The Final Order

[46] Douglas Durbin, a highly-respected ecologist, presented evidence accepted by the ALJ that water quality on the site will not be adversely affected and, in light of existing agricultural activities, will be maintained or improved both during mining and post-reclamation. (AR201604-07). In fact, Dr. Durbin evaluated water quality data from SFM-PC and compared data from the 10-year pre-mining to the 10-year post-mining period-finding water quality to be equivalent ***or better*** after mining began in Polk County. (AR135816-17).

from this proceeding was affirmed by Florida's Second District Court of Appeal. (AR201604-07). No significant impacts to water quality or quantity were identified in the modeling analysis determined by the Corps. (AR216931-34). All of this information was provided to, and considered by, the Corps in evaluating cumulative impacts. (AR216916-40)

Plaintiffs assert that this analysis was "inadequate" because it relied on the FDEP's issuance of the state Environmental Resource Permit ("ERP"). (AR135992-136621; PMSJ at 40). Their contention is baseless. The ERP constitutes the water quality certification required under CWA Section 401 and provides assurances that the proposed mining operations will not violate state water quality standards approved by EPA. This certification is entitled to substantial deference under the Corps' regulations. 33 C.F.R. § 320.4(d). According to Plaintiffs, because "cumulative impacts" were not considered in the state ERP, the Corps' reliance on the certification renders its entire cumulative impacts analysis flawed.[47] Plaintiffs are wrong. (PMSJ at 40-41.) Here, the Corps did not solely rely on certification, but independently evaluated cumulative impacts. No more is required.

**(iii) The Corps' decision to prepare an area-wide EIS has no bearing on the cumulative impacts of this Project.**

Plaintiffs' assertions about the future area-wide EIS (PMSJ at 41-42) simply regurgitate arguments previously made before and rejected by this Court.[48] There is no reason for this Court to find differently now that it has the benefit of a complete AR containing even more supporting information than the partial AR on which the Order was based. The Corps will be considering several new (different) phosphate mining permits together in the planned "area wide" EIS, which will

---

47 Plaintiffs fail to acknowledge that cumulative impacts are not considered when FDEP determines that mitigation is adequate. (AR044999). ("Unmitigated, the proposed activities would require the analysis of adverse cumulative impacts; however, the proposed mitigation is in the Peace River basin, so, if DEP deems the mitigation adequate, cumulative impacts are irrelevant by statute.").

48 "[T]he fact that the Corps and EPA have *now* agreed to conduct an EIS on the cumulative impacts of phosphate mining . . . [does not] lead[] the Court to conclude the Corps erred in making its FONSI finding." (Order at 11, fn. 4)

result in determinations completely unrelated to the SFM-HC Permit. *See* 76 Fed. Reg. 9560-9562 (Notice of intent to prepare EIS). Each project stands on it own, and this Court's review must be confined to whether the Corps followed the mandates of NEPA by taking a "hard look" at cumulative impacts based on the record it had before it issued the EA.

**3. The Project is not highly controversial under NEPA standards.**

Under NEPA, for a proposed action to be highly controversial, it must be subject to a substantial dispute concerning the specific environmental effects of the action. *Indiana Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003). Mere opposition to a proposed action does make a project "highly controversial." *Id.* Despite this settled principle, Plaintiffs primarily rely on information submitted by EPA and in Charlotte County's public comments to purportedly demonstrate a substantial dispute regarding (1) reclamation of wetlands; (2) benefits to socioeconomic resources; and (3) impacts to water flows. Thus, Plaintiffs' argument does no more than recite opposition to the Project. On this basis alone, Plaintiffs argument fails. And, even if Plaintiffs could establish that there was a "controversy" (which they cannot), a "substantial dispute" does not exist under NEPA if the record demonstrates that the agency has considered the dispute and addressed the concerns. *Id.* Here, the record clearly shows that issues regarding reclamation, water flows, and socioeconomics were fully vetted. Mosaic's Brief at III(C) (discussing wetland reclamation); Mosaic's Brief at III(B)(5) (discussing water flows); Mosaic's Brief at I(D) (discussing Corps thorough consideration of socioeconomic effects).[49] Plaintiffs have added nothing material to their prior arguments and, consequently, this Court should find no differently than it has previously: that Plaintiffs have not demonstrated that the action is highly controversial. (Order at 10-11, fn. 4).

[49] Plaintiffs' argument regarding socioeconomic impacts should be disregarded for the simple reason that the these concerns do not create a substantial dispute regarding the specific environmental effects of the action.

