**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| SIERRA CLUB, INC.; PEOPLE FOR PROTECTING THE PEACE RIVER, INC.; and MANASOTA-88, INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS; and COLONEL ALFRED A. PANTANO, JR., | ) | Case No. 3:10-cv-00564-HLA-JBT |
| | ) | **DISPOSITIVE MOTION** |
| Defendants, | ) | |
| and | ) | |
| MOSAIC FERTILIZER, LLC, | ) | |
| Intervenor-Defendant. | ) | |

**FEDERAL DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF 133) AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF THE CASE ........................................................................................ 1

I. The South Fort Meade-Hardee County Extension Project ............................................... 1

A. Legal requirements of the permit review process ................................................. 2

B. The Corps' review of Mosaic's permit application ............................................... 4

II. Course of Proceedings ........................................................................................ 10

ARGUMENT ............................................................................................................ 11

I. This Court's Review Of The Permit Must Be "Exceedingly Deferential" ...................... 11

II. The Corps Considered An Appropriate Range Of Alternatives And Identified The Least Environmentally Damaging Practicable Alternative ............................................. 13

A. The Corps reasonably defined the overall project purpose .................................. 13

B. The Corps considered a reasonable range of alternatives .................................... 17

III. The Corps Satisfied All Requirements For Public Participation ................................ 21

A. This Court should not substitute its judgment for that of the Corps on whether to hold a public hearing ......................................................................... 21

B. The Corps satisfied NEPA's public notice and comment requirements ............... 23

IV. The Corps Fully Complied With Its Obligations Under NEPA ................................... 24

A. The Corps properly evaluated "significance" under CEQ's regulations .............. 25

B. The Corps' Mitigation Plan renders the Project's impact insignificant ................ 31

V. This Court Should Decline To Consider Sierra Club's New "Area 2" Claim ................. 33

CONCLUSION ......................................................................................................... 35

**TABLE OF AUTHORITIES**

**CASES**

*Alabama-Tombigbee Rivers Coal. v. Kempthorne,*
477 F.3d 1250 (11th Cir. 2007) .......... 12

*Army Corps of Eng'rs,*
384 F.3d 1163 (9th Cir. 2004) .......... 35

*Auer v. Robbins,*
519 U.S. 452 (1997) .......... 22

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,*
462 U.S. 87 (1983) .......... 12

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,*
524 F.3d 938 (9th Cir. 2008) .......... 24, 26

*Citizens Advisory Comm. v. United States Dep't of Justice,*
197 F. Supp. 2d 226 (E.D. Pa. 2001) .......... 23

*C.A.R.E. Now, Inc. v. FAA,*
844 F.2d 1569 (11th Cir. 1988) .......... 4, 31

*Cabinet Mountains Wilderness v. Peterson,*
685 F.2d 678 (D.C. Cir. 1982) .......... 31

*Citizens Advisory Comm. v. U.S. Dep't of Justice,*
197 F. Supp. 2d 226 (E.D. Pa. 2001) .......... 24

*Citizens for Smart Growth v. Peters,*
716 F. Supp. 2d 1215 (S.D. Fla. 2010) .......... 33

*City of Oxford v. FAA,*
428 F.3d 1346 (11th Cir. 2005) .......... 12, 27

*Coal. on Sensible Transp., Inc. v. Dole,*
826 F.2d 60 (D.C. Cir. 1987) .......... 27

*Coliseum Square Ass'n, Inc. v. Jackson,*
465 F.3d 215 (5th Cir. 2006) .......... 29

*Druid Hills Civic Ass'n, Inc. v. FHWA,*
772 F.2d 700 (11th Cir. 1985) .......... 33

*Envtl. Protection Info. Ctr. v. U.S. Fish & Wildlife Serv.,*
*No. 04-4547,* 2005 WL 3877605 (N.D. Cal. April 22, 2005) .............................................. 35

*Florida Clean Water Network, Inc. v. Grosskruger,*
587 F. Supp. 2d 1236 (M.D. Fla. 2008)............................................................................ 14, 15

*Florida Keys Citizens Coal. Inc. v. U.S. Army Corps of Eng'rs,*
374 F. Supp. 2d 1116 (S.D. Fla. 2005) .................................................................................. 33

*Friends of the Earth v. Hintz,*
800 F.2d 822 (9th Cir. 1986)................................................................................................. 26

*Friends of the Payette v. Horseshoe Bend Hydroelectric Co.,*
988 F.2d 989 (9th Cir. 1993)................................................................................................. 22

*Fund for Animals, Inc. v. Rice,*
85 F.3d 535 (11th Cir. 1996)...................................................................................... 12, 14, 22

*Georgia River Network v. U.S. Army Corps of Eng'rs,*
334 F. Supp. 2d 1329 (N.D. Ga. 2003) ........................................................................... 26, 29

*Hill v. Boy,*
144 F.3d 1446 (11th Cir. 1998)............................................................................................. 24

*Humane Soc'y of U.S. v. Locke,*
626 F.3d 1040 (9th Cir. 2010)............................................................................................... 29

*Image of Greater San Antonio v. Brown,*
570 F.2d 517 (5th Cir. 1978)................................................................................................. 30

*Kleppe v. Sierra Club,*
427 U.S. 390 (1976) .............................................................................................................. 29

*Louisiana Wildlife Fed'n, Inc. v. York,*
761 F.2d 1044 (5th Cir. 1985) ......................................................................................... 14, 16

*Marsh v. Oregon Natural Res. Council,*
490 U.S. 360 (1989) ........................................................................................................ 26, 29

*Miami-Dade Cnty. v. EPA,*
529 F.3d 1049 (11th Cir. 2008)............................................................................................. 13

*Native Ecosystems Council v. U.S. Forest Service,*
428 F.3d 1233 (9th Cir. 2005)............................................................................................... 29

*Nat'l Wildlife Fed'n v. Whistler,*
27 F.3d 1341 (8th Cir. 1994)................................................................................................. 14

*Newton County Wildlife Ass'n v. Rogers*,
141 F.3d 803 (8th Cir. 1998)........................................................................................ 34

*North Buckhead Civic Ass'n v. Skinner*,
903 F.2d 1533 (11th Cir. 1990) ............................................................................ 12, 26

*Northwest Bypass Grp. v. U.S. Army Corps of Eng'rs*,
552 F. Supp. 2d 97 (D.N.H 2008)................................................................................... 26

*Norton v. S. Utah Wilderness Alliance*,
542 U.S. 55 (2004) ......................................................................................................... 34

*P.E.A.C.H. v. U.S. Army Corps of Eng'rs*,
87 F.3d 1242 (11th Cir. 1996)................................................................................. 26, 35

*Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*,
916 F. Supp. 1557 (N.D. Ga. 1995) ............................................................................... 26

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ....................................................................................................... 24

*Sierra Club v. Johnson*,
436 F.3d 1269 (11th Cir. 2006)....................................................................................... 23

*Sierra Club v. U.S. Army Corps of Eng'rs*,
464 F. Supp. 2d 1171 (M.D. Fla. 2006)
*aff'd*, 508 F.3d 1332 (11th Cir. 2007)............................................................................. 26

*Sierra Club v. Van Antwerp*,
526 F.3d 1353 (11th Cir. 2008)................................................................................ 11, 26

*Sierra Club v. Van Antwerp*,
719 F. Supp. 2d 58 (D.D.C. 2010) ................................................................................. 25

*Sylvester v. U.S. Army Corps of Eng'rs*,
882 F.2d 40 (9th Cir. 1989)..................................................................................... 14, 16

*Theodore Roosevelt Conservation P'ship v. Salazar*,
616 F.3d 49 (D.C. Cir. 2010) ......................................................................................... 24

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
222 F.3d 1105 (9th Cir. 2000) ........................................................................... 26, 29, 33

*Wyoming v. U.S. Dep't of Interior*,
360 F. Supp. 2d 1214 (D.Wyo. 2005)
*aff'd*, 442 F.3d 1262 (10th Cir. 2006)............................................................................. 35

**STATUTES**

Administrative Procedure Act (APA):
5 U.S.C. § 706(2) .......... 11

Clean Water Act (CWA):

33 U.S.C. § 1311(a) .......... 2

33 U.S.C. § 1341 .......... 9

33 U.S.C. § 1341(a)(1) .......... 3

33 U.S.C. § 1344(a) .......... 2

33 U.S.C. § 1344(b)(1) .......... 2

33 U.S.C. § 1344(c) .......... 21

33 U.S.C. § 1344(q) .......... 21

National Environmental Policy Act (NEPA)

