**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| SIERRA CLUB, INC.; PEOPLE FOR PROTECTING THE PEACE RIVER, INC.; and MANASOTA-88, INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS; and COLONEL ALFRED A. PANTANO, JR., | ) | Case No. 3:10-cv-00564-HLA-JB |
| Defendants, | ) | |
| and | ) | |
| MOSAIC FERTILIZER, LLC, | ) | |
| Defendant-Intervenor. | ) | |

# MOTION FOR PRELIMINARY INJUNCTION


Eric E. Huber
*Pro Hac Vice* (Colo. Bar no. 40664)
Sierra Club
1650 38th Street Suite 102W
Boulder, CO 80301
(303) 449-5595
fax (303) 449-6520

Marcy I. LaHart, Esq.
Fla. Bar no. 0967009
4804 SW 45th Street
Gainesville, FL 32608
(352) 224-5699
fax (888) 400-1464

ATTORNEYS FOR PLAINTIFFS

## TABLE OF CONTENTS

MOTION FOR PRELIMINARY INJUNCTION……………………………………………...1

MEMORANDUM OF LAW…………………………………………………………...3

I. PLAINTIFFS MEET ALL ELEMENTS FOR A PRELIMINARY INJUNCTION……...3

A. Plaintiffs have a Likelihood of Success on the Merits…………………………….3

B. There is a Substantial Threat of Irreparable Injury if the Injunction is not Granted…………………………………………………………….3

1. Mosaic's Mining and Related Activities cause Irreparable Harm………...5

2. Mosaic's Area 2 Activities will cause Irreparable Harm………………….6

3. Mosaic's Area 2 Activities are Contrary to the 11th Circuit Stay and will disrupt the Status Quo Pending a Decision on the Merits……………9

4. The NEPA violations cause Irreparable Harm…………………………...11

C. The Threatened Irreparable Injury Outweighs the Threatened Harm the Injunction may do to the Defendants…………………………………………….13

D. Granting the Preliminary Injunction will not Disserve the Public Interest………16

II. CONCLUSION……………………………………………………………………….18

Certificate of Service

**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Sierra Club, Manasota-88, Inc., and People for Protecting Peace River, Inc., pursuant to Fed. R. Civ. P. 65(a) and Local Rule 4.06, hereby respectfully move for a preliminary injunction pending this Court's final decision on the merits. In support therefor Plaintiffs show as follows:

1) Plaintiffs have a substantial likelihood of success on the merits; there is a substantial threat of irreparable injury if the injunction is not granted; the threatened irreparable injury outweighs the threatened harm the injunction may do to the defendant; and granting the preliminary injunction will not disserve the public interest. *Nat'l Wildlife Fed'n v. Marsh*, 721 F.2d 767, 770 (11th Cir. 1983); Local Rule 4.06.

2) The 11th Circuit Court of Appeals stayed the permit for the South Fort Meade extension project for 90 days, until July 7, 2011, "to permit the district court to proceed to a merits determination on the full record." 11th Cir. April 8, 2011 Order at p. 3. Plaintiffs request this preliminary injunction to accommodate the Court in the event that it requires additional time to issue its final merits determination and to, consistent with the 11th Circuit's stay, preserve the *status quo* pending this court's final ruling. "[M]aintenance of the status quo is the primary purpose of preliminary injunctive relief." *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir. 1983).

3) Plaintiffs request that, after Mosaic and the Corps have been heard in response to this motion, the Court issue this preliminary injunction as soon as possible in advance of July 7, 2011. The 11th Circuit stay notwithstanding, on April 19, 2011 Mosaic filed its 'Notice of Area 2 Uplands Mining." [Dkt. 118]. Mosaic has already cleared a dragline access path to the portion of the site it calls "Area 2," built a ditch and berm in a portion of that area, and has given notice that in "mid-June 2011" its "draglines walk through access corridor" and in "early July 2011" its

"draglines begin mining Area 2," hence Mosaic might begin mining before the 11th Circuit stay expires. [Dkt. 118 at 4]. This will have adverse impacts on the wetlands in and around Area 2. In addition, unless enjoined Mosaic may begin destruction of streams and wetlands throughout the 10,856 acre site when the current stay expires on July 7, 2011.

4) This Motion is based on: a) the following Memorandum of Law and exhibits attached hereto; b) Plaintiffs' Motion for Summary Judgment and Response in Opposition to Defendants' Cross-motions for Summary Judgment [Dkt. 133 and 147]; c) Plaintiffs' Verified Complaint and previous Motion for Temporary Restraining Order and Preliminary Injunction and the exhibits in support thereto [Dkt. 1-17]; d) Plaintiffs' Response to Notice of Area 2 mining [Dkt. 120] with the exhibits attached thereto; and e) all other materials properly of record.

