**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| SIERRA CLUB, INC.; PEOPLE FOR PROTECTING THE PEACE RIVER, INC.; and MANASOTA-88, INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES ARMY CORPS OF ENGINEERS; and COLONEL ALFRED A. PANTANO, JR., | ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| MOSAIC FERTILIZER, LLC, | ) ) |
| Defendant-Intervenor. | ) ) ) |

Case No. 3:10-cv-00564-HLA-JB

**PLAINTIFFS' RESPONSE TO MOSAIC FERTILIZER, LLC'S MOTION FOR**
**LIMITED STAY OF PRELIMINARY INJUNCTION PENDING APPEAL**

Eric E. Huber
*Pro Hac Vice* (Colo. Bar no. 40664)
Sierra Club
1650 38th Street Suite 102W
Boulder, CO 80301
(303) 449-5595
fax (303) 449-6520

Marcy I. LaHart, Esq.
Fla. Bar no. 0967009
4804 SW 45th Street
Gainesville, FL 32608
(352) 224-5699
fax (888) 400-1464

ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

Table of Authorities…………………………………………………………………………..i

INTRODUCTION…………………………………………………………………..………1

STANDARD OF REVIEW……………………..………………………………………………3

ARGUMENT………………………………………………………………………..…………4

I.      The Preliminary Injunction Covers Area 2……………………………….……………4

II.     Plaintiffs Have a Likelihood of Success on the Merits…………………………..………5

        A.      This Court Found a Likelihood of Success on Plaintiff's Area 2 Claims………...5

        B.      This Court has the Authority to Enjoin the Entire Project, Including
                Area 2 Uplands Mining……………………………………………...…………6

        C.      Mosaic's Area 2 Proposal would Require Modification of the
                Federal Permit, and Therefore Requires a Supplement to the
                Environmental Assessment………………………………………...…………15

        D.      Mosaic was not Entitled to an Evidentiary Hearing………..…………………17

II.     The Other Elements for Issuing the Preliminary Injunction Favor Plaintiffs……………19

CONCLUSION……………………………………………………..………………………23

Certificate of Service

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Allied Signal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568 (7th Cir. 1999)............................18

*American Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001)..........................17

*Amoco Prod. v. Vill. of Gambell*, 480 U.S. 531 (1987)...........................................20, 22

*Baykeeper v. U.S. Army Corps of Engineers*, 2006 WL 2711547 (E.D. Cal. Sept. 20, 2006)..... 13

*Cumulus Media, Inc. v. Clear Channel Communications, Inc.*,
304 F.3d 1167 (11th Cir. 2002)........................................................................... 17

*Davis v. Mineta,* 302 F.3d 1104 (10th Cir. 2002).......................................................22

*Deltona v. Alexander*, 682 F.2d 882 (11th Cir. 1982)................................................. 14

*Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*,
320 F.3d 1205 (11th Cir. 2003)................................................................. .......... 18

*Friends of the Earth, Inc. v. U.S. Army Corps of Engineers*,
109 F. Supp. 2d 30 (D.D.C. 2000)......................................................................13

*Garcia-Mir v. Meese*, 781 F.2d 1450 (11th Cir. 1986)...................................................3

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002)......................................16

*Hilton v. Braunskill*, 481 U.S. 770 (1987)..................................................................3

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989)................................16

*McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998).................................. 19

*New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1 (1st Cir. 2002)................3

*OVEC v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009).........................................14

*Park County Res. Council. v. U.S. Dep't of Agric.*, 817 F.2d 609 (9th Cir. 1987)................ 16

*Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. 1981)...............................................................3

*Ruiz v. Estelle*, 666 F.2d 854 (5th Cir. 1982)...........................................................3

*Save Our Cmty. v. U.S. E.P.A.*, 971 F.2d 1155 (5th Cir. 1992).....................................14

i

*Save Our Sonoran, Inc. v. Flowers*, 408 F.2d 1113 (9th Cir. 2005)……………2, 4, 7, 8, 9, 12, 14

*Sierra Club v. U.S. Army Corps of Engineers*, 2011 WL 2718144 (8th Cir. July 14, 2011)…….21

*Stewart v. Potts*, 996 F. Supp. 668 (S.D. Tex. 1998)……………………………………………13

*Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167 (7th Cir.1997)………………………………18

*White Tanks Concerned Citizens v. Strock*, 563 F.3d 1033 (9th Cir. 2009)………………..2, 4, 12

## FEDERAL STATUTES

5 U.S.C. § 706(1)………………………………………………………………………... 16

5 U.S.C. § 706(2)(A)...…………………………………………………………………………....16

5 U.S.C. § 706(2)(D)...…………………………………………………………………………....16

## FEDERAL REGULATIONS

33 C.F.R. § 325.7………………………………………………………………....……15

33 C.F.R. § 325 App. B...………………………………………………………………………… .6

33 C.F.R. § 325 App. B § 7(b)(3)………………………...……………………………………14

40 C.F.R. § 1502.9………………………………………………………………….....5, 16

40 C.F.R. § 230.10(a)(2)………………………………………………………………........21

## FEDERAL RULES

Fed. R. Civ. P. 62………………………………………………………………………….4

## MISCELLANEOUS

Middle Dist. of Fla. L.R. 3.01(j)………………………………………………………………17

## INTRODUCTION

Mosaic's Motion for Limited Stay of Preliminary Injunction Pending Appeal ("Mos. Mot.") seeks a stay of the injunction to allow it to go forward with mining "Area 2." To begin with, Mosaic attempts to cast doubt on whether the Court's injunction covers uplands mining, including Area 2, and asks the Court for clarification. Mos. Mot. at 1. However, both the plain language and the context of the injunction make clear that it covers the entire South Fort Meade extension project, which includes the uplands mining in Area 2. *See* Dkt. 168, July 8, 2011 Order (hereafter "Order") at pp. 2, 3, 5 and 7. This Court correctly found that Area 2 "alter[ed] the course of this very complicated case and, further, due to the new development, finds that a preliminary injunction should issue until this case is decided on the merits." Order at 3. Mosaic should not be excused to proceed with Area 2 since that is one of the actions that precipitated the preliminary injunction in the first place.