#### 4. The Project impacts are not highly uncertain and do not involve unknown risks.

NEPA regulations do not require a reviewing agency to eliminate all uncertainty prior to issuing a FONSI. *Northwest Envt'l Defense Center v. Wood*, 947 F. Supp. 1371, 1385 (D. Oregon 1996). Plaintiffs' contention that the Project is "uncertain" based on wetland reclamation is baseless. If any agency has expertise with wetland reclamation, it is the Corps, which thoroughly considered this issue before issuing the Permit. *See* Mosaic's Brief at III(c) (discussing why wetland reclamation is not uncertain.). Indeed, the Permit has stringent conditions to ensure that reclamation goals are met, thus clearly minimizing any uncertainty regarding reclamation. *Id.* (where Corps took a hard look at project's effects and implemented preventative measures, it "did all that NEPA requires in assessing project uncertainties.").[50]

#### 5. The Corps did not ignore impacts relevant to the smalltooth sawfish.

The ESA obligates federal agencies to consult with the Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service ("NMFS") if an agency action may affect an endangered species or its critical habitat.[51] The Corps, however, is under no obligation to initiate a consultation for endangered species not found within the action area and that will not be affected by the project, which is the exact circumstance here. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1222–23 (11th Cir. 2002) (finding that Corps had no obligation to consult with FWS regarding species not

---

[50] Plaintiffs have misstated the previous findings of this Court by representing that the Court found that "[p]laintiffs have demonstrated there is scientific uncertainty regarding the recreation of wetlands and streams;" while omitting the balance of this Court's Order, which provides that "[t]his alone, however, does not demonstrate the Corps findings lack scientific integrity." Accordingly, the Court concluded that "Plaintiffs' evidence is insufficient to carry their heavy burden given the degree of deference the Court must accord the Corps' determination." (Order at 11, fn 4). No different result should be reached here.

[51] The Corps fulfilled its ESA obligations with respect to all endangered or threatened species found within the action area of the SFM-HC Permit Application, and Plaintiffs do not argue otherwise. (AR214416-548) (FWS Biological Opinion); (AR216888) (summary of FWS consultation).

found in or near the action area); *see also Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 229 (D.D.C. 2005) (noting that the concept of action area "focuses on the effects of an action in a geographic 'area,' and not on a species") (*clarified and amended on other grounds, Oceana, Inc. v. Evans*, 389 F. Supp. 2d 4, 13-15 (D.D.C. 2005).[52]

Smalltooth sawfish live in marine and brackish estuarine environments. 74 Fed. Reg. 45353, 45353 (Sept. 2, 2009). They have been found in the Charlotte Harbor and portions of the lower Peace River. *Id*. (designating these areas as critical habitat). Sawfish are not found in freshwater environments, such as the Peace River adjacent to SFM-HC. *Id*. at 46356. No portion of SFM-HC is within or adjacent to the sawfish's habitat. Accordingly, it is clear that the Project will not directly affect the sawfish or its habitat.

Plaintiffs argue that the Project will indirectly affect downstream sawfish habitat by impacting water quality and quantity in the Peace River. The Corps expressly considered these issues and concluded there would be no such impacts. (AR216930-32). Plaintiffs ignore the Corps' thorough review of information about the Peace River watershed, including the Charlotte Harbor estuary. (AR216925-216930) (summarizing information). The Corps summarized the information showing that phosphate mining is not responsible for the drawdown of water quantity in the Peace River basin. *Id*. In fact, the Permit includes many features designed to ensure the uninterrupted delivery of freshwater to offsite waters and wetlands. (AR216931). Stormwater runoff on the site will be collected in ditches ringing the perimeter of the site, which will be routed to clay settling areas

[52] The Corps contacted NMFS, as required, to ascertain if any species of concern to that agency, such as the smalltooth sawfish, should be considered by the Corps. (AR031677; AR031613). NMFS took no position on the application. (AR216891).

("CSAs") where particulate matter will settle out.[53] Outfalls leading from the CSAs will deliver freshwater to Peace River tributaries.[54] By managing these outfalls, freshwater flows into the Peace River from SFM-HC can be maintained at historic levels.[55]

The Corps is extremely knowledgeable about these mining methods and did not base its conclusion about freshwater flows to the Peace River solely on Mosaic's mine design. The record contains numerous studies and models supporting these conclusions. (AR217144) (collecting record citations showing no harm to Peace River hydrology).[56] Based on this data, the Corps found that "no measurable disruption of surface and groundwater cycles will result" from mining.[57] (AR216932) This conclusion is consistent with FDEP's finding that mining at SFM-HC will not adversely affect state water quality. (AR216930).