42 U.S.C. § 4321 .......... 3

42 U.S.C. § 4332(C) .......... 25

42 U.S.C. § 4332(E) .......... 4

**FEDERAL REGULATIONS**

33 C.F.R. § 320.4(a)(1) .......... 2

33 C.F.R. § 320.4(a)(2)(ii) .......... 3

33 C.F.R. § 320.4(d) .......... 9

33 C.F.R. Part 325, App. B .......... 24

33 C.F.R. Part 325, App. B(9)(b)(4) .......... 14

33 C.F.R. § 325.7(a) .......... 36

33 C.F.R. § 327.4(b) .......... 22

33 C.F.R. § 328.3(a) .......... 2

40 C.F.R. Part 230 .................... 2

40 C.F.R. § 230.3(c) .................... 3

40 C.F.R. § 230.10(a) .................... 3

40 C.F.R. § 230.10(a)(2) .................... 14, 18, 19

40 C.F.R. § 230.10(a)(3) .................... 14, 18

40 C.F.R. § 230.10(b)(1) .................... 3

40 C.F.R. § 230.10(c) .................... 3

40 C.F.R. § 230.12(a)(2) .................... 3

40 C.F.R. § 230.12(a)(3)(i) .................... 13, 16

40 C.F.R. §§ 1501.3-1501.4 .................... 4

40 C.F.R. § 1501.4(e) .................... 4

40 C.F.R. § 1501.4(e)(2) .................... 24, 25

40 C.F.R. § 1507.27(b)(9) .................... 31

40 C.F.R. § 1508.7 .................... 28

40 C.F.R. § 1508.9(b) .................... 4

40 C.F.R. § 1508.14 .................... 31

40 C.F.R. § 1508.27 .................... 27

40 C.F.R. § 1508.27(b)(2) .................... 32

40 C.F.R. § 1508.27(b)(5) .................... 31

**FEDERAL REGISTER**

74 Fed. Reg. 45,353, 45,356 (Sept. 2, 2009) .................... 32

**OTHER**

Nancy H. Sutley, *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact* (Jan. 14, 2011) .................... 33

## INTRODUCTION

On June 14, 2010, after an exhaustive permit-review process, the Jacksonville District of the U.S. Army Corps of Engineers (Corps) issued a Clean Water Act Section 404 permit (Permit) to Mosaic Fertilizer, LLC (Mosaic), for an 18-year authorization to discharge dredged or fill material into 534.4 acres of jurisdictional wetlands and 56,661 linear feet of jurisdictional streams in connection with Mosaic's proposal to mine phosphate ore on its 10,856-acre South Fort Meade Mine Extension in Hardee County, Florida (Site).

As we explain below, in issuing the Permit, the Corps meticulously followed the mandates of Section 404, the rigorous Section 404(b)(1) Guidelines, the National Environmental Policy Act, and the Corps' own regulations. In short, the Corps did everything the law required it to do before issuing the Permit. Viewing the full administrative record "through the deferential lens mandated by the Administrative Procedure Act," as the Court of Appeals directed in this case, this Court should conclude that the Corps "came to a rational conclusion."

## STATEMENT OF THE CASE

### I. The South Fort Meade-Hardee County Extension Project.

The Site at issue in this litigation is located in an area of Florida commonly referred to as the Central Florida Phosphate District or "Bone Valley." AR201539-40, AR201807, AR201681. Although phosphate mining has taken place in Bone Valley for over 100 years, it still remains the largest reserve of phosphate in the United States. AR216916, AR201501.

While the 10,856-acre Site contains wetlands and streams that perform useful ecological functions, the Site is not a pristine landscape. In fact, more than 75% of the Site has been converted from native vegetation into pastures, groves, crop fields, roads, cattle-watering ponds, and single-family homes. AR216916, AR201462. Within the Site are 1,920.7 acres of "waters of the United

States" subject to the Corps' Clean Water Act jurisdiction, consisting of herbaceous wetlands, forested wetlands, open-water, and streams. AR201513, AR201462, AR213835. The Permit requires Mosaic to avoid a large majority of those waters and to implement a comprehensive mitigation plan to offset *all* unavoidable impacts to waters of the United States. AR214639-68.

### A. Legal requirements of the permit review process.

The Clean Water Act prohibits the discharge of pollutants, including dredged or fill material, into waters of the United States without a permit, 33 U.S.C. § 1311(a), including certain wetlands. 33 C.F.R. § 328.3(a), (b). When determining whether to authorize discharges of dredged or fill material into wetlands, 33 U.S.C. § 1344(a), the Corps conducts a public interest review that balances the "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1). The Corps must grant a request for a permit "unless the district engineer determines that [to do so] would be contrary to the public interest," *id*., or unless the permit application fails to meet other applicable criteria.

Among those criteria are the Clean Water Act Section 404(b)(1) Guidelines, promulgated by the U.S. Environmental Protection Agency (EPA) and found at 40 C.F.R. Part 230. *See* 33 U.S.C. § 1344(b)(1), (e)(1)(A) (requiring compliance with the Guidelines). The 404(b)(1) Guidelines prohibit permits for which there "is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a); *see also* 33 C.F.R. § 320.4(a)(2)(ii) (public interest review must consider "the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work"). If the project is not "water dependent," because it "does not require access or proximity to the special aquatic site [such as wetlands] in question to fulfill its basic purpose . . ., practicable

alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). An "aquatic ecosystem" is defined as "waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals." 40 C.F.R. § 230.3(c). To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

The Section 404(b)(1) Guidelines require the Corps to consider whether the issuance of a permit "will cause or contribute to significant degradation of the waters of the United States," 40 C.F.R. § 230.10(c), or will violate applicable state water quality standards. *Id.* § 230.10(b)(1). In making these determinations, the Corps may consider "appropriate and practicable discharge conditions [] to minimize pollution or adverse effects." *Id.* § 230.12(a)(2). State water quality standards are incorporated into a Section 404 permit, and an applicant must obtain a certification from the relevant state that the proposed discharge will comply with all state water quality requirements. 33 U.S.C. § 1341(a)(1).

In addition, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires the Corps to prepare an Environmental Impact Statement (EIS) if the Project is one "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In order to determine whether an action's impacts will be "significant," an agency may first prepare an Environmental Assessment (EA). 40 C.F.R. §§ 1501.3-1501.4. In contrast to the more detailed EIS, an EA need only "include brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(E)]," and "of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). If, after taking a "hard look" at the proposed action, the Corps concludes that there will be no significant environmental impact, the Corps may issue a Finding of

No Significant Impact (FONSI), and need not prepare an EIS. 40 C.F.R. § 1501.4(e). The Corps may also consider mitigation requirements and conditions placed on the permit when determining whether an action will have significant impacts. *C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1575 (11th Cir. 1988).

**B. The Corps' review of Mosaic's permit application.**

In October 2006, Mosaic applied to the Corps for a Section 404 permit to discharge dredged or fill material into waters of the United States in connection with its plan to mine phosphate ore on the Site. AR015731-876 and AR010426-15726. The Corps published a public notice of Mosaic's permit request in May 2007, and later extended the public comment period at EPA's request. AR031682. In addition to the comments received from federal and state agencies, the Corps received and considered 35 sets of comments from local agencies, non-governmental organizations, interested companies and individuals. In the course of reviewing the application, the Corps exchanged information with Mosaic on more than 70 occasions. In addition, the Corps met with EPA or the Fish and Wildlife Service (FWS) at least 8 times, and the Corps visited the Site more than a dozen times to verify information provided by Mosaic. In July 2009, the Corps met with Sierra Club to discuss its environmental concerns.

***The Corps' coordination with EPA.*** The "*Clean Water Act Section 404(q) Memorandum of Agreement (MOA) Between the Environmental Protection Agency and the Department of the Army*" outlines the process for EPA review of Section 404 permit applications, including procedures for EPA to "elevate" concerns it may have with the Corps' review of an individual permit application.[1] As relevant here, EPA may elevate an individual permit matter for higher-level review if it determines that a project "will result in unacceptable adverse effects to aquatic resources of national

---

[1] *See* http://www.usace.army.mil/CECW/Pages/moumoas.aspx.

importance." *Id.* at 6-7. Under the MOA, EPA must notify the Corps during the public comment period if it believes a "project *may* result in substantial and unacceptable impacts to aquatic resources of national importance." *Id.* at 7.

On July 26, 2007, EPA staff informed the Corps that EPA "considers the wetland and riverine resources within and neighboring the proposed project site to be aquatic resources of national importance." AR108022-23. Following a robust interagency dialogue that included at least 7 meetings and numerous correspondence, the Corps provided a draft EA and Permit to EPA on June 9, 2010. AR214589. The accompanying cover letter explained that "the Corps believes that this project will not result in unacceptable adverse effects to aquatic resources of national importance." *Id*. This finding was based on the Corps' independent review of information provided by Mosaic, various modifications that Mosaic agreed to incorporate into its proposal, and the substantial mitigation and monitoring that the Permit would require Mosaic to perform. *Id.* On June 14, 2010, EPA responded that it would not elevate the permit decision for higher-level review. AR214676.

***Project purpose and need.*** In its application, Mosaic defined the project purpose and need as follows:

> Extract phosphate ore from land located within a 10-mile radius of South Fort Meade ore separation/beneficiation plant and related infrastructure (*e.g.,* rail spur, administrative facilities, warehouses, maintenance shops, water supply and wastewater treatment facilities, etc.) supporting the existing South Fort Meade Mine – Polk County (SFM-PC), sufficient to allow the SFM ore separation/beneficiation plant to continue to process 6.6 mm [tons/year] of recoverable phosphate rock.