5) Plaintiffs should not be required to post a bond pursuant to Fed. R. Civ. P. 65(c), as this Court recognized in its prior preliminary injunction, since this is public interest litigation and Plaintiffs do not have a financial interest in the outcome. Dkt. 88 at 22.

6) Although Local Rule 3.01(g) does not require prior consultation for a motion for injunctive relief, counsel for Plaintiffs certifies that he discussed this motion with counsel for the Corps and Mosaic and they are opposed.

**WHEREFORE**, Plaintiffs respectfully request that the Court issue a preliminary injunction restraining and enjoining Mosaic and all of its agents, officers, employees and attorneys, from any ground disturbing activities, excavation, dredging, filling or other alteration of jurisdictional waters of the United States at the South Fort Meade Extension site, including but not limited to Mosaic's "Area 2," until the Court issues a final ruling on the merits. A proposed order is attached.

# MEMORANDUM OF LAW

## I. PLAINTIFFS MEET ALL ELEMENTS FOR A PRELIMINARY INJUNCTION

### A. Plaintiffs have a Likelihood of Success on the Merits

Plaintiffs (hereafter also referred to collectively as "Sierra Club") incorporate in full the arguments and citations of authority in Plaintiffs' Motion for Summary Judgment (hereafter "SC Br." [Dkt. 133]) and Plaintiffs' Response in Opposition to Defendants' Cross-Motions for Summary Judgment [hereafter "SC Resp." [Dkt. 147]. For the reasons set forth therein Plaintiffs have a likelihood of success on the merits of their claims that:

1) The Corps' alternatives analysis violated the CWA and NEPA regulations and was arbitrary and capricious. SC Br. at 15-23; SC Resp. at 1-6.

2) The Corps' definition of purpose and need was contrary to the CWA and NEPA regulations, and was arbitrary and capricious. SC Br. at 23-27; SC Resp. at 6-8.

3) The Corps violated its duty to independently evaluate and verify Mosaic's information SC Br. at 27-30; SC Resp. at 8-11.

4) The Corps' decisions to not hold any public hearing and not allow comment on the FONSI were arbitrary and capricious. SC Br. at 31-36; SC Resp. at 11-13.

5) The Corps' Finding of No Significant Impact, and its decision not to prepare an EIS, were arbitrary and capricious. SC Br. at 36-48; SC Resp. at 13-19.

6) Mosaic's "Notice of Area 2 Uplands Mining" requires a supplement to the Environmental Assessment. SC Br. at 48-50; SC Resp. at 19-20.

### B. There is a Substantial Threat of Irreparable Injury if the Injunction is not Granted

The clearest evidence of the severe impact of Mosaic's mining operation is provided by the attached aerial photographs of the South Fort Meade extension site. These are generally looking north, and show the completely barren nature of Mosaic's previous South Fort Meade mine for comparison to the undisturbed South Fort Meade extension site to the south. These

photographs also show Mosaic's "Phase I" mined area for comparison to Mosaic's "Area 2, " which is visible to the southwest of Phase I, and to the undisturbed remainder of the South Fort Meade extension site to the south. See Ex. A attached.[1]

The Court will recall that this project overall involves strip mining 7,687 acres in Hardee County, Florida for phosphate ore. The "South Fort Meade Extension Permit" authorizes the destruction of 534 acres of wetlands and 10.7 miles (56, 661 linear feet) of streams in the headwaters of the Peace River and Charlotte Harbor estuary. The Peace River watershed is considered a Priority Watershed and Aquatic Resource of National Interest ("ARNI") by the U.S. Environmental Protection Agency ("EPA") and is a drinking water source for hundreds of thousands of Floridians. The mining process involves the use of huge draglines that strip away all overlying vegetation, waterways, wetlands, topsoil, and overburden (the sandy soils that overlay the phosphate deposit) down to the phosphate-containing layer. The result is the utter destruction of the local natural environment from ground surface down to a depth of approximately 50-80 feet.