It is telling of the weakness of Mosaic's motion that it resorts to repeated *ad hominem* attacks on Plaintiffs' motives. And, in another argument that has no bearing on the legal or factual issues, Mosaic repeatedly contends that Plaintiffs, and the Court, are inconsistent in not having objected to Mosaic proceeding with the "no action" alternative in the first preliminary injunction, while objecting to the Area 2 uplands mining in the new preliminary injunction. But there is no dispute that the 1,033 acre "no-action" uplands have never included Area 2. Moreover, after the first preliminary injunction the record changed considerably, making an injunction on all uplands mining appropriate: 1) Mosaic's Myers declaration established harm to wetlands from uplands mining, which was confirmed by Plaintiffs' experts; and 2) on appeal Mosaic contended it was error for the District Court to have allowed uplands mining because that was a "de facto permit" and "there is no analysis in the administrative record of the

environmental impact of mining the 1,000 [upland] acres the district court purported to approve for mining operations." Dkt.  160-3 at 48-49. Thus, according to Mosaic, it is error for the District Court to both enjoin uplands mining and to not enjoin uplands mining.

The main issue raised by Mosaic's motion is, assuming there was no "fill" of the wetlands in and adjacent to Area 2, whether the Court can enjoin Area 2 mining since it is part of the larger permitted South Fort Meade extension project. The answer is yes, because Area 2 is factually and legally intertwined with the overall project. Mosaic has emphasized that Area 2 by itself is not economically feasible and, as the Corps stated in its Environmental Assessment asserting jurisdiction over the entire project, uplands mining would not occur "but for" the fill of wetlands in the project area. As this Court found, "Mosaic's own declaration (Myers declaration, Dkt. 96-3), which was submitted in August of 2010 to support its argument that uplands mining is not feasible, indicates that mining uplands will have adverse impacts on wetlands in the project area." Order at 5. Therefore, the  Court has the authority to enjoin the entire project in this case, including the Area 2 uplands mining. *Save Our Sonoran, Inc. v. Flowers*, 408 F.2d 1113, 1118-21 (9th Cir. 2005); *White Tanks Concerned Citizens v. Strock*, 563 F.3d 1033,1039-41 (9th Cir. 2009).

In addition, Mosaic re-argues the issues of immediate and irreparable harm, balancing and public interest, which were decided against it in the Order at pp. 5-7. Mosaic has not shown those findings were erroneous. For the reasons stated in Plaintiffs' preliminary injunction brief at Dkt. 148 pp. 3-18, and for the additional reasons below, the Court should maintain its findings on these subjects.

## STANDARD OF REVIEW

Mosaic's motion misstates the standard of review. In considering a Motion for Stay Pending Appeal pursuant to Fed. R. Civ. P. 62, a court must consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776-77, (1987) (citations omitted). The touchstone of the analysis is the first factor— whether the movant has made a *strong showing* of likelihood of success on the merits of the appeal. *New Comm. Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Id.*

Mosaic however argues that "demonstrating a probability of success on the merits is not always required," and when the movant demonstrates that the balance of equities weighs heavily in favor of a stay, the movant need only demonstrate that there is a 'substantial case on the merits' raising a 'serious legal question.'" Mosaic's Mot. at 4, *quoting Ruiz v. Estelle*, 650 F.2d 555, 565-66 (5th Cir. 1981) and *citing Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). That standard is not applicable since both cases were decided before *Hilton*. Moreover, a later panel on the *Ruiz* case emphasized that the Circuit had not eliminated the likelihood of success as a prerequisite for a stay pending appeal. *Ruiz v. Estelle*, 666 F.2d 854, 856-57 (5th Cir. 1982)(*Ruiz II).* Even applying Mosaic's standard it is clear that it must make a substantial case that it will succeed on the merits. For the reasons stated by this Court in its preliminary injunction order and the additional reasons supplied below, Mosaic does not do so.

**ARGUMENT**

**I.     The Preliminary Injunction Covers Area 2**

This Court held, "Defendants and Mosaic Fertilizer, LLC and all of their agents, officers, employees and attorneys are enjoined from conducting any activities in reliance on Corps permit SAJ-1997-4099, including but not limited to any ground disturbance, excavation, dredging, filling or other alteration of jurisdictional waters of the United States at the South Fort Meade Extension site." Order at 7.  Thus, any activities covered by the Corps permit are enjoined.

Uplands mining, including in Area 2, are covered by the permit and are thus enjoined. The Corps' Mine Plan for the South Fort Meade extension, which is Map C-16 and incorporated into the permit (Dkt. 120-1), shows that the Area 2 uplands are covered by the Permit. The Corps' Environmental Analysis (EA) explains that project area covers the entire 10,856 acres of the South Fort Meade site, because "[a]lthough upland fill is not subject to the jurisdiction of the Corps, fill would not be placed in uplands but for the placement of fill into waters of the U.S., including wetlands."  EA at 7; *and see id.* at 8 (EA states scope of Corps' jurisdiction is "over entire property"). The federal permit also incorporated the Florida DEP permit, see AR214637 ¶ 1, which indisputably covers Area 2 uplands. *See* AR135993 ("the project is to conduct phosphate mining activities on 7,753 acres of uplands, wetland and other surface waters"). Therefore, the Court had the authority to enjoin the entire project, including Area 2, and properly did so here. *Save Our Sonoran, Inc. v. Flowers*, 408 F.2d 1113, 1118-21 (9th Cir. 2005); *White Tanks Concerned Citizens v. Strock*, 563 F.3d 1033,1039-41 (9th Cir. 2009).