The Corps considered the potential for water quantity or quality changes in the Peace River watershed; such potential changes in Charlotte Harbor would be the arguable cause of any effect on the smalltooth sawfish or its critical habitat. While the Corps did not use the words "sawfish habitat" when addressing the Charlotte Harbor estuary, the vocabulary is irrelevant. The facts clearly show that the sawfish's habitat is outside the ESA action area for this Permit because there will be no direct or indirect impacts to that habitat. No "sawfish issues" were significant enough to warrant an EIS.

---

[53] *See* (AR216931) (describing ditch and berm function); (AR215346) (describing stormwater ditch and berm design); (AR214782) (ditch and berm cross section); (AR215235) (map of ditch and berm locations). The ditch and berm system will remain in place during mining and until reclamation is complete to ensure that freshwater delivery is not affected during mining and post-mining operations. (AR201619-20).

[54] The outfalls are subject to CWA 402 permits and have effluent limits to ensure that turbid or otherwise polluted water is not discharged from the mine site. (AR201590-93; AR213752-53).

[55] Similar water delivery features have been in use at the SFM-PC mine. A multi-year study found that they delivered water to the Peace River at rates comparable natural drainage flows. (AR216931).

[56] *See also* (AR216483-518) (description of water budget model); (AR216519) (wetland flow modeling data for individual wetlands); (AR216583) (same); (AR213739) (Peace River flow study); (AR203021) (post-reclamation wetlands modeling); (AR210906) (stormwater modeling).

[57] ALJ Donald R. Alexander also found that the information provided by Mosaic and evaluated by FDEP showed no adverse impacts to downstream waters in the Peace River or Charlotte Harbor. (AR135802).

### 6. The Corps adequately analyzed public health and safety.

Plaintiffs contend that the Corps failed to "adequately" consider the nuisance impacts of the mine on persons living nearby. (PMSJ at 45-46). This Court previously flatly rejected this exact argument. (Order at 11, fn. 4) (stating "the Court disagrees with this assertion and finds that [the] Corps sufficiently considered these very issues in its EA."). No different result should be reached now. The AR demonstrates that (1) potential impacts to neighbors were considered as part of the Corps' public interest evaluation, and found to be negligible; and (2) an exhaustive Development Regional Impact ("DRI") public hearing process,[58] which the Corps considered, determined that the potential noise, dust, and lighting impacts from the Project were within regulatory limits.[59] (AR201646-75; AR216880; AR216909-15).

### C. The Corps properly decided that wetland reclamation would mitigate the impacts such that the significance threshold was not reached.

The Corps' finding that mining impacts on wetlands would be mitigated to the level of insignificance[60] is amply supported by the record. Wetlands mitigation is squarely within the Corps' expertise and, therefore, is entitled to special deference. *NRDC*, 462 US 87 at 103. *See also Envt'l Coalition of Broward Cty. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987).

Rather than addressing what the Corps did, Plaintiffs rely on isolated record comments claiming that the wetlands will be lost, reclamation is uncertain, and mitigation will occur later than the wetlands impacts. This is a classic instance in which Plaintiffs disagree with a conclusion that the Corps was qualified to make and fully explained in its AR. Plaintiffs, like courts, are not permitted to

[58] Local ordinances, not the Corps, regulate levels of noise and dust emitted during mining operations.

[59] In response to public concerns about noise and dust, Mosaic also agreed to construct noise and dust berms when mining activities begin near residential properties (AR201656).

[60] Wetlands mitigation was not, however, the sole reason the Corps found that the Permit would not have a significant impact. The additional CEQ significance factors are addressed elsewhere in the EA.

substitute their judgment for that of a responsible agency. *Preserve Endangered Areas v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996). Notably, Plaintiffs raise no credible challenge to Mosaic's extensive Mitigation Plan (AR180504-187060; AR190544-196657; AR197471-201292), which the Corps rigorously analyzed and was revised substantially at the Corps' request, nor to the Permit's stringent mitigation conditions. This Plan includes wetland mitigation and monitoring, stream mitigation and monitoring, and conservation easements. (AR216939-70). Mosaic's Mitigation Plan will (1) restore 1,416 linear feet of stream channel and 43 acres of wetlands "following completion of use of five temporary mine infrastructure cord or stream crossings" and thereafter grant a conservation easement with respect to those areas; and (2) create (i) approximately 480 acres of wetlands and 61,000 linear feet of stream channels; (ii) 2,020.8 acres "in and adjacent to floodplains"; (iii) 521.8 acres of wetlands uplands and riparian buffers; and (iv) 41 acres on the former crossings. (AR216940).