AR216883. The Corps rejected Mosaic's stated purpose and need, concluding that it "unduly limited the range of alternatives that could potentially be evaluated" by the Corps in conjunction with its alternatives analysis. AR216883-84. The Corps redefined the overall project purpose as: "to extract phosphate ore from reserves located within a practicable pumping distance of the

existing [Polk County] ore Separation/beneficiation plant and supporting infrastructure in order to continue operation of the . . . plant at historical production rates." *Id*. The Corps then used this redefined project purpose as the starting point for its Clean Water Act alternatives analysis.

***The Corps' Decision.*** The Corps' decision to issue the Permit was documented in a Memorandum dated June 14, 2010, which constituted both an EA under NEPA and statement of findings under the Clean Water Act. This 101-page document (AR216879-980) incorporates by reference 49 additional documents (listed at AR216880-3), including the detailed analysis of environmental impacts in Mosaic's Memorandum for the Record-Revision No. 2 (Mar. 17, 2010). AR216981-7212. It also references numerous scientific studies, guidance documents and plans. AR216976-78. The extensive mitigation imposed as conditions for the Permit was described in detail. The Corps' district engineer decided that an EIS was not required: "Having reviewed the information provided by the Applicant and all interested parties and an assessment of the environmental impacts, I find that this permit action will not have a significant impact on the quality of the human environment." AR216974. The Corps also decided that the permit complied with the 404(b)(1) Guidelines and was not contrary to the public interest. AR216980.

***Alternatives analysis.*** Pursuant to the 404(b)(1) Guidelines, the Corps found that the Site is located in a "special aquatic site" (AR216908) but that phosphate mining is not a "water-dependent" activity because the project does not need to be located in water to fulfill its basic purpose, "to extract phosphate ore." AR216883. Thus, the Corps proceeded to analyze whether Mosaic had established that there were no practicable alternatives to its proposal that would not involve discharges into special aquatic sites. AR216897. The Corps considered two sets of alternatives to Mosaic's proposal: the first set ("avoidance" or "offsite alternatives") considered alternative means by which Mosaic could obtain phosphate ore; the second set ("minimization" or

"onsite alternatives") evaluated options that would allow Mosaic to mine on the Site while minimizing the environmental footprint of its project. AR216897-907; *see also* AR201515-61.

The Corps analyzed a broad range of offsite alternatives. AR216897-904, AR201515-45. The first three offsite alternatives included whether Mosaic could (1) purchase phosphate rock outside of Central Florida and ship it to its Polk County separation/beneficiation plant for processing; (2) mine phosphate rock outside of Central Florida and ship it to the plant; or (3) construct a new mine, or expand an existing mine, elsewhere in Central Florida and ship the phosphate rock to the plant. *Id.* The Corps determined that these alternatives did not meet the overall project purpose and, therefore, were not "practicable." *Id.*

The Corps then evaluated four offsite alternatives within practicable pumping distance of Mosaic's beneficiation/separation plant. AR216899-904, AR201536-45; *see also* AR201681, AR201684-89, AR201775, AR202093, and AR202107. Although these offsite alternatives met the overall project purpose, the Corps determined that three were not "practicable" because of increased transportation and logistical costs, the need to cross the Peace River, or insufficient quantity of phosphate reserves. AR216900. The fourth alternative was "practicable" but raised more environmental concerns than the alternative ultimately permitted. AR216900-04; AR201542-44.

The Corps next analyzed five onsite alternatives to ensure that Mosaic had taken all practicable steps to minimize impacts to jurisdictional waters. AR216904-07, AR201546-61, AR201690-93, AR178850. After approximately 34 meetings over a 1½ year time period, the Corps determined that onsite Alternative 2B was the least environmentally damaging practicable alternative. AR216907.[2] This alternative avoids approximately 88% of jurisdictional wetlands on

[2] Impacts to bayhead wetlands were reduced by 21% and impacts to streams were reduced by 2% from Mosaic's proposal. AR201560.

the Site.[3] AR216905. At the same time, this alternative allows Mosaic to recover only 64% of available ore on the Site. *Id*.

***Mitigation.*** After selecting the least environmentally damaging practicable alternative, the Corps determined that Mosaic's proposed mitigation plan, as revised to incorporate suggestions from the Corps, EPA, and others, would compensate fully for unavoidable impacts to the waters of the United States. AR216911, AR216939-40.

The principal components of that plan require Mosaic to: (1) provide a 2,020.8-acre conservation easement to protect onsite wetlands in and adjacent to floodplains; (2) create waters of the United States on areas authorized to be impacted by ore extraction or supporting infrastructure, including 170.9 acres of herbaceous wetlands, 310.3 acres of forested wetlands, and 61,016 linear feet of stream channels, and subsequently protect those waters by conservation easement; and (3) restore 1,416 linear feet of stream channels and 43 acres of jurisdictional wetlands and uplands, and subsequently protect the restored streams, wetlands, and uplands by conservation easement. AR216940.

***Direct impacts.*** The Corps not only analyzed the Project's impacts to waters of the United States, it also assessed other direct impacts as required by the 404(b)(1) Guidelines, the Corps' own public interest review factors, and NEPA. AR216907-15; *see also* AR213723-92 and AR201615-75. Impacts to water quality, water supply and conservation, and fish and wildlife values were analyzed, among others. The Corps considered and incorporated into its Permit all requirements imposed by a Florida Department of Environmental Protection (FDEP) permit,[4] which conclusively

[3] Sierra Club mistakenly claims (Br. 20) that the selected alternative would increase the total acreage of wetland impacts from Mosaic's proposal. In fact, the selected alternative actually results in a net decrease from Mosaic's proposal. *Compare* AR199337 (Alternative 2B, the selected alternative, would impact 534 acres) *with* AR168392 (Alternative 1, Mosaic's proposal, would impact 560 acres).

[4] AR216913-14, AR214637 (FDEP Environmental Resource Permit Number 0221122-004).

establishes compliance with applicable state water-quality standards under Section 401 of the Clean Water Act, 33 U.S.C. § 1341. 33 C.F.R. 320.4(d). The Corps also formally consulted with FWS, under the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, regarding listed species that either had been observed or have critical habitat within the action area, including the wood stork, eastern indigo snake, and Audubon's crested caracara. AR216887-88; AR216915-16. The Corps concluded that, with the required mitigation, none of the impacts were significant.

***Cumulative and secondary impacts.*** The Corps examined cumulative effects across the nearly 1.2 million-acre Peace River watershed. AR216916.[5] The Corps considered a time frame of more than 50 years – from 1977 to 2028 – to evaluate the cumulative impacts of urban land uses, other types of mining, agricultural uses, and native cover.[6] AR216918. The Corps also considered FDEP's and the Southwest Florida Water Management District's Peace River Cumulative Impacts Study and Charlotte Harbor National Estuary Program's Comprehensive Conservation and Management Plan. AR216925-30.

Although the Corps addressed many other resources potentially affected by the Project, it identified water quality, hydrology, and fish and wildlife habitat as the resources most likely to be negatively impacted by mining activities. *Id*. Based on its review of the technical data, the Corps concluded that the Project would cause no significant water quality impacts. AR216928, AR216930. Although the Corps concluded that the Project could cause hydrologic alterations, it found that the mitigation plan and water quality treatment systems that the Permit requires Mosaic

---

[5] The Corps independently evaluated and analyzed information submitted by Mosaic regarding cumulative impacts. *See, e.g.*, AR14253, AR217755-56, AR217846-47, AR217866, AR217888, AR217905, AR217908, AR217912, and AR217916.

[6] The Corps chose those years because relevant Clean Water Act regulatory authority became effective in 1977, and all physical mitigation, ore reclamation, and mitigation associated with the Project will be complete by 2028. AR216917.

to implement would maintain the flow regime and regional water budget during mining operations. AR216928-29, AR216930-34. The Corps also examined data concerning land use and reclamation efforts, and concluded that the Project would have no significant impacts on fish or wildlife habitats. AR216930, AR216934-37.

**II. Course of Proceedings.**

On June 30, 2010, Sierra Club filed suit seeking a temporary restraining order (TRO) and preliminary and permanent injunctive relief against the Corps, alleging that the Corps had acted arbitrarily and capriciously, and in violation of the Clean Water Act, NEPA, and the ESA, in issuing the Permit to Mosaic. ECF 2. At a hearing on July 1, 2010, this Court allowed Mosaic to intervene as a defendant, and then entered a TRO enjoining Mosaic from conducting any activities in reliance on the Permit. ECF 19.

The Corps then lodged its partial administrative record (ECF 63), and the Corps and Mosaic filed separate responses to Sierra Club's preliminary injunction motion. ECF 56, 62 (Corps); ECF 49-55 (Mosaic). Following a hearing on July 22, 2010, the Court took the matter under advisement and requested and received additional briefing from the parties.