In this Court's July, 2010 preliminary injunction it found that "the excavation of ecologically significant wetlands and streams often constitutes irreparable harm." Dkt. 88 at 18. In Mosaic's appeal to the 11th Circuit it seized on the Court's use of the word "often" to argue that the Court did not find irreparable harm, but was only presuming it. Therefore, Plaintiffs request that the Court find expressly find irreparable harm again, and submit the following to

[1] "Phase I" is a 200 acre portion of the South Fort Meade extension mine that includes the 8.79 acres of wetlands that Mosaic cleared before the Temporary Restraining Order in June, 2010. The parties reached a settlement regarding Phase I under which Mosaic finished mining that site in exchange for preserving approximately 14 acres of wetlands and 40 acres of uplands to the west of Phase I. Dkt. 114-1. This was made the order of the court. Dkt. 115.

summarize the evidence on that subject and to provide additional support regarding Mosaic's "Area 2" activities.

1. *Mosaic's Mining and Related Activities cause Irreparable Harm*

As the Court noted in its 2010 preliminary injunction, the EPA's technical comments provide considerable evidence of the irreparable harm to streams and wetlands from the project. The EPA discussed the "high functional level of the ecosystems affected by this project, the large acreage of impacts associated with the proposed project, and the potential for significant impacts to the Peace River and downstream estuaries which may result in significant cumulative adverse impacts." Dkt. 16-4, 16-7. The Court also had before it Plaintiffs' expert wetlands biologist's declaration describing the irreparable harm to wetlands from mining. He explained that in the mining process topsoil and impermeable confining layers that maintain the unique hydrologic regimes of headwater wetlands are removed and the associated groundwater aquifers are irreparably altered. [First] Winchester Declaration, Dkt. 8 at ¶ 9. The court also had before it several declarations from members of the Plaintiffs' groups, including members living in proximity to the mine, describing how the bright lights, loud noises, constant dust, and depletion of local water resources associated with the mining interfere with their use and enjoyment of their property. Dkt. 5-9. All of this evidence is applicable to the instant motion as well.

Since then Sierra Club has submitted further evidence regarding the harm to streams and wetlands. In response to Mosaic's Motion to Stay the July, 2010 Preliminary Injunction, Sierra Club submitted a second Winchester declaration, which discusses how once on-site wetlands are cleared they are lost to effective mitigation, and how dewatering the uplands effects the water table beneath adjacent wetlands basins. Dkt. 104-1 at 5. Plaintiffs also submitted the declaration of Dr. Sydney Bacchus, who describes how the project would irreversibly damage streams and

wetlands in the site, as well as how the large groundwater withdrawals associated with the mining expand the zone of impact beyond the immediate wetlands, since they are connected to the underlying aquifer system. Dkt. 104-4 at ¶¶ 16 - 24.

Mosaic might argue, as it did in the July, 2010 preliminary injunction, that any harm to the wetlands will be offset by mitigation or reclamation. But the Court will recall the record contains serious questions about the effectiveness of Mosaic's mitigation, that reclamation of wetlands after phosphate mining "presents daunting and sometimes insurmountable challenges," and that Mosaic has been unable to demonstrate its ability to do it after decades of trying. [First] Decl. of Brian Winchester at ¶¶ 9-11, 14,17, 18, 25-29. The EPA warned that the Corps' mitigation regime was inadequate to protect the unique resources at stake. Dkt. 16-5 at 2. Furthermore, much of the reclamation would not occur until 2026. See e.g. AR 2010_06_14 Permit Instrument Attachment2d at 2. Mosaic is seeking to mine this area before it has reclaimed the wetlands from its previous mining. R:17-3 at 7 and 11. As this Court found: "the fact remains that even if the restoration is successful there is a significant time lag between the mining activity and the restoration completion; in many cases, restoration will not be accomplished for a decade or more." Dkt. 88 at 19. That delay makes the harm to these wetlands "of long duration," *i.e.* "irreparable." *Amoco Prod. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

2. *Mosaic's Area 2 Activities will cause Irreparable Harm*

In spite of the 11th Circuit stay, on April 19, 2011 Mosaic filed it "Notice of Area 2 Uplands Mining." Mosaic stated it would conduct "site preparation and access corridor construction" in "April-May 2011." In the photographs attached hereto the "access corridor" is clearly visible as the wide clearing between the Phase I area heading southwest to the undisturbed 700 acre parcel Mosaic refers to as "Area 2." Mosaic did not define what its "site

preparation" consists of, and in the map attached to its Notice it identifies portions of Area 2 that will be "disturbed, not mined," without defining that term. This apparently includes Mosaic building a ditch and berm system, and the photographs show that Mosaic has already built a portion of that system. These photographs were taken May 14, 2011, hence Mosaic has likely performed more "site preparation" and "disturbed" more of the area since then. Mosaic states that its draglines will begin mining Area 2 in "early July 2011," which indicates mining may occur before the 11th Circuit stay expires on July 7, 2011. [Dkt. 118 at 4].