)

)

)

## II.    Plaintiffs Have a Likelihood of Success on the Merits

### A.    This Court Found a Likelihood of Success on Plaintiff's Area 2 Claims

Mosaic's first argument is that this Court did not find a likelihood of success on the merits regarding Area 2. (Mos. Mot. at 2,9). That has no basis since the Court expressly found "Plaintiffs make a compelling argument that Mosaic's Area 2 proposal should be examined as a modification to the overall plan and, *further, is evidence that the prior alternatives analysis was incomplete and/or improperly verified . . .*" Order at 3 (emphasis added). As a result, "Plaintiffs have demonstrated the likelihood of success on the merits of their claims that the Corps issued the permit in violation of the Clean Water Act (CWA) and National Environmental Policy Act (NEPA)." Order at 4. Therefore, the Court found a likelihood of success on the merits of Plaintiffs' claims that Area 2 constituted new evidence in support of Plaintiffs' Counts I and II that the Corps violated the CWA and NEPA in regards to the alternatives analysis and lack of verification. *Id.*

Mosaic is also wrong on whether this Court found a likelihood of success on the supplemental EA issue. The Court stated that "Mosaic's notice of Area 2 mining alters the course of this very complicated case *and, further, due to the new development*, finds that a preliminary injunction should issue until this case is decided on the merits." Order at 3 (emphasis added). Thus the preliminary injunction was predicated on the fact that Area 2 constituted a change in circumstances and/or a substantial change in the project. The only one of Plaintiffs' claims to which a change of circumstances or a change in the project would be relevant is Claim IV, which called for a supplemental EA under 40 C.F.R. § 1502.9 on that basis. Thus, although the Court did not expressly find a likelihood of success on Plaintiffs' new NEPA claim in Claim IV, that is the implication of its holding.

**B.    This Court has the Authority to Enjoin the Entire Project, Including Area 2 Uplands Mining**

Mosaic argues that because Area 2 uplands mining allegedly would not result in a discharge into jurisdictional waters that would require a CWA §404 permit, it is not subject to the Corps' jurisdiction or this Court's injunction.  However, Mosaic's arguments are both legally and factually wrong. There is no question that the Corps has authority over the South Fort Meade-Hardee County extension project ("SFM-HC") due to discharges into jurisdictional waters that require a §404 permit.  It is further undisputed that the §404 permit requires the Corps to conduct a NEPA analysis.   Under the Corps regulations, the EA, the Permit and applicable case law, this authority extends to the uplands in the SFM-HC project as well as the jurisdictional waters.

The Corps' regulations implementing NEPA dictate that in situations such as these, uplands activities come under the "control and responsibility" of the Corps. For example, 33 C.F.R. § 325 App. B states:

> The district engineer is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action.

As set forth in more detail below, the environmental consequences of mining at SFM-HC are products of Corps' §404  permit because the mine absolutely depends on the permit.

The regulations list one factor used to consider whether the Corps' decision extends to the non-jurisdictional parts of the project: "[w]hether there are aspects of the uplands facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity." *Id*.  That applies here. The Area 2 uplands are "in the immediate vicinity" of jurisdictional wetlands and neither Mosaic nor the Corps have disputed that mining Area 2 would

6

"affect the location and configuration of the regulated activity," since the berms around the wetlands, the access corridors, and the order of the mining plan would all be changed.

Nevertheless, Mosaic's motion hinges on the false assertion that "Plaintiffs cite no legal authority for this Court to enjoin Area 2 mining because there is none." Mos. Mot. at 9. In fact, Plaintiffs cited considerable authority for this. Courts have roundly recognized that a district court can and should enjoin uplands portions of a project where the overall project involves fill or discharge to jurisdictional waters and the entire project is subject to NEPA review.

For example, in *Save Our Sonoran, Inc., v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) ("*SOS*"), the Ninth Circuit court held that the Corps was responsible for analyzing all parts of a project in its EA, including the uplands, and that the district court properly enjoined the uplands along with the rest of the project. There, a planned gated community would impact jurisdictional waters in the form of washes that comprised 5% of the 608-acre project site, and thus required a §404 permit from the Corps and a NEPA analysis. *Id*. at 1118. The district court found a likelihood of success on plaintiffs' claim that the Corps had unduly restricted its analysis to the jurisdictional washes, and enjoined the entire project, including the uplands, because the whole project depended on the Corps' permit. *Id*. at 1119. Soon thereafter, the applicant, like Mosaic, announced that it was moving forward with construction on an uplands part of the project that would not involve discharges to jurisdictional waters. *Id*. at 1119. Plaintiffs sought, and the court issued, a clarification that the injunction applied to the entire project because "the *status quo* could be preserved only if [the applicant] ceased any and all development on the site." *Id*. Similarly, in the instant case the Court enjoined the entire project, including the uplands, because that is necessary to maintain the *status quo* pending a final decision on the merits. Order at 6.

Like Mosaic, the applicant in *SOS* argued that the court had no jurisdiction to enjoin construction on the upland parts of the project since that did not require dredging or filling of jurisdictional waters. However the Ninth Circuit upheld the injunction, holding that:

> The district court's conclusion that the Corps had improperly confined its NEPA analysis does not end our analysis as to the propriety of the preliminary injunction. The authority to enjoin development extends only so far as the Corps' permitting authority. Although the Corps' improperly constrained analysis violated NEPA, the district court could only enjoin the developer from acts that required a Corps permit. In this case, the district court found the washes subject to federal jurisdiction could not be segregated from private lands; *the district court had the power to enjoin the entire project. . . . Because the district court found that any development by Lone Mountain would impact jurisdictional waters, the whole of the property falls under the Corps' permitting authority and the court's authority to enjoin development.*

*SOS*, 408 F.3d at 1123 (emphasis supplied).