The Corps comprehensively considered and addressed the risks and success of mitigation.[61] The Corps required the mitigation to meet the "no net loss" of aquatic functions policy (AR216934), which requires demonstration that all proposed impacts to wetlands be compensated on a one-to-one basis, ***based on functions, not acres*** as Plaintiffs assert. *See* 40 C.F.R. § 230.93(a); 33 C.F.R. § 332.3(a).[62] Moreover, the Corps calculated the SFM-HC Permit mitigation using a widely accepted

[61] *See, e.g.,* (AR216883-216909) (noting numerous meetings with Mosaic, EPA, and FWS to discuss mitigation); (AR216890-91) (acknowledging concerns of EPA and other groups); (AR216896) (noting that the Corps visited the site and identified concerns about earlier version of mitigation plan); (AR216912) (noting that special permit conditions were imposed to ensure success of mitigation); (AR216934-36) (describing effects of mitigation); and (AR216939-40) (detailing mitigation measures).

[62] This functional approach is well established in Corps' policy. *See* Regulatory Guidance Letter 02-02, December 24, 2002 (available at http://www.usace.army.mil/CECW/ Documents/cecwo/reg/rgls/RGL2-02.pdf ("Districts will determine what level of mitigation is "appropriate" based upon the functions lost or adversely affected"); *see also* Section 2.d (encouraging use of quantitative functional assessment methodologies in lieu of acreage).

methodology that takes into account—and requires additional mitigation for—temporal loss of wetland functions, as well as the functional quality of the impacted wetlands.[63]

The Corps uses the Wetland Rapid Assessment Procedure ("WRAP") to evaluate both impacts and the mitigation. (AR216934).[64] It has been recognized as a scientifically sound and appropriate method to evaluate mitigation measures under the CWA and NEPA. *Sierra Club*, 464 F. Supp. 2d at 1214–15, 1225. Under WRAP, wetlands functions are evaluated and given numerical scores, which enables the Corps to quantitatively compare existing wetlands to mitigation wetlands.[65] For each wetland, the record reflects when it will first be impacted, (*Id.*, AR215931), and when compensatory wetlands will be created. (AR215861-884). Plaintiffs raise no question as to the accuracy of this well-established quantitative methodology.

Importantly, WRAP accounts for temporary losses in wetland function associated with the fact that a wetland may be impacted years before the mitigation is complete. This is done by a downward adjustment of the WRAP score assigned to the mitigation: this means that if mitigation is delayed, more mitigation is required.[66] WRAP also accounts for uncertainty over wetlands creation by discounting the value assigned to mitigation wetlands. Again, this means that more mitigation is required where mitigation success is uncertain.[67] Furthermore, these projected WRAP scores were

---

63 (AR217376-78) (listing dozens of mitigation wetlands in the CFPD evaluated and released by Corps).

64 *Raymond Miller & Boyd E. Gunsalus*, SWFWMD, WETLAND RAPID ASSESSMENT PROCEDURE (2d ed. 1999) [WRAP Procedure]. In addition, WRAP is used by FDEP for its evaluation of wetlands impacts and mitigation. A thorough explanation is available at http://www.sfwmd.gov/portal/page/portal/xrepository/sfwmd_repository _pdf/wrap99.pdf.

65 WRAP scores were assigned to every wetland on the SFM-HC site. (Table C-1) (AR215861-215884).

66 All of the onsite wetlands will not be impacted at once. Mining blocks will be cleared sequentially over an eleven-year period. Thus, some wetlands on the site will not be disturbed until eleven years after mining has begun. Reclamation work will begin after mining in an area is complete. Thus, at any given time at the site there may be wetlands left undisturbed as well as wetlands being mined.

67 By way of comparison, the average WRAP score of wetlands on the site that will be impacted is 0.55 and the average score of wetlands to be avoided is 0.68. (AR217000).

not created arbitrarily, but are based on typical WRAP scores from thousands of acres of mitigation wetlands at other sites, including nearby SFM-PC.[68] The Corps certified that it independently verified Mosaic's submissions, which would include the appropriate risk factor built into the projected WRAP scores for created wetlands. (AR216907).

The Corps also accounted for the fact that all wetlands types are not equal. WRAP scores are calculated separately for herbaceous and forested wetlands to ensure that there would be no net loss for either. (AR215861). This addresses the comments Plaintiffs cite about mitigation of bayhead swamps. First, Plaintiffs ignore the fact that two-thirds of the higher-functioning bayhead swamps will be avoided completely under the selected 2010 EPA alternative. (AR162336). Second, Plaintiffs offer no reason to question the record evidence that the bayhead swamps that will be impacted are those with low WRAP scores due to damage caused by agricultural canals. Finally, these bayhead swamps will be mitigated at a rate of 1.6 functional units created for every 1.0 units impacted. (AR201665). The record shows that both herbaceous wetlands and forested wetlands show a significant positive net increase in wetland function as a result of the approved Mitigation Plan. (*Id.*; *see also* AR215965-66).