The Court entered a preliminary injunction on July 30, 2010, prohibiting Mosaic from proceeding under the Permit. ECF 88 (PI Order). The Court concluded that Sierra Club was likely to prevail on the merits of its claim that the Corps violated Section 404 of the Clean Water Act by giving inadequate consideration in its permitting decision to practicable alternatives to dredging and filling waters of the United States. *See id.* at 16-17. As to Sierra Club's NEPA claim, the Court held that "the evidence produced at this stage in the proceedings is insufficient" to conclude that the Corps violated NEPA by preparing an EA rather than an EIS. *Id.* at 12. The Court also concluded that it need not decide whether the Corps' decision not to hold a public hearing violated the Clean

Water Act but that "a public hearing should be conducted" in any event. *Id.* at 18.

Mosaic appealed the preliminary injunction to the Eleventh Circuit. ECF 89. The Corps did not appeal. Sierra Club filed a cross-appeal on the NEPA claim. ECF 98.

On April 8, 2011, the Court of Appeals vacated this Court's PI Order and remanded the case for further consideration of the merits based on the full administrative record. ECF 129 (Remand Order). The Court of Appeals concluded that undue weight was placed on EPA's letters in evaluating the Corps' practicable alternatives analysis, and directed this Court to analyze the merits "through the deferential lens mandated by the Administrative Procedure Act" to determine whether the Corps came to a "rational conclusion." *Id.* at 2.

Mosaic has since filed a Notice that it will begin to mine approximately 700 acres of uplands on a portion of the Site that it refers to as "Area-2." ECF 118. On May 4, 2010, two days before it filed for summary judgment, Sierra Club moved to supplement or amend its complaint to add a claim under NEPA alleging that the Corps violated a non-discretionary duty to prepare a supplemental EA regarding issues raised in Mosaic's Notice.[7] ECF 130 at 1. Even though its motion is still pending, Sierra Club has sought summary judgment on this new claim. ECF 133.

## ARGUMENT

### I. This Court's Review Of The Permit Must Be "Exceedingly Deferential."

Sierra Club's challenges to the Permit are brought under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), which provides that a district court may set aside agency action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See Sierra Club v. Van Antwerp,* 526 F.3d 1353, 1359-60 (11th Cir. 2008) (applying "arbitrary and capricious" standard in review of Corps actions under Clean Water

[7] The Corps filled an opposition to Sierra Club's motion to amend or supplement. ECF 136.

Act and NEPA); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996) (same). The Eleventh Circuit has explained that a district court must be "exceedingly deferential" to the Corps' decision to issue a Section 404 permit, *Fund for Animals*, 85 F.3d at 541, and that it must affirm the Corps' decision so long as the Corps "reached a conclusion that rests on a rational basis." *City of Oxford v. FAA*, 428 F.3d 1346, 1352 (11th Cir. 2005). Under this standard, a district court may not substitute its judgment for that of the Corps concerning the wisdom or prudence of the proposed action. *Id.* at 541 (quoting *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538-39 (11th Cir. 1990)). In fact, "along the standard of review continuum" the arbitrary-and-capricious standard affords a reviewing court "the *least* latitude in finding grounds for reversal." *Fund for Animals*, 85 F.3d at 541-42; *N. Buckhead*, 903 F.2d at 1538 (same).

Under arbitrary-and-capricious review, a court may set aside an agency's decision only if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007).

Where, as here, a plaintiff's challenge requires an evaluation of scientific determinations by an agency with respect to judgments within that agency's expertise, the Supreme Court has instructed that the reviewing court "must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983). Although the Court is not required to "rubber stamp" the Corps' FONSI and decision to issue Mosaic a Section 404 permit, it must review that Permit and the accompanying Environmental Assessment "not as the chemist, biologist, or statistician that it is qualified neither by training nor experience to be, but as a reviewing court exercising certain minimal standards of rationality." *Miami-Dade Cnty. v. EPA*, 529 F.3d 1049,

1065 (11th Cir. 2008) (alterations, citations, and internal quotations omitted); *cf.* Remand Order at 3 (directing this Court to evaluate the merits "through the deferential lens mandated by the Administrative Procedure Act" when considering if "the Corps came to a rational conclusion").

Under this exceedingly deferential standard, the Permit must be upheld.

## II. The Corps Considered An Appropriate Range Of Alternatives And Identified The Least Environmentally Damaging Practicable Alternative.

Consistent with the Clean Water Act and governing regulatory provisions, the Corps conducted an extensive analysis of Mosaic's proposal to discharge dredged or fill materials into waters of the United States and to provide extensive mitigation through protection and creation of new wetlands and streams. As we demonstrate below, the Corps permissibly found that (1) there were no practicable alternatives with fewer adverse impacts to the aquatic ecosystem; (2) adverse impacts were minimized to the maximum extent practicable; and (3) appropriate mitigation would be performed to offset any unavoidable impacts to waters of the United States.

### A. The Corps reasonably defined the overall project purpose.

Before the Corps will issue a dredge-and-fill permit, it must consider whether there is a less environmentally damaging practicable alternative that will accomplish the applicant's goal. *See* 40 C.F.R. § 230.12(a)(3)(i). A "practicable alternative" is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

The first step in the Corps' evaluation of practicable alternatives is defining what it is the applicant proposes to do. Where, as here, the Corps determines that the project's *basic purpose* is not water dependent (*i.e.*, mining phosphate ore can and often does take place in upland areas), there is a rebuttable presumption that practicable alternatives are available that do not involve

discharges to special aquatic sites such as wetlands. AR216883 (citing 40 C.F.R. § 230.10(a)(3)). The presumption applies until the permit applicant "clearly demonstrate[s] otherwise." *Id.*

After the Corps determines whether the project's basic purpose is water dependent, it analyzes practicable alternatives in light of a project's *overall purpose*, "which is more particularized to the applicant's project than is the basic purpose, and reflects the various objectives the applicant is trying to achieve." *Florida Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1243 (M.D. Fla. 2008) (citation omitted). Thus, central to evaluating practicable alternatives is the Corps' determination of the applicant's overall project purpose. *See Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1345 (8th Cir. 1994). The Corps must consider the applicant's objectives in its definition of overall purpose, since "'it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and substitute a purpose it deems more suitable.'" *Sylvester v. U.S. Army Corps of Eng'rs,* 882 F.2d 407, 409 (9th Cir. 1989) (quoting *Louisiana Wildlife Fed'n, Inc. v. York (LWF),* 761 F.2d 1044, 1048 (5th Cir. 1985)). At the same time the Corps must, "in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and public's perspective." 33 C.F.R. Part 325, App. B(9)(b)(4). *See also Fund for Animals,* 85 F.3d at 543 (citing *Sylvester and LWF,* and explaining that a "practicable alternative analysis is not susceptible to numerical precision, but instead requires a balancing of the applicant's needs and environmental concerns").

Here, the Corps exercised its independent judgment when it rejected Mosaic's proposed overall project purpose after concluding that Mosaic's "stated purpose and need unduly limited the range of alternatives that could potentially be evaluated." AR216883. The Corps instead reasonably redefined the overall project purpose to permit Mosaic to mine phosphate "within a

practicable pumping distance” of its existing separation/beneficiation plant and to allow that plant to continue operating “at historical production rates.” AR216884.

In redefining the overall project purpose, the Corps evaluated Mosaic’s claims of the public need for phosphate as a crop nutrient used to produce fertilizer and several other industrial uses (AR201497-503), as well as the public interest in the local and regional jobs[8] and revenue generated by the phosphate industry in Central Florida. AR216914-15; *see also* AR201504-06. The Corps recognized that “some of the population opposes the disruption associated with the phosphate mining overall” but, on balance, concluded that “[t]he public will benefit” from a project of this scale. AR216914-15. Specifically, the Corps found that a project that meets the redefined overall purpose would (a) provide “an uninterrupted source of phosphate . . . for the U.S. marketplace”; (b) ensure that people “remain employed in their current positions” involving “phosphate and phosphate byproducts”; and (c) benefit the economy because this industry is a “major constituent” of the regional economy, both in its contributions to the tax base and to regional employment. *Id.*

The Corps permissibly redefined the project purpose such that it would consider only those alternatives located a practicable pumping distance from Mosaic’s Polk County beneficiation plant so that Mosaic could continue to operate the plant at “historical production rates.” AR216885. In determining what constitutes a practicable pumping distance, the Corps accounted for Mosaic’s interest in continuing to use its beneficiation plant which, the record reflects, required a $325 million capital investment (AR216884), and it permissibly excluded alternatives outside of a 10-mile radius because the Corps concluded that pumping phosphate matrix, clays, and sand tailings in a slurry pipeline more than 10 miles would increase capital, operating, and power costs, such a

[8] AR201497-510; AR201639-40

significant degree that the project would be impracticable.[9] AR201537-9. *See* 40 C.F.R. § 230.12(a)(3)(i) (practicability must take into account cost, existing technology, and logistics); *Sylvester*, 882 F.2d at 409 (Corps may not ignore "genuine and legitimate" purpose for which the applicant seeks a permit); *LWF*, 761 F.2d at 1048 (noting Corps' duty under the 404(b)(1) Guidelines to account for applicant's objectives in assessing project purpose). In determining Mosaic's historic production rate, the Corps permissibly used as its baseline Mosaic's production at the Polk County plant from 2006 to 2009, which the Corps calculated based on its evaluation of 10-K reports that Mosaic had previously filed with the U.S. Securities and Exchange Commission. AR216884-85. Those filings reflect that the Polk County plant has had, during the baseline period, an average production rate of 6.17 million short-tons/year and a capacity of up to 6.6 million short-tons/year. *Id.*

Sierra Club argues (Br. 25) that the Corps so narrowly defined the overall project purpose that the only practicable alternative would have been one that authorized Mosaic "indefinitely" to mine "all" phosphate near the beneficiation plant.[10] Sierra Club's hyperbole notwithstanding, the Corps' considered *no alternative* that would have allowed Mosaic to conduct unlimited mining of an indefinite duration. *See* AR216897-907.