Although Mosaic promises it will only mine "uplands" in Area 2, this will have immediate and irreparable impacts on wetlands. The map attached to Mosaic's notice shows that the Area 2 uplands are adjacent to wetlands and that there are jurisdictional wetlands in the middle of Area 2. Dkt. 118-1. Mosaic apparently plans to wall these central wetlands off with another ditch and berm system and surround them with mining, which would leave them elevated and hydrologically isolated.

Sierra Club has submitted a declaration from its wetlands expert establishing how these "uplands only" activities would cause irreparable harm to the wetlands in and around Area 2 by dewatering the wetlands. Winchester Declaration (Dkt. 120-5). He describes how many of the adjacent wetlands lying just outside the northern and western boundaries of Area 2 are headwater forested wetlands that are hydrologically-dependent upon groundwater flows from Area 2. Any mining activity that affects the soils or subsoils of these adjacent uplands has the potential to alter the timing and volume of groundwater flows to these down-gradient wetlands. Such alteration of groundwater flows can result in substantial adverse impacts to the hydrologic regime, vegetation, fish and wildlife of these wetlands. *Id.*

In addition, while asserting the Permit is inapplicable, Mosaic asserts that they will "protect" adjacent or nearby wetlands in Area 2 by implementing various protective measures required by the Permit. Of these measures, the only one specifically mentioned that is intended to maintain wetland hydrology is the use of recharge ditches. However, such recharge ditches are unreliable and ineffective in maintaining the hydration of wetlands adjacent to the mining operation. Therefore, they cannot be relied upon to provide adequate and continuous protection of "off-site" wetlands during active mining operations. Winchester Declaration (Dkt. 120-5).

Mosaic has admitted the harm of such "uplands only" mining in the Declaration of Thomas Myers, Mosaic's Assistant Vice President, at Dkt. 96-3 (filed with Mosaic's "Motion for Limited Stay Pending Appeal") ¶¶ 11-15. Mr. Myers stated that "uplands-only mining" results in a negative "materials balance," in which there is insufficient backfill material to refill the mine cuts and properly perform reclamation activities to mitigate wetlands impacts. Id. at ¶ 7. According to Mosaic: "[W]ith uplands only mining at SFM-HC, there is no space available to construct the clay settling areas. [Myers. Decl. at ¶ 8]. As a result, there would be a significant negative materials balance, and the mining cuts could not be adequately filled. [Myers Dec. at ¶9]. This would cause a change in topography (i.e. drop in the land surface) by approximately 10-15 feet in most of the mined areas, resulting in either lakes or uplands that are substantially lower than the adjacent wetlands. [Myers Decl. at ¶10] . . . [t]he movement of surface water over the land and groundwater through the soil would not be restored to function of the adjacent wetlands. [Myers Decl. at ¶10]." Dkt. 96 at 8-9. In sum, Myers' declaration clearly demonstrates that Mosaic is fully aware that their proposed uplands only mining would create a post-mining landscape in which the uplands that feed water to the adjacent wetlands would no longer do so

because the reclaimed uplands would now be elevationally lower than the adjacent wetlands. Winchester declaration. (Dkt. 120-5).

### 3. *Mosaic's Area 2 Activities are Contrary to the 11th Circuit Stay and will disrupt the Status Quo Pending a Decision on the Merits*

In the Corps' Environmental Assessment it asserted its authority over the entire 10,856 acre project area, which includes the Area 2 uplands. In the Corps words, it "has sufficient control and responsibility over private actions at the SFM-HC to warrant federal review of the entire complex under [NEPA] for the following reasons: . . Although upland fill is not subject to the jurisdiction of the Corps, fill would not be placed in uplands but for the placement of fill into waters of the U.S., including wetlands." EA at 7; and see EA at 8 (Corps' scope of review is "over entire property"). AR:2010_06_14 SFM_EASOF_attachments at 7-8. This shows the Corps issued the permit as part of the mine-wide consideration and balancing of impacts. As a result, mining Area 2 by itself should, at a minimum, require a revision or reconsideration of the mitigation measures in the EA and reconsideration of the federal permit, like Mosaic's Mr. Myers and Plaintiffs' Mr. Winchester describe. Dkt. 96-3 ¶¶ 11-15; Dkt. 120-5.