The *SOS* court affirmed the district court's finding that the uplands were not "separable from the navigable waters; rather, the uplands are interspersed through the section surrounded by washes on every side." *Id.* at 1124. The court agreed with the district court that the washes run through the entire project "in a way that capillaries run through tissue. It is difficult to deal with tissue without dealing with capillaries and difficult to deal with capillaries without dealing with tissue." *Id*. at 1119. Therefore, the court concluded that "the Corps' permitting authority, and likewise the court's authority to enjoin development, extended to the entire project." *Id.*

Mosaic blatantly takes one sentence out of *SOS* out of context and ignores the remainder of the opinion that upheld the injunction in order to argue that "without CWA jurisdiction, there can be no NEPA-based injunction." Mos. Mot. at 12, *see also* Mosaic's Sur-reply (Dkt. 167) at 2. However, *SOS* stands for the proposition that where there *is* CWA jurisdiction over a part of a project, and the rest of the project could not proceed without the permitted part, a NEPA-based injunction over all components of the project is appropriate. *SOS* directly contradicts Mosaic's

argument and upheld the District Court's injunction on the uplands development.  *SOS*, 408 F.3d at 1123.

Like the district court in *SOS*, this Correct was correct to enjoin Area 2 because the jurisdictional waters within the South Fort Meade site are interspersed throughout the project such that the uplands are inseparable from the project as a whole.  The 10,856 acre South Fort Meade site hosts a complex hydrological system that runs through all sections of the project, totaling 10.7 miles of first-order streams and 534.4 acres of wetlands (246.1 acres of herbaceous wetlands, 261.8 acres of forested wetlands, 26.2 acres of open water).  EA at 1-2.  The maps attached to the MFR-2 and incorporated into the permit demonstrate that these hydrological features are interspersed throughout the entire project site and not concentrated in particular areas. *See, e.g.*, Map C-30 (Dkt. 161-1). The EA explains that the project area covers the entire 10,856 acres of the South Fort Meade site, including the uplands, because "[a]lthough upland fill is not subject to the jurisdiction of the Corps, fill would not be placed in uplands but for the placement of fill into waters of the U.S., including wetlands."  EA at 7. As in *SOS*, the wetlands and streams in SFM-HC run throughout the project area "in a way that capillaries run through tissue" and are inseparable.  *SOS*, 408 F.3d at 1119.  This applies to Area 2 in isolation as well inasmuch as there are jurisdictional wetlands near the center of Area 2 and numerous jurisdictional wetlands adjacent to and surrounding it. Mosaic's Notice Dkt. 118-1; Ex. B to Plaintiffs' Preliminary Injunction Reply brief, Dkt. 160-2.

Mosaic acknowledges the importance of the "separability" question but argues that it can mine Area 2 "precisely because the 2% of this area that is jurisdictional can and will be readily segregated from its uplands."   Mos. Mot. at 12.  This statement is flatly contradicted by the facts.  Mosaic's idea of "readily segregating" the wetlands involves strip-mining around all sides

of the two central jurisdictional ponds, such that they would be left on a pedestal completely surrounded by a 55-foot deep strip mine. *See, e.g.*, Decl. of Theodore Smith (Dkt. 173-2) at Ex. A, B.  Similarly, the only way Mosaic can access Area 2 is by walking the draglines through a narrow channel in violation of the permit requirement that there be a 450 ft. buffer between wetlands.[1]

Mosaic's claim that Area 2 uplands can be "readily segregated" from the rest of the project is also contradicted to its past representations.  Mosaic argued in August of 2010 that the uplands are inseparable from the larger project. Decl. of Thomas Myers ("Myers") (Dkt. 96-3). Myers explained that uplands-only mining would harm wetlands because it would result in a negative "materials balance" where there is insufficient backfill material to refill the mine cuts and properly perform reclamation activities to mitigate wetlands impacts. *Id.* at ¶ 7. This would cause a change in topography by approximately 10-15 feet in most of the mined areas, resulting in either lakes or uplands that are substantially lower than the adjacent wetlands. *Id.* at ¶10. Myers stated that "[t]he movement of surface water over the land and groundwater through the soil would not be restored to support the function of the adjacent wetlands." *Id.* at ¶11. Thus, Mosaic is fully aware that after Area 2 mining, the reclaimed uplands would be elevationally lower than the adjacent wetlands and could no longer feed water to the wetlands.  Myers' assertions were confirmed by Plaintiffs' expert, Mr. Winchester (Dkt. 120-5).

The interrelation of uplands mining and the wetlands fill is also evident from Myers's statements that Mosaic could not engage in uplands-only mining because it constituted a substantial change in the project that would require modification of its state and local permits. Dkt. 96-3 at ¶¶ 12-15. The state permits are incorporated into the Corps' permit at Special

---

[1] See Fourth Winchester Declaration (Dkt. 160-1) at ¶12; Ex. A to Mosaic's Notice (Dkt. 118-1); MFR-2 at 3-13.

Conditions 1-3 (2010_06_14 DA Permit SAJ-1997-4099 Instrument at page 4). Therefore, there is no issue that the §404 permit would have to be revised as well. Mosaic confirmed that in its appeal of the first injunction, arguing in its brief that uplands only mining would require the federal permit to be revised. Dkt. 160 Ex. C at 49.

Mosaic further argued that uplands areas are inseparable from the larger mining project because with "with uplands only mining at South Fort Meade, there is no space available to construct the clay settling areas." Myers. Decl. at ¶ 8. Under the Mining Plan, the clay settling areas (CSAs) that will serve the entire mine site are slated to permanently occupy a large area in the northeast portion of the mine. Without these CSAs, which require dredging and filling of jurisdictional waters, uplands-only mining could not proceed because there would be no place to put the mining waste.