Moreover, the Permit's special conditions and detailed criteria impose stringent checks and balances to ensure that mitigation goals are met and that Mosaic does not have an unfettered right to mine. (AR216960-66). *See Wetlands Action Network v. U.S. Army Corp of Eng'rs*, 222 F.3d 1105, 1121-22 (9th Cir. 2000). Among others, these include (1) annual compliance reviews by a number of federal agencies (***including EPA***) with the power to stop mining; (2) adherence to an extremely

---

[68] *See* (AR217366; AR217376-78) (detailing Mosaic's experience creating wetlands and obtaining releases); (AR217370) (noting that a DEP study of reclaimed wetlands on former mining land released since 2000 found an average score of 0.63 units under an evaluation system comparable to WRAP).

detailed mitigation schedule; (3) the power to suspend, modify, or revoke the Permit at ***any*** time; and (4) the requirement to post a bond equal to 110% of past and future mitigation costs on a rolling three-year basis. (AR136000; 214637-40; 214672).

Based on this comprehensive Mitigation Plan, the Corps rationally concluded, based on its experience with mitigation and the independently reviewed WRAP analysis, that mitigation would reduce the wetland impacts to an insignificant level. .

## IV. PLAINTIFFS' ARGUMENTS REGARDING AREA 2 MINING ARE MERITLESS.

Mosaic's Notice of Area 2 Mining (Dkt. 118) identified approximately 700 upland acres which can be mined without any impact on jurisdictional wetlands. Plaintiffs subsequently sought leave to file a Second Amended Supplemental and Amended Complaint to rely on Area 2 to (1) challenge the Corps' alternatives analysis; and (2) argue that the Corps should prepare a supplemental EA, which has been strongly opposed by both Mosaic and the Federal Defendants.[69] While no leave of Court has been granted, Plaintiffs have nevertheless improperly addressed Area 2 matters in their PMSJ. Mosaic will not presume the Court's ruling but, instead, fully reserves its arguments concerning Area 2, incorporating by reference those set forth in Mosaic's Opposition (Dkt. 134).

## CONCLUSION

For the foregoing reasons, Mosaic respectfully requests that that this Court (i) enter Summary Judgment in favor of Defendants; and (ii) deny Plaintiffs' Motion for Summary Judgment in its entirety. Mosaic requests oral argument and estimates that three hours will be required.

[69] Plaintiffs Motion for Leave to Supplement and Amend the Amended Complaint Regarding Mosaic's Notice of Area 2 Mining (Dkt. 130) was filed May 4, 2011 ("Plaintiffs' Motion"). Mosaic's Opposition (Dkt. 134) and Federal Defendants Opposition to Plaintiffs' Motion (Dkt. 136) were filed on May 12 and May 18, respectively. The Court then directed Plaintiffs to respond to Defendants' opposition papers by May 23 (Dkt. 137). Therefore, there will no ruling on Plaintiffs' Motion before Defendants file their summary judgment motions. Should the Court grant Plaintiffs' Motion, Mosaic respectfully requests leave to file a supplemental brief on this issue within 7 days of the Court's Order, which will not exceed five pages in length.

Dated: May 20, 2011

Respectfully submitted,


_/s/ David B. Weinstein_
David B. Weinstein
Fla. Bar No. 604410
weinsteind@gtlaw.com
Kerri L. Barsh
Fla. Bar No. 443840
Kimberly S. Mello
Fla. Bar No. 002968
mellok@gtlaw.com
**GREENBERG TRAURIG, P.A.**
625 E. Twiggs St., Ste. 100
Tampa, FL 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900

and

Frank E. Matthews
Fla. Bar No. 328812
frankm@hgslaw.com
**HOPPING GREEN & SAMS, P.A.**
123 South Calhoun Street
P.O. Box 6526
Tallahassee, FL 32314-6526
Telephone: (850) 222-7500
Facsimile: (850) 224-8551

_Counsel for Mosaic Fertilizer, LLC_

## CERTIFICATE OF SERVICE

I certify that on May 20, 2011, the foregoing was electronically filed with the Clerk of Court via the CM/ECF system.

*/s/ David B. Weinstein*
Attorney