---

[9] One pump is required per mile of pipeline, at a cost of $1 million each. When accounting for the cost of pumps as well the as associated electrical gear and set-up costs, pumping in excess of 10 miles from the Polk County beneficiation/separation plant would have likely resulted in more than $20 million in additional costs. AR201538. Moreover, the record reflects that the estimated annual power costs for a 10-mile pumping system is $7.2 million. AR201538-39.

[10] Sierra Club similarly claims that the Corps defined the project to allow Mosaic to "mine enough ore to satisfy historic levels of production *ad infinitum*," and, by doing so, "essentially defined the project as being the extraction of all possible ore that could be mined and transported to the plant, until all ore is exhausted, regardless of whether the ore is under wetlands." Br. 26. This is simply incorrect. The permit authorizes Mosaic to mine for 18 years (AR214634), during which it may mine 64% of the phosphate ore on the site. AR 216905.

### B. The Corps considered a reasonable range of alternatives.

Sierra Club struggles to find a basis for the Court to set aside the Corps' alternatives analysis (Br. 15-21), and ultimately it does not succeed. A major flaw in Sierra Club's challenge stems from its mistaken belief that there are only 50 million metric tons of recoverable phosphate ore on the Site. *See* Br. 15 (characterizing the Corps' alternatives analysis as "boiled down to one basic proposition: that Mosaic can mine *all of the approximately 50 million metric tons of recoverable phosphate* on the site. . . .") (emphasis added). But the record on this point is unequivocal: The Site contains nearly *80 million metric tons* of minable phosphate, of which Mosaic may mine 50.38 million metric tons. AR216905.

After considering each of the alternatives described below, the Corps reasonably concluded that the least environmentally damaging practicable alternative that would meet the overall project purpose would be for Mosaic to mine 64% of ore on the Hardee County site while leaving undisturbed approximately 88% of the jurisdictional wetlands and 68% of the jurisdictional streams.

***Offsite alternatives.*** Because the Corps determined that phosphate mining is not a "water dependent" activity, there is a rebuttable presumption that practicable alternatives are available that do not involve discharges to wetlands or other special aquatic sites. 40 C.F.R. § 230.10(a)(3). The Corps thus conducted an "offsite alternatives analysis," considering whether the overall project purpose could be met by obtaining phosphate ore by other means or at other sites. AR216897-904; *see also* 201515-45. The Corps considered seven offsite alternatives, of which four satisfied the overall project purpose.[11] *See* 40 C.F.R. § 230.10(a)(2) ("An alternative is practicable if it is

[11] The three alternatives that the Corps rejected because they did not meet the overall project purpose were (1) purchasing phosphate ore from outside of Central Florida; (2) mining outside of Central Florida; (3) and constructing a new or expanded mine elsewhere in Central Florida. AR216897-99.

available and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes*.") (emphasis added).

The four offsite alternatives that the Corps determined would meet the overall project purpose were all within a practicable pumping distance of the existing beneficiation plant. AR216899-904, AR201536-45; *see also* AR201681, AR201684-89, AR201775, AR202093, and AR202107. The Corps determined, however, that three of these alternatives were not "practicable" because of increased transportation and logistical costs, the need to cross the Peace River, or insufficient quantity of phosphate reserves. AR216900; AR201515-45. A fourth alternative was practicable, but it raised more environmental concerns than the permitted alternative, and was therefore rejected because it was not the "least environmentally damaging" practicable alternative. AR216900-04, AR201542-44. Thus, the Corps found no practicable offsite alternative to the proposed project site (AR216897-904), which was "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

***Onsite alternatives.*** The Corps then considered five onsite alternatives to determine whether Mosaic had taken all practicable steps to minimize potential adverse impacts on protected waters. AR216904-07, AR201546-61, AR201690-93, AR178850. The project, as initially proposed by Mosaic (Alternative 1), would have permitted Mosaic to mine 7,753 acres on the Site, resulting (according to Mosaic's initial submittal) in the disturbance of 498.9 acres of jurisdictional wetlands[12] and 58,000 linear feet of jurisdictional streams, and would have involved six dragline crossings across jurisdictional streams. AR216905. Alternative 2A would have avoided 57,799

[12] The Corps requested additional information from Mosaic to verify whether Mosaic's preferred alternative would have limited impacts to 498.9 acres of jurisdictional wetlands. *See, e.g.,* AR190314, AR196750. The Corps concluded that the proposal would have resulted in impacts to 560 acres of jurisdictional wetlands. AR162342.

linear feet of jurisdictional streams, but the Corps determined that this alternative was impracticable because it would not permit Mosaic to mine sufficient ore to satisfy the overall purpose and because of increased cost and logistical constraints associated with the creation of ditch-and-berm systems and clay-settling areas. AR216906. Alternative 3, the "no action alternative," would have allowed Mosaic to mine 1,033 acres of the nearly 11,000-acre Site without a permit. AR216905. The Corps rejected that alternative because it would not meet the overall project purpose of mining a sufficient amount of ore to "continue operation of the [Polk County] separation/beneficiation plant at historical production rates." AR216906.

Alternative 4, the "stream crossings only alternative," would have allowed Mosaic to mine 4,604 acres of uplands by crossing (and, in doing so, disturbing) 11 streams.[13] The Corps determined that Alternative 4 was not practicable because it would not provide sufficient contiguous upland area to construct a clay settling area, which is necessary to contain the clay generated in the mining process. AR216906; AR201561; AR178850. Mining at the Site would have been limited to the remaining storage capacity in the clay settling areas on Mosaic's Polk County mine. Therefore, Mosaic would only be able to mine phosphate ore from about 55% of the Site, which the Corps concluded would not generate sufficient phosphate ore to meet the overall project purpose. AR201561, AR213752, AR201550, AR201558-59.

Ultimately, after 34 meetings with Mosaic, the Corps, EPA, and FWS, the Corps determined that, when accounting for mitigation, a different alternative – Alternative 2B – constituted the least environmentally damaging practicable alternative. AR216907. Under that alternative, Mosaic may

[13] "Stream crossings" in this context refers to where Mosaic would move draglines or install pipelines across a stream in order to access to another portion of the Site. EPA expressed interest in minimizing stream crossings. *See, e.g.*, AR196792-98 (EPA's January 15, 2010 letter suggesting that the Corps minimize stream crossings); AR196772 (February 2, 2010 minutes of meeting with EPA where the agencies discussed that 3 stream-crossings could be minimized).

mine approximately 50 million metric tons or 64% of phosphate ore on the tract. AR216905. The Corps determined that Alternative 2B is the environmentally-preferable alternative because, among other reasons, it (1) avoids permanent impacts to 88% of the jurisdictional wetlands on the Site (*id.*); (2) would not result in "significant degradation" to jurisdictional waters (AR216908); (3) requires Mosaic to immediately place in conservation easement more than 2,000 acres of onsite wetlands in and adjacent to floodplains (AR216940, AR214664-65; *see also* AR214042); (4) results in a reduction of impacts to bayhead wetlands (by 21%) and to streams (by 2%) from Mosaic's initial proposal (AR201560); and (5) ensures that 70% of bay systems and 68% of streams throughout the entire 10,856-acre tract (not just those portions that will be mined) will be avoided. AR201560.

Sierra Club exaggerates (Br. 8-11,15-19, 26, 28, 33) the significance of certain letters the Corps received from EPA, and ignores the extent to which the Corps revised Mosaic's proposal in response to EPA comments.[14] First, the Eleventh Circuit has already held that it was reversible error for this Court to set aside the Permit based on the same EPA letters (Remand Order at 2), and Sierra Club has offered no new arguments as to why those same letters undermine the Corps' analysis. Second, had EPA been dissatisfied with the decision to approve the Permit, it had two administrative mechanisms by which it could have elevated the issues for resolution by more senior personnel within the two agencies.[15] EPA employed neither. Finally, while EPA raised certain

[14] For example, based on EPA's suggestions, the Corps required that Mosaic eliminate impacts to a bayhead wetland and a stream segment, and that it protect by conservation easement the mitigation areas, including created wetlands and streams. AR197471.