Mining Area 2 "uplands only" is in fact covered by the Permit. The Corps' Permit covers the entire South Fort Meade Extension mine – including Mosaic's Area 2. See Map C-16, which is an attachment to the Permit, which sets out the boundaries of the mine. (Attached as Exhibit B). There is no question that the Area 2 uplands were not within the "no-action" uplands identified by the Corps that could be mined without a §404 permit. That is shown by the absence of the Area 2 uplands in Map C-30, which identifies the "no-action" uplands. (*See* Exhibit C hereto.) Therefore, the Permit covers Area 2.

Mosaic confirmed that such "uplands only" mining is covered by the Permit in its appellate brief. It argued that this Court's injunction allowing it to mine the uplands constituted

reversible error because, Mosaic stated, "*all* of Mosaic's previously obtained permits from federal . . . authorities would have to be modified to allow [uplands only] mining . . . which would require Mosaic to develop a new mine plan for submittal to these agencies." Dkt. 120-3 at 2 (emphasis Mosaic's).

Mosaic's current and future Area 2 activities would require a change to the Corps' Mine Plan by changing the order of the mining areas; adding a new access corridor; and reconfiguring the ditch and berm system. *See* Dkt.130 at 7. Mosaic has not denied this. Because of these changes to the project, the federal permit will have to be modified. AR:2010_06_14 DA Permit at 4; AR214637. Proceeding with Area 2 without modification of the permit is a violation of the permit, which states:

> If the Permittee proposes to change any part of the authorized activity, including the mitigation, it is the Permittee's responsibility to request a modification of this DA permit from the Tampa Regulatory Office. . . . This permit is valid only for the specific processes, operations and designs indicated on the approved drawings or exhibits submitted in support of the permit application. Any substantial deviation from the approved drawings, exhibits, specifications or permit conditions, including construction within the total land area but outside the approved project area(s), may constitute grounds for revocation or enforcement action by the Corps of Engineers, unless a modification has been applied for and approved. . . . Any such revisions or refinements to the authorized work will require subsequent review by the Corps of Engineers in accordance with 33 CFR 325.7.

AR 2010_06_14 DA Permit SAJ-1997-4099 Instrument page 4.

Therefore, Mosaic's uplands mining in Area 2 is in violation of the current 11th Circuit stay. Because Mosaic' Notice at page 4 indicates it intends to begin mining in "early July," which is potentially before the stay expires on July 7, 2011, Mosaic must be enjoined.

The Corps' passive acquiescence to Mosaic's actions does not excuse Mosaic from complying with the permit or the stay. Mosaic represents that the Corps "has no objection" to Mosaic proceeding "in compliance with the terms and conditions of the Permit, with which

Mosaic agrees that it will comply." Mosaic also states it "will mine Area 2 based on the Corps-approved mine plan." Dkt. 118 at 4. That is a tacit admission by Mosaic and the Corps that the Permit applies, and that Mosaic is violating the stay. First, the 11th Circuit stated: "*we direct the district court to stay the issuance of the permit for 90 days from the date of this order*." 11th Cir. April 8, 2011 Order at 3. Therefore, there is no permit for Mosaic to comply with, and any activities under color of that permit are illegal. Second, the Corps' position shows it is cognizant that the permit applies to Mosaic's Area 2 activities. Third, the fact that the Corps conditioned its approval on Mosaic complying with the mitigation measures shows that the Area 2 activities will have adverse impacts on the wetlands in an around Area 2. See Dkt. 118 at 4. In sum, the Corps cannot unilaterally create a variance to the 11th Circuit stay.

4. *The NEPA violations cause Irreparable Harm*

There is no issue that Area 2 was not included in the "no action alternative" as land that could be mined without a permit.[2] That means that Area 2 uplands mining is covered by the Permit. Even if Mosaic were correct that no permit is necessary for mining Area 2 uplands, this means no environmental analysis of the impacts of mining this 700 acres as a stand alone "uplands" area was done by the Corps. Put another way, if Area 2 was considered part of the "stream-crossing only" alternative as Mosaic contends, that alternative was *rejected* by the Corps as economically infeasible, and the Corps' EA contains no analysis of the environmental impacts

[2] A comparison of Map C-30 (Exhibit C hereto) to Exhibit A of Mosaic's Notice demonstrates that Area 2 is *not* within the 1,033 acres of uplands that the Corps included in the "No Action Alternative" area that could be mined without a §404 permit. Area 2 is west of County Road 664B/Platt Road as shown on Exhibit A, whereas the "no action" uplands are east of that road as shown on Map C-30. In addition, as shown on Map C-30, the only other "no action" uplands are in an area north of Area 2, which are clearly separated from Area 2 by a large area of jurisdictional wetlands. In short, none of the 700 acres of Area 2 are included in the 1,033 acre "no action" zone. Rather Area 2 is significantly south and west of the "no action" uplands and closer to the Peace River.

of that alternative.[3] The impacts of Area 2 uplands mining therefore require a supplemental EA.