Myers' latest (fifth) declaration reaffirms that mining Area 2 cannot be separated from the rest of the project because it would result in a materials imbalance that would adversely impact wetlands. Myers states that if Mosaic was permanently limited to Area 2, it would have to come up with a new reclamation plan, modify its permits, and would have to find another off-site source of backfill materials to fill in the Area 2 mine cuts. Dkt. 159-15 at ¶¶10-11. Myers states that Mosaic could likely accomplish this, but that is pure speculation— he does not explain where this material would come from, how it would be transported to the South Fort Meade site, whether there would be environmental impacts from the transfer, or how long the materials balance would persist before the mining cuts are filled in. In short, there has been no environmental analysis of this hypothetical project, no revision of Mosaic's permits, and no showing that this could be carried out. Thus, Myers' Fifth Declaration reaffirms his earlier

position that mining smaller uplands areas cannot be accomplished in absence of the enjoined §404 permit.

Another case on point that supports the Court's authority to enjoin the uplands is *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033 (2009). That involved a proposed housing community in the desert where the Corps' jurisdiction stemmed from the project's impact on washes that were spread throughout the property. *Id.* at 1036. The facts were close to those in *SOS* because the "waters are dispersed throughout the site, so that any construction on the site would be impossible without affecting the waters, and a §404 permit would be required for any project." *Id*. at 1040-41. The *White Tanks* court largely based its decision on the applicant's own admissions that the "no action alternative" was not a feasible option. *Id*. at 1041; *see also SOS*, at 1125 ("Here…denying the permit 'would not allow the site to be developed in a manner that would accomplish the applicant's project purpose.'"). Thus, both *White Tanks* and *SOS* held the applicants to its past assertions that a smaller project would be inseparable from the project as a whole, and found that this supported enjoining the entire project, including the uplands.

Similarly here, Mosaic acknowledged the inseparability of the uplands when it repeatedly rejected the no action alternative and any smaller footprint configurations. Mosaic and the Corps have both asserted that avoiding any additional wetlands would strand too much ore and would thus be impracticable because it would not meet the project's purpose. For example, Mosaic argued that:

> If mining 4,064 acres [of the Crossing Only Alternative] and extracting 22 million tons of phosphate does not meet the project purpose, then mining… 17% (*i.e.*, 700 acres) [of Area 2] would not do so either…[I]n addition to failing to meet the project purpose, the full 1,733 acre tract—including Area 2—is subsumed within the 4,604 acre Stream Crossing Only Alternative. (*See* Exh. 1, AR 178850). Thus, the Corps did consider Area 2's 700 upland acres in its alternatives analysis and

> properly concluded that the available mining acres were inadequate for the project purpose.

Mos. Supp. Resp. (Dkt. 155) at 7. Mosaic should be held to these representations as was the applicant in *White Tanks*.

Another example of the Court's authority to include Area 2 in the injunction is supplied by *Stewart v. Potts*, 996 F. Supp. 668, 682-83 (S.D. Tex. 1998). That held that where two acres of wetlands were interspersed throughout a 200 acre golf course, the Corps had NEPA jurisdiction over the entire project, including clearing of trees in the uplands. The court found that the Corps' characterization of the filling of the wetlands as separate and distinct from the clearing of trees was "irrational," and held that "the golf course proposed is one activity, and the tasks necessary to accomplish it are so interrelated and functionally interdependent as to bring the entire project within the jurisdiction of the Corps, and therefore under the mandate of NEPA." *Id.* Likewise, Area 2 and the larger SFM-HC project are interrelated and functionally interdependent, as Mosaic's assertions that Area 2 by itself is infeasible and that uplands mining requires modifications of the permits attest.

For further authority supporting the injunction over uplands as well as wetlands s*ee Friends of the Earth, Inc. v. U.S. Army Corps of Engineers*, 109 F. Supp. 2d 30, 40-41 (D.D.C. 2000) (the Corps' jurisdiction over permitting floating casinos extended to the analyzing the upland development that would result from, and was therefore a product of, the Corps' permit action); and *Baykeeper v. U.S. Army Corps of Engineers*, CV.S 06 1908 FCD/GGH, 2006 WL 2711547 (E.D. Cal. Sept. 20, 2006). In *Baykeeper*, a port applied for a §404 permit for the dredging of seven docks as part of a large Development Plan Project that included hundreds of acres of marine terminal, commercial, and industrial park facilities that would triple the Port's size and double its level of ship traffic. *Id.* After three years of seeking the permit, the Port

submitted a revised §404 permit application for dredging only two of the docks, claiming that was independent of the larger project. The court disagreed and held that the Corps could not carve out a smaller section of the project because "it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility." *Id.* (quoting *Sonoran,* 408 F.3d at 1122). The court applied 33 C.F.R. § 325 (App.B, § 7(b)(3)) and expanded the Corps' jurisdiction to the upland part of the project because the dredging was an "integral and critical component" of it. *Id.*

Finally, Mosaic argues that the Corps lacks jurisdiction over Area 2 because while there may be *impacts* to jurisdictional waters, there are no actual *discharges* which are required for CWA jurisdiction. Mos. Mot. at 10. This is a red herring, because in the cases Mosaic relies on the project as a whole involved *no* discharges of dredge or fill material. For example, in *Save Our Cmty. v. U.S. E.P.A.*, 971 F.2d 1155, 1165 (5th Cir. 1992), there was no larger project with actual discharges that anchored the Corps' jurisdiction, as there is in this case.[2] Here, it is undisputed that the Corps has CWA jurisdiction over the larger project due to discharges into jurisdictional waters. Thus, it is obligated to conduct a NEPA analysis on the entire project, including actions that will *impact* jurisdictional waters, and the Court can enjoin uplands activities that come under the NEPA analysis. *SOS*, 408 F.3d at 1122-23. Contrary to Mosaic's arguments on pages 9-14 of its Motion, Area 2 is a "regulated activity" that is well within the Corps' jurisdiction under the CWA and NEPA, and well within this Court's injunctive powers.