[15] EPA could have either (1) elevated the issue for resolution under the 33 U.S.C. § 404(q) MOU between the two agencies (discussed *supra* at 4-5) if EPA believed that the project would "result in unacceptable adverse effects to aquatic resources of national importance," or (2) exercised its authority under Section 404(c), 33 U.S.C. § 1344(c), to veto the Permit if it believed "the discharge of materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas."

concerns in its letters, Sierra Club fails to explain how the Permit *that the Corps ultimately required* was arbitrary and capricious.

***Mitigation.*** The Corps determined that the revised mitigation plan (summarized at page 8 above) would ensure that Mosaic fully compensates for all unavoidable impacts to the waters of the United States. AR216911, AR216939-40. Regarding wetlands, the Corps concluded, based on a quantitative functional analysis, that the plan will result in no net loss of wetland functions. AR216911. Regarding stream channels, the Corps concluded that the plan (which requires Mosaic to, among other things, place in conservation easement more than 100,000 linear feet of avoided streams) will result in a net benefit. AR217355.

## III. The Corps Satisfied All Requirements For Public Participation.

### A. This Court should not substitute its judgment for that of the Corps on whether to hold a public hearing.

In its PI Order, this Court correctly "recognize[d] the Corps' considerable discretion" in determining whether to hold a public hearing on a permit application. PI Order at 17. The Court then described the public hearing regulations, 33 C.F.R. § 327.4(b), as limiting the Corps' discretion on whether to deny a hearing to those cases where the Corps "determines it has the information necessary to reach its decision *and* there is no valid interest to be served by holding a hearing."[16] *Id.* (emphasis added). The Court then stated that "a public hearing should be conducted" (PI Order at 18), without addressing whether the Corps abused its "considerable discretion" (*id.* at 17) in declining to hold a hearing in the first instance.[17] *See id.* at 18.

---

[16] Under the Corps' public hearing regulation, the Corps may deny a hearing if it concludes that the "issues raised are insubstantial" *or* that "there is otherwise no valid interest to be served by a hearing." 33 C.F.R. § 327.4(b).

[17] The Court found that it "need not decide whether the Corps' refusal to conduct a hearing would itself necessitate a stay of the permit because a remand is otherwise necessary." PI Order at 18.

That discretion is indeed broad. Under the Corps' regulations, if the Corps determines that "the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing[,] the Corps has the discretion not to hold one. 33 C.F.R. § 327.4(b). Here, Sierra Club does not even allege that its written comments and its June 2009 meeting with the Corps were insufficient for it to be heard or that the Corps' ultimate determination would have been different if a public hearing had been held.

The Corps received eight written requests to hold a public hearing (AR216889-96), but ultimately determined that the issues raised in each either was insubstantial or had been considered by the Corps and, therefore, no valid interest would be served by holding a public hearing. *Id.*; AR216973. *See Fund for Animals*, 85 F.3d at 545 (Corps has "discretion to hold hearings on permit applications on an 'as needed' basis"); *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 997 (9th Cir. 1993) (Corps acted within its discretion in denying 250 requests for hearing on the grounds that a hearing would "be useful only as a forum to enable project proponents and opponents to air their views" and it "was aware of strong support on both sides"). The Corps here conducted a "thorough review of the submitted comments," and it reasonably concluded that all "substantial issues raised [by the public] have been considered by the Corps." AR216973. *See also* AR216894-96 (identifying where in the EA the Corps responded to each written comment). The Corps has permissibly interpreted its hearing regulations as requiring no more. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (Court must defer to agency's interpretation of its own regulations unless "plainly erroneous or inconsistent with the regulation").

Sierra Club suggests (Br. 34) that the Court should set aside the Permit because some hypothetical citizen – "not just Plaintiffs or those who commented" – might have "provide[d] information to the Corps at a hearing," claiming (*id.* at 34-35) that the Eleventh Circuit accepted "an

analogous argument" in *Sierra Club v. Johnson,* 436 F.3d 1269 (11th Cir. 2006). *Sierra Club* is inapposite. That case involved a challenge to EPA's decision not to object to a state-issued Clean Air Act (CAA) permit, and the dispositive issue there was whether Sierra Club had standing to challenge EPA's compliance with its CAA public-notice regulations where Sierra Club received actual notice and provided comment. *Id.* at 1275-76. Here, the United States has not challenged Sierra Club's standing to press its public notice argument. We instead argue that, on the merits, Sierra Club has not established that the Corps' discretionary decision not to hold a public hearing was arbitrary and capricious.

### B. The Corps satisfied NEPA's public notice and comment requirements.

Sierra Club incorrectly contends (Br. 35-36) that a Council on Environmental Quality (CEQ) regulation, 40 C.F.R. § 1501.4(e)(2), required the Corps to issue a draft EA/FONSI and provide a 30-day public comment period before making a decision on Mosaic's permit application. That regulation has no applicability here. Public comment is required on a draft EA/FONSI only in two "limited circumstances": (1) when "[t]he proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to Sec. 1507.3"; or (2) when "[t]he nature of the proposed action is one without precedent." Neither circumstance is present here. The applicable Corps regulations, 33 CFR Part 325 App. B,[18] do not provide that a decision whether to issue a Section 404 permit normally requires the preparation of an EIS.[19] And Sierra Club properly does not assert that issuing this 404 permit is "without precedent."

[18] These procedures refer to the Corps' NEPA regulations, 33 CFR part 230, for additional guidance.

[19] Sierra Club's citation (Br. 35) to *Citizens Advisory Comm. v. United States Dep't of Justice*, 197 F. Supp. 2d 226, 246-47 (E.D. Pa. 2001), is inapposite. Under Department of Justice regulations implementing NEPA, the Department's proposed construction of a prison normally required an EIS. The court concluded that the proposed construction of a prison by a private entity at the behest of the Department was a closely

Sierra Club's interpretation of 40 C.F.R. § 1501.4(e)(2) would require the Corps to circulate a draft EA for every Section 404 permit application. The Ninth Circuit has rejected the contention that circulation of a draft EA on a Section 404 permit application is required in every case. *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 951-53 (9th Cir. 2008); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 518-20 (D.C. Cir. 2010) (BLM was not required to circulate draft EAs on applications for drilling permits).

**IV. The Corps Fully Complied With Its Obligations Under NEPA.**

NEPA "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). A federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Thus, "'[t]he initial responsibility of the federal agency is to determine the extent of the environmental impact.'" *Hill v. Boy*, 144 F.3d 1446, 1459 (11th Cir. 1998) (quoting *C.A.R.E. Now, Inc. v.* FAA, 844 F.2d 1569, 1572 (11th Cir. 1988)). In making a finding of no significant impact, an agency must: (1) accurately identify the relevant environmental concerns; (2) take a "hard look" at the environmental consequences of the action; (3) make a "convincing case" that the potential environmental impact is not significant enough to require an EIS; and (4) if there is a significant impact, show that "changes or safeguards in the project sufficiently reduce the impact to a minimum." *Hill*, 144 F.3d at 1449 (internal quotations and citation omitted).

Here, the Corps prepared an EA which identified the relevant environmental concerns and took the requisite hard look at the project's environmental impacts. Notably, 32 pages of the EA are devoted to specifying the required mitigation for the impacts to wetlands and streams. AR216941-

similarly action. Here, Sierra Club has not pointed to any Corps regulation presumptively requiring an EIS for any similar action, as there is no such regulation.

72.[20] Impacts to higher-quality wetlands were avoided to a great extent, and impacted wetlands will be restored, resulting in a "no-net loss of wetland values and functions." AR216940; *see also* AR216943-57. Impacts to streams were also avoided to a great extent, and, where unavoidable, streams will be restored or created. AR216957-66. Mitigation work is staged to proceed as mining proceeds from block to block. Pursuant to Special Condition 4 of the Permit (AR216942), the Corps, EPA and USFWS will review Mosaic's mitigation work on an annual basis and Mosaic may not proceed to the next mine block until the agencies determine that it is in compliance with all permit terms and conditions. AR216942. Based on this extensive required mitigation, the Corps determined that there would be no significant impact and that an EIS was not required. AR216974. A court must give "substantial deference" to an agency's decision whether to prepare an EA or EIS. *Sierra Club*, 526 F.3d at 1361. Sierra Club has not demonstrated that the Corps' finding of no significant impact was arbitrary or capricious.

**A. The Corps properly evaluated "significance" under CEQ's regulations.**

CEQ has instructed agencies that the evaluation of significance "requires considerations of both context and intensity," and has provided a list of ten factors to be "considered in evaluating intensity." 40 C.F.R. § 1508.27. Sierra Club misinterprets and misapplies this provision in arguing (Br. 36-46) that the Corps' FONSI was arbitrary and capricious. Sierra Club incorrectly asserts (Br. 37) that an EIS is required "[i]f any one or more of these [intensity] factors are present." Neither a plain reading of the provision, nor the D.C. Circuit cases Sierra Club cites, supports that interpretation.[21]

---

[20] Even more detail is provided in Mosaic's Mitigation Plan-Revision No. 2 (Mar.10, 2010), also incorporated into the EA by reference. AR197471-AR201292.

[21] To the extent that language in *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 58, 65-68 (D.D.C. 2010), can be read as supportive of Sierra Club's interpretation, that decision is presently on appeal to the D.C. Circuit. D.C. Cir. No. 10-5284.