There is no issue that considering Area 2 uplands as mineable without a permit would add approximately 70% of acreage (700 acres) and ore to the "no action" alternative, which means that alternative needs to be reconsidered in a supplemental EA. SC Br. at 48-50; SC Resp. Br. at 6, 20. Consideration of a proper "no action" alternative is mandatory under NEPA "to facilitate reader comparison of the beneficial and adverse impacts of other alternatives to the applicant doing nothing." 40 C.F.R. § 1502.14(d). This "provides a benchmark, enabling decision makers to compare the magnitude of environmental effects of the action alternatives." *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, 46 Fed. Reg. 18,026, 18,031 (March 23, 1981).

NEPA violations constitute cognizable procedural injury. *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1171 (11th Cir. 2006). A fundamental purpose of NEPA is to ensure "that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *see also North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1540 (11th Cir. 1990). Also see 40 C.F.R. § 1506.1

[3] The fact Mosaic is proceeding with "Area 2 uplands only mining" proves that the Corps' alternatives analysis was arbitrary and capricious. The Corps found any alternative, other than Mosaic's proposal and the chosen alternative, were impractable, and yet proceeding with Area 2 is economically practicable otherwise Mosaic would not be doing it. Mining the Area 2 "uplands only" is also an example of a the smaller "iterative combinations" of the project that EPA called for, but which were not analyzed by the Corps. For instance, the final alternative allowed for the destruction of 534.4 acres and yet Mosaic's Area 2 uplands only scenario shows the economic practicability of a total project mining 16 acres less wetlands, or 518.4 acres total. This was not considered by the Corps as part of its "stream crossing only" alternative since that considered avoiding the entire 534.4 acres of wetlands and rejected it as impracticable. The Corps did not consider lesser alternatives like Mosaic's "Area 2 uplands only" alternative and thus its finding that the chosen alternative was the least damaging practicable alternative was erroneous. This also begs EPA's question of how many other practicable iterations of the project exist which were not considered by the Corps .

(limitations on actions during NEPA process). Therefore, the Corps' delay in preparing a supplemental EA until after Mosaic's "Area 2 uplands mining" and related activities constitutes irreparable procedural harm in addition to the on-the-ground harm – and Mosaic's "Area 2 uplands mining" and related activities should be enjoined pending a final ruling on the merits.

### C. **<u>The Threatened Irreparable Injury Outweighs the Threatened Harm the Injunction may do to the Defendants</u>**

There is no harm to the Corps if injunctive relief is granted. In the July, 2010 preliminary injunction this Court recognized there would be some economic harm to Mosaic, however it also found that many of Mosaic's dire claims were exaggerated or unsupported. Dkt. 88 at 20, 21 n. 13.

Economic harm is not irreparable and does not provide an adequate basis for denying injunctive relief. *See e.g., Sampson v. Murray*, 415 U.S. 61, 90 (1974) (potential monetary injury is not irreparable). Courts have enjoined mining operations, despite the claimed economic harms by the mining company even in the situation where the mining has already commenced. *See Southeast Alaska Conservation Council v. U.S. Army Corps of Engineers*, 472 F.3d 1097 (9th Cir. 2006)(denying mining company's request for vacating injunction pending appeal); and in *S. Fork Band Council v. U.S. Dept. of Interior*, 588 F.3d 718 (9th Cir. 2009) the court noted that, even with billions of dollars in potential lost revenue that could result from a preliminary injunction against the mine, and even though the company had already spent hundreds of millions of dollars on initial construction, a preliminary injunction should issue because "the resulting hardship asserted by [the mining company] and the government is cast principally in economic terms of employment loss, but that may for the most part be temporary." *Id.* at 728.

Mosaic claimed in opposition to the previous injunction that it "could be forced to lay off" employees, and in that regard it essentially laid down an ultimatum for the Court: that either

it gets to mine according to its illegal permit or it would shut down and wreak havoc on its workers and the local community. However, this Court recognized that situation was largely of Mosaic's making since it had refused to explore a smaller footprint mine and should not now be allowed to manipulate the equities. Dkt. at 21 n. 13. "Self-inflicted" costs weigh against defendants in a preliminary injunction. *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002); and *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 806 (3d Cir.1998) (stating that "[t]he self-inflicted nature of [defendant's] harm ... weighs in favor of granting preliminary injunctive relief"). *See also Dunkin' Donuts Franchised Rest. LLC v. D & D Donuts, Inc.,* 566 F. Supp. 2d 1350, 1361-62 (M.D. Fla. 2008).