---

[2] Mosaic also relies on *Deltona v. Alexander*, 682 F.2d 882, 893 (11th Cir. 1982), which simply states in *dicta* that a §404 permit is required for wetlands not uplands; and *OVEC v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009), which is not applicable because the issue was the Corps' failure to consider the development's impact on surrounding uplands, *id.* at 207, whereas here the issue is whether the uplands mining affects the wetlands.

**C.     Mosaic's Area 2 Proposal would Require Modification of the Federal Permit, and Therefore Requires a Supplement to the Environmental Assessment**

Mosaic correctly notes that this Court agreed with Plaintiffs that "Mosaic's Area 2 proposal should be examined as a modification to the overall plan." But Mosaic then makes the false assertion that this issue "relates entirely to Plaintiffs claims that the reclamation plan is part of the Permit." Mos. Mot. at 14. Actually Mosaic's Area 2 plan would require modification of the Corps' mine plan in several respects, not just reclamation. The permit states:

> If the Permittee proposes to *change any part of the authorized activity*, including the mitigation, it is the Permittee's responsibility to request a modification of this DA permit from the Tampa Regulatory Office. . . . This permit is valid only for the specific processes, operations and designs indicated on the approved drawings or exhibits submitted in support of the permit application. *Any substantial deviation* from the approved drawings, exhibits, specifications or permit conditions, *including construction within the total land area but outside the approved project area(s)*, may constitute grounds for revocation or enforcement action by the Corps of Engineers, unless a modification has been applied for and approved. . . . Any such revisions or refinements to the authorized work will require subsequent review by the Corps of Engineers in accordance with 33 C.F.R. § 325.7.

AR 2010_06_14 DA Permit SAJ-1997-4099 Instrument p. 4 (emphasis supplied). This Court found that Area 2 changes the order of mining and the access corridors. Order at 2. In addition, Area 2 requires reconfiguring the ditch and berm system. *See* Dkt.130 at 7; Dkt. 160 at 5 and n. 2. Thus, Mosaic *is* changing the authorized activity, substantially deviating from the approved drawings and plans, and constructing (*i.e.* mining) within the total project area but outside the approved wetlands, which under the plain language of the permit requires modification. In addition, since the Permit requires mitigation and reclamation in a sequence based on the order of mining, (see permit p. 6 ¶¶ 10-11), the permit is further subject to modification.

Mosaic is on record that all of its permits, state, local and federal would have to be revised to allow uplands only mining. Dkt. 160-3 at 49. It contradicts that by arguing in its

current motion that it need not modify its federal permit, but it also states that it has already "*obtained the necessary non-federal approvals*" for its Area 2 proposal. Mos. Mot. at 6. This further proves Plaintiffs' point that Mosaic must seek a modification of its federal permit since the state permit is incorporated into the federal permit. The §404 Permit states the Florida Dept. of Environmental Protection permit "with its special conditions shall be made a part of this DA permit." AR214637 ¶ 1.

Against this background, Mosaic's contention that the Corps has discretion on whether to enforce the permit's modification provisions is simply irrelevant. Plaintiffs have not asked the Court to order the Corps to modify the permit and the preliminary injunction does not order it. Rather, Plaintiffs asked the Court to enjoin Area 2 pending a supplement to the EA to address these proposed changes in the permitted action, which is required by 40 C.F.R. § 1502.9. The Court has jurisdiction under the APA to review the Corps' decision not to prepare a supplemental EA. 5 U.S.C. §§ 706(1) and (2)(A) and (D). See Dkt.133 at 48-50; Dkt. 147 at 19-20. And the deference due the Corps does not shield it from review. "In conducting our NEPA inquiry, we must 'make a searching and careful inquiry into the facts and review whether the decision ... was based on consideration of the relevant factors and whether there has been a clear error of judgment.' " *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). Whether or not it enforces its permit, the Corps is not due deference in interpreting NEPA. *Park County Res. Council. v. U.S. Dep't of Agric.,* 817 F.2d 609, 620 (9th Cir. 1987) ("[d]eference is inapplicable in the NEPA context, [because] NEPA imposes duties on agencies; agencies do not exist to administer NEPA."); *Grand Canyon Trust v. FAA,* 290 F.3d 339, 341-42 (D.C. Cir. 2002) ("the court owes no deference" to an agency's interpretation of NEPA because NEPA was addressed to all federal agencies and not to one agency alone).

16

### D.      Mosaic was not Entitled to an Evidentiary Hearing

Mosaic also argues that it was reversible error for this Court to issue a preliminary injunction without first holding a hearing to resolve disputed factual issues.  Mos. Mot. at 15. That fails as a threshold matter because Mosaic did *not* request a hearing as required by M.D. Local Rule 3.01 (j).  That rule states that motions are ordinarily decided on the papers submitted by the parties, as the Court did here, but "the Court may allow oral argument *upon the written request* of any interested party…"  *Id.* (emphasis added). "Requests for oral argument *shall* accompany … the opposing brief or legal memorandum, and *shall* estimate the time required for argument." *Id.* (emphasis added).  Mosaic's Opposition to Plaintiffs' Motion for Preliminary Injunction (Dkt. 159) does not include a written request for a hearing, nor does it estimate the time required for such a hearing as required by the rule.  If Rule 3.01(j) is to have meaning, Mosaic's *post hoc* request for a hearing should be denied.

Even if Mosaic had properly requested a hearing, it was not entitled to one.  It is well-settled that the decision whether to hold a hearing lies with the "sound discretion of the district court." *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002).  When a party seeks a review of an agency action under the APA, the entire case on review is a question of law and "[a]bsent very unusual circumstances the district court does not take testimony." *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001).  In this case, Mosaic submitted hundreds of pages of documentary evidence and sworn testimony by its witnesses in declarations, in addition to the voluminous Administrative Record citations upon which it relied. Mosaic's declarations included specific arguments against the opinions submitted by Plaintiffs' declarants. The Court took this under submission and, as its preliminary injunction opinion attests, ruled on that evidence. Thus Mosaic's real objection is not

that it was deprived of an opportunity to present its case, it is that it did not get to present its declaration evidence again though live testimony. But a party has no right to present redundant or cumulative testimony through live witnesses.