***Proximity to wetlands and ecologically critical areas, Section 1508.27(b)(3).*** The Corps obviously considered the Project's effect on wetlands and other jurisdictional waters within the project area in great detail since the proposed action was a permit authorizing discharges of dredged or fill material into these waters. The Corps also paid careful attention to potential impacts on downstream waters, including the Peace River and Charlotte Harbor estuary. AR216928-37. The Corps has no categorical obligation to prepare an EIS for every Section 404 permit application. Courts, for example, have repeatedly upheld Corps FONSIs based upon the use of mitigation measures to offset impacts to wetlands. *See, e.g., Bering Strait*, 524 F.3d at 955-56; *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1121-22 (9th Cir. 2000); *Friends of the Earth v. Hintz*, 800 F.2d 822, 836-38 (9th Cir. 1986); *Sierra Club v. U.S. Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1225 (M.D. Fla. 2006), *aff'd*, 508 F.3d 1332 (11th Cir. 2007); *Northwest Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 135 (D.N.H. 2008); *Ga. River Network v. U.S. Army Corps of Eng'rs,* 334 F. Supp. 2d 1329, 1337 (N.D. Ga. 2003); *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,* 916 F. Supp. 1557, 1564-65 (N.D. Ga. 1995), *aff'd*, 87 F.3d 1242 (11th Cir. 1996).

Sierra Club has failed to demonstrate that the Corps' reliance on its data about the Project's impacts on wetlands and other water resources, and on its expert's conclusions based on that data that there would be no significant impacts from the Project as mitigated, were arbitrary and capricious. *N. Buckhead*, 903 F.2d at 1539, 1541 (an agency is entitled to "rely on the reasonable opinions of its own qualified experts"). While Sierra Club has a different view, the resolution of this issue "implicates substantial agency expertise," and this Court "must defer to 'the informed discretion of the responsible federal agenc[y].'" *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989) (internal quotations omitted).

***Cumulative impacts, Section 1508.27(b)(7***). The Corps amply fulfilled its obligation to analyze cumulative impacts.[22] The EA's 25-page analysis (AR216916-40) covered the Peace River watershed (some 1,198,165 acres) and a 50-year time period (1977-2028), addressing the effects of mining, agricultural use and urban land use on water quality, hydrology, fish and wildlife habitat, air quality, water supply, cultural and historical resources, socioeconomic resources, public safety, and energy needs. Sierra Club's only complaint about the scope of the cumulative impacts analysis (Br. 40) is that it did not include mining activity after 2028. But the Corps reasonably decided to end its analysis in 2028 when reclamation at the Site was projected to be completed. AR216917. The Corps explained that the "rate of reclamation and mitigation now essentially equals the rate of mining on a basin-wide basis, such that the acreage of land in mining use is relatively constant." AR216926. Sierra Club has not demonstrated that extending the cumulative impacts analysis beyond 2028 would have provided additional information "useful to [the agency] and the public." *City of Oxford*, 428 F.3d at 1354; *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987) (noting that the "NEPA process involves an almost endless series of judgment calls," and holding that the agency's treatment of cumulative impacts in the EA/FONSI was adequate).

Sierra Club fails to demonstrate that the Corps' conclusion of no significant cumulative impacts was arbitrary and capricious. Sierra Club's references to various reports[23] about environmental changes in the Peace River watershed resulting from *all* land uses (including agriculture and urban development) does not undercut the EA's very detailed analysis. Sierra Club does not challenge the finding that the number of acres impacted by phosphate mining has steadily

---

[22] Cumulative impacts are those environmental impacts that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." 40 C.F.R. § 1508.7.

[23] Sierra Club cites FDEP's 2007 Peace River Cumulative Impact Study on which the Corps heavily relied. AR216925-30.

*decreased* since 1993 (AR216927), nor does it challenge the Corps' judgment that 25,000 acres of unreclaimed mined land is an appropriate significance threshold for the sustainability of the resources in the watershed. AR216939. In any event, the Corps is entitled to deference on this judgment as it may opt to "rely on the reasonable opinions of its own qualified experts." *N. Buckhead*, 903 F.2d at 1539.

Sierra Club's allegation (Br. 40-41) that the Corps did not undertake a cumulative impacts analysis of water quality in the watershed is simply false. The State of Florida concluded that the *Project* would not significantly impact water quality and quantity, and the Corps more broadly evaluated land use and reclamation efforts across the entire Peace River Watershed. AR216930, AR216934-37.

Finally, Sierra Club argues that the cumulative impacts from this Project must be significant because the Corps and EPA decided shortly after the decision on this permit to conduct a region-wide EIS on future phosphate mining in Central Florida. *See* Br. 41. This Court has already reasonably determined that "the fact that the Corps and EPA have *now* agreed to conduct an EIS on the cumulative impacts of phosphate mining" *does not* "lead[ ] the Court to conclude the Corps erred in making its FONSI finding." PI Order at 12 n.6. Sierra Club provides no new argument on this point. This EA can and must be judged on its own merits. As explained above, Sierra Club has not met its burden to show that the EA's conclusion of no significant cumulative impacts was arbitrary and capricious.

***"Highly controversial," Section 1508.27(b)(4).*** Sierra Club's contention (Br. 42-44) that the Corps had to prepare an EIS because the Project is "highly controversial" is similarly unpersuasive. "The use of the word 'highly' in the NEPA regulations to modify 'controversial' and 'uncertain' means that information merely favorable to [Plaintiffs'] position . . . does not necessarily

raise a substantial question about the significance of the project's environmental effects . . . ." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005). Courts have often found that seemingly-controversial agency actions do not rise to the level of "highly controversial," as that term is used in the NEPA regulations. *See Humane Soc'y. of U.S. v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010) (upholding FONSI for decision to allow killing of eighty-five California sea lions annually); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 240-41 (5th Cir. 2006) (upholding FONSI for agency action resulting in destruction of low-income housing development); *Ga. River Network*, 334 F. Supp. 2d at 1338 (upholding FONSI for construction of 1,477-acre reservoir).

Sierra Club's reliance on *Georgia River Network* actually undercuts its argument that questions about the functional value of reclaimed wetlands,[24] socioeconomic impacts of phosphate mining, and potential impacts to water flow demanded an EIS. The court in *Georgia River Network* concluded that an EA and FONSI were adequate, despite comments demonstrating concern over the project's size and effect, where the Corps responded in the EA to the concerns that had been raised. *Id.* at 1338. Though not styled as direct responses to the commenters themselves, the Corps here similarly addressed each of the issues in the EA and provided a well-reasoned basis for its conclusions. *See* AR216911, AR216939-40 (wetlands restoration); AR216910-15 (socioeconomic impacts); AR216930, AR216934-37 (water flow); *see also Wetlands Action Network v. U.S. Army Corps of Eng'rs***,** 222 F.3d 1105, 1120-21 (9th Cir. 2000) (where the administrative record "reveals that an agency based a finding of no significant impact upon relevant and substantial data, the fact that the record also contains evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious"); *Marsh*, 490 U.S. at 378 ("When specialists express

[24] Sierra Club's argument (Br. 44) that uncertainty about the restoration of wetlands and streams required an EIS under 40 C.F.R. § 1508.27(b)(5) is essentially a reiteration of this argument.

conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts").[25]

***Endangered species, Section 1508.27(b)(9).*** Sierra Club incorrectly asserts (Br. 44) that the mere potential to adversely affect an endangered species requires preparation of an EIS. It does not. That potential triggers the need to consult with FWS and/or National Marine Fisheries Service (NMFS) pursuant to the Endangered Species Act. Under NEPA, the Corps had to consider "the degree to which the action may adversely affect" listed species or critical habitat, 40 C.F.R. § 1507.27(b)(9). After consulting with FWS with respect to the wood stork, eastern indigo snake, and Audubon's crested caracara, the Corps reasonably concluded that potential impacts on these species would not be significant. AR216887-88, AR216915-16. The Corps also reasonably determined more broadly that the Project would not have a significant impact on fish and wildlife habitats. AR216930, AR216934-37.

While it is true that the EA does not specifically mention the Smalltooth sawfish, that does not demonstrate that the Corps "entirely failed to consider an important aspect of the problem." Br. 45. The Smalltooth sawfish has been found in the Charlotte Harbor estuary and brackish portions of the lower Peace River, about *forty miles* downstream from the Project area. *See* 74 Fed. Reg. 45,353, 45,356 (Sept. 2, 2009). Notably, NMFS, which has jurisdiction over marine species under the ESA, declined to take action in response to the Corps' public notice for the permit. AR216891, AR031613, AR031677. That is not surprising given the significant distance between the Project area and the marine environment. The Corps analyzed whether there would be downstream water quality impacts in its cumulative impacts analysis, including any impacts to fish and wildlife habitat, and concluded that there would not be. AR216928-37; *see also* AR216911 (considering

[25] Moreover, socio-economic effects, standing alone, do not trigger NEPA's EIS requirement. 40 C.F.R. § 1508.14; *Image of Greater San Antonio v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978).

fish and wildlife values as part of its public interest review). Moreover, Sierra Club itself does not appear overly concerned with the Corps' consultation with NMFS or the critical habitat issue. While it initially asserted an ESA claim, it dropped that claim in its Amended Complaint (ECF 109) and also from its Second Supplemental and Amended Complaint (ECF 130-1).