Any harm to Mosaic is further self-inflicted since it has had nearly one year since the June, 2010 temporary restraining order and July, 2010 preliminary injunction to revise its federal mine plan and revise any other state or local permits. Mosaic had no margin of error built into its plan in case it did not get its permit or if it was enjoined, and similarly it should not be heard to complain of any administrative difficulties arising from an injunction now. *See Alaska Center for the Environment v. West,* 31 F.Supp.2d 711, 723 (D. Alaska 1998) (noting longer permit processing time was "not of consequence sufficient to outweigh irreversible harm to the environment").

According to Mosaic's Notice of Area 2 Uplands Mining, its "Phase I" mining will be completed in "June 2011." Doc 118 at 4. This mining has lasted approximately seven months since the November 3, 2011 settlement agreement was made the order of the Court. Dkt. 114 and 115. That is three months longer (or more than 50% more) than the "approximately four months" Mosaic stated the Phase I mining would take in its filing with the Court. Dkt. 96 at 4. This seven months of mining mitigates any harm to Mosaic since it was allowed to mine all of

the ore in the 200 acre site, including under the wetlands.

Finally, the Court should enjoin *all* uplands mining as part of this preliminary injunction. In the July, 2010 injunction the Court agreed with Plaintiffs that Mosaic could proceed with the "no-action alternative," *i.e.* go forward with the mining it could do without a permit. Dkt. 88 at 19 and n. 11; and see n. 12 ("the No Action Alternative allows Mosaic to continue its mining operation for a significant amount of time."). However, that should not be repeated in this injunction for several reasons. First, Mosaic contended that it was an *error* on appeal for the Court to allow it to proceed with the no-action alternative. Mosaic argued that allegedly constituted the court writing a "de-facto" new permit; and that the Court could not consider its ability to mine the uplands in its balancing since there was "no analysis in the administrative record of the environmental impact of mining the 1,000 acres that the district court purported to approve for mining operations." See Dkt. 120-3 at 2. Mosaic also argued in regards to it being allowed to mine uplands: "[T]he district court's 'short-cut' approach is simply untenable." Like the remand portion of the order, Mosaic contended this portion of the injunction constituted reversible error, even though it mitigated harm to Mosaic.

Second, after the July, 2010 injunction Mosaic submitted the Myers declaration, discussed above, which establishes the "materials imbalance" and concomitant harm to wetlands resulting from uplands only mining. This is confirmed by the Third Winchester declaration discussed above. Third, mining any part of the 10,856 acre site covered by the federal Mine Plan is part of the federal permit and the EA, which would have to be revised. Fourth, Plaintiffs did not object to uplands only mining in the July, 2010 injunction in reference to the 1,033 acres of "no-action uplands" that were identified in the EA – but at no time was "Area 2" considered part of that by Plaintiffs, by the Court (or by the Corps). Since then, the factual record has been

developed that mining the no-action uplands would have significant impacts on the wetlands in and around the site. Therefore, it should be enjoined in this preliminary injunction.

**D. Granting the Preliminary Injunction will not Disserve the Public Interest**

Congressional intent and statutory purpose can be taken as a statement of public interest. *Johnson v. U.S.D.A.*, 734 F.2d774, 788 (11th Cir. 1984). The purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The purpose of NEPA is essentially to force "federal agencies to document the potential environmental impacts of significant decisions before they are made, thereby ensuring that environmental issues are considered by the agency and that important information is made available to the larger audience that may help to make the decision or will be affected by it." *Wilderness Watch v. Mainella*, 375 F.3d 1085, 1094 (11th Cir. 2004). See also *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) (enjoining construction of marine cargo terminal for failing to comply with NEPA); and *Davis v. Mineta*, 302 F.3d 1104, 1114 (10th Cir. 2002)("In mandating compliance with NEPA's procedural requirements as a means of safeguarding against environmental harms, Congress has presumptively determined that the failure to comply with NEPA has detrimental consequences for the environment").