Mosaic's motion "fails to indicate what, if anything, a live witness would have added in light of the voluminous exhibits, affidavits, and depositions each side provided." *Allied Signal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568 (7th Cir. 1999). In *Allied Signal*, the court noted that "there is no general requirement that a district judge hear live testimony or conduct a hearing at all" and held that it is the burden of the party seeking a hearing to show that "intends to introduce evidence that if believed will so weaken the moving party's case as to affect the judge's decision on whether to issue the injunction." *Id.* at 577 (quoting *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir.1997)). The court in *Ty, Inc.* denied a party's request for an evidentiary hearing on a preliminary injunction, finding that a hearing would not be productive because it would duplicate the witness's affidavit, which was already in evidence. *Ty, Inc., 1*32 F.3d at 1171. That is the case here. Mosaic was not entitled to an evidentiary hearing to submit the same evidence already submitted in its declarations and documentary evidence.

Mosaic relies on *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205 (11th Cir. 2003) for the argument that where material facts are in dispute, an evidentiary hearing is required, but that is easily distinguished. There, a temporary restraining order was reversed where the court provided only two days notice for a hearing, which resulted in a foreign party never having a chance to present any evidence. *Id.* at 1211. The court held that in such situations, a court must "afford[] both parties an adequate opportunity to present their arguments and educate the court about the complex issues involved." *Id.* at 1212. Here, Mosaic had more than adequate opportunity to present its arguments and in fact did so.

Nonetheless, Mosaic argues that an evidentiary hearing was required because there is a "bitterly contested" factual dispute as to whether Area 2 will impact wetlands.  Dkt. 159 at 16 (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998)).  However, as Mosaic acknowledges, the Court based its injunction on Mosaic's *own evidence*, including a declaration by its Vice President Mr. Myers that stated Mosaic cannot engage in uplands only mining because it would impact wetlands.  Thus, Mosaic admitted that Area 2 would impact wetlands. This Court noted this in the preliminary injunction order. *See* Order at 3.  Thus the "bitterly contested" facts are between the evidence Mosaic submitted in 2010 versus the new evidence it submitted after the remand. Mosaic is not entitled to a hearing to contest its own prior evidence.

## II.    The Other Elements for Issuing the Preliminary Injunction Favor Plaintiffs

This Court held found irreparable harm in the Order at p. 5:

> Without preliminary injunctive relief, Plaintiffs and the environment will suffer irreparable harm.  The phosphate mining at issue requires Mosaic to strip away vegetation, waterways, wetlands, topsoil, and overburden (the sandy soils that overlay the phosphate deposit) down to the phosphate-containing layer and, further, repair of the excavated wetlands and streams with human-engineered wetlands and streams is controversial.
>
> In addition, Mosaic's own declaration, which was submitted in August of 2010 to support its argument that uplands mining is not feasible, indicates that mining uplands will have adverse impacts on wetlands in the project area.

See also the Order, at 3 n. 3: "although Mosaic's notice states that Area 2 mining will not result in discharges to jurisdictional wetlands, Plaintiff's evidence as well as Mosaic's August 2010 declarations demonstrate that "absent a properly studied plan with an appropriate mitigation design movement of surface water… would not be restored to support the function of the wetlands."  (Dkt. 96-3, par 11).  Thus, it appears that Area 2 mining requires a permit modification because it will impact jurisdictional wetlands even if there are no discharges into

these wetlands."

Mosaic nevertheless argues that the harm is not irreparable since it can be "repaired" through compensatory mitigation, including reclamation. Mos. Mot. at 18. But the Court will recall the record contains serious questions about the effectiveness of Mosaic's mitigation. The EPA warned that the Corps' mitigation regime was inadequate to protect the unique resources at stake. Dkt. 16-5 at 2. Furthermore, much of the reclamation would not occur until 2026. *See e.g.* AR 2010_06_14 Permit Instrument Attachment2d at 2. And Mosaic is seeking to mine this area before it has reclaimed the wetlands from its previous mining. Dkt. 17-3 at 7 and 11. As this Court found previously: "the fact remains that even if the restoration is successful there is a significant time lag between the mining activity and the restoration completion; in many cases, restoration will not be accomplished for a decade or more." Dkt. 88 at 19. That delay makes the harm to these wetlands "of long duration," *i.e.* "irreparable." *Amoco Prod. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

This Court also held that "the harm is imminent in that, according to its schedule, Mosaic has already cleared a dragline access path to Area 2, built a ditch and berm in a portion of that area, and gave notice that in "early July 2011" its "draglines begin mining Area 2" Order, at 5-6 (emphasis added). Thus based on Mosaic's own statements it was about to begin or had already begun mining Area 2. However it now argues that harm is not imminent since it would not complete its encirclement of the jurisdictional wetlands near the center of Area 2 until 2012. Mos. Mot. at 17-18. The fact is it has already cleared Area 2 around the northern edge of those wetlands, as its aerial photographs indicate. Dkt. 173-2 at 4. And encircling those wetlands is not

the only problem since Area 2 is adjacent to numerous other wetlands.[3]  In addition, Mosaic's

Lulf declaration states "upland mining activities adjacent to any wetlands of concern identified

by Plaintiffs is not scheduled to begin until sometime in August, 2011," which is imminent. Dkt.

159-3 at 2.