***Public Health and Safety, 40 C.F.R. § 1508.27(b)(2).*** Sierra Club acknowledges (Br. 45-46) that the Corps considered the mine's visual, noise and dust impacts on nearby residents, and that Hardee County required mitigation measures as conditions of its land use approval, but argues that the wording of the EA's discussion of these issues in a summary chart (AR216910) indicates that the Corps did not seriously consider them. This semantic quibble provides no basis to conclude that the Corps was arbitrary and capricious in deciding not to prepare an EIS based on these impacts.

**B. The Corps' Mitigation Plan renders the Project's impact insignificant.**

Even where a major federal action would otherwise result in significant environmental impacts, an EIS is unnecessary where those impacts will be mitigated. *C.A.R.E.*, 844 F.2d at 1575. "To require an EIS in such circumstances would . . . 'diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment.'" *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982). CEQ has recently confirmed the "appropriateness, value, and efficacy" of using mitigation conditions to reduce potentially significant impacts to insignificant levels. Nancy H. Sutley, "*Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*" (Jan. 14, 2011), at 7. CEQ advises agencies to take steps to "ensure that mitigation conditions are actually implemented," *id*. at 8, which the Corps did here. Here, the Corps' conclusion that the Project would have no significant impact, and thus that no EIS was

required, was based in part on the extensive mitigation measures imposed as Permit conditions. AR216911, AR216939-40.

The mitigation plan comprehensively addresses how impacts will be offset by analyzing erosion control, success criteria, performance standards, monitoring requirements, adaptive management plans, and long-term protection plans.[26] AR197475-609, AR214012-40. The Corps independently analyzed and verified a quantitative pre- and post-mining functional analysis of jurisdictional wetlands and streams. AR216940, AR197475-609. This included calculation and comparison of functional wetland loss with the mitigation's planned functional wetland gain. AR197544-64. The calculation considered both temporal lag and mitigation risk. AR217358, AR217360, AR217364, AR217366-67. The result of that analysis is a net gain in functional forested and herbaceous wetlands. AR217376. Further, the *thirty-two* mitigation-based special conditions in the Permit include measures to ensure the success of the mitigation plan. Mosaic will not be allowed to proceed with the next scheduled mine block if, during annual reviews, the Corps, EPA, and FWS determine that it is not in compliance with the terms and conditions of the permit, including mitigation. AR216914, AR214637-38. And all compensatory mitigation must be completed within six months of initiating work on each mine phase, but in no case later than two years following completion of mining. AR216944, AR214639.

The Sierra Club's and some commenters' disagreement with the Corps' conclusion on the effectiveness of wetlands mitigation is of no import. NEPA does not allow for a "battle of experts,"

---

[26] Sierra Club's contention that the Corps did not thoroughly assess the mitigation or address contrary evidence is wholly rebutted by the administrative record. The Corps independently reviewed and verified the mitigation plan, evaluated at least twenty Mosaic submittals in response to Corps and EPA comments or requests for additional information, and considered peer-reviewed and government resources. *See, e.g.*, AR000546, AR000920, AR010408, AR018550, AR018589, AR178559, AR178561, AR178911, AR178912, AR178926, AR180504-7060, AR196674, AR196780, AR196816, AR196827, AR196831, AR196819, AR197471-201292, AR202723, AR202965, AR202982, AR202987, AR203008, AR203010, AR203304, AR203307, AR203311, AR203322, AR203341, AR203360, AR214330, AR214340, AR214341, AR214345.

instead allowing the Corps to rely on any methodology that has a rational basis. *Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d 1215, 1226 (S.D. Fla. 2010) (citing *Druid Hills Civic Ass'n, Inc. v. FHWA*, 772 F.2d 700, 711 (11th Cir. 1985)). Where, as here, "an agency base[s] a finding of no significant impact upon relevant and substantial data, the fact that the record also contains evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious." *Wetlands Action Network*, 222 F.3d at 1120-21. And even the administrative record document to which Sierra Club cites concedes that wetlands reclamation is possible. *See* Br. 45 (citing AR: 2007_07_12 Charlotte Cty. BCC_Attachment A-2(2) at ¶¶ 704, 741 and 882 for statement that "no successful reclamation of bay head swamps has ever taken place, *except under circumstances inapplicable to [a different mine site]*" (emphasis added)). The Corps relied upon evidence that the mitigation plan will succeed, and that highly-technical determination is entitled to accorded substantial deference. *Fla. Keys Citizens Coal. v. U.S. Army Corps of Eng'rs,* 374 F. Supp. 2d 1116, 1155 (S.D. Fla. 2005).

**V. This Court Should Decline To Consider Sierra Club's New "Area 2" Claim.**

Two days before it filed for summary judgment, Sierra Club moved to amend its complaint to add new claims stemming from events that occurred long after the Corps issued the challenged Permit. What's more, Sierra Club sought summary judgment on these new claims (Br. 48-50) before the Court had an opportunity to rule on the motion to amend, in violation of Fed. R. Civ. P. 15(b). Federal Defendants have filed an opposition to Sierra Club's motion to amend (ECF 136) and, for the reasons stated therein, believe that it would be improper to consider these new claims in this APA-challenge.

Even if the Court reaches the merits of Sierra Club's "Area 2" claims, it should conclude that Mosaic's April 2011 announcement that it intends to begin mining uplands is irrelevant to the

question whether the Corps' June 2010 decision to issue the Permit violated the Clean Water Act or NEPA. *See Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1176 n.16 (9th Cir. 2004) ("We cannot rely on information available only after the Corps' issuance of the 2001 ROD in evaluating whether the 2001 ROD was arbitrary and capricious or contrary to law."); *Newton Cnty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 808 (8th Cir. 1998) (refusing to consider information "not available to the Forest Service when it prepared the Environmental Assessments" in reviewing the Service's decision). If Sierra Club believes that it can make a colorable claim that Mosaic's decision to mine uplands "constitutes a substantial change in the project" that reveals "significant new information relevant to environmental concerns" (Br. 49), it may petition the Corps' district engineer to revoke, suspend, or modify the permit based on this alleged new information. *See* 33 C.F.R. § 325.7(a) ("The district engineer may reevaluate the circumstances and conditions of any permit . . . at the request of . . . a third party . . . and initiate action to modify, suspend, or revoke a permit as may be made necessary by considerations of the public interest."). The Corps would then have an opportunity to assess this new claim in the first instance. To rule on Sierra Club's new claims would require this Court improperly to cross the line from reviewer to decisionmaker. The Court should decline this invitation.

Regardless, no NEPA analysis is necessary for the Area 2 mining, so long as the mining does not require any action – such as a Section 404 permit – from the Corps. Sierra Club has not cited authority to suggest that the Corps must consider the environmental consequences of an action that does not have a direct impact on jurisdictional waters. Simply put, "[t]here is no ongoing 'major Federal action' that could require supplementation." *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 73 (2004); *see Cold Mountain,* 375 F.3d at 894 ("Because the Permit has been approved and issued, the Forest Service's obligation under NEPA has been fulfilled."); *Envtl.*

*Protection Info. Ctr. v. U.S. Fish & Wildlife Serv.*, No. 04-4647, 2005 WL 3877605, at *2 (N.D. Cal. Apr. 22, 2005) ("In 1999 the government issued Pacific Lumber its incidental take permit. There is no other ongoing major federal action; accordingly NEPA does not apply."); *Wyo. v. U.S. Dep't of Interior*, 360 F. Supp. 2d 1214, (D.Wyo. 2005) ("[O]nce the [wolf] reintroduction plan went into effect the need for [NEPA] supplementation was at an end"). Without any new federal action, there is no need for a supplemental NEPA review. Moreover, judicial review of NEPA is limited to the administrative record, *P.E.A.C.H. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.2 (11th Cir. 1996), and Sierra Club's argument is based entirely on extra-record materials because the facts supporting its new claim occurred months after the Corps issued the challenged Permit.

**CONCLUSION**

For the foregoing reasons, the Court should grant the Corps' motion for summary judgment and deny Sierra Club's motion for summary judgment.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

*<u>/s/ Adam J. Katz</u>*
Adam J. Katz
Environmental Defense Section
United States Department of Justice
P.O. Box 23986
Washington DC 20004
Telephone: (202) 514-2689
Facsimile: (202) 514-8865
adam.katz@usdoj.gov

J. NATHANAEL WATSON
Natural Resources Section
United States Department of Justice
P.O. Box 663
Washington DC 20004
Telephone: (202) 305-0475
Facsimile: (202) 305-0267
joseph.watson@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2011, the foregoing was electronically filed with the Clerk of the Court using CM/ECF, which will send a notice of electronic filing to counsel of record. I also certify that the foregoing document is being served this day on the following counsel of record in the manner specified.

*/s/ Adam J. Katz*