In this Court's July, 2010 injunction it correctly found irreparable harm to the environment, weighed the equities, and, consistent with the comments of the EPA and three downstream counties, found that the public interest would be served by an injunction. Dkt. 88 at 18-22. That is consistent with EPA taking a valid stand in the public interest by insisting Mosaic avoid the key wetlands and streams which are functionally vital to the health of the Peace River and downstream Charlotte Harbor. The downstream counties of Lee, Charlotte and Sarasota also took issue with the permit for many reasons, not the least of which is their desire to protect the

source of their residents' drinking water. In three separate letters to the Corps, they all objected to the project and raised concerns about the cumulative impacts of phosphate mining on Peace River Watershed and Charlotte Harbor estuary. AR:2007_07_11 Sarasota County Letter; AR:2007_07_12 Charlotte County BCC(1); and AR:2007_08_10 Lee County_request for public hearing letter. The total Charlotte County comments were over 100 pages long and provided nearly two discs of significant evidence of the adverse impacts of phosphate mining on the Peace River and Charlotte Harbor. AR 2007_07_12 Charlotte Cty BCC (1).

The Corps' regulations themselves define wetland protection as a paramount public interest: "Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1). *Cooper v. Wisdom*, 440 F. Supp. 1027, 1030 (S.D. Fla. 1977). ("It is undeniable that the public has a strong interest not only in the preservation of the marine ecology, but also in the proper functioning of the Corps of Engineers in granting its permits").

Mosaic's invocation of economic harm to Hardee County on the other hand is controversial and misleading. The Hardee County "Development Agreement" under which Mosaic would pay the county was established because the county deserved mitigation from the industry for the environmental and economic harm that would result from phosphate mining on the South Fort Meade site, such as for aquifer restoration and reservoirs, as well as to try to rebuild the economy after the mining occurs. For example, the EPA found that the South Fort Meade extension would have a "net negative economic impact" on Hardee County. It relied on the report of Richard Weisskoff, a Ph.D. economist at the University of Miami. *See* the Corps' Addendum to AR, Doc. 131-1 at p. 4. Plaintiffs submitted a report to the Corps from Dr. Weisskoff establishing this with their public comments, and these are in the Administrative

Record at AR:2010_06_08 Ltr to agencies from Sierra Club at pdf p. 16.

Attached to Plaintiffs' Motion for Summary Judgment is another report by Dr. Weisskoff showing the net job loss to Hardee County from Mosaic's mine. This discusses the "boom and bust" cycle of mining jobs and how jobs from the mine would be moving from Polk County to Hardee County, hence jobs would be preserved but nothing new would be created. He also discusses the net *loss* of jobs to the county due to mining versus farming. He also discusses how the mining would displace agriculture, eco-tourism, new crops, large scale recreational ranches and even a solar energy generator (as was done in DeSoto County). Regardless of whether it can be considered in connection with the summary judgment proceedings, this report can be considered in support of this motion. *See e.g., GTE Sylvania, Inc. v. Consumer Products Safety Comm'n*, 404 F.Supp. 352 (D.Del. 1975)(limitation of case to administrative record is inapplicable where there is a request for preliminary or permanent injunctive relief).

Finally, "there is no reason to believe that the delay in construction activities caused by the court's injunction will reduce significantly any future economic benefit that may result from the mine's operation." *Se. Alaska Conservation Council v. U.S Army Corps of Eng'rs*, 472 F.3d 1097, 1101 (9th Cir. 2006), *rev'd on other grounds*, 129 S. Ct. 2458 (2009). If this mine is a good project now, it will be a good or even better project for the county if and when a valid permit issues, hence it should be enjoined pending this Court's final merits determination.

## II. CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction, so that the invaluable natural resources at and surrounding the South Fort Meade Extension site may be preserved pending the final adjudication of this case on the merits. This injunction should restrain and enjoin Mosaic and all of its agents,

officers, employees and attorneys, from any ground disturbing activities, excavation, dredging, filling or other alteration of jurisdictional waters of the United States at the South Fort Meade Extension site, including but not limited to Mosaic's "Area 2," until the Court issues a final ruling on the merits.

Respectfully submitted this 7th day of June, 2011.

**/s/ Eric E. Huber**
Eric E. Huber
*Pro Hac Vice* (Colo. Bar no. 40664)
Sierra Club
1650 38th Street Suite 102W
Boulder, CO 80301
(303) 449-5595
fax (303) 449-6520

**/s/ Marcy I. LaHart**
Marcy I. LaHart, Esq.
Fla. Bar no. 0967009
4804 SW 45th Street
Gainesville, FL 32608
(352) 224-5699
fax (888) 400-1464

# CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of June, 2011, I electronically filed the foregoing by using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

**/s/ Eric E. Huber**
Eric E. Huber