This Court also found that the balancing of the equities and the public interest favor the

injunction. Order at 6.  The Court stated "any harm to Mosaic is largely self-inflicted and Mosaic

has had ample time since the beginning of this lawsuit in June of 2010 to modify its federal mine

plan and NEPA analysis as well as revise any other state or local permits necessary to go

forward." Order, at 6.  Mosaic's harm was largely self-inflicted because Mosaic was responsible

for proving that an alternative with less adverse impact is impractable, 40 C.F.R. § 230.10(a)(2);

Mosaic apparently had no backup plan if it did not obtain the permit or if an injunction issued;

and it forged ahead with Area 2 over Plaintiffs' objections. Mosaic deviated from the Mine Plan,

cut the new access corridor, cleared much of the area, built the ditch and berm system and

intended to begin mining -- all before expiration of the 11th Circuit's 90-day stay. See this

Court's Order at 3: "the Court finds that Mosaic's notice of Area 2 mining alters the course of

this very complicated case . . ." The reason that Mosaic chose to proceed into Area 2 instead of

the no-action uplands was because it is more costly to mine in the no-action uplands than it is in

Area 2. Mos. Mot. at 6 and n.3.  Thus it was Mosaic's financial decision that forced the Area 2

issue, and it should not be heard to complain about the consequences of its decision.

The instant case is similar to the recent decision in *Sierra Club v. U.S. Army Corps of

Engineers*, 10-3452, 2011 WL 2718144 (8th Cir. July 14, 2011). The court upheld a preliminary

---

[3] Under Mosaic's Area 2 plan the ditch and berms have been or would be rearranged by wetland
nos. 2-12, 2-13, 2-13A, 2-16 thru 2-19, 2-21, 2-32, 10-1, 11-1 thru 11-4, 11-8, 11-10, 11-13, 11-
28, 11-30, and 11-501.  Exhibit B to Plaintiffs' Preliminary Injunction Reply brief, dkt. 160-2.

injunction on Defendant SWEPCO's construction of a power plant based on an insufficient §404 permit.  The 8th Circuit affirmed the district court finding that plaintiffs would suffer harm to their enjoyment of the environment, which "can seldom be adequately remedied by money damages and is often permanent or at least of long duration." *Id*. at 15 (citing *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987)). It then held that "any injury to SWEPCO was largely self inflicted" because SWEPCO had proceeded with construction before all legal issues regarding its §404 permit were resolved, and ignored a warning letter from the Corps regarding the same. *Id.*  The Court noted that SWEPCO's decision to move forward in the face of this uncertainty was its own, and was based on a "litigation strategy of analyzing the costs and benefits of an injunction through the lens of the §404 permit." *Id.*  The Court concluded that "SWEPCO cannot now have it both ways" by claiming harm from that decision. When agencies "jump the gun" or "anticipate[ ] a pro forma result" in permitting applications, they become "largely responsible for their own harm." *Davis v. Mineta,* 302 F.3d 1104, 1116 (10th Cir. 2002).

Similarly here, Mosaic was fully aware of the repeated warning letters from the EPA about the deficiencies in the permitting process and the permit itself.  During the decade-long permitting process, the Corps and Mosaic refused to hold a public hearing and refused to heed EPA's call for less damaging mine configurations.   The risks of moving forward under these circumstances became more obvious when this case commenced in June of 2010, and even more obvious when this court entered its temporary restraining order and first injunction over a year ago.  Despite these red flags, Mosaic has steadfastly refused to seek a revision of its §404 permit. This was Mosaic's own decision, presumably based on a "litigation strategy of analyzing the costs and benefits of an injunction through the lens of the §404 permit."  Moreover, it was Mosaic's decision to proceed with Area 2 mining despite an 11th Circuit stay and pending

summary judgment motions before this court. Mosaic has had ample opportunity to correct the deficiencies in the permit but has chosen not to, so it cannot now complain that a preliminary injunction will cause it financial harm.

Finally, Mosaic takes a "sky is falling" approach to the preliminary injunction, invoking the "continued economic well-being of the state and the needs of society" and the "loss of taxes, fees, jobs and unreclaimed lands." Mos. Mot. at 19-20. The Court has previously found many of Mosaic's claims to be embellishments. Dkt. 88 at 21 n.3. That is the case again. For example, while claiming that Area 2 is "needed to meet Mosaic's phosphate production commitments," Mos. Mot. at 16, Mosaic stated in a press release that despite the injunction it could "support planned finish phosphate fertilizer production levels through the end of fiscal year 2012 through a combination of existing phosphate rock inventories, higher output from its other Florida mines, increasing shipments from the Company's Miski Mayo joint venture, and supplemental purchases of phosphate rock from third parties."[4] This Court correctly found that the public interest in protecting the public resource, and in seeing that the Corps complies with the law in issuing its permits, weighs in favor of the injunction, and the Court should sustain that finding.

## CONCLUSION

For the reasons set forth above, Mosaic's Motion for Limited Stay of Preliminary Injunction Pending Appeal should be denied.

**[Attorneys' signatures appear on next page]**

---

[4] Mosaic Press Release, July 11, 2011, available at http://savesouthfortmeade.com/news/mosaic-responds-to-district-court%E2%80%99s-preliminary-injunction/

Respectfully submitted this 10th day of August, 2011.

/s/ **Eric E. Huber**

Eric E. Huber
*Pro Hac Vice* (Colo. Bar no. 40664)
Douglas P. Hayes
*Pro Hac Vice* (Colo. Bar no.39216)
Sierra Club
1650 38th Street Suite 102W
Boulder, CO 80301
(303) 449-5595
fax (303) 449-6520

/s/ **Marcy I. LaHart**

Marcy I. LaHart, Esq.
Fla. Bar no. 0967009
4804 SW 45th Street
Gainesville, FL 32608
(352) 224-5699
fax (888) 400-1464

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that on the 10th day of August, 2011, I electronically filed the foregoing by using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

      Respectfully submitted,

      **<u>/s/ Eric E. Huber</u>**
      Eric E. Huber